John S. Persell (OSB # 084400)
Oregon Wild
5825 N Greeley Avenue
Portland, OR 97217
(503) 896-6472
jp@oregonwild.org

Erin E. Hogan-Freemole (OSB # 212850)
WildEarth Guardians
213 SW Ash Street, Suite 202
Portland, OR 97204
(971) 417-6851
ehoganfreemole@wildearthguardians.org

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| **OREGON WILD** and **WILDEARTH GUARDIANS**, <br><br> Plaintiffs, <br><br> v. <br><br> **DAVID WARNACK,** in his official capacity as Supervisor for Willamette National Forest; and **UNITED STATES FOREST SERVICE,** <br><br> Defendants, <br><br> and <br><br> **AMERICAN FOREST RESOURCE COUNCIL,** <br><br> Defendant-Intervenor. | Case No. 6:24-cv-949-AP <br><br> **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT** <br><br> Oral Argument Requested |

## MOTION FOR SUMMARY JUDGMENT

Plaintiffs Oregon Wild and WildEarth Guardians ("Oregon Wild") hereby submit this Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(a). In accordance with Local Rule 7-1, the undersigned certifies that the Parties made a good faith effort to resolve the dispute but were unable to do so.

Oregon Wild challenges the final agency actions of the United States Forest Service and David Warnack ("Forest Service," "agency," or "Defendants") in authorizing the Youngs Rock Rigdon Project ("YRR Project" or "the Project") without fully complying with the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq*, and its implementing regulations.[1] Specifically, the Forest Service failed to consider a reasonable range of alternatives and failed to take the requisite "hard look" at the Project's effects on, *inter alia*, carbon and climate; wildfire risk; mature and old-growth forests; and the northern spotted owl.

Oregon Wild respectfully asks this Court to declare that the Forest Service violated NEPA and its implementing regulations. To remedy these violations of law, Oregon Wild further asks

---

[1] Through NEPA, Congress established the Council on Environmental Quality ("CEQ") to develop national policies to promote environmental quality. 42 U.S.C. §§ 4342, 4344(4); 40 C.F.R. § 1500.1 (2019). The CEQ regulations had remained virtually unchanged since their adoption in 1978, but they underwent a number of revisions between 2020 and 2024 before being revoked entirely, effective April 11, 2025. *See* 90 Fed. Reg. 10,610 (Feb. 25, 2025). However, the Forest Service expressly chose to analyze and authorize the Project under the pre-2020 version of the regulations, previously codified at 40 C.F.R. §§ 1500.1-1508.28 (2019). AR17984. This Motion and the supporting Memorandum will therefore refer to the 2019 version of the NEPA regulations unless otherwise noted. The applicable version of the NEPA regulations can be found here.

Courts have long recognized that CEQ's interpretation of NEPA is "entitled to substantial deference." *Andrus v. Sierra Club*, 442 U.S. 347, 358 (1979) (cases have been cleaned up with internal citations omitted). As such, the 1978 regulations are "relevant to interpreting NEPA's statutory commands" and provide a benchmark for reviewing the Forest Service's compliance with its NEPA obligations. *State of Cal. v. Block*, 690 F.2d 753, 769 (9th Cir. 1982).

this Court to vacate the YRR Project Final Environmental Impact Statement ("FEIS") and Record of Decision ("ROD") and to remand the decision to the Forest Service.

In support of this Motion, Oregon Wild respectfully refers this Court to the following Memorandum in Support and the declarations of Chandra LeGue (ECF No. 39) ("LeGue Decl.") and Ryan Talbott (ECF No. 40) ("Talbott Decl.") filed concurrently herewith.

MOT. FOR SUMMARY JUDGMENT—II

**MEMORANDUM IN SUPPORT**

**TABLE OF CONTENTS**

MOTION FOR SUMMARY JUDGMENT.................................................................I

MEMORANDUM IN SUPPORT...........................................................................i

TABLE OF CONTENTS.......................................................................................i

TABLE OF AUTHORITIES ............................................................................... iii

GLOSSARY OF TERMS .................................................................................. viii

INTRODUCTION ............................................................................................... 1

LEGAL FRAMEWORK AND STANDARD OF REVIEW ................................ 2

    I.    Administrative Procedure Act.................................................................. 2

    II.   National Environmental Policy Act ....................................................... 3

    III.  Endangered Species Act ........................................................................ 5

FACTUAL BACKGROUND ............................................................................... 6

    I.    Northern Spotted Owls ........................................................................... 6

    II.   The Youngs Rock Rigdon Project .......................................................... 9

       A.  Scoping and Draft EIS ....................................................................... 9

       B.  Final EIS ........................................................................................... 10

       C.  Objections and Review ..................................................................... 10

       D.  Final ROD .......................................................................................... 11

ARGUMENT ..................................................................................................... 12

    I.    Plaintiffs Have Standing. ....................................................................... 12

    II.   The Forest Service Failed to Consider Reasonable Alternatives................................. 13

       A.  The Agency Failed to Consider a Reasonable Range of Alternatives. ......................... 13

       B.  Oregon Wild Suggested a Reasonable Alternative...................................................... 14

C.    The Agency Failed to Adequately Explain Its Omission of Oregon Wild's
Alternative.................................................................................................... 17

III.    The Forest Service Failed to Take a Hard Look at the Project's Impacts. ................... 18

A.    The Agency Did Not Take a Hard Look at NSO Impacts. .......................................... 18

B.    The Forest Service Failed to Take a Hard Look at Fuel Reduction and Fire Risks. .... 29

C.    The Forest Service Failed to Take a Hard Look at Impacts to Mature and Old-Growth
Forests and Carbon Storage and Emissions. .............................................................. 31

RELIEF ...................................................................................................................... 36

CONCLUSION ........................................................................................................... 36

# TABLE OF AUTHORITIES

**Cases**

*350 Mont. v. Haaland*,
   50 F.4th 1254 (9th Cir. 2022) ......................................................... 4, 31, 35

*Andrus v. Sierra Club*,
   442 U.S. 347 (1979) ............................................................................... I

*Bark v. U.S. Forest Service*,
   958 F.3d 865 (9th Cir. 2020) .......................................................... 30, 33

*Cal. Comm'ys Against Toxics v. EPA*,
   688 F.3d 989 (9th Cir. 2012) .................................................................. 36

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ................................................................................. 3

*Conservation Cong. v. Finley*,
   774 F.3d 611 (9th Cir. 2014) ................................................................. 19

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
   538 F.3d 1172 (9th Cir. 2008) ...................................................... 5, 35, 36

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
   623 F.3d 633 (9th Cir. 2010) ............................................................... 3, 4

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
   807 F.3d 1031 (9th Cir. 2015) ................................................................ 5

*Ctr. for Biological Diversity v. U.S. Forest Serv.*,
   349 F.3d 1157 (9th Cir. 2003) ..................................................... 4, 27, 28

*Ctr. for Biological Diversity v. U.S. Forest Serv.*,
   687 F. Supp. 3d 1053 (D. Mont. 2023) ............................................ 31, 35

*Dine CARE v. Haaland*,
   59 F.4th 1016 (10th Cir. 2023) ............................................................. 35

*Earth Island Inst. v. Hogarth*,
   494 F.3d 757 (9th Cir. 2007) ................................................................... 3

*Earth Island Inst. v. U.S. Forest Serv.*,
   351 F.3d 1291 (9th Cir. 2003) ............................................................... 29

*Earth Island Inst. v. U.S. Forest Serv.*,
   697 F.3d 1010 (9th Cir. 2012) ................................................................... 33

*Envtl. Prot. Info. Ctr. v. Blackwell*,
   389 F. Supp. 2d 1174 (N.D. Cal. 2004) ...................................................... 26

*Friends of the Inyo v. U.S. Forest Serv.*,
   103 F.4th 543 (9th Cir. 2024) ....................................................................... 3

*Friends of Yosemite Valley v. Kempthorne*,
   520 F.3d 1024 (9th Cir. 2008) ................................................................... 13

*Friends of Yosemite Valley v. Norton*,
   348 F.3d 789 (9th Cir. 2003) ....................................................................... 3

*Greater Yellowstone Coal. v. Servheen*,
   665 F.3d 1015 (9th Cir. 2011) ..................................................................... 2

*Gulf v. Burgum*,
   775 F. Supp. 3d 455 (D.D.C. 2025) ........................................................... 23

*Hawaii Longline Ass'n. v. Nat'l Marine Fisheries Serv.*,
   281 F. Supp. 2d 1 (D.D.C. 2003) ............................................................... 26

*Idaho Conservation League v. Mumma*,
   956 F.2d 1508 (9th Cir. 1992) ................................................................... 16

*Jayne v. Sherman*,
   706 F.3d 994 (9th Cir. 2013) ..................................................................... 12

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*,
   387 F.3d 989 (9th Cir. 2004) ......................................................... 19, 21, 27

*Lands Council v. Powell*,
   395 F.3d 1019 (9th Cir. 2005) ................................................................... 21

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ................................................................................... 12

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ....................................................................................... 2

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
   177 F.3d 800 (9th Cir. 1999) ......................................................... 4, 13, 17

*N. Cascades Conservation Council v. U.S. Forest Serv.*,
    136 F.4th 816 (9th Cir. 2025) ............................................................. 31

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,
    668 F.3d 1067 (9th Cir. 2011) ...................................................... 21, 29

*Native Ecosystems Council v. U.S. Forest Serv.*,
    418 F.3d 953 (9th Cir. 2005) ............................................................. 23

*Native Ecosystems Council v. U.S. Forest Serv.*,
    428 F.3d 1233 (9th Cir. 2005) ........................................................... 14

*Neighbors of Cuddy Mountain v. U.S. Forest Service*,
    137 F.3d 1372 (9th Cir. 1998) ........................................................... 34

*Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*,
    625 F.3d 1092 (9th Cir. 2010) ............................................................. 3

*Oregon Nat. Res. Council Action v. U.S. Forest Serv.*,
    445 F. Supp. 2d 1211 (D. Or. 2006) ................................................. 19

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) ....................................................................... 3, 4

*Se. Alaska Conservation Council v. Fed. Highway Admin.*,
    649 F.3d 1050 (9th Cir. 2011) ..................................................... 14, 15

