ADAM R.F. GUSTAFSON
United States Department of Justice
Principal Deputy Assistant Attorney General
Environment & Natural Resources Division

SHAUN M. PETTIGREW (CA Bar No. 254564)
Senior Trial Attorney
Natural Resources Section
c/o NOAA, Damage Assessment
7600 Sand Point Way, NE
Seattle, WA 98115
(202) 532-5973
shaun.pettigrew@usdoj.gov

LAWRENCE K. PITTMAN (GA Bar No. 568134)
Trial Attorney
Natural Resources Section
150 M St. NE
Washington, D.C. 20002
 (202) 305-0420
lawrence.pittman@usdoj.gov

*Attorneys for Federal Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION**

| | | |
|---|---|---|
| OREGON WILD, an Oregon nonprofit corporation; and WILDEARTH GUARDIANS, a New Mexico nonprofit corporation, | ) ) ) ) | Case No. 6:24-cv-00949-AP |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) ) | FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY |
| | ) | JUDGMENT, MEMORANDUM IN |
| DAVID WARNACK, in his official capacity as Supervisor of the Willamette National Forest; and UNITED STATES FOREST SERVICE, a federal agency, | ) ) ) ) | SUPPORT OF CROSS-MOTION, AND RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |
| | ) | |
| Federal Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |

AMERICAN FOREST RESOURCE            )
COUNCIL,                            )
                                    )
      Defendant-Intervenor.        )
_____    )

      Federal Defendants hereby cross-move for summary judgment under Federal Rule of Civil Procedure 56(a). The parties have conferred in good faith and have been unable to resolve the dispute.

      The Forest Service approved the Youngs Rock Rigdon Project on the Willamette National Forest in December 2023 to improve the resiliency of forest stands and protect them against severe wildfire. In doing so, the Forest Service extensively analyzed the potential effects of various alternatives in a final environmental impact statement (FEIS). Plaintiffs now bring purely procedural claims under the National Environmental Policy Act (NEPA), challenging the FEIS and seeking to prevent this important Project from proceeding. But the Supreme Court recently admonished courts to avoid using the "procedural cross-check" of NEPA as a "substantive roadblock" to important projects. *Seven County Infrastructure Coalition v. Eagle County*, 605 U.S. 168, 173 (2025). As explained in the memorandum accompanying this motion, the FEIS more than satisfied NEPA's requirements and Plaintiffs' claims are without merit. Accordingly, the Court should grant summary judgment in favor of Federal Defendants.

## TABLE OF CONTENTS

I.  INTRODUCTION ............................................................................................. 1

II. BACKGROUND ............................................................................................. 2

    A.  Factual Background ............................................................................. 2

        1.  Management of the Willamette National Forest ......................... 2

        2.  The Rigdon Landscape Analysis ................................................ 3

        3.  The Youngs Rock Rigdon Project .............................................. 6

    B.  Legal Background ............................................................................... 9

        1.  National Environmental Policy Act ........................................... 9

        2.  Endangered Species Act ........................................................... 10

III. STANDARD OF REVIEW ............................................................................. 11

IV. ARGUMENT ................................................................................................. 11

    A.  The FEIS Considered a Reasonable Range of Alternatives.................. 12

    B.  The FEIS reasonably assessed the Project's potential impacts............. 17

        1.  Northern Spotted Owl ............................................................... 17

        2.  Fuel Reduction and Fire Risks .................................................. 26

        3.  Carbon Storage and Emissions .................................................. 30

    C.  Remedy ............................................................................................. 35

V.  CONCLUSION .............................................................................................. 35

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*350 Mont. v. Haaland,*
  50 F.4th 1254 (9th Cir. 2022) ............................................................. 33, 34

*Audubon Soc'y of Portland v. Haaland,*
  40 F.4th, 967 (9th Cir. 2022) .................................................................. 16

*Bark v. U.S. Forest Service,*
  958 F.3d 865 (9th Cir. 2020) .................................................................. 29

*Barnes v. U.S. Dep't of Transp.,*
  655 F.3d 1124 (9th Cir. 2011) ................................................................ 32

*Cascadia Wildlands v. U.S. Bureau of Land Mgmt.,*
  153 F.4th 869 (9th Cir. 2025) ............................................................ 10, 33

*Center for Biological Diversity v. U.S. Forest Serv.,*
  *(Black Ram),* 687 F. Supp. 3d 1053 (D. Mont. 2023).......................... 33, 34

*City of Los Angeles v. FAA,*
  63 F.4th 835 (9th Cir. 2023) ........................................................ 13, 14, 15

*Dine CARE v. Haaland,*
  59 F.4th 1016 (10th Cir. 2023) ............................................................... 33

*Earth Island Inst. v. Gibson,*
  834 F. Supp. 2d 979 (E.D. Cal. 2011) .................................................... 32

*Earth Island Inst. v. Muldoon,*
  82 F.4th 624 (9th Cir. 2023) ................................................................... 29

*Earth Island Inst. v. U.S. Forest Serv.,*
  697 F.3d, 1010 (9th Cir. 2012) ............................................................... 16

*Envt'l Prot. Info. Ctr. v. U.S. Forest Serv.,*
  451 F.3d 1005 (9th Cir. 2006) ................................................................ 29

*Friends of Big Bear Valley v. U.S. Forest Serv.,*
  776 F. Supp. 3d 824 (C.D. Cal. 2025) .................................................... 29

*Hapner v. Tidwell,*
  621 F.3d 1239 (9th Cir. 2010) ........................................................... 32, 34

*Lands Council v. McNair,*
  537 F.3d 981 (9th Cir. 2008) ............................................................ 11, 33

*Marsh v. Or. Nat. Res. Council,*
  490 U.S. 360 (1989).................................................................................. 24

*Miller v. Gammie,*
  335 F.3d 889 (9th Cir. 2003) .................................................................. 32

*N. Cascades Conserv. Council v. U.S. Forest Serv.,*
  136 F.4th 816 (9th Cir. 2025) ................................................................. 13

*N. Cascades Conserv. Council v. U.S. Forest Serv.,*
  No. 2:20-cv-1321-RAJ-BAT, 2021 WL 8344155 (W.D. Wash. May 28, 2021) ..................... 16

*Native Ecosys. Council v. U.S. Forest Serv.,*
  428 F.3d 1233 (9th Cir. 2005) ............................................................... 16

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.,*
  475 F.3d 1136 (9th Cir. 2007) ............................................................... 11

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.,*
  957 F.3d 1024 (9th Cir. 2020) ............................................................... 11

*Seven County Infrastructure Coalition v. Eagle County,*
  605 U.S. 168 (2025).................................................................... passim

*Swan View Coalition v. Steele,*
  No. 22-35137, 2023 WL 3918686 (9th Cir. June 9, 2023) ....................................... 22

*Swomley v. Schroyer,*
  484 F. Supp. 3d 970 (D. Colo. 2020) ........................................................ 32

*W. Watersheds Proj. v. Salazar,*
  993 F. Supp. 2d 1126 (C.D. Cal. 2012) ...................................................... 22

*Westlands Water Dist. v. U.S. Dep't of Interior,*
  376 F.3d 853 (9th Cir. 2004) ............................................................ 12, 13

*WildEarth Guardians v. BLM,*
  870 F.3d 1222 (10th Cir. 2017) ............................................................. 33

**Statutes**

16 U.S.C. § 1536(a)(2)................................................................... 10, 11

42 U.S.C. § 4332(2)(C)...................................................................... 9

42 U.S.C. § 4336e(6) ....................................................................... 9

5 U.S.C. § 706(2)(A)....................................................................... 11

**Regulations**

40 C.F.R. § 1502.2(b)...................................................................... 32

50 C.F.R. § 402.14(a)...................................................................... 11

## I.    INTRODUCTION

Wildfire historically played a major role in the Willamette National Forest (Forest), supporting a diverse and varied landscape. But past management focused on fire suppression has led to unnatural forest conditions, resulting in a less resilient forest that is more susceptible to disturbances such as extreme wildfire. In 2019, the Forest Service issued a detailed assessment of the 104,000-acre Rigdon landscape in the south of the Forest, documenting the landscape's departure from desired historic and future conditions and setting forth a restoration strategy. In December 2023, following four years of planning, public participation, environmental analysis, and consultation with tribes and other government authorities, the Forest Service approved the Youngs Rock Rigdon Project (Project) to begin implementing the restoration strategy and improving the resiliency of a portion of the Rigdon landscape. The Forest Service supported the Project with an extensive final environmental impact statement (FEIS) under the National Environmental Policy Act (NEPA).