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
    145 S.Ct. 1497 (2025) ............................................................... 2, 3, 4

*State of Cal. v. Block*,
    690 F.2d 753, 769 (9th Cir. 1982) .......................................... I, 15, 28

*Te-Moak Tribe v. U.S. Dept. of Interior*,
    608 F.3d 592 (9th Cir. 2010). ........................................................... 15

*Vill. of False Pass v. Watt*,
    565 F. Supp. 1123 (D. Alaska 1983) ........................................... 25, 26

*W. Watersheds Project v. Bernhardt*,
    543 F. Supp. 3d 958 (D. Idaho 2021) ............................... 16, 17, 18, 19

*W. Watersheds Project v. Kraayenbrink*,
    632 F.3d 472 (9th Cir. 2011) ...................................................... 28, 29

*Westlands Water Dist. v. U.S. Dep't of Interior*,
  376 F.3d 853 (9th Cir. 2004) ............................................................ 18

*WildEarth Guardians v. Bucknall*,
  756 F. Supp. 3d 1017 (D. Mont. 2024) ........................................ 21, 27

*WildEarth Guardians v. Bureau of Land Management*,
  457 F. Supp. 3d 880 (D. Mont. 2020) .............................................. 17

*WildEarth Guardians v. U.S. Bureau of Land Mgmt.*,
  870 F.3d 1222 (10th Cir. 2017) ........................................................ 35

*WildEarth Guardians v. USDA APHIS Wildlife Servs.*,
  135 F.4th 717 (9th Cir. 2025) .......................................................... 30

**Statutes**

5 U.S.C. § 706 ........................................................................... 2, 18, 36

16 U.S.C. § 1531 ................................................................................. 5

16 U.S.C. § 1532 ................................................................................. 5

16 U.S.C. § 1533 ................................................................................. 5

16 U.S.C. § 1536 ................................................................................. 5

16 U.S.C. § 1538 ................................................................................. 5

42 U.S.C. § 4321 ................................................................................. I

42 U.S.C. § 4331 ................................................................................. 3

42 U.S.C. § 4332 ....................................................................... 3, 4, 15, 31

42 U.S.C. § 4336e ............................................................................. 31

42 U.S.C. § 4342 ................................................................................. I

42 U.S.C. § 4344 ................................................................................. I

**Regulations**

40 C.F.R. § 1500.1 ..................................................................................................... I

40 C.F.R. § 1502.14 .............................................................................................. 4, 13

40 C.F.R. § 1502.24 ................................................................................................. 4

40 C.F.R. § 1502.9 ............................................................................................... 4, 33

40 C.F.R. § 1503.4 ................................................................................................. 33

50 C.F.R. § 17.11 .................................................................................................... 6

**Other Authorities**

77 Fed. Reg. 71,876 (Dec. 4, 2012) ....................................................................... 6

85 Fed. Reg. 81,144 (Dec. 15, 2020) ..................................................................... 6

88 Fed. Reg. 41,560 (June 27, 2023) ...................................................................... 6

90 Fed. Reg. 10,610 (Feb. 25, 2025) ...................................................................... I

**Rules**

Fed. R. Civ. P. 56 .................................................................................................... I

Local Rule 7-1 ......................................................................................................... I

**GLOSSARY OF TERMS**

| | |
|---|---|
| 2019 BA | Biological Assessment for Timber Harvest and Routine Activities Likely to Adversely Affect Listed Species and Critical Habitat on the Columbia River Gorge National Scenic Area, Mt. Hood National Forest, Willamette National Forest, and the Northwest Oregon BLM District (Dec. 6, 2019) |
| 2019 BiOp | Biological Opinion for the Willamette National Forest Timber Harvest and Routine Activities (Dec. 30, 2019) |
| 2023 BA | 2023 Revised Biological Assessment for Timber Harvest and Routine Activities that are Likely to Adversely Affect Listed Species and Critical Habitat on the Columbia River Gorge National Scenic Area, Mt. Hood National Forest, Willamette National Forest, and the BLM Northwest Oregon District (April 11, 2023) |
| 2023 BiOp | Biological Opinion on Willamette National Forest Timber Harvest and Routine Activities (June 6, 2023) |
| AFRC | Intervenor American Forest Resource Council |
| APA | Administrative Procedure Act |
| BA | Biological Assessment |
| BiOp | Biological Opinion |
| Canopy cover | The degree to which the forest canopy blocks sunlight or obscures the sky. |
| Capable habitat | An area theoretically capable of developing into NSO habitat but not currently providing it. |
| CEQ | Council on Environmental Quality |
| dbh | Diameter at breast height. The standard measurement of a tree's trunk diameter, taken at a height of 4.5 feet above the ground |
| Defendants | David Warnack, in his official capacity as Supervisor of the Willamette National Forest, and the United States Forest Service |
| DEIS | Youngs Rock Rigdon Project Draft Environmental Impact Statement |
| Dispersal habitat | NSO habitat that supports life needs during dispersal and generally supports foraging, roosting, and protection from predators. |
| EIS | Environmental Impact Statement |
| ESA | The Endangered Species Act |
| FEIS | Youngs Rock Rigdon Project Final Environmental Impact Statement |
| Forest | Willamette National Forest |
| Forest Service | Defendants David Warnack and the United States Forest Service |
| FWS | United States Fish and Wildlife Service |
| Guardians | Plaintiff WildEarth Guardians |
| Impact or effect | Used synonymously to describe an action's environmental effects. "Direct" effects are caused by an action and occur at the same time and place. "Indirect" effects are caused by an action and are later in time or farther removed in distance. "Cumulative" effects are the action's incremental effect added to past, present, and reasonably foreseeable future actions. |
| ITS | Incidental Take Statement |
| Mature stand | A forest stand at least 80 years old with some but not necessarily all of the attributes of old-growth forests. |

| MOG | Mature and old growth |
|---|---|
| NEPA | National Environmental Policy Act |
| NRF | Nesting, roosting, and foraging ("suitable" habitat for northern spotted owls |
| NSO | Northern spotted owl |
| Old growth | Characterized by large, old trees; high canopy cover; multilayered canopy; numerous large snags; and heavy accumulations of large dead wood. |
| Oregon Wild | Plaintiffs Oregon Wild and WildEarth Guardians |
| PDC | Project Design Criteria |
| Project | The Youngs Rock Rigdon Project |
| ROD | Record of Decision |
| Suitable habitat | NSO nesting, roosting, and foraging habitat. Older stands with the structure, size, and adequate food sources to meet most or all life needs of NSO. |
| YRR | Youngs Rock Rigdon |

## INTRODUCTION

South of Oakridge, Oregon, near the headwaters of the Middle Fork of the Willamette River, diverse plant communities and stands of mature and old-growth forest thrive. Due to its scenic features, proximity to the Middle Fork National Recreational Trail, and diverse forest habitat, this area of the Willamette National Forest is beloved and visited by many who seek solitude and enjoyment in natural settings, and is home to the northern spotted owl ("NSO"), an iconic, federally protected species.

Now, though, the Forest Service has targeted this area for aggressive logging through the Youngs Rock Rigdon Project. Largely under the guise of reducing wildfire risk and increasing resilience, the agency authorized 7.5 miles of new road construction and commercial logging on 2,242 acres, primarily through "regeneration" logging in younger forests and heavy commercial thinning in 1,053 acres of mature and old-growth ("MOG") stands—some over 200 years in age. This intensive logging will degrade or destroy thousands of acres of NSO habitat, adversely affect soils and water quality, and release unknown tons of stored carbon into the atmosphere. Counter to the Forest Service's stated goals, the Project may *increase* wildfire risk and *decrease* resilience.

The Project includes genuine restoration components that Oregon Wild has consistently supported, including floodplain and meadow restoration and the reintroduction of fire as a management tool.[1] However, the Forest Service failed to harmonize competing objectives and conservation values, despite repeated requests that it do so. The Forest Service failed to consider reasonable alternatives to its proposal and failed to take the "hard look" at impacts to NSO, mature and old-growth stands, carbon storage and emissions, and wildfire risks that NEPA requires. The

---

[1] Fire has shaped plant and tree communities in this area for millennia. In 2024, the Coffee Pot Fire intersected with several younger stands at the northern edge of the Project Area, primarily burning at low or very low severity.

MEMORANDUM IN SUPPORT—1

Forest Service failed to grapple with scientific literature counter to its narrative that aggressive commercial logging is necessary to reduce wildfire risk and increase resilience. The Forest Service's decision to authorize the Project was arbitrary and capricious because it failed to consider all relevant factors and important aspects of the problem and failed to articulate rational bases for its ultimate choices.

Accordingly, Oregon Wild now respectfully requests that this Court grant its Motion for Summary Judgment, declare that the Forest Service violated NEPA, hold unlawful and set aside the FEIS and ROD, and remand the Project to the agency until it complies with NEPA.

## LEGAL FRAMEWORK AND STANDARD OF REVIEW

### I.    Administrative Procedure Act

NEPA challenges are reviewed under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06. Under the APA, a court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, or otherwise unlawful. *Id.* § 706(2). An action is arbitrary and capricious where the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In short, a court must "ensure that the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Greater Yellowstone Coal. v. Servheen*, 665 F.3d 1015, 1023 (9th Cir. 2011).

While "a court should afford substantial deference to [an] agency" when undertaking judicial review of NEPA claims, *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S.Ct. 1497, 1511-12 (2025), courts "may not rubber-stamp administrative decisions that they deem

MEMORANDUM IN SUPPORT—2

inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 793 (9th Cir. 2003). Rather, a court must conduct a "thorough, probing, in-depth review." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971).

Although courts should defer to agencies' "predictive and scientific judgments" based on technical expertise, *Seven Cnty.*, 145 S.Ct. at 1512, those decisions must still have a "substantial basis in fact," *Earth Island Inst. v. Hogarth*, 494 F.3d 757, 766 (9th Cir. 2007), and be "fully informed and well-considered." *Friends of the Inyo v. U.S. Forest Serv.*, 103 F.4th 543, 551 (9th Cir. 2024). Moreover, the agency must provide the information on which it based its conclusions and explain its methodological and scientific judgments—a court "cannot defer to a void." *Or. Natural Desert Ass'n v. Bureau of Land Mgmt. ("BLM")*, 625 F.3d 1092, 1121 (9th Cir. 2010).