Plaintiffs brought this suit seeking to halt the Project. In doing so, Plaintiffs alleged no substantive claims under the Endangered Species Act, National Forest Management Act, or any other substantive statute. Instead, Plaintiffs bring purely procedural claims under NEPA. But Plaintiffs fail to acknowledge that the Supreme Court in *Seven County Infrastructure Coalition v. Eagle County*, 605 U.S. 168, 173, 184 (2025), recently issued a "course correction" for all NEPA cases to ensure that NEPA acts as "a procedural cross-check, not a substantive roadblock" to projects. Despite this admonition, Plaintiffs now seek to block this important Project based on perceived inadequacies in the FEIS. As explained below, none of Plaintiffs' claims is well taken. The FEIS considered a reasonable range of alternatives and reasonably assessed the potential effects of those alternatives on the northern spotted owl (NSO), fuels and wildfire, and carbon

storage and emissions. The FEIS's analysis is entitled to "substantial deference" and should be upheld. *Id.* at 180.

## II.    BACKGROUND

### A.  Factual Background

#### 1.  Management of the Willamette National Forest

The Forest spans around 1.7 million acres, "stretch[ing] for 110 miles along the western slope of Oregon's Cascade Mountains," bounded by the Willamette Valley to the west and the crest of the Cascades to the east. AR00238-40. The Forest is organized into various ranger districts, *id.*, that the Forest Service manages under the 1990 Willamette National Forest Land and Resource Management Plan (Forest Plan), as amended by the 1994 Northwest Forest Plan (NWFP). AR17984-88; *see* AR01916-2468 (Forest Plan); AR02979-5212 (NWFP).

The Forest Plan sets forth general goals, desired future conditions, and objectives as well as more specific management area standards and guidelines (which are "bounds or constraints within which all management activities and practices will be implemented"). AR01955; *see* AR17984. And the NWFP allocates lands to various management areas to which additional standards and guidelines apply, including Matrix, Riparian Reserves, and Late-Successional Reserves (LSR). AR17984; *see* AR02991-92.

LSRs are "managed to protect and enhance conditions of late-successional and old-growth forest ecosystems." AR17987; *see* AR02991. Riparian Reserves "are areas where the conservation of aquatic and riparian-dependent terrestrial resources receives primary emphasis" that are managed to protect "the health of the aquatic system and its dependent species." AR17987; *see* AR02992, AR03006-11. Matrix areas are all other lands that are not included in the LSRs, Riparian Reserves, or other designated areas. AR02992. "Production of timber and other commodities is an important objective for the matrix," as is providing connectivity between the LSRs and "habitat

for a variety of organisms associated with both late-successional and younger forests." AR02995-96. Silvicultural treatments in the Matrix should provide for "commercial yields of wood," retain "moderate levels of ecologically valuable old-growth components such as snags, logs, and relatively large green trees," and increase "ecological diversity by providing early-successional habitat." AR02999-3000.

### 2. The Rigdon Landscape Analysis

The Rigdon landscape is a 104,000-acre area in the southern part of the Forest within the headwaters of the Middle Fork Willamette River and Hills Creek Reservoir watersheds. AR14224-25. It contains the northernmost extent of contiguous mixed conifer (i.e., ponderosa pine, incense cedar, sugar pine, and Douglas fir) on the west side of the Cascades, providing habitat for spring chinook, bull trout, and northern spotted owl (NSO). AR14225; AR12298 (describing mixed conifer). It also "produces forest products and offers an abundance of recreational opportunities." AR14225. The Rigdon landscape is displayed below in relation to the Forest:



*Figure 1 Vicinity map of the Rigdon landscape*

AR14224.

The forest in parts of this area was historically "much more open than it is now," containing "a more or less open forest of large Douglas-fir, ponderosa pine, incense cedar, and sugar pine" maintained "by frequent, low intensity fire." AR12298-99. But nearly a century of fire suppression resulted in "the grassy spaces between the old and fire resistant trees [becoming] forested relatively quickly, primarily with Douglas-fir." AR12299. This led to a dense overstory, shading out forest floor vegetation, creating intense below-ground competition, preventing pine regeneration and indirectly leading to the mortality of old-growth trees. AR12299-301; *see also* AR17974 ("Past forest management practices . . . have led to areas of degraded habitat, and a landscape less resilient to natural disturbances such as wildfire and flooding.").

In April 2019, the Forest Service issued the Rigdon Landscape Analysis (RLA) to understand ecological systems and integrate management activities in the Rigdon landscape. AR14222-299. This was the product of a years' long process led by a Forest Service interdisciplinary team and that involved extensive coordination with the Southern Willamette Forest Collaborative (SWFC), comprising "community organizations, agencies, conservation groups, small businesses and community members" devoted to promoting "local forest management solutions that foster ecological resiliency and promote socioeconomic health in the southern Willamette Forest area and communities." AR14228-30.

The RLA identified valued resources, assessed ecosystem components, function, and stressors, and developed a restoration blueprint for the area to inform conservation strategies and restoration efforts, decisions about where resiliency can be enhanced, and opportunities for integrating "restoration goals to increase landscape health and function." AR14225. The RLA did this by detailing the historic and current conditions across the Rigdon landscape, AR14231-55, explaining the landscape's natural processes and succession, AR14256-65, disclosing management objectives from the Forest Plan and NWFP, AR14266-77, and summarizing goals and target landscape patterns to inform desired future landscape conditions that would provide the basis for project level activities, AR14282-89. The RLA then began the effort of "transition[ing] from a landscape level analysis into project design," by suggesting the Youngs Rock Rigdon Project in a 33,000-acre area in the northeast portion of the Rigdon area (illustrated below) that focused on "mixed conifer forest areas as well as restoration activities in and near the mainstem of the Upper Middle Fork Willamette River." AR14289-90.



AR14291.

### 3. The Youngs Rock Rigdon Project

In May 2019, shortly after issuing the RLA, the Forest Service convened an eighteen-member interdisciplinary team to consider the RLA's "important information regarding local current condition" and to integrate that information into developing a proposed action that would "restore and enhance the ecological, social and economic aspects of the landscape." AR14303-04. In June 2019, the Forest Service published a scoping notice indicating that the Forest Service intended to prepare an environmental impact statement (EIS) for the proposed Youngs Rock Rigdon project in a 33,000-acre project area. AR14376. The scoping notice explained the need for the project "to improve stand and landscape diversity, structure, and resiliency; strategically reduce hazardous fuels; . . . and provide a sustainable supply of forest products." AR14377. The proposed

project would apply forest management treatments to about 6,800 acres within the project area, with about 4,500 acres receiving commercial and non-commercial thinning and regeneration harvest to create a diverse network of forest habitat and around 1,300 acres receiving hazardous fuel reduction treatments. AR14376-77. The remaining 1,000 acres of treatment would restore meadows or riparian areas. AR14377.

After receiving and considering comments on the scoping notice, along with other public outreach, the Forest Service issued a Draft EIS in July 2021. AR15819-16253; *see* AR15856-57 (public outreach and scoping comments). Release of the Draft EIS triggered another public comment period that overlapped with a public meeting and field trip to the project area coordinated by the Forest Service and SWFC. AR16254-256; AR16283-284; AR17995.

The Forest Service then released the FEIS in March 2023. AR17956-8431. The nearly 500-page FEIS set forth the purpose and need for the proposed action, AR17973-82, identified the no-action alternative and two action alternatives that would meet the purpose and need for action, AR17998-8009, explained why other alternatives were considered but eliminated from detailed analysis, AR18010-11, and assessed the potential environmental effects of the three alternatives on thirteen resources, AR18055-270.

As explained in the FEIS, the "degraded portions of the landscape in need of restoration" identified by the RLA "provided the basis for the project purpose and need." AR17976. This included improving stand and landscape diversity, structure, and resiliency in mixed conifer and moist forest, restoring meadow and oak savannahs, restoring aquatic resources and floodplains, strategically reducing hazardous fuels, and providing a sustainable supply of forest products. AR17976-81. The two action alternatives (Alternatives 2 and 3) would achieve this purpose and need through a variety of commercial and non-commercial harvest, post-harvest burning and

mastication, meadow and floodplain restoration, and fuel reduction treatments. AR17998-18009. The Forest Service considered several other proposed alternatives that were eliminated from consideration as they would not achieve the purpose and need for action, would cause greater environmental effects, or were inconsistent with the NWFP's standards and guidelines. AR18010-11.