## II.     National Environmental Policy Act

"In NEPA, Congress recognized the 'profound impact' of human activities … on the environment and declared a national policy 'to create and maintain conditions under which man and nature can exist in productive harmony.'" *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 642 (9th Cir. 2010) (quoting 42 U.S.C. § 4331(a)). To this end, NEPA created "action-forcing" procedures designed to ensure that agencies take a "hard look" at environmental effects and to foster meaningful public participation. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349-50 (1989).

NEPA requires federal agencies to prepare and disclose a "detailed" environmental impact statement ("EIS") describing the impacts of and alternatives to any major federal action which may "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(2)(C). This

MEMORANDUM IN SUPPORT—3

EIS must describe the proposed action, reasonable alternatives to that action, and all reasonably foreseeable environmental effects thereof. 42 U.S.C. § 4332(2)(C).

The alternatives analysis is "the heart of" NEPA. *Ctr. for Biological Diversity*, 623 F.3d at 642 (citing 40 C.F.R. § 1502.14). It must "sharply defin[e] the issues and provid[e] a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14. An agency must "[r]igorously explore and objectively evaluate all reasonable alternatives," and "discuss the reasons" for eliminating alternatives from detailed study. *Id.* Failure to examine a reasonable alternative renders an EIS inadequate. *See Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813 (9th Cir. 1999).

To satisfy NEPA's "hard look" requirement, an agency must provide "a reasonably thorough discussion of the significant aspects of the probable environmental consequences," and "undertake a full and fair analysis." *350 Mont. v. Haaland*, 50 F.4th 1254, 1265 (9th Cir. 2022). Information must be of high quality and sufficient to allow the public to question the agency's rationale and understand its decision-making process. *See Robertson*, 490 U.S. at 349. This includes "accurate scientific analysis, expert agency comments and public scrutiny." *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1167 (9th Cir. 2003). An agency must respond explicitly and directly to all responsible opposing views and address public criticism. *See id.*; *see also* 40 C.F.R. § 1502.9. An agency must "make use of reliable data and resources" and "ensure the professional integrity, including scientific integrity" of the EIS. 42 U.S.C. § 4332(2)(D)-(E); *see also* 40 C.F.R. § 1502.24.

While "NEPA imposes no substantive constraints on the agency's ultimate decision," *Seven Cnty.*, 145 S.Ct. at 1511, it requires agencies to consider projects' impacts before decisions are made and before actions are taken—NEPA "prohibits uninformed agency action." *Ctr. for*

*Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1214 (9th Cir. 2008) ("*NHTSA*").

## III.    Endangered Species Act

Congress enacted the Endangered Species Act ("ESA") to provide a "means whereby the ecosystems upon which endangered and threatened species may be conserved." 16 U.S.C. § 1531(b). The U.S. Fish and Wildlife Service ("FWS") is tasked with listing terrestrial species as endangered or threatened. *Id.* § 1533. The ESA generally prohibits "take" of listed species, which includes killing, harming, and harassment. *Id.* §§ 1538(a), 1532(19). If its proposed action may adversely affect a listed species, a federal agency must consult with FWS to ensure that it is "not likely to jeopardize the continued existence of" that species. *Id.* § 1536(a)(2). The "action agency" prepares a biological assessment ("BA") detailing its proposed action and anticipated impacts on listed species. *Id.* § 1536(c). FWS, in turn, explains its "jeopardy" determination in a biological opinion ("BiOp"). *Id.* § 1536(a)-(b). Agencies must use "the best scientific and commercial data available." *Id.* § 1536(a)(2). If FWS concludes that an agency's proposed action may cause "take," the action may only proceed once FWS issues an incidental take statement ("ITS") explaining the permitted level of take and imposing mandatory terms and conditions to minimize harm to the species. *Id.* § 1536(b)(4).

Agencies may also agree to conduct "programmatic" consultation, intended to "evaluate landscape-level effects" of a suite of similar or related actions. *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d 1031, 1040 (9th Cir. 2015). Such programmatic BiOps do not describe the impacts of any particular action and are not accompanied by an ITS. *See id.* at 1053. For specific actions under such a BiOp, the agencies must conduct a project-level consultation for any project that may cause incidental take. *Id.*

## FACTUAL BACKGROUND

**I.     Northern Spotted Owls**

The NSO, which inhabits structurally complex MOG forests throughout western Oregon, has been largely extirpated in significant portions of its historical range. 88 Fed. Reg. 41,560, 41,578 (June 27, 2023). In 1990, FWS listed the species as "threatened" under the ESA, primarily due to habitat loss from logging. *See* 50 C.F.R. § 17.11(h). However, NSOs' outlook has grown increasingly bleak, and the species is now at significant risk of total extinction in the foreseeable future. *See* 85 Fed. Reg. 81,144, 81,145 (Dec. 15, 2020); AR18648. Populations in many areas have declined more than 70 percent since the species' listing, with rates accelerating downward due to increasing competitive pressure from non-native barred owls and ongoing habitat loss. AR18647-49.

NSOs require MOG habitat, so the continuing loss of older forests has severe adverse impacts on the species. AR19690. NSO habitat is broadly categorized as either "suitable" or "dispersal" habitat.[2] AR19670. Suitable habitat consists of nesting, roosting, and foraging habitat. *Id.* Nesting and roosting habitat has 60 to 90 percent canopy cover and multilayered, multi-species canopies with large overstory trees, many large snags and fallen trees, and sufficient space under the canopy for owls to fly. AR19670-71. Foraging habitat typically has at least 40 percent canopy cover and many of the same structural components as nesting and roosting habitat. 77 Fed. Reg. 71,876, 71,905-07 (Dec. 4, 2012).

Dispersal habitat supports NSOs' "transience and colonization phase," *id.* at 71,906, and it is "essential" to NSO conservation as displacement due to barred owl competition increases,

---

[2] Forested—or previously forested—areas that are not NSO habitat are referred to as "capable" habitat, in that they could theoretically develop into habitat given time. AR18549.

heightening the importance of habitat connectivity. *See* AR18621; AR19725-26, 19747. Stands in the Forest typically begin to provide dispersal habitat at roughly 40 years old and at least 40 percent canopy cover. AR19747. While dispersal habitat "may currently be unsuitable for nesting, roosting, or foraging," survival rates are highest in forests with old-growth characteristics. AR19670-71; *see also* AR16348-49.

In 2019, the Forest Service consulted with FWS and prepared a programmatic biological assessment ("2019 BA") regarding the effects of "Timber Harvest and Routine Activities" on NSOs in northwest Oregon. AR15290. FWS then released a programmatic BiOp that purported to analyze the impact of all such "routine activities" within the Willamette National Forest. AR14849. The "2019 BiOp" explained that NSO populations continued to be threatened by "the legacy effects of past and current habitat loss" and "the ongoing range expansion and increasing competition from the non-native barred owl." AR14895.

The 2019 BiOp did not analyze any specific projects' effects. *See* AR14890-83, 15225-26. Instead, it determined expected impacts over the next 27 years and included specific caps on habitat removal or degradation within any five-year period and overall. AR14851-54. Ultimately, FWS concluded that the proposed activities would not jeopardize the species' survival or recovery. AR14935-36.

In 2020, though, unexpectedly large and severe wildfires impacted thousands of acres of NSO habitat across Oregon. AR19628. These fires "changed the forested environmental baseline of the action area," and undercut agency assumptions regarding habitat loss rates. AR19216, 19622. Also in late 2020, FWS found that threats to NSO "are of such imminence, intensity, and magnitude to indicate that [the species] is now in danger of extinction throughout all of its range," warranting reclassification under the ESA from "threatened" to "endangered." 85 Fed. Reg. at

81,146. An expert consensus began to emerge that it was necessary to protect as much NSO habitat as possible, including unoccupied areas, to mitigate the impacts of barred owls. *See*, *e.g.*, AR19692-706; AR22416-18.

In light of these developments, in April 2023 the Forest Service and FWS reinitiated formal ESA consultation, culminating in an updated programmatic BA and BiOp. AR19621-22; AR19613. The 2023 BA and BiOp made significant changes. They expanded the discussion of barred owls and stressed the importance of preserving unoccupied NSO suitable habitat, dispersal habitat, and "older forest connectivity corridors" for displaced NSOs and to ease competition with barred owls. AR19700; *see also* AR19691-92, 19700-11, 19763-65. The 2023 BA and BiOp incorporated updated information on the species' accelerating decline and warned that localized and range-wide extinction were likely within decades. AR18069-10; AR19046-47; AR19704-08, 19711.

The 2023 BiOp also substantially decreased the acceptable amount of NSO habitat removal and degradation and dramatically changed projections for NSO habitat in 2046. *See infra* at 22-24. Finally, it imposed new restrictions on logging projects implemented under the programmatic consultation. *Compare* AR15017-26 (project design criteria ("PDCs") from 2019 BiOp) *with* AR19644-58, 19661-67 (PDCs from 2023 BiOp). FWS explained that these changes were necessary to prevent incidental take of NSO and avoid jeopardizing the species' survival and recovery. AR27737.[3]

---

[3] A discrepancy in pagination exists in the record. The pagination of documents added on December 20, 2024 (ECF No. 25-2), overlaps with the pagination of documents added on July 15, 2025 (ECF No. 35-2). Citations to AR27737 to AR27755 are to the document found at the cited pages added on December 20, 2024.

MEMORANDUM IN SUPPORT—8

II.     **The Youngs Rock Rigdon Project**

A.  **Scoping and Draft EIS**

In its 2019 scoping notice for the YRR Project, the Forest Service proposed logging and other "treatments" in both second-growth ("managed") and older stands, which it argued were necessary to reduce wildfire risk and create "early seral habitat." AR14383-92. The Project would also involve road work and decommissioning or storage, as well as prescribed burns and meadow restoration. AR14384. Commenters expressed concern with the extent and intensity of logging, raised a variety of environmental issues relevant to the Project, and pressed the agency to consider alternatives that would better balance the Project's putative restoration goals with the need to conserve MOG stands, riparian reserves, and NSO habitat. *See* AR14479-80; AR14498-99; AR14512-25.