The Forest Service released a draft Record of Decision (ROD) in April 2023, considered objections to the draft ROD, and issued a final ROD approving the Youngs Rock Rigdon Project (Project) in December 2023. *See* AR22232-34. The Project is a modified version of Alternative 2 in the FEIS. AR22210. The Project authorizes 2,242 acres of commercial harvest—including thinning in natural stands, thinning with gaps in managed stands, and regeneration harvest in managed stands—to improve the diversity, structure, and resiliency of the forest. AR22211. It also authorizes various non-commercial activities, such as thinning around pine and oaks, skips in harvest stands, and fuel treatments (i.e., piling, mastication, and burning). *Id.* As summarized in the ROD, there are "many competing priorities in the project area," but "careful consideration of public and agency comments" revealed that the Project "best meets the needs of restoring terrestrial and aquatic habitats, maintaining older stands for late seral species found in this area, and returning fire to the landscape while also providing for human uses like recreation, special forest product gathering, indigenous uses, and a sustainable supply of timber." AR22217.

Before approving the Project, the Forest Service completed programmatic consultation with the U.S. Fish and Wildlife Service (FWS) under the Endangered Species Act (ESA), analyzing effects of a "suite of timber harvest activities as well as routine land management activities proposed for implementation within the Willamette and North Coast Planning Provinces of Oregon that have been designed to avoid the incidental take of spotted owls." AR15247. The

geographic area covered by the consultation included the Willamette National Forest, Mt. Hood National Forest, the Columbia River Gorge National Scenic Area, and much of the Northwest Oregon BLM District. AR15249; AR15277. As part of the programmatic consultation process, the Forest Service issued a 2019 biological assessment (BA) considering, among other things, the status of northern spotted owls (NSO), NSO critical habitat, and effects of the program of activities on the NSO and its critical habitat. AR15278-94, AR15299-326, AR15400-80. In December 2019, FWS issued a concurrence letter and a biological opinion (BiOp), finding that the proposed actions were not likely to jeopardize the continued existence of the NSO or adversely modify its critical habitat. AR14849-953; AR14935. After wildfires in 2020, 2021, and 2022, the agencies prepared a revised BA in May 2023. AR18510-19344. In June 2023, FWS issued a revised BiOp finding the actions were not likely to jeopardize the continued existence of the NSO or adversely modify critical habitat. AR19613-841; AR19797.

## B. Legal Background

### 1. National Environmental Policy Act

NEPA requires a federal agency to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *see also id.* § 4336e(6) (defining EIS as "a detailed written statement that is required by section 4332(2)(C) of this title."). An EIS must assess the "reasonably foreseeable environmental effects of the proposed agency action" and "a reasonable range of alternatives to the proposed agency action . . . that are technically and economically feasible, and meet the purpose and need of the proposal." *Id.* § 4332(C)(i), (iii). "NEPA imposes no substantive environmental obligations or restrictions. NEPA is a purely procedural statute that [in some instances] . . . requires an agency to prepare an EIS—in essence, a report." *Seven Cnty.*, 605 U.S. at 173. And in preparing that report, "an agency may weigh environmental consequences as the agency reasonably sees fit under its governing

statute and any relevant substantive environmental laws." *Id.* "NEPA is a procedural cross-check, not a substantive roadblock. The goal of the law is to inform agency decisionmaking, not to paralyze it." *Id.*

"The limited scope of NEPA also circumscribes the scope of judicial review." *Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*, 153 F.4th 869, 880 (9th Cir. 2025). The Supreme Court recently emphasized that "[a] course correction of sorts is appropriate to bring judicial review under NEPA back in line with the statutory text and common sense." *Seven Cnty.*, 605 U.S. at 184. To do this, judicial review of an agency's EIS "must account for the fact that NEPA is a *purely procedural statute*." *Id.* at 180. "So when reviewing an agency's EIS, the only role for a court is to confirm that the agency has addressed environmental consequences and feasible alternatives as to the relevant project." *Id.* (citation modified). In engaging in this review, "a court should afford substantial deference" to an agency's identification and analysis of "significant environmental impacts and feasible alternatives" because such decisions require an agency to "make predictive and scientific judgments in assessing the relevant impacts (what are the likely impacts; do they rise to the level of 'significant'?) and alternatives (what are the potential alternatives; are they really 'feasible'?)." *Id.* at 180-81. If they "fall within a broad zone of reasonableness," courts must defer to an agency's "fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry—and also about the length, content, and level of detail of the resulting EIS." *Id.* at 183. "The bedrock principle of judicial review in NEPA cases can be stated in a word: Deference." *Id.* at 185.

### 2. Endangered Species Act

Under Section 7(a)(2) of the ESA, federal agencies must ensure that any action funded, authorized, or carried out by the agency is "not likely to jeopardize the continued existence of any endangered species or threatened species" or to destroy or adversely modify its critical habitat. 16

U.S.C. § 1536(a)(2). Action agencies must consult with FWS whenever an action "may affect" a listed species. *Id.*; 50 C.F.R. § 402.14(a). If the action is "likely to adversely affect" listed species or critical habitat, the agencies must engage in formal consultation. *Id.* § 402.14(a). Formal consultation culminates in the issuance of a Biological Opinion by FWS. *Id.* § 402.14(h).

## III.  STANDARD OF REVIEW

Plaintiffs' NEPA claims are reviewed under the Administrative Procedure Act. *See Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc). A court may set aside an agency action only if it determines the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under this standard, "a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained." *Seven Cnty.*, 605 U.S. at 180. An agency action is arbitrary and capricious only where "the agency has relied on factors which Congress has not intended it to consider," failed to consider important factors, offered an explanation inconsistent with the record, or the decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 957 F.3d 1024, 1033 (9th Cir. 2020). This standard of review is "highly deferential, presuming the agency action to be valid." *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (citation modified).

## IV.  ARGUMENT

Plaintiffs claim the FEIS failed to consider a reasonable range of alternatives and did not adequately consider potential effects to NSO, fuel reduction and fire risks, or carbon storage and emissions. Pls' Mot. for Summ. J. & Mem. in Supp. (Pls.' Br.) 13-35, Dkt. 41. None of these claims is well-taken. As detailed below, the FEIS more than met its obligations under NEPA to consider a reasonable range of alternatives and analyze the potential effects of those alternatives.

Plaintiffs' arguments to the contrary either misunderstand the record, omit important information, or misconstrue the agency's obligations under NEPA.

### A.  The FEIS Considered a Reasonable Range of Alternatives.

The FEIS explained that "[p]ast forest management practices within the project area have led to areas of degraded habitat, and a landscape less resilient to natural disturbances such as wildfire and flooding." AR17974. The unnatural densely stocked stands compete for resources with legacy trees and encroach on meadows, while roads established for past "forest management have impacted important riparian habitats." *Id.* In light of this degraded landscape, the FEIS explained that there was a purpose and need for a project to: (1) improve stand and landscape diversity, structure, and resiliency by increasing diversity and structure in mixed conifer and moist forests, restoring meadows and oak savannahs, and restoring and improving the complexity and diversity of riparian areas; (2) strategically reduce hazardous fuels to reduce fire risk and promote wildfire response; (3) sustainably manage recreation; (4) identify a sustainable road system; and (5) provide a sustainable supply of forest products. AR17976-82.

Plaintiffs rightfully do not challenge this statement of purpose and need. Instead, they claim the FEIS should have considered more alternatives. Pls.' Br. 13-17. But this claim flouts the substantial deference afforded the Forest Service's identification and consideration of alternatives, and it ignores the FEIS's reasoned explanations for not considering more alternatives in detail because those alternatives would not meet the purpose and need for the action.

A court affords "substantial deference" to an agency's range of alternatives determination, *Seven Cnty.*, 605 U.S. at 180, employing a "rule of reason" under which an "EIS need not consider an infinite range of alternatives, only reasonable or feasible ones," *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004). An agency also need not "undertake a separate analysis of alternatives which are not significantly distinguishable from alternatives actually

considered, or which have substantially similar consequences." *Id.* And an EIS need not consider "remote and speculative alternatives," nor must it consider alternatives that "extend beyond those reasonably related to the purpose of the project." *Id.* A plaintiff bears the "burden to show that" another alternative is feasible or viable. *N. Cascades Conserv. Council v. U.S. Forest Serv.*, 136 F.4th 816, 828 (9th Cir. 2025); *see also City of Los Angeles v. FAA*, 63 F.4th 835, 846-47 (9th Cir. 2023) (noting party "challenging an agency's failure to consider an alternative" must show "alternative is viable").