Over two years later, the Forest Service published a draft EIS ("DEIS"). AR15819. Notwithstanding public comment—and the 2020 wildfires—the agency's proposal and rationale remained virtually unchanged—other than adding additional logging in riparian reserves and reducing road storage mileage. *Compare* AR14383-84 *with* AR15833-36; *see also* AR15845-47; AR16272-81. The DEIS analyzed a no-action alternative and two virtually identical action alternatives, both of which would authorize over 2,000 acres of intensive logging in both second-growth and MOG stands, including NSO habitat. *See* AR15834-36.

Oregon Wild submitted extensive comments on the DEIS, again emphasizing the Project's significant effects on MOG forests, carbon and climate, wildfire risks, and NSO habitat. *See* AR16303-09; AR16318-438. It again flagged the agency's failure to properly account for these impacts, particularly on carbon and climate change. *See* AR16375-438. Oregon Wild also

MEMORANDUM IN SUPPORT—9

specifically asked the Forest Service to consider a "conservation alternative" that focused on retaining mature and old-growth trees and preserving NSO habitat. AR16320-26.

## B.  Final EIS

On March 29, 2023, the Forest Service issued the Project FEIS. AR17956. Despite public comment and multiple intervening developments, including the nearby 2022 Cedar Creek Fire, executive orders regarding carbon emissions and MOG forest conservation, and new information on NSO, the FEIS remained largely unchanged from the DEIS.

Although the Forest Service had recognized in 2021 that the 2019 BiOp was no longer valid, and had recently finished a draft of the 2023 BA, the NSO section in the FEIS is word-for-word identical to the draft analysis—both of which relied almost entirely on the 2019 BA and BiOp. *Compare* AR15986-94 *to* AR18123-31. Despite Oregon Wild's extensive comments on climate and carbon, the FEIS added only two general paragraphs to its discussion but provided no additional site-specific analysis. *Compare* AR16114-16 *to* AR18251-53. Although the Forest Service summarized public comments and generally noted Plaintiffs' concerns in an appendix to the FEIS, it failed to respond to opposing science and omitted references to key issues. *See* AR18395-429.

## C.  Objections and Review

Oregon Wild timely objected to the FEIS and draft ROD, reiterating their concerns about MOG forests, carbon and climate, roads, wildfire risks, and NSO, as well as the Forest Service's failure to adequately consider a reasonable range of alternatives. *See* AR19359-419; AR19478-504. The agency ultimately dropped some logging in occupied NSO sites, but did not address many other concerns. *See* AR20965-70; AR21210; AR21362-67.

MEMORANDUM IN SUPPORT—10

During the objection resolution process, FWS reviewed Project activities that could adversely impact occupied NSO sites. *See* AR17734-55. Pursuant to this review, the Forest Service explained that all "thinning" treatments in MOG stands would render them non-habitat for the foreseeable future—an outcome it had not disclosed in the FEIS—and tacitly conceded that 40% canopy cover was insufficient for even dispersal habitat. *See* AR27742-49. Indeed, as the agency explained, the Project's "intent is to produce open old-growth habitat more adapted to climate warming, but *likely not spotted owl suitable habitat*." AR27742-43 (emphasis added).

FWS concluded that the planned logging in one occupied unit was noncompliant with the 2023 BiOp, AR27737-38, and the Forest Service ultimately dropped all commercial logging in known-occupied NSO core areas. AR19882. However, it did not change its plans to aggressively log non-core suitable habitat, or even unoccupied NSO core areas. *See* AR18124; AR22212, 22222.

### D. Final ROD

On December 8, 2023, the Forest Service adopted a modified version of its preferred "Alternative 2" in a final ROD. AR22210. Despite dropping commercial logging from occupied NSO sites, the Project authorized 2,242 acres of commercial logging, including heavy thinning within 1,053 acres of MOG stands and 273 acres of riparian reserves, and 453 acres of clearcuts in younger stands. AR22210-11. Only a limited number of "legacy" trees were specifically protected from logging, leaving the vast majority of older trees on the literal chopping block. *See* AR22223; AR18048, 18280. This logging and associated activities would require construction of 7.5 miles of new roads and the complete removal of nearly 3,000 acres of NSO habitat.[4] *See*

---

[4] The Forest Service stated that the final decision shifted roughly 500 acres from commercial logging and fuels treatments to noncommercial fuels treatment only. *See* AR22233. It did not update its explanation of NSO impacts, so the record does not specify how many acres of

AR22212; *see also* AR18124 (noting 2,799 and 467 acres of habitat removal under unmodified Alternative 2); AR22233 (ROD reducing NSO suitable habitat removal by an estimated 500 acres).

## ARGUMENT

### I.    Plaintiffs Have Standing.

Oregon Wild and WildEarth Guardians are nonprofit organizations whose missions and members' interest are harmed by the Project's authorization. Their members, supporters, and staff extensively use and enjoy the Project Area for a variety of personal, professional, and recreational purposes. *See* LeGue Decl. ¶¶ 11-15 (describing use and enjoyment of Project Area); Talbott Decl. ¶ 5 (same). Oregon Wild's members, supporters, and staff have repeatedly visited the Project Area for professional, recreational, and aesthetic purposes and have concrete plans to return. *See* LeGue Decl. ¶ 16 (describing plans to visit Project Area); *see* Talbott Decl. ¶ 5 (same).

Oregon Wild has sufficiently established recreational or aesthetic interests that would be harmed by the Project. LeGue Decl. ¶¶ 17-18 (Project will destroy suitable habitat, making wildlife presence less likely; degrade scenic quality of forest; and spread weeds, diminishing her enjoyment of the area); Talbott Decl. ¶¶ 8-16 (Project will destroy wildlife habitat and MOG stands, diminishing his enjoyment of the area). Opportunities to engage in hiking, photography, wildlife viewing, and more for Oregon Wild's members would be irreparably damaged by the authorized logging; these injuries would be redressed by the remedy requested. *See Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61, 572-73 n.7 (1992)*. This is sufficient to confer standing on Oregon Wild. *Jayne v. Sherman, 706 F.3d 994, 999 (9th Cir. 2013)*.

---

critical habitat, suitable habitat, dispersal habitat, or owl sites will be logged under modified Alternative 2.

## II.     The Forest Service Failed to Consider Reasonable Alternatives.

An agency's obligation to consider "every reasonable alternative" is "the heart" of NEPA.

*Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1038 (9th Cir. 2008) (quoting 40 C.F.R.

§ 1502.14). Here, the Forest Service failed to consider a reasonable range of alternatives and

excluded Oregon Wild's suggested alternative without explanation. This violated NEPA. *See id.*

### A.     The Agency Failed to Consider a Reasonable Range of Alternatives.

An agency cannot satisfy its duty to consider a "reasonable range of alternatives" with

action alternatives that are "virtually indistinguishable from each other." *Kempthorne*, 520 F.3d at

1038. But that is precisely what occurred here: "The EIS considered only a no action alternative

along with two virtually identical alternatives." *Muckleshoot Indian Tribe*, 177 F.3d at 813.

As described in the FEIS, Alternatives 2 and 3 do not vary noticeably in treatment type,

and not at all in scale. Both call for cutting and burning the same 2,780 acres of MOG stands and

1,515 acres of managed stands. *See* AR17971-73, 17998-18013 (comparison, description, and

maps of alternatives). Both authorize the same acreages of fuel treatments, pine release, "skips,"

commercial thinning with half-acre gaps, and thinning in riparian reserves. AR18012-13. Indeed,

on most of the Project (3,279 of 4,295 acres), there was *no* difference between alternatives.[5] Two

such largely identical alternatives do not constitute a "reasonable range," and consideration only

of proposals for heavy industrial logging across all forest and management types "fails to provide

policymakers and the public with sufficient information to make an informed comparison of the

---

[5] And on another 261 acres, Alternative 2 authorizes "regeneration" harvest, while
Alternative 3 authorizes heavy commercial thinning with large, clearcut "gaps." *See* AR18006,
18012-13, 18164. The difference seems to be primarily the label. *Cf. Muckleshoot Indian Tribe,*
177 F.3d at 812-13 (holding that relabeling land transfer as donation rather than exchange was not
a meaningful difference).

alternatives." *Se. Alaska Conservation Council v. Fed. Highway Admin.*, 649 F.3d 1050, 1058 (9th Cir. 2011).

Additionally, both alternatives contemplate virtually the same *type* of treatments: Both allow heavy thinning and extensive clearcuts in managed stands, and even heavier "thinning" in MOG stands that may reduce the canopy cover below that associated with regeneration harvest. *Compare* AR18125 ("thinning" "natural stands" to 28% canopy cover) *with* 18164 ("regeneration" logging to 21 to 38% canopy cover). Both allow logging in NSO habitat, MOG stands, and riparian reserves. *See* AR17982-84, 18006-13. The Forest Service never considered an alternative that would leave more canopy cover in treated areas, focus on managed stands rather than MOG stands, or simply treat fewer acres. *See* AR17998-18013. The Forest Service never even considered commercial treatments that would not render MOG stands uninhabitable for NSO *for the foreseeable future* (nor did it reveal this impact in the FEIS). *See* AR17982-84, 18006-13; AR21325; AR27741-49.

Two proposals that both authorize heavy cutting and burning in the precise same stands do not constitute a "reasonable range" of alternatives, particularly for an EIS. *See Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005) ("The rigor with which an agency must consider alternatives is greater when the agency determines that an EIS is required for a particular federal action."). Moreover, the Forest Service ignored suggestions that it consider a genuine alternative.

## B.    Oregon Wild Suggested a Reasonable Alternative.

An agency must "rigorously explore and objectively evaluate all reasonable alternatives to a proposed action," including those proposed by the public. *Se. Alaska Conservation Council*, 649 F.3d at 1056. A "reasonable" alternative must be both "significantly distinguishable from

alternatives actually considered," and "viable." *Se. Alaska Conservation Council*, 649 F.3d at 1056, 1060. If the agency declines to consider such an alternative, it must rationally explain that decision. *See id.* at 1056. Oregon Wild suggested a "conservation alternative" that the Forest Service failed to consider in violation of NEPA's clear mandate to provide a "detailed statement on alternatives to the proposed action." *Block*, 690 F.2d at 766 (citing 42 U.S.C. § 4332); *see also* AR16320, 16323-30; AR19388-92 (suggested alternatives).