The FEIS considered the potential effects of three alternatives in detail: Alternative 1 (no-action alternative); Alternative 2 (preferred alternative); and Alternative 3. The no-action alternative considered "what effects would occur to forest ecosystems and resources in the project area if no action is taken." AR17998. This permitted comparison of those effects to the two action alternatives, which considered specific silviculture and other activities that the Forest Service determined would meet the purpose and need for action. *See* AR17971-73; AR17998-8009. Alternative 2 would treat about 6,500 acres. AR17998. Among other activities, it would create "late seral open forest by thinning, underburning, and leaving skips across 2,780 acres of older natural stands in mixed conifer forest," accelerate "the development of late seral patch connectivity by thinning and leaving skips across 984 acres of younger managed stands in mixed conifer and upland moist forest," and create "complex early seral habitat by regeneration harvesting and leaving skips across 453 acres of younger managed stands in mixed conifer and upland moist forest." *Id.* The preferred alternative would also decommission around 12 miles of roads to move "towards a sustainable road system in the project area." AR18001. In contrast to the preferred alternative, Alternative 3 "would yield an estimated 42 million board feet (MMBF) compared with 63 MMBF under Alternative 2." AR18006; AR17973. This 33 percent reduction in volume would

come from changes in treatments to focus "more on commercial thinning with large gaps instead of regeneration harvest in managed stands," as well as commercially harvesting fewer acres in NSO critical habitat, resulting in a reduction of commercial harvest in natural stands from 1,420 acres to 660 acres. *Id.*; AR17971; AR18011. Alternative 3 would also decommission 8 more miles of roads. AR18006.

In addition to considering these three alternatives in detail, the FEIS explained why other alternatives were considered but eliminated from detailed consideration. AR18010-11. First, an alternative eliminating temporary road construction would result in "certain environmental effects" being greater, reduce funds for environmental restoration activities, compromise another purpose of the project to store and decommission roads, and be economically unfeasible. AR18010. Second, an alternative eliminating commercial harvest in natural stands would "reduce the amount and effectiveness of creating late seral open forest in the mixed conifer habitat," foreclose restoration of "fire resiliency to portions of the landscape," eliminate funds that would be used to implement the non-commercial treatments, and result in "many of the elements identified in the purpose and need" statement not being met. AR18011. Third, an alternative treating more acres in dry mixed conifer forest was not feasible because it "would be inconsistent with the standards and guidelines of the Northwest Forest Plan." *Id.*

This approach to identifying and considering alternatives is precisely the type of line drawing that the Supreme Court made clear in its recent course correcting decision in *Seven County* is within the sound discretion of the Forest Service and to which courts must afford substantial deference. *Seven Cnty.*, 605 U.S. at 181-82. But even before that course correction, the Ninth Circuit made clear in *City of Los Angeles v. FAA*, 63 F.4th 835 (9th Cir. 2023), that the Forest Service's approach here satisfied NEPA. There, the agency identified ten potential alternatives and

then subjected those alternatives to a "two-step screening process" that asked whether the alternative could achieve the purpose and need of the proposed action and whether an alternative was "practical or feasible to implement from a technical or economic standpoint." *Id.* at 845. This process eliminated nine alternatives, leaving just the proposed action alternative and no-action alternative for consideration in the EIS. *Id.* at 845-46. In upholding this range of alternatives, the court explained that "there is no minimum number of alternatives that must be discussed in an EIS," and that an agency can "compare the proposed action to only a no action alternative where the circumstances justified that choice." *Id.* at 847. The FEIS went above and beyond here by considering a no-action alternative, two action alternatives, and reasonably explaining the basis for not considering additional alternatives.

Rather than engage with this binding precedent (indeed, Plaintiffs do not even mention it), Plaintiffs argue the FEIS should have considered another alternative in detail. *See* Pls.' Br. 15-18. In particular, Plaintiffs claim the FEIS should have considered a "conservation alternative" that "find[s] a better balance between pine/oak enhancement on the one hand, and old growth conservation, spotted owl recovery, watershed projection [sic], and carbon storage on the other." AR16324. But rather than reflecting a feasible alternative that would meet the FEIS's purpose and need, this reflects a redrafting of the purpose and need. Indeed, Plaintiffs made this clear in their comments when they claimed "[t]he purpose and need for this project should be adjusted," and then proposed an alternative that they thought aligned with their redrafted purpose and need. AR16321; *see* AR16320-25. But Plaintiffs no longer challenge the FEIS's statement of purpose and need, and the Forest Service reasonably exercised its discretion to consider alternatives that met the stated purpose and need rather than Plaintiffs' reconceived purpose and need. The Forest Service further explained that the elements comprising Plaintiffs' "conservation alternative" are

either included in elements of the action alternatives or are inconsistent with the purpose and need for action because they would not be effective at creating late seral open forest and restoring fire resiliency to the landscape and would foreclose implementation of other activities necessary to meet the purpose and need for action. *See* AR18411-21; AR21314-16; AR21319.

These "fact-dependent, context-specific, and policy-laden choices about the depth and breadth of [the FEIS's] inquiry" were reasonable and subject to substantial deference. *Seven Cnty.*, 605 U.S. at 183. This more than satisfied NEPA. *See also Audubon Soc'y of Portland v. Haaland*, 40 F.4th, 967, 991 (9th Cir. 2022) ("Ultimately, FWS concluded that continued grazing would 'help achieve its wildlife and habitat objectives,' while reduced grazing would 'have the opposite overall effect.' It is not our role to question that informed scientific judgment."); *see also Native Ecosys. Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1248 (9th Cir. 2005) ("Native Ecosystems has not persuaded us that the Forest Service ignored a reasonable alternative."); *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d, 1010, 1023 (9th Cir. 2012) (no duty for Forest Service to consider alternatives that would increase fire risk where purpose of project is to reduce fire risk). Indeed, as another court explained, "the Forest Service, in the exercise of its discretion, has properly determined that it is an appropriate purpose for the agency to improve habitat in forest stands in the Project area, including those that contain merchantable timber. NEPA does not require the Forest Service to scale back its project in favor of an arguably more environmentally-friendly alternative that plaintiffs would prefer." *N. Cascades Conserv. Council v. U.S. Forest Serv.*, No. 2:20-cv-1321-RAJ-BAT, 2021 WL 8344155, at *22 (W.D. Wash. May 28, 2021), *adopted by* No. 2:20-cv-1321-DGE, 2022 WL 1043930 (W.D. Wash. April 7, 2022), *aff'd by* No. 22-35430, 2023 WL 2642930 (9th Cir. Mar. 27, 2023).

**B. The FEIS reasonably assessed the Project's potential impacts.**

Plaintiffs also claim the FEIS failed to sufficiently consider potential effects to the NSO, fuel reduction and fire risk, and carbon storage and emissions. Pls.' Br. 18-36. But Plaintiffs fail to seriously engage with the substantial analyses in the FEIS and supporting documents as to each of these topics. Plaintiffs' second guessing of the scope of the Forest Service's analyses is squarely foreclosed by *Seven County*. As the Supreme Court emphasized, the determination of "what details need to be included in any given EIS" is primarily a factual issue that "requires the exercise of agency discretion—which should not be excessively second-guessed by a court." 605 U.S. at 180-81. As explained below, the FEIS more than satisfied NEPA's procedural requirements.

**1. Northern Spotted Owl**

The FEIS provided a thorough and detailed analysis of the Project's potential effects on the NSO. *See* AR18123-31 (FEIS). In doing so, the FEIS incorporated the 2019 BA's "full description of the northern spotted owl in the province and on the Forest," as well as "its life history, ecology, and use of forest stands." AR18123; *see* AR15278-90, AR15299-316, AR15630-83 (2019 BA).

As explained in the FEIS and 2019 BA, the NSO is a species that resides in mature and old-growth forests that was listed as a threatened species under the ESA in 1990. AR18123; AR15278; AR15631. The NSO's range extends from British Columbia south through Washington and Oregon and into northern California and is divided into twelve physiographic provinces "based on recognized landscape subdivisions exhibiting different physical and environmental features." AR15632. The five Oregon provinces are: Oregon Coast Range, Willamette Valley, Western Oregon Cascades, Eastern Oregon Cascades, and Oregon Klamath. *Id.*; *see also* AR15633 (map of NSO range by province).