### 1. Oregon Wild's alternative is distinguishable.

To merit detailed analysis, an alternative must be meaningfully distinct from other alternatives under consideration. *See Te-Moak Tribe v. U.S. Dept. of Interior*, 608 F.3d 592, 602 (9th Cir. 2010). The conservation alternative, which proposed different intensities and extents of treatment, satisfies this requirement.

Oregon Wild suggested significantly different prescriptions than the Forest Service's alternatives: In contrast to the Forest Service's heavy logging prescriptions, which differed very little between alternatives, the "conservation alternative" would retain all large trees and all trees with old-growth characteristics, and retain significantly more trees overall. *See* AR16324-26; AR19388-90.

The conservation alternative also called for treating significantly less acreage overall than either Alternative 2 or 3—which both proposed cutting and burning the exact same 4,295 acres. *See supra* at 13. Oregon Wild urged the Forest Service to log less NSO habitat, and to field-verify whether areas slated for logging should be protected as high-quality habitat. AR16325. It proposed dropping commercial logging from riparian reserves and special interest areas, AR19392; avoiding road construction, AR16325, 16339-46; and protecting MOG stands, AR16319-20, 19390.

None of these suggestions were incorporated into the alternatives given detailed consideration, nor in the alternatives "initially proposed … and subsequently eliminated from further consideration." AR18010. Oregon Wild's conservation alternative was thus significantly distinguishable from those considered and warranted consideration in the FEIS.

### 2. Oregon Wild's alternative is viable.

Oregon Wild's conservation alternative is technically and economically practical or feasible and advances the Project's purpose and need at least as well as the chosen alternative, which focuses myopically on timber production and fuels reduction to the detriment of other goals. The Forest Service erred by failing to give this viable alternative detailed consideration. *See Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1520 (9th Cir. 1992).

Oregon Wild suggested a conservation alternative that would meet the Project's primary goals of restoring pine savannahs and reducing hazardous fuels, while better harmonizing those objectives with the need to protect late-successional forests and recover NSO habitat. *See* AR16324-26; AR27742-43, 27745-46 (explaining that logging would produce open forest "more adapted to climate warming, but likely not spotted owl suitable habitat"). This conservation focus and the Project's goals are in no way "mutually exclusive." *W. Watersheds Project v. Bernhardt*, 543 F. Supp. 3d 958, 982-84 (D. Idaho 2021) (agency's purpose and need did not exclude goal of "protecting other resource values").

Scaling back the thinning acreage would reduce labor and costs, both for immediate implementation and in the future. *See* AR16325-26. Retaining more trees would reduce blowdown, suppress ladder fuel growth, and reduce weed spread; the intensive logging proposed by both action alternatives would create flammable slash and encourage the growth of invasive weeds, undergrowth, and heavy ladder fuels. *See*, e.g., AR439, 688, 722, 737, 1471; AR16324-25, 16331,

16360, 16365-69; AR16479-80; AR23750. Without continual upkeep, the agency's alternatives would not effectively meet its fuel reduction goals. *See* AR16324-26. Nor would they protect NSO habitat from wildfire, because both alternatives would eliminate existing habitat and prevent its re-development indefinitely. AR27741-49 ("periodic maintenance burning" would "delay or prevent" reestablishment of NSO habitat). "[T]he Forest Service failed to consider an alternative that was more consistent with its basic policy objectives than the alternatives that were the subject of final consideration." *Muckleshoot Indian Tribe*, 177 F.3d at 813.

### C.    The Agency Failed to Adequately Explain Its Omission of Oregon Wild's Alternative.

If an agency declines to consider a viable alternative, it must explain why the proposal is subsumed by other alternatives (why it is not significantly distinguishable), or why it does not meet the project's purpose and need (why it is not viable). *See Bernhardt*, 543 F. Supp. 3d at 982-84 (rejecting agency justification for not considering suggested alternative); *see also WildEarth Guardians v. BLM*, 457 F. Supp. 3d 880, 891 (D. Mont. 2020) (same).

Here, the Forest Service never asserted that the "conservation alternative" was "subsumed" by its own action alternatives, which both proposed intensive cutting and burning on the same forest stands, or the no-action alternative. *See supra* at 13; AR18411-27. Nor did the Forest Service assert that the conservation alternative was not viable. *See* AR18411-27. It stated that its own action alternatives "were developed to meet the purpose and need of the project and the items identified for development of additional alternatives were considered[.]" AR18411. But this does not satisfy the agency's obligation to explain why Oregon Wild's alternative was not considered. It is not enough for the Forest Service to claim it considered NSO, climate, and riparian habitat in developing its own alternatives—it must show why the suggested alternative was not reasonable. *See Bernhardt*, 543 F. Supp. 3d at 982-84.

MEMORANDUM IN SUPPORT—17

The Forest Service neither considered a genuine alternative that would have been more protective of MOG forests and imperiled species nor rationally explained why such an approach was unreasonable. This omission was arbitrary and capricious, and antithetical to informed decisionmaking. *See* 5 U.S.C. § 706(2); *see Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 872 (9th Cir. 2004).

## III.   The Forest Service Failed to Take a Hard Look at the Project's Impacts.

### A.   The Agency Did Not Take a Hard Look at NSO Impacts.

The Forest Service failed to take the requisite hard look at the Project's impact on the NSO. Its brief, conclusory discussion of this crucial issue did not consider or disclose inconvenient data, resulting in an inaccurate and misleading picture of the Project's impacts that fell far short of NEPA's demands.

#### 1.   The FEIS lacks any meaningful analysis of NSO impacts.

Although the effect on NSO habitat "was identified as a key issue during public scoping," AR18419, the Forest Service's discussion was cursory at best. The FEIS acknowledges that the Project would remove or modify thousands of acres of owl habitat, and concedes that that it is "likely to adversely affect" NSO. AR18122, 18124. But it contains no actual analysis of potential impacts to the species or individuals.

While the FEIS acknowledges that the Project will remove or modify over 3,000 acres of habitat and identifies impacts to NSO sites, it lacks any detailed discussion of the species' rapid descent toward extinction, or the Project's impacts in that context. *See* AR18124-29. "Though unquestionably important and useful, such fact-based information is only a simple snapshot inventory of involved [NSO sites]; it is not, however, any sort of *analysis*" of NSO or habitat needs, condition, threats, or trajectory. *Bernhardt*, 543 F. Supp. 3d at 986 (emphasis in original).

MEMORANDUM IN SUPPORT—18

It does not explain the significance of removing or modifying this amount of habitat. *See* AR18124. This is insufficient. *Cf. Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 994-96 (9th Cir. 2004) ("A calculation of the total number of acres to be harvested in the watershed is a necessary component of a cumulative effects analysis, but it is not a sufficient description of the actual environmental effects that can be expected from logging those acres."); *Oregon Natural Res. Council Action v. U.S. Forest Serv.*, 445 F. Supp. 2d 1211, 1226-28 (D. Or. 2006) (requiring data to be "incorporated into a careful analysis and explanation.").

The FEIS fails to explain the causes for declining NSO populations or acknowledge the significance of removing habitat in this context. *See*, *e.g.*, AR19682 ("Because of the barred owl competitive pressure on spotted owls, [FWS] considers habitat removal and modification in known occupied spotted owl sites when barred owls are present to be of particular concern presently."), 19702-08 (discussing interaction of habitat modification and barred owl competition). Indeed, it fails to even *mention* barred owls, widely recognized as the current primary driver of NSOs' decline. *See* AR18621-28, 19058-62, 19701-12. The fact that barred owls are present throughout the Project Area is omitted, *see* AR27741-42, as is any discussion of how the Project would impact both species and their interactions. *Cf. Conservation Cong. v. Finley*, 774 F.3d 611, 621 (9th Cir. 2014) (holding that agency took requisite hard look where EIS directly addressed "how the project affects the barred owl threat"). The FEIS also does not reveal the scientific consensus that retaining as much NSO habitat as possible is crucial to reducing the impact of barred owl competition. *See*, *e.g.*, AR19692, 19698-708, 19764-65, 22416-18.

This last omission is particularly troubling. The Forest Service ultimately agreed to drop "commercial harvest treatments that would remove suitable habitat from occupied home ranges." AR21307; AR27737-38 (warning that planned logging in occupied core area was inconsistent with

the 2023 BiOp). But the Forest Service still intends to remove over 2,000 acres of owl habitat, much of which it concedes will remain unsuitable "for the foreseeable future[.]" AR21325; *see also* AR27742-43, 27745-46, 27748-49 (for natural stands, "the project biologist expected it to become [non-habitat] post-treatment" and noting that "[t]he intent is to produce open old-growth habitat more adapted to climate warming, but likely not spotted owl suitable habitat."). This is inconsistent with expert warnings that protecting *unoccupied* suitable habitat is important for NSOs to survive barred owl competition. *See* AR19367, 19372-78, 19692, 19698-708, 19764-65, 22416-18. But the Forest Service never acknowledged the *long-term* loss of owl habitat or its significance in the context of barred owl competition. *See* AR18123-30 (NSO analysis), 18411-12 (responding to Oregon Wild's comments regarding NSO); *compare* AR21325 (disclosure of long-term impact) *with* AR18124 (cited FEIS page).

The FEIS additionally neglected to discuss the growing importance of managing for non-territorial owls given the large number of displaced NSOs. *See* AR19699-700. "Maintaining areas for non-breeding spotted owls to persist on the landscape may help floaters who are waiting for territories to open up," necessitating the maintenance of "older forest connectivity corridors" and "older forest patches in close proximity to occupied territories." *Id.*; *see also* AR18424, AR27742-49 (Project would log older forests near occupied territories and remove or modify 1,500 acres of dispersal habitat). Nor did the Forest Service disclose that its ability to detect NSOs and determine which sites are actually occupied has been impacted by barred owls. *See* AR19699 (noting difficulty of detecting floaters), 19711 (noting NSOs' "reduced detectability" around barred owls); AR27465-68 (same). This information was needed to give the Forest Service's brief inventory of affected acres meaning, *see Klamath-Siskiyou.*, 387 F.3d at 994-96, and important context for its decision to log purportedly "unoccupied" NSO sites. *See* AR18054, 18124-29; AR27741-49.