NSOs range widely for prey but are anchored to a nest site. AR15634. Assessment of NSO

habitat typically occurs at the home range and core area spatial scales. *Id.* The home range is the area NSO individuals use for normal activities of food gathering, mating, and rearing young. *Id.* A core area is a smaller area within the home range that receives concentrated use, "typically surrounding the nest site and favored foraging areas." AR15634. The scientific literature suggests "that when spotted owl home ranges have less than 40 to 60 percent nesting/roosting/foraging (NRF), they were likely to have lower occupancy and fitness." AR15635. "A reduction in the amount of suitable habitat [i.e., NRF] reduces spotted owl abundance and nesting success." AR15636. In assessing whether timber harvest activities result in an incidental take of NSO under the ESA, FWS "has used a 40 percent incidental take avoidance guideline at the scale of a spotted owl home range to determine if death or injury of the spotted owl is likely to occur when suitable habitat is removed by a timber harvest action." AR15284. Stated differently, "if post treatment suitable habitat drops below around 40 percent, then impacts to breeding spotted owls at that scale is considered to have impacts to the spotted owl pair's ability to use the site to support their life history needs." AR15284-85. Similarly, FWS "has used a 50 percent rule at the scale of a spotted owl core area (500 acres – 0.5 mile radius circle around nest tree) to determine if timber harvest actions are likely to cause death or injury of the spotted owl." AR15285.

NSOs "generally rely on older forested habitats because such forests contain the structures and characteristics required for nesting, roosting, and foraging." AR15636. Nesting and roosting habitat typically has various features, including a moderate to high canopy closure (60 to 80 percent), a multi-layered and multi-species canopy with overstory trees greater than thirty inches in diameter, high incidence of large trees with decadent features (e.g., large cavities, broken tops, and mistletoe infections), large dead trees, accumulated fallen trees and other down woody debris, and space below the canopy for flight. *Id.* Foraging habitat varies from areas with complex

structure "to a broader range of forests with lower canopy closure and smaller trees than forests containing nests or roosts." AR15637. Such habitat "provides a food supply for survival and reproduction." *Id.* "Dispersal habitat is essential to maintaining stable populations by filling territorial vacancies when resident northern spotted owls die or leave their territories." *Id.* This habitat "at a minimum, consists of stands with adequate tree size and canopy closure to provide protection from avian predators and at least minimal foraging opportunities." *Id.*

The 2019 BA explained that "[t]rends for suitable habitat are largely declining rangewide, with rates of loss varying by province and land allocation." AR15662. At the time of the NWFP, about 9 million acres of nesting/roosting habitat existed on federal lands with almost 3.5 million acres on non-federal lands. AR15663. Two decades later, about 650,000 acres of nesting/roosting habitat had been lost, with most of that occurring due to high severity wildfires within the Klamath Physiographic Provinces. *Id.*

In 2013, FWS designated approximately 9.5 million acres of critical habitat "in 11 units and 60 subunits in California, Oregon, and Washington." AR15672. "The conservation role of northern spotted owl critical habitat is to adequately support the life-history needs of the species to the extent that well-distributed and inter-connected northern spotted owl nesting populations are likely to persist within properly functioning ecosystems at the critical habitat unit and rangewide scales." AR15673. FWS designated critical habitat in consideration of "the physical or biological features essential to the conservation of the species," which "are forested areas that are used or likely to be used for nesting, roosting, foraging, or dispersing." AR15673.

Designation of critical habitat is intended to work "in concert with other recovery actions. These include actions like those contemplated by the Project that (1) conserve old growth trees and forests on federal lands while undertaking "appropriate restoration treatment in the threatened

forest type," (2) "[i]mplement science-based, active vegetation management projects to restore forest health," and (3) encourage "landscape-level planning and vegetation management that allow historical ecological processes, such as characteristic fire regimes and natural forest succession, to occur on the landscape throughout the range of the spotted owl." AR15292.

The 2019 BA disclosed that of the nearly 1.7 million acres on the Forest, 817,931 acres were suitable NSO habitat and there were 624 known spotted owl nest sites. AR15299; AR15302-03. The FEIS noted that "45.8% of the [33,000-acre Project] area is suitable NSO habitat and 10.3% is dispersal habitat." AR18123. Two years of "protocol surveys (2017 and 2018)" and three "spot checks in 2019 and 2020" disclosed fourteen nest sites "wholly or partially within the project boundary that would have harvest or fuel treatments within their home range," one site wholly within the Project area with no treatments within its home range, three sites whose home ranges intersect the Project area that would not be treated, and two sites within the Project area that would only have floodplain treatments in their home ranges. *Id.* Six of the fourteen nest sites were considered "functional" because at least "50% of the core area is in suitable habitat and 40% of the home range is in suitable habitat." AR18123-24. Eight of the nest sites were unoccupied, one had a single resident owl, three had pairs (with one pair successfully reproducing), and the occupancy of one site was unknown. AR18124.

The FEIS detailed the potential effect of the alternatives on NSO nest sites and habitat in the Project area. AR18123-31. In doing so, the FEIS assessed whether the alternatives would be consistent with the limitations set forth in the programmatic consultation under the ESA that prohibited "incidental take of NSO through habitat removal" on the Forest. AR18124. "This means that no occupied sites' habitat may be reduced below the amount of suitable habitat functional thresholds or, if already below thresholds, may not be reduced any further by the removal of

suitable habitat, and occupied nest patches cannot be adversely affected. All occupied sites must be maintained." *Id.*

The FEIS then detailed the potential effects of the no-action alternative and the two action alternatives. The no-action alternative would not directly affect NSO because no habitat would be modified, but "no dense managed stands would be thinned to promote future suitable habitat conditions." *Id.* As to the two action alternatives, the FEIS detailed the acres of suitable, dispersal, and designated critical (containing suitable and dispersal) habitat that would be removed or modified but maintained. AR18124. The below table summarizes the effects by alternative:

Table 35: Effects to Habitat by Alternative

| Habitat Type in all of YRR and in Critical Habitat only | No Action Alternative 1 Habitat removed (acres) | Alternative 2 Habitat removed (acres) | Alternative 2 Habitat modified but maintained (acres) | Alternative 3 Habitat removed (acres) | Alternative 3 Habitat modified but maintained (acres) |
|---|---|---|---|---|---|
| Suitable | 0 | 2,799 | 0 | 1,914 | 885 |
| Dispersal | 0 | 467 | 997 | 229 | 1,235 |
| Suitable, Critical Habitat | 0 | 1,561 | 0 | 676 | 885 |
| Dispersal, Critical Habitat | 0 | 82 | 377 | 59 | 400 |

*Id.*

Beyond the total acreage affected by the alternatives in suitable, dispersal, and critical habitat, the FEIS provided a detailed summary of each potential NSO nest site, disclosing whether it was occupied, the amount of suitable and dispersal habitat in the core areas and home ranges, the activities from the two action alternatives within that habitat, and the effects of those proposed actions on the NSO. *See* AR18126-27 (Table 36 detailing effects of preferred alternative), AR18128-29 (Table 37 detailing effects of other action alternative).

This detailed analysis more than satisfied the Forest Service's procedural obligations under NEPA to "ensure[] that the agency and the public are aware of the environmental consequences of

proposed projects." *Seven Cnty.*, 605 U.S. at 177. Ignoring that a court must "afford substantial deference" to the Forest Service's analysis, Plaintiffs now seek to improperly use NEPA's "procedural cross-check" as a "substantive roadblock" to foreclose this important forest restoration project. *Id.* at 173, 180. In doing so, Plaintiffs first erroneously argue that the FEIS "contains no actual analysis of potential impacts to the species or individuals." Pls.' Br. 18. But as discussed above, the FEIS applied the same methods and metrics used to assess effects to the species under the ESA (i.e., effects to suitable habitat within home ranges and core areas).[1] In doing so, the FEIS details exactly how much NSO habitat would be affected by the alternatives and how such habitat modification would affect nest sites within the Project area. Plaintiffs are simply wrong to claim otherwise.