### 2.  The Forest Service relied on documents it knew to be outdated and inaccurate.

What little information the FEIS *did* provide was "too stale to carry the weight assigned to it," or simply inaccurate. *N. Plains Res. Council, Inc. v. Surface Transp. Bd*., 668 F.3d 1067, 1086 (9th Cir. 2011) (explaining that "faulty reliance" on stale data "does not constitute the 'hard look' required under NEPA"). Most of the NSO section is a recitation of standards imposed by the 2019 BiOp and a list of known owl sites, including occupation status. AR18124-27. Both are too outdated to form the basis for reasoned decisionmaking. *See WildEarth Guardians v. Bucknall, 756 F. Supp. 3d 1017, 1033-36 (D. Mont. 2024)* (faulting agency for failing to consider updated, relevant data *before* project approval).

The FEIS used owl surveys from 2017-2018 to make "occupied" determinations, and FWS used the same data during its 2023 BiOp consistency review. *See* AR12880-99, 13943-44, 18123. Although the Project requires "spot checks two years prior to implementation and during implementation" of activities that will adversely affect NSOs, these will be too late to influence analysis and decisionmaking. AR18054. The decision whether to log known NSO sites was thus based on "data that is too stale to carry the weight assigned to it[.]" *N. Plains Res. Council*, 668 F.3d at 1086; *see also Lands Council v. Powell*, 395 F.3d 1019, 1031 (9th Cir. 2005) (concluding that data from six-year-old fish surveys was too stale).

Worse, the Forest Service predicated its "analysis" and ESA compliance on information it knew to be incorrect. The NSO section opens with the standards and limits imposed by the 2019 BiOp. AR18124. It recites the number of NSO sites on the Forest and how many may be impaired under that BiOp, and mentions rates of site occupancy and population decline. AR18124. But the FEIS never mentions the 2023 consultation, which presented a much grimmer outlook for NSOs based on updated analyses, and imposed different substantive limits on activities than the previous

BiOp. *See infra* at 23-24. The Forest Service was entirely aware of this issue when it issued the DEIS and FEIS—agency experts had been consulting with FWS and working on a revised BA since early 2021. *See* AR19621-22. And Oregon Wild repeatedly brought much of the information in the 2023 BiOp to the Forest Service's attention, and alerted the agency that its reliance on the invalid 2019 BiOp was unlawful. *See infra* at 26-29. The Forest Service ignored it all.

### a. The 2019 consultation does not satisfy the "hard look" requirement.

The FEIS relies almost entirely on the 2019 BA and BiOp for its NSO analysis, *see* AR18123-24, 18330-33 (only four FEIS references, including 2019 BA and BiOp, specific to NSOs). But the Forest Service knew when it drafted the DEIS and FEIS that the 2019 consultation was outdated and inaccurate. Moreover, the agency had access to relevant, accurate information that it should have considered and disclosed in its NEPA analysis. The 2019 consultation is inadequate to satisfy NEPA's "hard look" requirement.

The Forest Service and FWS concluded in April of 2021 that the 2019 BiOp no longer reflected conditions on the ground. *See* AR19223 (description of changes between 2019 and 2023 BAs), AR19621-22 (consultation history). But the Forest Service still opted to rely solely on the 2019 consultation for its analysis of the issue. *See* AR21310-11. Misrepresenting the 2023 consultation, the Forest Service suggested that any new information was inapplicable because the 2020 fires did not occur in the Project area. *See* AR21310-11.

But the 2023 consultation contained much more than an explanation of how NSOs were faring in the fires' immediate vicinities. Rather, it incorporated significant new data relevant to NSO across the planning area—including several issues specifically raised by Oregon Wild but

ignored by the Forest Service.[6] AR18510-19344, 21318, 21320. NEPA obligated the Forest Service to consider this information. *See Gulf v. Burgum*, 775 F. Supp. 3d 455, 486-88 (D.D.C. 2025) (finding that agency could not rely on expert agency's analysis but ignore its updates thereto). It did not do so.

In addition to the updated analysis, the 2023 consultation contains an updated baseline for NSO and its habitat, and updated standards directly applicable to the Project. *See*, *e.g.*, AR18529, 18641-48. The Forest Service's failure to consider and disclose this information was arbitrary and capricious. *See Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 964 (9th Cir. 2005) ("To take the required 'hard look' at a proposed project's effects, an agency may not rely on incorrect assumptions or data."); *cf. Gulf*, 775 F. Supp. 3d at 480-82 (explaining that reliance on an outdated baseline is arbitrary and capricious).

The 2020 fires' impact on NSO habitat across the Forest heightened the significance of removing any unburned habitat, AR19214-225, 19324-25; logging 3,000 acres of owl habitat is more significant if the total amount of suitable habitat has decreased significantly. *Cf.* AR17845-48, 17855-56; AR19220; AR19745-46 (habitat trends). In recognition of these changed circumstances, FWS reduced the amount of NSO habitat that may be removed through "management activities" and significantly revised its projections for owl habitat over the next three decades. *Compare* AR19631 *with* AR15424-25.

---

[6] Specifically, the 2023 BA and BiOp included new information and conclusions regarding, *inter alia*, the species' trajectory; the impact of barred owls; the importance of retaining unoccupied suitable habitat; the importance of transient owls on the species' viability, and the related importance of maintaining higher quality dispersal habitat; and the amount of habitat that could be downgraded or removed on the Forest without jeopardizing the NSO's survival and recovery. *See supra* at 18-21. None of this information appeared in the 2019 BA and BiOp or was included in the FEIS. *See id.*

MEMORANDUM IN SUPPORT—23

In the 2019 BA, the agencies had predicted that implementation of the Forest's timber program, combined with natural disturbances, would result in a 12% increase in suitable habitat by the end of the 27-year period, and determined that 1,774 acres of suitable and 604 acres of dispersal habitat could be removed or downgraded annually by "management activities" without jeopardizing the species' survival or recovery. *See* AR15424-25. In their 2023 consultation, the agencies substantially revised this projection and lowered the allowable level of timber harvest "to reduce the management loss of suitable habitat." AR19750-51; *see also* AR17436-44, 17873-74, 17883, 17896-99; AR18815-22; AR19743-51. Even so, the predicted outcome has changed: By 2046, the agencies expect to see an overall 3% *decrease* in NSO habitat on the Forest relative to 2019. *Compare* AR19751 *with* AR15424-25. There will be a 6.5% loss of suitable habitat per decade, "which is higher than the [previously] assumed 5% range-wide loss of spotted owl habitat on federal lands due to fire and timber harvesting." AR19743-44. Without an "adjustment of the proposed action"—*i.e.*, the reduction of loss through "management activities"—the outlook would be even worse. *See* AR19750 (positive trend from 2021 baseline "largely due" to reduced levels of logging).

The Project's removal of 3,000 acres of habitat has greater significance in this context than it would have in 2019—yet the Forest Service continued to rely on an outdated baseline and old analyses it *knew* were invalid to support its desired conclusions in the FEIS. The analysis and data in the 2019 BA and BiOp are inaccurate, incomplete, and misleading, and the Forest Service's total reliance on these documents for its NSO analysis was arbitrary and capricious.

**b. The Forest Service cannot rely on the 2023 consultation.**

In apparent recognition of these problems with the FEIS and the 2019 consultation documents, the Forest Service belatedly attempted to rely on the 2023 BA's discussion of "issues

such as increased numbers of barred owls, climate change in the terms of longer fire seasons, fuel reduction objectives in conflict with habitat owl objectives, ... effects to non-territorial spotted owls, and how timber activities may affect barred owl-spotted owl competition" to save its analysis. AR21320. It cannot do so. Not only did the 2023 BA and BiOp postdate the FEIS, and thus could not have been considered in the agency's analysis, but the Forest Service affirmatively stated that they were irrelevant to the Project. AR21310-11, 21320. The Forest Service's analysis must therefore stand or fall based on the contents of the FEIS and the 2019 BA and BiOp. *See Vill. of False Pass v. Watt, 565 F. Supp. 1123, 1141 (D. Alaska 1983), aff'd sub nom. Vill. of False Pass v. Clark, 733 F.2d 605 (9th Cir. 1984)* (declining to consider the information in a BiOp that was not prepared until after the issuance of the FEIS "to add to that already contained in the [EIS]," but considering it "in determining whether the scope of the discussion in the [EIS] is adequate").

Despite the agencies beginning work on the revised BA in April 2021, the DEIS and FEIS cite solely to the 2019 BA and BiOp. *See* AR15819 (DEIS date), 15982 (DEIS citation), 18119 (FEIS citation), 19621-22 (consultation history). The FEIS NSO analysis is word-for-word identical to the DEIS, with the only change an appendix note that consultation had been reinitiated. *Compare* AR15985-94 *with* AR18123-31, 18360.

In its later objection responses, however, the Forest Service issued contradictory statements regarding its NSO analysis. The agency stated that it had relied on the 2019 consultation and that although the 2023 BA "is now being used for this project," "the Project area was not affected by [the 2020 fires] and therefore, *the determinations made in the YRR analysis remain unchanged*." AR21310-11 (emphasis added). The Forest Service asserted that the 2019 BA had "fully disclos[ed] the project's impacts to ESA-listed species," AR21312-13, but also that it had satisfied

MEMORANDUM IN SUPPORT—25

its "hard look" obligation as to NSO in the 2023 BA, which it cited in answer to Oregon Wild's objections. AR21320.