Plaintiffs are similarly wrong to claim the FEIS failed to address declining NSO populations, including the impact of barred owls and role of non-territorial NSOs. *See* Pls.' Br. 19-20. Again, as detailed above, the FEIS incorporates the 2019 BA's comprehensive overview of the status of the NSO throughout its range and on the Forest in particular. This includes detailed discussions of the impact of barred owls on the NSO and the role of non-territorial owls.[2]

---

[1] Tellingly, Plaintiffs bring no claims under the ESA challenging the use of these methods and metrics to assess effects to NSO. Instead, Plaintiffs misleadingly suggest that NEPA's procedural requirements require a more detailed effects analyses than the ESA. This has it backwards. *See Swan View Coalition v. Steele*, No. 22-35137, 2023 WL 3918686, at *2 (9th Cir. June 9, 2023) (explaining district court's conclusion that a biological opinion was deficient under the ESA "did not necessarily mean that the FEIS violated NEPA" because "NEPA involves different standards than the ESA."); *W. Watersheds Proj. v. Salazar*, 993 F. Supp. 2d 1126, 1135-36 (C.D. Cal. 2012) (noting EIS omission of information in a biological opinion did not violate NEPA because "NEPA requires only discussion of *significant* impacts.").

[2] The 2019 BA also explains that large-scale wildfire threatens the NSO and its habitat. AR15646. Since 2005, wildfire had resulted in "significant losses of nesting/roosting habitats," and silvicultural treatments were underway "in an attempt to reduce the levels of fuels that have accumulated during nearly 100 years of effective fire suppression." *Id.* The Project authorizes precisely these types of silvicultural treatments.

The 2019 BA explained that "[b]arred owls currently appear to be the primary threat to northern spotted owls," with the range of the barred owl now completely overlapping with the NSO's range. AR15643; *see also* AR15288-90. Barred owls outcompete northern spotted owls for food and habitat, and consensus exists "in the literature on the negative influence of barred owls . . . on northern spotted owl site occupancy, fecundity, reproduction, apparent survival, and detectability." AR15644. The 2019 BA summarized numerous studies detailing the interaction between barred owls and NSO, explaining that "[a]s barred owls have expanded, the occupancy of historical spotted owl territories appears to be declining." *Id.*; *see* AR15644-46; *see also* AR15307 (explaining how the presence of barred owls affects NSO occupancy patterns), AR15309 ("The presence of barred owls strongly positively correlated with local extinction rates of spotted owls," and "Barred owl presence had a strong negative effect on colonization rates for owl pairs"). The 2019 BA, however, explained that "there is no scientific support that the silvicultural treatments assessed in [the BA] will expand the range of barred owls," and that "available information does not provide support for the hypothesis that thinning young and mature forest or the creation of early seral habitat or forest edge selectively favors barred owls over spotted owls in the action area." AR15289. Plaintiffs ignore all this.

Similarly, the 2019 BA explains that "[s]ome spotted owls are not territorial but either remain as residents within the territory of a pair or move among territories (Gutiérrez 1996, p. 4). These birds are referred to as 'floaters.' Floaters have special significance in spotted owl populations because they may buffer the territorial population from decline (Franklin 1992, p. 822)." AR15634. Plaintiffs again simply ignore this, adopting a head-in-the-sand approach to the analysis in the 2019 BA. Such an approach does not establish a NEPA violation.

Plaintiffs then challenge the FEIS based on the erroneous premise that it determined

whether a nest site was occupied with information from 2017 to 2018. Pls.' Br. 21. But occupancy determinations were made based on data from 2017 *to 2020*, AR18123, and the Project explains exactly how later surveys will affect implementation, AR18039. Plaintiffs offer no evidence whatsoever to suggest that the data the Forest Service relied on within the Project area was somehow incorrect or stale.

Recognizing the weakness of this argument, Plaintiffs next claim the FEIS should have provided more information about the NSO from the 2023 BA. Pls.' Br. 21-24. Tellingly, however, Plaintiffs do not bring a claim under NEPA alleging the Forest Service should have supplemented the FEIS following release of the 2023 BA. In failing to do so, Plaintiffs effectively concede that the information contained in the 2023 BA did not present "significant new circumstances or information relevant to environmental concerns *and bearing on the proposed action or its impacts*." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 372 (1989) (emphasis added).

This is confirmed by the FEIS itself, which explained that although wildfires in 2020 "resulted in an estimated 5.5% loss of suitable owl habitat forest wide," the fires "had a minimal effect on the critical habitat unit within which" the Project area is located, and the Project area itself was not affected by those fires. AR18123; *see also* AR22224 (explaining "none of the recent wildfire have changed the impacts of this project and its proposed actions as they did not occur within the affected area that resource specialists used as the basis of their analysis."). This assessment of the "usefulness of any new potential information to the decisionmaking process" is within the sound discretion of the Forest Service and "should not be excessively second-guessed by a court." *Seven Cnty.*, 605 U.S. at 181. Plaintiffs' claim is meritless for this reason alone.

Further, although the FEIS (and incorporated 2019 BA) itself fully complies with NEPA, Plaintiffs are wrong that the Forest Service failed to consider information in the 2023 BA as part

of the NEPA process. *See* Pls.' Br. 24-27. Publication of the draft ROD and FEIS triggered an objection-resolution period during which those who had commented "during any designated opportunity for public participation," including during scoping and in response to the draft EIS, could object to the draft ROD and FEIS based on their previous comments "*or new information that arose after the opportunities for comment.*" AR18471 (emphasis added).

Plaintiff Oregon Wild availed itself of that opportunity, submitting over 60 pages of objections, including several pages related to the Forest Service's consultation under the ESA and the FEIS's consideration of barred owls and wildfire. *See* AR19363-70; *see generally* AR19359-419 (objections). The Forest Service responded to these objections, explaining the "re-initiation of formal consultation with USFWS and the preparation of a revised Biological Assessment was completed to determine the effects of recent fires on listed species and their critical habitat [under the ESA]. However, the YRR project area was not affected by these fires and therefore, the determinations made in the YRR [FEIS] analysis remain unchanged."[3] AR21311.

This process occurred before the Forest Service authorized the Project, meaning it continued to promote NEPA's goals of fostering public participation and informing agency decision-making. As the Supreme Court explained, the "ultimate question is not whether an EIS in and of itself is inadequate, but whether the agency's final decision was reasonable and reasonably explained." *Seven Cnty.*, 605 U.S. at 184-85. The Forest Service's approval of the Project considered the information contained in the 2023 BA and was clearly reasonable and

---

[3] Plaintiffs mistakenly claim the Forest Service "issued contradictory statements" in the objection response by indicating the "2023 BA 'is now being used for this project.'" Pls.' Br. 25 (quoting AR121310-11). What Plaintiffs fail to acknowledge, however, is that the objection response indicated the 2023 BA was "now being used for this project" to programmatically consult with FWS *under the ESA*. *See* AR21310. The Forest Service has consistently explained that the consultation did not affect the FEIS's analysis of Project effects because the Project area was not affected by the fires.

reasonably explained. This is all that NEPA requires.

Finally, Plaintiffs recycle many of their misguided arguments about barred owls, suitable habitat, and decline of the NSO to argue the Forest Service somehow violated NEPA by not "address[ing] adverse expert opinion" or properly responding to comments. Pls.' Br. 27-29. But, as noted above, the Forest Service reasonably considered each of these issues in assessing the potential effects of the Project. And the FEIS provides a detailed response to Plaintiffs' comments on the draft EIS. *See* AR18398-400; AR18411-29; *see also* AR21320. This robust process fully complied with NEPA.

### 2. Fuel Reduction and Fire Risks

The FEIS extensively assessed the potential effect of the alternatives on fuel reduction and fire risks. The action alternatives considered in the FEIS would promote forest diversity and structure through a combination of "commercial thinning, regeneration harvesting, and gap creation" followed by fuels treatments that include "underburning, pile burning, and mastication." AR17998. Non-commercial treatments would include, among other things, "recurring maintenance underburning." *Id.* The action alternatives would also reduce hazardous fuels "to improve fire resiliency, reduce fire risk around key areas, and create opportunities to manage wildfire safely and effectively" through "underburning, understory thinning, pruning, chipping, piling, and burning." AR18000. Appendix A of the FEIS explained these various vegetation treatments. AR18287-300.

The FEIS detailed precisely how the action alternatives would improve the resiliency of the forest by shifting its composition "toward fire- and drought-tolerant species," moving "stands toward late-successional conditions in the long-term," and generally increasing the "diversity and structure of both mixed conifer and moist forests in the project area." AR18056; *see generally* AR18063-72. The FEIS further explained that commercial and non-commercial treatments would

reduce fire severity in the area and promote firefighters' ability to respond to wildfire. AR18072-82.