In short, the Forest Service insists that the 2019 BA contained the necessary analysis, but also that it is relying on the 2023 BA—which postdated the FEIS, and which the agency stated had not affected its decisionmaking process—to satisfy its "hard look" obligation. It now seeks to backfill its NEPA analysis with a document that the agency did not consider in its decisionmaking. *See* AR21310-11; *cf. Vill. of False Pass*, 565 F. Supp. at 1141 (explaining that "the adequacy of the [EIS] itself is to be judged solely by the information contained in that document," including material properly incorporated by reference, and declining to consider post-decisional analysis). But this violates both NEPA and basic principles of administrative law. *See Envtl. Prot. Info. Ctr. v. Blackwell*, 389 F. Supp. 2d 1174, 1204-05 (N.D. Cal. 2004) ("[T]he FWS Biological Opinion was not even provided to the FS itself until … well after the EA was posted … Given this timeframe, the possibility for public review of a document on which the FS stated that it relied as part of its decision regarding the sale was virtually nonexistent."); *see also Hawaii Longline Ass'n. v. Nat'l Marine Fisheries Serv.*, 281 F. Supp. 2d 1, 30 (D.D.C. 2003), *aff'd in relevant part on reconsideration*, 288 F. Supp. 2d 7 (D.D.C. 2003) (explaining that agency could not rely on BiOp postdating its decision to support its decisionmaking process). "[T]he existence of a post-decisional 'no-jeopardy' finding by USFWS does not remedy the deficiencies in [the FEIS]."[7]

---

[7] The 2023 BA and BiOp are not strictly "post-decisional," as they post-date the FEIS and draft ROD but pre-date the *final* ROD. *See* AR17956 (FEIS); AR18445 (draft ROD); AR19613, 19621-22 (2023 BiOp and consultation history); AR22205 (final ROD). However, they were not incorporated into the FEIS, where support for the agency's decision must be found. *See* AR21310-11 (asserting that 2023 consultation was not relevant to and did not affect decisionmaking). The information in the 2023 BA and BiOp should not be considered as part of the FEIS, but only "in determining whether the scope of the [FEIS] discussion … is adequate." *Vill. of False Pass*, 565 F. Supp. at 1141.

MEMORANDUM IN SUPPORT—26

*Bucknall*, 756 F. Supp. 3d at 1036 (emphasis in original) (explaining that NEPA requires consideration of relevant information *before* decision); *see also* *Klamath-Siskiyou*, 387 F.3d at 998 (a non-NEPA document cannot satisfy agency's NEPA obligations).

That the Forest Service did not rely on the 2023 BA and BiOp would not matter if the agency had independently provided a full, accurate, and up-to-date NSO analysis in the FEIS. But the Forest Service did not do so. It cannot now point to later documents to bolster its conclusions. *See* *Ctr. for Biological Diversity*, 349 F.3d at 1167-69 (explaining that information outside EIS cannot remedy its deficiencies).

### 3.  The Forest Service failed to address adverse expert opinion.

NEPA obligated the Forest Service to include in the FEIS expert opinions and information that undercut its conclusions regarding the Project's effects on NSOs, much of which it collected during the BA and BiOp revision, and all of which was available to the agency before it published the FEIS. *See supra* at 21-24. The Forest Service failed to do so. It likewise failed to address, or even acknowledge, the results of the FWS review or Oregon Wild's comments regarding NSOs. *See supra* at 11; *see also* AR18411-29. This, too, violated NEPA.

Reflecting broad scientific consensus, Oregon Wild's comments focused on the growing barred owl threat, the need to conserve more suitable NSO habitat, and the increasingly grim outlook for the species. *See* AR16324-28, 16347-49, 16463-68.

> Habitat conservation is an essential tool to increase the chances that spotted owls can co-exist with barred owls, instead of circling the drain toward extinction. Top owl scientists say we need to retain as much suitable owl habitat as possible, not just a subset of the highest quality owl habitat … An important part of the strategy to help spotted owls coexist with barred owls is to maximize the availability of suitable habitat. This project conflicts with that goal.

AR16326. Additionally, Oregon Wild noted that the Project's draconian "thinning" prescriptions conflicted with research calling for far greater canopy cover in NSO dispersal habitat. AR16348-

49. For these issues, Oregon Wild cited scientific papers and expert opinion ignored by the Forest Service (although much of it appeared in the 2023 BA and BiOp). *See* AR16327-28, 16348-49, 16463-68.

The Forest Service did not change its NSO analysis by a single word, nor did it include Oregon Wild's comments in the FEIS. *See* AR15986-94 (DEIS analysis), 18123-30 (FEIS analysis), 18391-431 (FEIS response to comments). The Forest Service further failed to accurately summarize—much less adequately respond to—Oregon Wild's comments. *See* AR18411-29 (summarizing comments but omitting reference to specific NSO issues) Indeed, the agency omitted any reference to competition from barred owls, the importance of conserving suitable habitat, or the need for higher levels of canopy cover. *See* AR18123-30, 18411-29. The agency's decision to ignore Oregon Wild's central concerns and the research on which they were based violated the "public comment procedures [] at the heart of the NEPA review process," *Block*, 690 F.2d at 770, which require the Forest Service to address "any responsible opposing view" and "indicate the agency's response to the issues raised" in the FEIS. *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 492 (9th Cir. 2011). The agency may not sweep inconvenient comments or concerns under the administrative rug. *See Block*, 690 F.2d at 773 (holding that FEIS must reveal the substance of public comments and provide "good faith, reasoned analysis in response").

Because Oregon Wild's "evidence and opinions directly challenge the scientific basis upon which the [FEIS] rests and which is central to it, [the Forest Service was] required to disclose and respond to such viewpoints … [Its] failure to disclose and analyze these opposing viewpoints violates NEPA." *Ctr. for Biological Diversity*, 349 F.3d at 1167. The Forest Service failed to ensure that its analysis reflected "[a]ccurate scientific analysis, expert agency comments, and

public scrutiny," including responsible opposing views—in other words, to take a hard look at the Project's impacts on NSO. *Kraayenbrink*, 632 F.3d at 491-93.

In sum: The Forest Service failed to conduct any Project-specific NSO analysis, instead relying entirely on the 2019 BA, which it knew to be inaccurate and outdated. The Forest Service ignored Oregon Wild's comments and extensive expert literature. The Forest Service omitted relevant, up-to-date information. And the Forest Service failed to address adverse scientific opinion from its own experts and FWS. Because it omitted critical information from the FEIS, and much of the evidence before the agency was "too stale to carry the weight assigned to it," *N. Plains Res. Council*, 668 F.3d at 1086, the Forest Service did not take the requisite hard look or make "a reasoned decision based on its evaluation of the evidence," *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1301 (9th Cir. 2003).

### B. The Forest Service Failed to Take a Hard Look at Fuel Reduction and Fire Risks.

In its comments, Oregon Wild specifically expressed concerns that the Forest Service had not fully analyzed or disclosed the adverse trade-offs associated with the purported fuel reduction "thinning" proposed as part of the Project. AR16331, 16360, 16434. In particular, Oregon Wild noted the low likelihood that wildfire would ever interact with an area "treated" for fuel reduction within the effective window of time, and that all logging, including thinning, results in adverse impacts and trade-offs, particularly within older stands. AR16331, 16360; *see also* AR16397 (citing Campbell et al. 2011) (there is "a low likelihood that treated forests will be exposed to fire"). Moreover, the Project may actually make fires *worse* by creating "a hotter-drier-windier microclimate that is favorable to greater flame lengths and rate of fire spread." AR16360; *see also* AR16367 (citing Lesmeister et al. 2019). Oregon Wild reiterated these concerns in its objection. AR19400.

MEMORANDUM IN SUPPORT—29

As part of its hard look obligation, the Forest Service needed to respond to Oregon Wild's comments and discuss "any responsible opposing view." 40 C.F.R. §§ 1502.9(b), 1503.4(a). Yet the Forest Service never grappled with the adverse trade-offs and responsible opposing science brought to its attention. Instead, the agency provided cursory responses to Oregon Wild's points without addressing their substance or underlying scientific bases. *See* AR18426-28; AR21317, 21325 (noting Lesmeister et al. 2019 "make[s] some good points in terms of fire resiliency," but failing to reconcile those points with analysis or decision).

Recent Ninth Circuit case law is instructive regarding an agency's obligation to respond to responsible opposing science as part of its "hard look." In *Bark v. U.S. Forest Service*, plaintiffs submitted numerous studies disputing the "conclusion that thinning is helpful for fire suppression and safety." 958 F.3d 865, 870 (9th Cir. 2020). They pointed out that "often the treated area is not affected by fire before fuels return to normal levels," while "fuel reduction may actually exacerbate fire severity" when "projects leave behind combustible slash, open the forest canopy to create more ground-level biomass, and increase solar radiation which dries out the understory." *Id.* at 871. Despite being presented with these materials, in that case, as here, the Forest Service "did not engage with the considerable contrary scientific and expert opinion," but "instead drew general conclusions." *Id.*

Even more recently, the Ninth Circuit again reiterated that "NEPA generally requires the agency to 'engage with … contrary scientific and expert opinion' and uncertainty as part of its duty to 'consider all important aspects' of a proposed agency action." *WildEarth Guardians v. USDA APHIS Wildlife Servs.*, 135 F.4th 717, 736 (9th Cir. 2025) (citing *Bark*, 958 F.3d at 871). And while *Bark* and *WildEarth Guardians* specifically concerned agencies' failure to prepare an EIS, the obligation to respond to and "engage with … contrary scientific and expert opinion"

MEMORANDUM IN SUPPORT—30

applies with greater force when the proposed action's impacts are already known to be significant, warranting a full EIS. *See* 42 U.S.C. §§ 4332(C), 4336e(6) ("detailed written statement"); *see also N. Cascades Conservation Council v. U.S. Forest Serv.*, 136 F.4th 816, 829 (9th Cir. 2025) (EIS "requires more detailed information than an" EA).

Environmental analysis must be full and fair to satisfy NEPA's hard look requirement. *350 Mont.*, 50 F.4th at 1265. Yet here, the Forest Service failed to fully or fairly discuss multiple probable environmental consequences of the Project. In particular, the agency did not acknowledge the low likelihood that wildfire will ever interact with treated areas within their effectiveness windows, yet all the adverse impacts associated with commercial logging operations will certainly accrue, including the potential for *increased* fire risks. By ignoring contrary science and adverse trade-offs that did not fit its narrative, the Forest Service failed to provide a reasonably thorough discussion—let alone a fair one—regarding the complex ways aggressive thinning in mature and older forest stands will affect their wildfire risk and resilience.

### C.    The Forest Service Failed to Take a Hard Look at Impacts to Mature and Old-Growth Forests and Carbon Storage and Emissions.