In analyzing the effects of the alternatives on fuels and wildfire, the FEIS discussed the wildfire history in the area, explained that past fire suppression has caused the area to depart from the natural fire regime, provided detailed baseline information on fuel loading, weather, and fuel moisture, and quantified the effects of the alternatives through complex modeling that relied on this baseline information. AR18073-79. All this showed that the proposed activities would "reduce canopy density and increase spacing between crowns, creating forested stands less susceptible to a sustained crown fire," reduce surface fuels that would decrease the risk of fire climbing into the crowns of trees, and create "barriers to wildfire spread across the landscape," which would improve "firefighter effectiveness and provid[e] opportunities to protect resources at risk." AR18079-80. Indeed, the FEIS showed that surface fuel loading and crown-fire potential were substantially lower under either action alternative. AR18082 (Table 17: Predicted fire behavior by activity type).

Plaintiffs do not dispute that the area departs from the natural fire regime, they do not challenge the detailed baseline information in the FEIS, and they do not quibble with the results of the modeling showing the action alternatives would substantially reduce the risk of crown fire. Instead, Plaintiffs claim the FEIS's detailed analysis is somehow invalid because they commented during the administrative process that there was a "low likelihood that wildfire would ever interact with an area 'treated' for fuel reduction within the effective window of time." Pls.' Br. 29. This is misguided for several reasons.

First, by claiming there is no need for action because wildfire will not timely occur in the action area, Plaintiffs seek to undermine the entire purpose and need for action. *See* AR18426 (noting "a variety of fuels treatments were developed and proposed for the project area to meet the

purpose and need"). But Plaintiffs have not brought such a challenge (and any such challenge would fail as the Forest Service extensively explained the purpose and need of a project). Second, whether fire ultimately interacts with the treated areas says nothing about the forest resiliency-enhancing effects of the action alternatives and their ability to begin to return the area to a natural fire regime. *See id.* Third, "maintenance underburning" occurring every ten to fifteen years after the desired conditions are reached would ensure the area remains within the natural fire regime for years into the future. AR18080. Finally, Plaintiffs ignore reality. Wildfires regularly burn on the Forest, and it is only a matter of time before wildfire returns to the Project area. AR17829. And when it does, the Project will reduce the likelihood of a catastrophic, high-severity wildfire that destroys NSO habitat and threatens lives. Plaintiffs' demand for certainty as to the timing of that eventuality in no way undermines the FEIS's thorough and detailed analysis. Indeed, requiring certainty would prevent the Forest Service from ever acting to improve forest resiliency and reduce wildfire severity. That cannot be the case.

Plaintiffs further point to Oregon Wild's comment on the draft EIS that "[d]epending on how thinning is done thinning can have adverse impacts such as . . . creating a hotter-drier-windier microclimate that is favorable to greater flame lengths and rate of fire spread, etc." AR16360.[4] This generic and unsupported statement in no way questions the detailed analysis contained in the FEIS. Nevertheless, the Forest Service responded to Oregon Wild's comments, explaining that "thinning can have beneficial and adverse impacts on the landscape and this is addressed in the EIS. The impacts from thinning are described throughout the entire DEIS, but have also been distilled into the summary provided at the start of each section in Chapter 3." AR18428; *see*

---

[4] Plaintiffs also cite to comments at AR16367 (citing Lesmeister et al. 2019) without explanation. Pls.' Br. 29. The comments' summary of Lesmeister et al. 2019 in no way indicates the Project will somehow increase flame lengths or rate of fire spread.

*generally* AR18411-29. And the FEIS candidly acknowledged that "[i]mmediately following harvest there would be an increased fire risk in stands until fuel reduction activities can take place due to the creation of post-harvest activity generated fuels." AR18080. The FEIS's analysis fully complies with NEPA. *See Envt'l Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1011, 1016-17 (9th Cir. 2006) (finding Forest Service's acknowledgment that "short-term fuel loading increases will occur but long-term loading will be reduced" to be "an adequate disclosure of the risk and a reasoned evaluation of it.").

Plaintiffs' reliance on *Bark v. U.S. Forest Service*, 958 F.3d 865 (9th Cir. 2020) is misplaced. Unlike here where the Forest Service already prepared an EIS, *Bark* addressed only whether the agency should have prepared an EIS. *Id.* at 870-73. Further, *Bark* found the agency had not properly addressed what the court described as "[s]ubstantial expert opinion" and "considerable contrary scientific and expert opinion" presented during the administrative process allegedly disputing the Forest Service's finding that the thinning at issue in that case was "helpful for fire suppression and safety." *Id.* at 870. Plaintiffs point to no scientific or expert opinion, much less substantial or considerable opinion, questioning the FEIS's analysis of the potential effects of the alternatives on fuels or fire behavior. Indeed, the Ninth Circuit has since clarified that *Bark* is to be read narrowly. *See Earth Island Inst. v. Muldoon*, 82 F.4th 624, 637-40 (9th Cir. 2023); *see also Friends of Big Bear Valley v. U.S. Forest Serv.*, 776 F. Supp. 3d 824, 832-33 (C.D. Cal. 2025) (distinguishing *Bark*). And just as in *Muldoon*, the Project here provides for "low intensity underburning that would return fire's natural disturbance to parts [of] the ecosystem, increase forest health, and reduce the severity of future wildfires." AR18073; *see Muldoon*, 82 F4th at 639-40 (noting post-thinning prescribed burning distinguishes *Bark*); *Friends of Big Bear Valley*, 776 F. Supp. 3d at 832 (finding that the project "involves thinning followed by prescribed burns" was

"a significant distinction" from *Bark*). *Bark* is inapposite. The FEIS fully explained the basis for its finding that the action alternatives would reduce wildfire severity, and Plaintiffs' unsupported claims to the contrary do not establish a NEPA violation.

### 3. Carbon Storage and Emissions

The action alternatives considered in the FEIS would improve the resiliency of the forest in the project area by "increasing diversity and structure of both mixed conifer and moist forests," AR18056, "decrease crown fire potential," AR18073, "reduce the long-term risk of large severe wildfires," AR18074, and "favor the retention and growth of more fire adapted species such as ponderosa pine, Douglas fir, oak, and madrone," *id.* The alternatives would do this through a variety of treatments, including up to 1,419 acres of commercial thinning in natural stands. AR17971. The FEIS examined the potential effects on climate change of these restorative activities on a small project in a small project area within a larger national forest. AR18251-53. Understandably, the FEIS explained that potential effects "would be minor" because the proposed activities would affect only about 20 percent of the 33,000-acre project area and there would be no effects to below-ground carbon stocks, which store 50 percent or more of ecosystem carbon. AR18251. The proposed activities would have "negligible" direct or indirect effects on greenhouse gas emissions and climate change. AR18252. The FEIS supported this conclusion with a detailed qualitative analysis of the potential effects of the proposed activities, AR18251-53, and it supported that analysis with an extensive bibliography of relevant references, AR18345-47.

The FEIS explained the largest source of global greenhouse gas emissions from the forestry sector is deforestation, which is "the removal of all trees to convert forested land to other land uses that do not support trees or allow trees to regrow for an indefinite period of time." AR18252. Far from converting forest land to other uses, the FEIS explained the proposed activities would not "result in the loss of forested areas," but would instead retain forest stands while using thinning,

harvesting, and prescribed burning "to mimic natural fire effects to maintain a vigorous condition that supports enhanced tree growth and productivity, thus contributing to long-term carbon uptake and storage." AR18252. And while these activities may result in a "relatively small quantity of carbon released to the atmosphere" in the short term, "any initial carbon emissions . . . would be balanced and possibly eliminated as the stand recovers and regenerates because the remaining trees and newly established trees typically have higher rates of growth and carbon storage (Hurteau and north 2009, Dwyer et al. 2010, McKinley et al. 2011)." AR18253. Further, some of the activities will result in carbon continuing to be stored in wood products or would be used in place of other products that would emit more greenhouse gas emissions. *Id.*

The FEIS directly responded to Plaintiffs' comments regarding potential carbon impacts. In doing so, the FEIS reiterated that "[r]estoration activities like thinning and prescribed fire incur a short-term carbon trade-off," but that in the long-term temporarily reducing stand density "through thinning or disturbance" will result in "enhanced growth rates with lower density [and] lead to carbon stores returning to their maximum levels within a few decades. Stand recovery growth can meet or exceed the growth rates in an unharvested stand (Raymond et al. 2015)." AR18412. The FEIS continued by acknowledging that although evidence exists showing carbon benefits from treating forest stands, "how these trade-offs work in the real world [is] not settled science. There is no consensus in the literature on whether thinning to reduce disturbance severity is a net climate benefit or not (McKinley et al. 2011)." AR18412. But the approach proposed by the action alternatives "is in line with national and international guidance as stated in the EIS," "emphasize[s] ecosystem functions and resilience, and recognize[s] carbon sequestration as one of many ecosystem services." AR18413; *see also* AR18417-18.