A proposed action's direct impacts on carbon and climate "fall within NEPA's framework." *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 687 F. Supp. 3d 1053, 1073 (D. Mont. 2023) ("*Black Ram*") (*affirmed in part, reversed in part on other grounds*, *Ctr. for Biological Diversity v. U.S. Forest Serv.*, No. 23-2882, 2025 WL 586358 (9th Cir. Feb. 24, 2025). Here, though, the Forest Service's cursory and flawed discussion of the Project's carbon impacts failed to satisfy the agency's "hard look" obligation. The Forest Service devoted less than three pages to the issue. It ignored the numerous scientific studies Oregon Wild brought to its attention— indeed, it almost entirely ignored Oregon Wild's extensive comments on the matter. This cursory analysis does not constitute a "hard look," nor does it support the Forest Service's conclusions

regarding climate and carbon.

Mature and old-growth stands like those targeted for aggressive "thinning" here store immense amounts of atmospheric carbon. *See* AR19440-41. Logging these stands releases that carbon, which cannot be quickly replaced by post-logging tree growth. AR19441. Rather, logging converts forests to younger age classes that store *less* carbon. AR16384-89. In light of these forests' key role as a natural climate solution, Oregon Wild raised these concerns throughout the Project's development. *See* AR14512-14, 14532-44; AR16342-47, 16389-438.

In its comments, Oregon Wild both emphasized the importance of thoroughly analyzing carbon impacts and identified available ways to do so, extensively quoting scientific literature regarding the ways forest management relates to carbon storage and emissions. *See* AR16342-47, 16389-438. It submitted a 64-page supplement consisting of expert literature on the subject, much of which directly undercut the Forest Service's conclusions. AR16375-438. The Forest Service ignored this information entirely. Not only did it not alter its cursory analysis in response to this adverse scientific opinion,[8] the Forest Service did not disclose or respond to Oregon Wild's comments on the issue. *See* AR18411-29 (response to Oregon Wild's comments). Instead, it reduced Oregon Wild's climate-related comments to a suggestion to consider an alternative that "avoid[ed] [carbon] emissions by keeping carbon stored in forests," omitting any further reference to carbon or climate. AR18411; *compare* AR16375-438 (carbon-related comments) *with* AR18411-29 (summary of and response to comments).

This failure to include or respond to Oregon Wild's comments plainly violates NEPA,

---

[8] The FEIS added only two paragraphs to the draft climate discussion. AR16114-16 (DEIS); AR18251-53 (FEIS). This additional "analysis" does not concern the effects of the Project itself, but broadly describes existing and predicted climate conditions and a departmental climate "action plan," unidentified aspects of which the agency suggests the Project incorporates. *See* AR18251.

MEMORANDUM IN SUPPORT—32

which requires agencies to "assess," "consider," and "respond" to comments, which "should be attached to the [FEIS]." 40 C.F.R. § 1503.4; *see also* *Bark*, 958 F.3d at 871. The Forest Service's failure to address the adverse scientific opinion Oregon Wild submitted likewise violates NEPA's requirement that agencies respond to all responsible opposing views "explicitly and directly." *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1020 (9th Cir. 2012); 40 C.F.R. § 1502.9(b).

The Forest Service entirely failed to quantify or provide any detailed qualitative analysis of the Project's climate impacts. Instead, it merely asserted that "[t]he relatively small quantity of carbon" released, and "the short-term nature of the effect" were "justified" because the Project would increase resistance to wildfire, and the remaining trees and new seedlings would sequester more carbon. AR18253. The Forest Service also stated that the felled trees "would be transferred to the wood products sector," and that "removing carbon from forests for human use can result in" lower net carbon emissions. *Id*. These broad assertions were poorly supported by and misconstrued the expert literature on which they purportedly relied, and the agency conspicuously failed to acknowledge Oregon Wild's scientific sources that directly contradicted the agency's conclusions. *See* AR18251-53.

For example, Oregon Wild cited findings that the proposed fuel treatments would not result in increased carbon sequestration. AR16392; AR22353 (Campbell and Ager 2013).[9] Existing trees, especially large, old trees, "are already growing, storing carbon, and sequestering more carbon more rapidly than newly planted and young trees." AR16386; AR22461 (Moomaw et al. 2019); *see also* AR19489; AR19597 (DellaSala 2022 for same proposition). Indeed, such thinning is not even carbon-neutral for at least four decades post-logging. AR16430-31; AR22368, 22370

---

[9] Citations in this section with page numbers between AR22319 and 22477 are to the documents added on July 15, 2025 (ECF No. 35-2).

(Zhou et al. 2013). And reducing the amount of carbon lost in a wildfire "requires the removal of a much greater amount of [carbon]," since most stored carbon "remains unconsumed even by high-severity wildfires." AR16393; AR22319 (Mitchell et al. 2009); *see also* AR22346 (Campbell et al. 2012); AR22451 (Chiono et al. 2017). And it is unclear whether using wood products actually reduces emissions or effectively stores carbon. *See* AR18253; AR16413 (citing AR22470 (Harmon 2019, estimating that benefits of product substitution "may have been overestimated 2- to 100-fold").

Finally, logging large trees and older stands is not necessary to achieve wildfire resistance. *See* AR18253. Rather, "[s]ignificant increases in wildfire resistance can be achieved by thinning only smaller ladder fuels and fire-sensitive intermediate trees without reducing the majority of the live-tree carbon pool in intermediate and large trees of all species." AR16402; AR22341 (North et al. 2009). The Forest Service did not acknowledge or respond to any of these points.

Instead, the Forest Service attempted to sweep all adverse scientific opinion under the rug—or simply shrugged its shoulders. The FEIS first confidently asserts that the Project will have negligible adverse consequences, ultimately "contributing to long-term carbon uptake and storage," AR18252, but elsewhere states that "[t]here is no consensus in the literature on whether thinning to reduce disturbance severity is a net climate benefit or not (McKinley et al. 2011)." AR18417. This is inadequate: An alleged lack of "settled science" or "consensus" obligated the agency to dig deeper into the literature and more closely examine the Project's carbon and climate trade-offs. *Cf. Neighbors of Cuddy Mountain v. U.S. Forest Service*, 137 F.3d 1372, 1380 (9th Cir. 1998) ("General statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided.").

Moreover, modeling tools did exist for the Forest Service to quantify the Project's climate

MEMORANDUM IN SUPPORT—34

impact—climate science is no longer a "barely emergent knowledge and technology[.]" *WildEarth Guardians v. BLM*, 870 F.3d 1222, 1236-37 (10th Cir. 2017). Agencies may not reject available tools for carbon accounting or climate modeling absent an objective rationale or alternate analytic method. *See Dine CARE v. Haaland*, 59 F.4th 1016, 1041-44 (10th Cir. 2023). The Forest Service was not obligated to "use any specific methodology," *id.* at 1043, but nor was it free to omit the analysis of environmental effects entirely when an accepted methodology exists to quantify the impact of carbon emissions. *WildEarth Guardians*, 870 F.3d at 1236-37. Here, Oregon Wild's comments provided extensive peer-reviewed scientific studies and resources the agency could have used to provide a more detailed, quantified analysis of the issue. AR16375-438. Oregon Wild repeatedly urged the Forest Service to utilize the social cost of carbon framework; the agency affirmatively chose not to do so, without explaining its choice or picking a different carbon accounting tool. *See* AR16342-46, 16375-80.

Finally, the Forest Service's assertion that "at the global and national scales," the Project's "contribution to [greenhouse gases] and climate change would be negligible," AR18252, is flatly inadequate under NEPA. In the recent *Black Ram* case, the court rejected a similar attempt to downplay loss of stored carbon from logging as negligible on a global scale, holding that "merely discussing carbon impacts and concluding that they will be minor does not equate to a 'hard look.'" 687 F. Supp. 3d at 1073; *see also 350 Mont.*, 50 F.4th at 1259; *NHTSA*, 538 F.3d at 1224. "NEPA requires more than a statement of platitudes, it requires appraisal to the public of the actual impacts of an individual project," especially for "an increasingly serious national and global problem" like climate change. *Black Ram*, 687 F. Supp. 3d at 1077. Such a "boilerplate" analysis violates NEPA's requirement that the agency "utilize high quality and accurate information[.]" *Id.* at 1075. The Forest Service cannot minimize the Project's impact simply by comparison to national or

MEMORANDUM IN SUPPORT—35

global greenhouse gas emissions. *See 350 Mont.*, 50 F.4th at 1259. Indeed, "the impact of greenhouse gas emission on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct." *NHTSA*, 538 F.3d at 1217.

Because the Forest Service wholly failed to engage with contrary scientific and expert opinion and failed to take the requisite hard look at NSO, fuels and fire risk, or carbon and climate, the FEIS and ROD are arbitrary and capricious and must be set aside. 5 U.S.C. § 706(2).

## RELIEF

Vacatur remains the presumptive remedy under the APA for violations of NEPA. *See id.* (a "reviewing court *shall hold unlawful and set aside* agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law") (emphasis added). The Forest Service bears the burden to demonstrate that vacatur should not result. *Cal. Comm'ys Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012). Because the agency's errors here were "serious" and there would be no "severe" disruptive consequences of vacatur, this Court should apply the presumptive remedy. *See id.* ("[W]e have only ordered remand without vacatur in limited circumstances.").

## CONCLUSION

For all of the foregoing reasons, Oregon Wild respectfully asks this Court to grant its Motion for Summary Judgment, hold unlawful and set aside the Forest Service's FEIS and ROD for the Youngs Rock Rigdon Project, and remand to the agency to comply with NEPA.


Respectfully submitted this 5th day of September, 2025.


MEMORANDUM IN SUPPORT—36

*/s/ John S. Persell*
John S. Persell (he/him)
Oregon Wild
5825 N Greeley Ave
Portland, OR 97217
(503) 896-6472
jp@oregonwild.org

Erin E. Hogan-Freemole (she/her)
WildEarth Guardians
213 SW Ash Street, Suite 202
Portland, OR 97204
(971) 417-6851
ehoganfreemole@wildearthguardians.org

*Attorneys for Plaintiffs*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 10,937 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, and certificate of compliance.

*/s/ John S. Persell*
John S. Persell (he/him)
Oregon Wild
5825 N Greeley Ave
Portland, OR 97217
(503) 896-6472
jp@oregonwild.org