Plaintiffs challenge the FEIS's analysis and response to their comments, claiming the

31

potential effects to climate change from this relatively small forest restoration project should have somehow been quantified or analyzed in more depth. Pls.' Br. 33-34. But "NEPA does not require the agency to weigh environmental consequences in any particular way," and instead permits an agency to "weigh environmental consequences as [it] reasonably sees fit under its governing statute and any relevant substantive environmental laws." *Seven Cty.*, 605 U.S. at 173. The FEIS reasonably analyzed the issue in proportion to its significance, and this reasonable "fact-dependent, context-specific, and policy-laden choice[] about the depth and breadth of its inquiry—and also about the length, content, and level of detail of the resulting EIS" must be given "substantial deference." *Id.* at 183. Indeed, the Ninth Circuit previously upheld an environmental assessment for a project under NEPA that authorized timber harvest "to reduce likely fire intensity" that included *no* discussion of climate change. *Hapner v. Tidwell*, 621 F.3d 1239, 1242, 1245 (9th Cir. 2010). In doing so, the court correctly noted that potential "[i]mpacts shall be discussed in proportion to their significance." *Id.* at 1245 (quoting 40 C.F.R. § 1502.2(b)); *see also Swomley v. Schroyer*, 484 F. Supp. 3d 970, 975-77 (D. Colo. 2020) (upholding EA's discussion of climate impacts of forest resilience project); *Earth Island Inst. v. Gibson*, 834 F. Supp. 2d 979, 990 (E.D. Cal. 2011) (deference to agency's assessment of climate impacts of fuel reduction project); *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1140 (9th Cir. 2011) (upholding analysis of greenhouse gas emissions).

The cases Plaintiffs cite to support their position all predate *Seven County* and are of questionable precedential effect. *See Miller v. Gammie*, 335 F.3d 889, 899-900 (9th Cir. 2003) (noting "circuit precedent, authoritative at the time it issued, can be effectively overruled by subsequent Supreme Court decisions that are closely on point, even though those decisions do not expressly overrule the prior circuit precedent."). But, even if they were still binding or persuasive,

they are easily distinguishable. Most of them address production of oil, gas, or coal, which involve far different greenhouse gas emissions considerations than a forest restoration project. *See* Pls.' Br. 35 (citing *WildEarth Guardians v. BLM*, 870 F.3d 1222, 1236-37 (10th Cir. 2017) (coal), *Dine CARE v. Haaland*, 59 F.4th 1016, 1041-44 (10th Cir. 2023) (oil and gas), *350 Mont. v. Haaland*, 50 F.4th 1254, 1259 (9th Cir. 2022) (coal)). And Plaintiffs' reliance on *Center for Biological Diversity v. U.S. Forest Serv. (Black Ram)*, 687 F. Supp. 3d 1053, 1073 (D. Mont. 2023), is misplaced. Pls.' Br. 31, 35. That case involved a "cookie -cutter" analysis in which an analysis for a project on one forest was copied and pasted into an analysis for a different project on another forest. *Black Ram*, 687 F. Supp. 3d at 1074 n.7. Similar facts are not present here. But even if *Black Ram* were factually similar, it is unpersuasive.

First, *Black Ram* fails to defer to Forest Service expertise in assessing the potential climate impacts of a forest resiliency project. But this is precisely the type of assessment where a court's deference is "at its apogee," and a court may not order an "agency to explain every possible scientific uncertainty." *See Cascadia Wildlands*, 153 F.4th at 906; *see also Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008) (en banc). This failure is reflected in the court's facile framing of the issue: "logging causes immediate carbon losses, while re-sequestration happens slowly over time, time that the planet may not have." *Black Ram*, 687 F. Supp. 3d at 1076. This ignores that harvested timber continues to store carbon when converted to wood products. And removal of fuels is specifically designed to prevent or reduce the severity of insect infestations, disease outbreaks, and wildfire, all of which contribute to carbon emissions and limit sequestration. The Forest Service properly relied on its expertise to consider all potential carbon impacts of the Project and reasonably determined they would be negligible. *Black Ram* erred by myopically focusing solely on re-sequestration through new vegetation growth.

Second, *Black Ram* improperly disregarded *Hapner* and *Swomley* while relying on *350 Montana*. 687 F. Supp. 3d at 1075-76. Notably, *Black Ram* is the only case in which a court has found a discussion of potential climate impacts for a forest resiliency project to be inadequate under NEPA. In doing so, *Black Ram* found neither *Hapner* nor *Swomley* applicable because those cases involved 810 acres and 1,631 acres of timber harvest respectively, while the project in *Black Ram* involved 3,902 acres. *Id.* at 1076. But the court did not explain why the potential carbon impact of a project involving 3,902 acres is meaningfully different from a project involving 810 acres or 1,631 acres. Further, *Black Ram* ignored that the EA in *Hapner* provided no assessment of climate impacts. 621 F.3d at 1245. In doing so, the court failed to explain why a project involving 810 acres of timber harvest requires no analysis of potential climate impacts while a project involving 3,902 acres requires more than the qualitative analysis provided in that case. The Forest Service is best suited to make such determinations.

*Black Ram* and Plaintiffs' reliance on *350 Montana* to suggest otherwise is misplaced. 687 F. Supp. 3d at 1075; Pls.' Br. 35-36. Unlike the project intended to improve forested ecosystem functions at issue in *Hapner* (and *Swomley*, *Earth Island Institute*, and here), *350 Montana* addressed an EA for a coal mine expansion that would "generate more [greenhouse gases] annually than the largest single point source of [greenhouse gas] emissions in the United States," totaling nearly 0.5 percent of annual *global* greenhouse gas emissions. 50 F.4th at 1265-66. The court faulted the agency for not citing "any scientific evidence supporting the characterization of the project's emissions as 'minor' compared to global emissions," nor identifying "any science-based criteria the agency used in its determination." *Id.* at 1266. But that case presented a qualitatively different scenario than the limited potential effects of forest resiliency projects that will have, at most, minor potential carbon-storage impacts from the removal of vegetation followed by

improved carbon sequestration from healthier forests.

### C.  Remedy

Finally, Plaintiffs argue that vacatur of the ROD approving the Project is the presumptive remedy for any NEPA violation and that the Forest Service "bears the burden to demonstrate that vacatur should not result." Pls.' Br. 36. This is wrong. Although the Court need not reach this issue because the FEIS fully complies with NEPA, the Supreme Court recently clarified that "courts not only must defer to the agency's reasonable choices regarding the scope and contents of the EIS, but also must keep in mind that review of an agency's EIS is not the same thing as review of the agency's final decision concerning the project." *Seven Cnty.*, 605 U.S. at 184. Thus, "[e]ven if an EIS falls short in some respects, that deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the EIS." *Id.* at 185. Plaintiffs have not even attempted to show that there is reason to believe the Forest Service might disapprove the Project if it added more to the FEIS. Therefore, even if the FEIS fell short in some respect (which it did not), vacatur of the Project would be improper.

### V.    CONCLUSION

For the reasons stated above, the Court should deny Plaintiffs' motion for summary judgment, grant Federal Defendants' cross-motion and enter judgment in favor of Federal Defendants.


Respectfully submitted this 12th day of December, 2025.

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment & Natural Resources Division

*/s/ Shaun M. Pettigrew*
SHAUN M. PETTIGREW (CA Bar No. 254564)
Senior Trial Attorney
c/o NOAA Damage Assessment
7600 Sand Point Way, NE
Seattle, WA 98115
(202) 532-5973
shaun.pettigrew@usdoj.gov

LAWRENCE K. PITTMAN (GA Bar No. 568134)
Trial Attorney
Natural Resources Section
150 M St. NE
Washington, D.C. 20002
 (202) 305-0420
lawrence.pittman@usdoj.gov

*Attorneys for Federal Defendants*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief is 10,516 words in compliance with the applicable word-count limitation under

LR 7-2(b).

<u>/s/ *Shaun M. Pettigrew*</u>
Shaun M. Pettigrew
*Attorney for Federal Defendants*