Sara Ghafouri, OSB #111021
American Forest Resource Council
700 N.E. Multnomah, Suite 320
Portland, Oregon 97232
Telephone: (503) 222-9505
Fax: (503) 222-3255
Email: sghafouri@amforest.org

Greg Hibbard, OSB #183602
American Forest Resource Council
924 S. Capitol Way South, Suite 102
Olympia, WA 98501
Telephone: (360) 352-3910
Fax: (360) 352-3917
Email: ghibbard@amforest.org

*Attorneys for Defendant-Intervenor*

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## EUGENE DIVISION

| | |
|---|---|
| **OREGON WILD**, an Oregon nonprofit corporation; and **WILDEARTH GUARDIANS**, a New Mexico nonprofit corporation,<br><br>        Plaintiffs,<br><br>        vs.<br><br>**DAVID WARNACK,** in his official capacity as Supervisor of the Willamette National Forest; and **UNITED STATES FOREST SERVICE,** a federal agency,<br><br>        Defendants,<br><br>        and<br><br>**AMERICAN FOREST RESOURCE COUNCIL,** an Oregon non-profit corporation,<br><br>        Defendant-Intervenor. | Civil No. 6:24-cv-00949-AP<br><br>**DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION [ECF No. 41]** |

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7-1(a)(1)**

Counsel for Defendant-Intervenor American Forest Resource Council certifies that the parties made a good faith effort through conferences to resolve the disputes addressed in this Cross-Motion for Summary Judgment and have been unable to do so. Accordingly, a ruling from the Court is required.

**CROSS-MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56-1, Defendant-Intervenor submits its Cross-Motion for Summary Judgment and respectfully asks this Court to deny Plaintiffs' Motion for Summary Judgment (ECF No. 41).

This action concerns the Forest Service's Youngs Rock Rigdon Project (YRR Project or Project) on the Willamette National Forest. Plaintiffs Oregon Wild and WildEarth Guardians (Plaintiffs) challenge the YRR Project's Final Environmental Impact Statement (FEIS) and Record of Decision (ROD) under the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 et seq. This Court should uphold the YRR Project because the Forest Service considered a reasonable range of alternatives and took the requisite "hard look" at the Project's effects on the northern spotted owl (NSO), wildfire risk, and climate change.

In support of this Cross-Motion for Summary Judgment, Defendant-Intervenor relies on the following Memorandum of Points and Authorities, the administrative record and supplemental administrative records lodged by Federal Defendants (ECF Nos. 25, 35, 37), the pleadings and papers on file in this case (including the Declaration of Andy Geissler (ECF No. 20, Geissler Decl.)), and such oral argument the Court may entertain.

WHEREFORE, Defendant-Intervenor requests that the Court grant Defendant-Intervenor's Cross-Motion for Summary Judgment, grant Federal Defendants' Cross-Motion for Summary Judgment (ECF No. 50), deny Plaintiffs' Motion for Summary Judgment, and enter summary judgment in favor of all Defendants.

# <u>TABLE OF CONTENTS</u>

CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7-1(A)(1) ......................................... i

CROSS-MOTION FOR SUMMARY JUDGMENT ....................................................................... i

I.    INTRODUCTION ....................................................................................................... 1

II.   FACTUAL BACKGROUND ....................................................................................... 2

    A.  The Northwest Forest Plan ................................................................................ 2

    B.  The Youngs Rock Rigdon Project ..................................................................... 3

    C.  The Northern Spotted Owl ................................................................................. 6

III.  LEGAL BACKGROUND ............................................................................................ 8

IV.   STANDARD OF REVIEW ....................................................................................... 10

V.    ARGUMENT............................................................................................................. 10

    A.  The Forest Service Analyzed a Reasonable Range of Alternatives.................................11

        1.  The Forest Service analyzed a reasonable range of alternatives because Alternatives 2 and 3 are meaningfully distinct ............................................11

        2.  The Forest Service explained why Plaintiffs' Proposed Alternative was not considered in detail ................................................................................ 14

    B.  The Forest Service Took the Requisite Hard Look ......................................... 19

        1.  The Forest Service took a hard look at NSO Impacts.................................. 20

            a.  The FEIS took the requisite hard look under NEPA ............................. 20

            b.  The subsequent 2023 consultation documents do not undermine the FEIS's analysis.......................................................................................... 24

        2.  The Forest Service took a hard look at fuels reduction and fire risks....................... 27

        3.  The Forest Service took a hard look at carbon storage and emissions ..................... 31

VI.   REMEDY ................................................................................................................. 36

VII.  CONCLUSION ................................................................................................................. 37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*350 Montana v. Haaland*,
　50 F.4th 1254 (9th Cir. 2022) ........................................................................35, 36

*Audubon Soc'y of Portland v. Haaland*,
　40 F.4th 967 (9th Cir. 2022) .......................................................................... *passim*

*Bark v. U.S. Forest Serv.*,
　958 F.3d 865 (9th Cir. 2020) ..........................................................................29, 30

*Cascadia Wildlands v. Thrailkill*,
　49 F.Supp.3d 774 (D. Or. 2014), *aff'd*, 806 F.3d 1234 (9th Cir. 2015)....................24

*Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*,
　153 F.4th 869 (9th Cir. 2025) ...............................................................................9

*Ctr. for Biological Diversity v. U.S. Forest Serv.*,
　687 F.Supp.3d 1053 (D. Mont. 2023), *aff'd in part and rev'd in part*, 2025
　WL 586358 (9th Cir. 2025) .............................................................................33, 34

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
　538 F.3d 1172 (9th Cir. 2008) ...............................................................................8

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
　141 F.4th 976 (9th Cir. 2025) ...............................................................................11

*Ctr. for Biological Diversity v. U.S. Forest Serv.*,
　No. 23-CV-110-M-DWM, 2025 WL 3549515 (D. Mont. Dec. 11, 2025) ..............................34

*Dine Citizens Against Ruining Our Env't v. Haaland*,
　59 F.4th 1016 (10th Cir. 2023) ...............................................................................35

*Earth Island Inst. v. Muldoon*,
　82 F.4th 624 (9th Cir. 2023) ...............................................................................30

*Env't Prot. Info. Ctr. v. U.S. Forest Serv.*,
　451 F.3d 1005 (9th Cir. 2006) ...............................................................................25

*Friends of Big Bear Valley v. U.S. Forest Serv.*,
　776 F.Supp.3d 824 (C.D. Cal. 2025) ...............................................................................30

*Friends of Yosemite Valley v. Kempthorne*,
　520 F.3d 1024 (9th Cir. 2008) ...............................................................................12

*Hapner v. Tidwell*,
　621 F.3d 1239 (9th Cir. 2010) ...................................................................32, 33, 36

*Hawaii Longline Ass'n. v. Nat'l Marine Fisheries Serv.*,
　281 F.Supp.2d 1 (D.D.C. 2003) ................................................................................26

*Headwaters, Inc. v. Bureau of Land Mgmt., Medford Dist.*,
　914 F.2d 1174 (9th Cir. 1990) ..................................................................................17

*Lands Council v. McNair*,
　537 F.3d 981 (9th Cir. 2008) (en banc) .....................................................................10

*Marsh v. Or. Nat. Res. Council*,
　490 U.S. 360 (1989).................................................................................................26

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
　177 F.3d 800 (9th Cir. 1999) ...................................................................................12

*N. Alaska Env't Ctr. v. Kempthorne*,
　457 F.3d 969 (9th Cir. 2006) ...................................................................................15

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,
　668 F.3d 1067 (9th Cir. 2011) ...................................................................................8

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*,
　137 F.3d 1372 (9th Cir. 1998) ..................................................................................33

*Robertson v. Methow Valley Citizens Council*,
　490 U.S. 332 (1989)...................................................................................................8

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
　747 F.3d 581 (9th Cir. 2014) ...................................................................................25

*Seattle Audubon Soc'y v. Moseley*,
　80 F.3d 1401 (9th Cir.1996) .....................................................................................11

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colo.*,
　605 U.S. 168 (2025) ...................................................................................... *passim*

*Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*,
　608 F.3d 592 (9th Cir. 2010) ...................................................................................15

*W. Watersheds Project v. Salazar*,
　993 F.Supp.2d 1126 (C.D. Cal. 2012) ......................................................................26

*WildEarth Guardians v. Bucknall*,
　756 F.Supp.3d 1017 (D. Mont. 2024)........................................................................26

*WildEarth Guardians v. U.S. Bureau of Land Mgmt.*,
   870 F.3d 1222 (10th Cir, 2017). ...................................................................35, 36

*WildEarth Guardians v. U.S. Dep't of Agric. Animal & Plant Health Inspection*
   *Serv. Wildlife Servs.*,
   135 F.4th 717 (9th Cir. 2025) ................................................................30

**Statutes**

5 U.S.C. § 706(2)(A)...................................................................................10

42 U.S.C. § 4332(2)(F) ..............................................................................11

42 U.S.C. § 4332(C) ...................................................................................8

**Other Authorities**

40 C.F.R. 1502.9(c)(1)(ii) ..........................................................................25

40 C.F.R. §1502.2(b) ..................................................................................32

40 C.F.R. § 1502.14(a)................................................................................11

40 C.F.R. § 1503.4(a)(5) .............................................................................32

85 Fed. Reg. 43304 (July 16, 2020)............................................................8

87 Fed. Reg. 23453 (Apr. 20, 2022) ...........................................................8

89 Fed. Reg. 35442 (May 1, 2024)..............................................................8

90 Fed. Reg. 10610 (Feb. 25, 2025) ...........................................................8

**ACRONYM LIST**

| BA | Biological Assessment |
|---|---|
| BiOp | Biological Opinion |
| BLM | Bureau of Land Management |
| CEQ | Council on Environmental Quality |
| DEIS | Draft Environmental Impact Statement |
| ESA | Endangered Species Act |
| EIS | Environmental Impact Statement |
| FEIS | Final Environmental Impact Statement |
| FWS | Fish and Wildlife Service |
| IPPC | Intergovernmental Panel on Climate Change |
| LSR | Late-Successional Reserves |
| MMBF | Million Board Feet |
| NEPA | National Environmental Policy Act |
| NRF | Nesting/Roosting and Foraging |
| NSO | Northern Spotted Owl |
| NWFP | Northwest Forest Plan |
| ROD | Record of Decision |
| SWFC | Southern Willamette Forest Collaborative |

## I.    INTRODUCTION

Before this Court is Plaintiffs' challenge to the YRR Project on the Willamette National Forest, an important forest health project aimed at improving stand and landscape diversity, promoting forest resiliency, reducing hazardous fuels to reduce wildfire risk, and contributing to a sustainable supply of timber.  Previously, this area was impacted by frequent fires that influenced the landscape and created more open forest habitat on south facing slopes, large meadows, and moist conifer types in northern areas.  However, these areas have now shown signs of decline based on past management activities focused on fire suppression efforts.  To address those concerns, the Project will treat about 6,500 acres in a manner that strikes an important balance between improving stand conditions back to historic conditions *and* maintaining habitat for the benefit of the NSO.  With the recent increase in devastating wildfires, the need to improve forest resiliency and ensure NSO habitat is not further lost from natural disturbances is more prevalent.

Plaintiffs' challenge to the YRR Project is based solely on procedural violations under NEPA.  Although Plaintiffs disagree with the Project's purposes and needs and would rather the Forest Service design the Project differently, they do not raise that challenge under NEPA.  Instead, Plaintiffs assert that the Forest Service failed to analyze a reasonable range of alternatives and failed to take the requisite hard look at impacts on the NSO, fuels and wildfire risk, and climate change.  However, Plaintiffs fail to acknowledge the Supreme Court's recent "course correction" in NEPA cases outlined in *Seven County Infrastructure Coalition v. Eagle County*, *Colorado*, 605 U.S. 168, 184 (2025) (*Seven County*).  The Supreme Court reaffirmed that "NEPA is a procedural cross-check, not a substantive roadblock.  The goal of the law is to inform agency decisionmaking, not to paralyze it."  *Id.* at 173.  Moreover, an agency is entitled

to "substantial deference" for its "fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its" significant effects and feasible alternatives analyses so long as they fall within "a broad zone of reasonableness." *Id.* at 183–84. Against that important backdrop, Plaintiffs' claims lack merit because the Forest Service's alternatives analysis and effects analysis clearly fall within the broad zone of reasonableness and should be afforded substantial deference. Accordingly, this Court should uphold the much-needed YRR Project.

## II.    FACTUAL BACKGROUND

### A.    The Northwest Forest Plan.

In response to the listing of the NSO, AR15278, the 1994 Northwest Forest Plan (NWFP) provided land use allocations and standards and guidelines for the management of habitat for late-successional and old-growth related species within the NSO's range. AR02905. The NWFP provides several land use allocations, including Matrix, Riparian Reserves, and Late-Successional Reserves (LSR).

LSR areas represent 30 percent of the federal lands within the NSO's range and "are designed to serve as habitat for late-successional and old-growth related species including the [NSO]." AR02907. Riparian Reserves represent 11 percent of the federal lands within the NSO's range and are designed "to protect the health of the aquatic system and its dependent species." AR02908. Riparian Reserves also "provide for greater connectivity of late-successional forest habitat." *Id*.

In contrast to reserves, Matrix lands represent 16 percent of the federal land within the NSO's range and are "the area[s] in which most timber harvest and other silvicultural activities will be conducted." *Id.* "Production of timber and other commodities is an important objective" for Matrix lands. AR02995. Unlike in the LSR, Matrix lands were designated to emphasize "the

economic and social benefits of timber harvest," not quality habitat for the NSO.  AR02951.

That said, Matrix lands "provide for important ecological functions such as dispersal … and

maintenance of ecologically valuable structural components such as down logs, snags, and large

trees," and increase "ecological diversity by providing early-successional habitat."  AR02996.

## B.    The Youngs Rock Rigdon Project.

The YYR Project is located on the Willamette National Forest, south and east of

Oakridge, Oregon, along Forest Road 2100 (Rigdon Road).  AR17970.  Past management

activities and fire suppression efforts have led to areas of degraded habitat and areas that are

susceptible to wildfire and flooding events.  AR17974–76.  Fire exclusion has altered the stand

composition and fuel conditions, leaving the landscape with densely stocked stands that are

dominated by older forests with high canopy cover.  AR17973–74.  For that reason, the 2019

Rigdon Landscape Analysis was developed to identify areas for restoration opportunities and

served as the basis for developing project specific actions.  AR17973.

The Project area is approximately 33,000 acres, but treatment would occur on about

6,500 acres.  AR17974–75.  There are approximately 6,000 acres of private timberland owned by

AFRC member Sierra Pacific Industries within the Project area.  AR17975; Geissler Decl. ¶ 15.

The Forest Service identified five purposes and needs for the Project:  (1) "[i]mprove stand and

landscape diversity, structure, and resiliency"; (2) "[s]trategically reduce hazardous fuels"; (3)

"[s]ustainably manage existing trail system and dispersed recreation while minimizing impacts to

natural resources"; (4) "[i]dentify a sustainable road system needed for safe and efficient travel

and for administration, utilization, and protection of National Forest System Lands"; and (5)

[p]rovide a sustainable supply of Forest Products."  AR17976–82.  For each purpose and need,

the Forest Service explained why the agency was taking action, the existing conditions, and the desired conditions. *Id.*

The Project area is in a transition zone comprised of two forest types—dry forests in the south and moist forests in the north. AR17976. Historic fire suppression efforts have degraded meadows and oak savannas through the encroachment of conifers and non-native invasive species. AR17978. The Project seeks to restore meadows and oak savanna areas to provide well-distributed unique habitats that are more connected to each other. *Id.* In the moist areas, the stands occupy a variety of topographic conditions and are "dominated by Douglas-fir and western hemlock in lower elevations and Pacific silver fir and mountain hemlock in higher elevations." AR17977. Fire suppression efforts have promoted closed late-seral forest conditions, which have increased stand density and decreased diversity. *Id.* Specifically, the Project area has seen a decrease in ponderosa pine, Oregon white Oak, and sugar pine tree species. AR17976. The current stand composition is at risk of high-intensity wildfires because fire can easily spread in closed-canopy forest conditions. *Id.* Therefore, canopy fuel treatments would reduce the likelihood of sustaining crown fires, protect private timberlands, and improve firefighting effectiveness. AR17980; AR18000.

In 2019, the Forest Service scoped the Project and held a public field trip. AR17994. Since the Project's inception, the Southern Willamette Forest Collaborative (SWFC) was involved in the Project's development. SWFC helped develop the Project's location, design, and proposed treatments and was instrumental in public outreach and engagement efforts. AR17993. The Forest Service consulted with tribal partners and engaged in formal consultation in May 2019 with several tribes. AR17992. During the scoping period, the Forest Service received 20

comment letters, and the Forest Service's interdisciplinary team identified key issues based on those comments. AR17995–97.

On July 8, 2021, the Forest Service published the Draft Environmental Impact Statement (DEIS) and held a 45-day comment period. AR17995; AR15819–16253. The DEIS analyzed three alternatives—No-Action, Alternative 2 (preferred alternative), and Alternative 3. AR15834. A portion of Alternative 3 was developed in response to public comments expressing concerns regarding the Project's effects to NSO habitat. AR17996. However, the Forest Service only received comments from six commenters on the DEIS, and the responses are summarized in the FEIS's Appendix K. AR18391–431.

On December 8, 2023, the Forest Service issued its ROD and selected a modified Alternative 2. AR22210. The modified Alternative 2 authorizes treatments on approximately 6,500 acres including 2,242 acres of commercial harvest activities (thinning in natural stands, thinning in managed stands, and regeneration harvest[1]); about 4,900 acres of non-commercial activities (thinning around pine and oaks, roadside pine release, and fuels treatment); and 276 acres of meadow restoration. AR22210–11. Commercial harvest treatments will occur in managed stands (less than 80 years old) and natural stands (up to 140 years old). AR22210; *see also* AR18060 (noting that managed stands are about 37 to 65-years old; whereas natural stands are about 92 to 198 years old). The modified Alternative 2 dropped 500 acres of commercial treatment in natural stands to reduce the amount of NSO suitable habitat removed. AR22233; AR22211. The modified Alternative 2 also authorizes various road management activities.

---

[1] Regeneration harvest is "a harvesting system in which most of the trees are removed to begin a new age class." AR18282. Variable retention regeneration harvest "create[s] complex early seral forest" "by retaining single and clumps of larger trees, a variety of tree species and dead standing and down wood." *Id.*

AR22212.  The ROD acknowledged that the modified Alternative 2 will allow more timber harvest activities in natural stands within the NSO's critical habitat than Alternative 3 but emphasized that these areas are in need of restoration and fire resiliency work.  AR22217.

One of the Project's purposes is to provide a sustainable supply of forest products and contribute to the local economy in a manner consistent with the Willamette National Forest Plan and the NWFP.  AR17981.  The Project activities are primarily in Matrix lands, where timber production is the central objective.  AR17985–86; *see* AR17988 (Figure 2).  The Project will generate about 55–63 million board feet (MMBF) of volume over five timber sales.  Geissler Decl. ¶ 6; AR18239.  The Project's volume will contribute toward the NWFP's 111 MMBF Probable Sale Quantity target.  AR17982.

### C.    The Northern Spotted Owl.

The Project overlaps with NSO habitat and critical habitat.  AR18123.  Evaluations of NSO habitat are usually conducted at two spatial scales—the home range and core areas. AR15634.  The home range is the "area traversed by the individual in its normal activities of food gathering, mating, and caring for young."  *Id*. (internal quotation marks omitted).  In the Western Cascades, the home range is a 1.2-mile radius circle used by an NSO pair.  AR15237. The core area is an area "receiving concentrated use, typically surrounding the nest site and favored foraging areas."  AR15634.  The core area is typically defined as the "0.5-mile radius circle around a known or potential spotted owl site or at least a 500-acre area delineated around the best habitat."  AR15236.

There are two main types of NSO habitat—suitable and dispersal.  Suitable habitat encompasses nesting/roosting and foraging (NRF) habitat and "provides for the highest-quality dispersal opportunities."  AR15229.  Dispersal habitat "supports the transience and colonization

phases of spotted owl dispersal." AR15231.  Suitable habitat requires a canopy cover greater than 60 percent along with other habitat elements to adequately protect NRF habitat within the stand; whereas, dispersal habitat requires a canopy cover of greater than 40 percent.  AR15240.

At the time of listing, large-scale wildfires posed a threat to the NSO and its habitat. AR15646.  More recently, "there have been significant losses of nesting/roosting habitats."  *Id.* The Project's silvicultural treatments strike an important balance between maintaining NSO habitat and reducing the risk of loss of habitat from catastrophic wildfires.

Within the Project area, 45.8 percent (15,050 acres) is suitable habitat and 10.3 percent (3,400 acres) is dispersal habitat.  AR18123.  There are 14 NSO sites within the Project's boundary area that include treatments within their home ranges, but 8 NSO sites are unoccupied. *Id.*  All sites had two years of protocol surveys, and spot check surveys will be ongoing during project implementation.  AR18123; AR18130.  In the FEIS, the Forest Service analyzed the amount of NSO suitable, dispersal, and critical habitat (suitable or dispersal) that would be removed or modified but maintained.  AR18124.  However, no harvest treatments will occur in Recovery Action 32 areas, which provide for high quality habitat under the 2011 NSO Recovery Action Plan.  AR18130; AR15316.  Moreover, no incidental take of NSOs is authorized, meaning that any sites that are found to be occupied must be maintained.  AR18124.  Finally, in response to objections made during the pre-decisional review process, the Forest Service agreed to "commit[] to monitoring harvest treatments in stands over 80 years old to ensure any RA-32 habitat that exists within the stands are left untreated"; and drop about 500 acres of "commercial harvest treatments that would remove suitable habitat from occupied home ranges" in natural stands.  AR22233.

### III.     LEGAL BACKGROUND

NEPA establishes the procedures by which federal agencies must consider the

environmental impacts of their actions but does not dictate substantive results.  *Robertson v.*

*Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).  NEPA's purpose is twofold:  to

ensure that agencies carefully consider information about significant environmental impacts in

proposing actions and to guarantee relevant information is available to the public.  *Id.* at 349.

The Forest Service must prepare an Environmental Impact Statement (EIS) for "major

Federal actions significantly affecting the quality of the human environment . . . ."  42 U.S.C. §

4332(C); *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172,

1185 (9th Cir. 2008).  Regulations promulgated by the Council on Environmental Quality (CEQ)

provided guidance on what level of NEPA review is warranted.  CEQ had longstanding NEPA

implementing regulations that were in place since 1978, but those regulations were subsequently

amended and ultimately rescinded in 2025.  85 Fed. Reg. 43304 (July 16, 2020); 87 Fed. Reg.

23453 (Apr. 20, 2022); 89 Fed. Reg. 35442 (May 1, 2024); 90 Fed. Reg. 10610 (Feb. 25, 2025).

Relevant here, and referenced by Defendant-Intervenor throughout this brief, are the 2019

versions of CEQ's NEPA implementing regulations.  AR17984; AR22230.

"Judicial review of agency decision-making under NEPA is limited to the question of

whether the agency took a 'hard look' at the proposed action . . . ."  *N. Plains Res. Council, Inc.*

*v. Surface Transp. Bd.*, 668 F.3d 1067, 1075 (9th Cir. 2011) (internal quotation marks omitted).

One measure of whether an agency has taken a sufficient "hard look" is whether it has satisfied

the requirement to "analyze a reasonable range of alternatives to the proposed action."  *Audubon*

*Soc'y of Portland v. Haaland*, 40 F.4th 967, 980 (9th Cir. 2022).  "But an EIS need not consider

an infinite range of alternatives, only reasonable or feasible ones" and "alternatives eliminated

from detailed study need only be briefly discussed." *Id.* at 981 (internal quotation marks omitted). "The range of alternatives that an agency must consider under NEPA is based on the purpose and need of the proposed agency action." *Id.* The extent of the alternatives analysis is limited by an "inherent … rule of reason." *Seven Cnty.*, 605 U.S. at 183 (internal quotation marks omitted); *see Audubon Soc'y of Portland*, 40 F.4th at 980 ("The rule of reason guides both the choice of alternatives as well as the extent to which the EIS must discuss each alternative." (internal quotation marks, brackets omitted)).

Recently, the Supreme Court issued a seminal decision regarding the application of NEPA, holding that "the central principle of judicial review in NEPA cases is *deferenc*e." *Seven Cnty.*, 605 U.S. at 179 (emphasis added). Under NEPA, "[a]n agency must make predictive and scientific judgments in assessing the relevant impacts," including whether impacts "rise to the level of 'significant.'" *Id.* at 181. The Supreme Court emphasized that the agency's decision to prepare an environmental assessment or an EIS, the level of detail included in NEPA documents, and the identification of significant environmental impacts and feasible alternatives are all issues of fact in which the agency must be given "substantial deference." *Id.* at 180–83; *see Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*, 153 F.4th 869, 903 (9th Cir. 2025) (applying *Seven County*). "Black-letter administrative law instructs that when an agency makes those kinds of speculative assessments or predictive or scientific judgments, and decides what qualifies as significant or feasible or the like, a reviewing court must be at its most deferential." *Seven Cnty.*, 605 U.S. at 182 (internal quotation marks omitted). *Seven County* also cautioned courts against taking an "aggressive role in policing agency compliance with NEPA" and instructed to "not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Id.* at 179, 183.

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 9

IV.    **STANDARD OF REVIEW**

Plaintiffs' claims are reviewed under the Administrative Procedure Act's deferential arbitrary and capricious standard of review.  5 U.S.C. § 706(2)(A).  The arbitrary and capricious standard is a narrow one that precludes a reviewing court from substituting its own judgment for that of the agency.  *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc).  Rather, an agency may only be reversed "if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Id.* (internal quotation marks omitted).  In *McNair*, the Ninth Circuit held that "the Forest Service acts arbitrarily and capriciously only when the record plainly demonstrates that the Forest Service made a clear error in judgment . . . ."  *Id.* at 994.

V.    **ARGUMENT**

Plaintiffs allege that the Project violates NEPA for two reasons.  First, Plaintiffs argue that the Forest Service failed to analyze a reasonable range of alternatives because it did not analyze in detail its proposed alternative (Proposed Alternative).  Plaintiffs' Proposed Alternative, however, was not viable because it failed to meet the purposes and needs for the Project, and the Forest Service reasonably explained why it was considered but not analyzed in detail, consistent with NEPA's requirements.  Second, Plaintiffs' claim that the Forest Service failed to take the requisite hard look at NSO impacts, fire and fuels treatments, and carbon storage and emissions.  The Forest Service took the requisite hard look at the environmental impacts, and the agency's analysis is entitled to substantial deference.

A.      **The Forest Service Analyzed a Reasonable Range of Alternatives.**

NEPA requires federal agencies to "study, develop, and describe technically and economically feasible alternatives." 42 U.S.C. § 4332(2)(F). The Forest Service must "evaluate all reasonable alternatives" to the proposed action and for alternatives that the agency eliminated from detailed study, "briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a). The Forest Service does not need to "consider every possible alternative to a proposed action, nor must it consider alternatives that are unlikely to be implemented or those inconsistent with its basic policy objectives." *Seattle Audubon Soc'y v. Moseley*, 80 F.3d 1401, 1404 (9th Cir.1996). The "touchstone" of a court's review "'is whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation.'" *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 141 F.4th 976, 993–94 (9th Cir. 2025) (quoting *Audubon Soc'y of Portland*, 40 F.4th at 982). A court's "role" is "to confirm" that the agency has addressed feasible alternatives, and the court's review of an agency's alternatives "must be at its most deferential." *Seven Cnty.*, 605 U.S. at 180, 182 (internal quotation marks omitted).

Plaintiffs' claims that the Forest Service's alternatives analysis violates NEPA fail for two reasons. First, Plaintiffs misrepresent that the FEIS's Alternative 2 and 3 are identical and that the range of alternatives was too narrow. Second, Plaintiffs incorrectly assert that the Forest Service failed to explain why their Proposed Alternative was not considered in more detail.

1.      **The Forest Service analyzed a reasonable range of alternatives because Alternatives 2 and 3 are meaningfully distinct.**

Plaintiffs allege that the Forest Service failed to consider a reasonable range of alternatives, misrepresenting that the FEIS's Alternatives 2 and 3 are virtually identical. Pls.' Br. at 13. The FEIS's Table 6 provides a comparison of all the alternatives, highlighting the

differences among the no action and action alternatives.  AR18012–13; *see also* AR17971 (Table 1).  Most notably, there are significant differences in the amount of acres of commercial and non-commercial activities.  Alternative 2 authorizes 2,608 acres of commercial harvest and about 4,500 acres of non-commercial activities; whereas, Alternative 3 authorizes 1,853 acres of commercial harvest and about 5,300 acres of non-commercial activities.  *Id.*  Alternative 3 also proposes to decommission 20 miles of roads, which is 8 miles more than Alternative 2.  AR17972.

Regarding the non-commercial activities, Alternative 3 proposes 907 acres of non-commercial gap creation (755 acres more than Alternative 2) within NSO critical habitat to increase diversity and structure in mixed-conifer forests and strategically reduce hazardous fuels.  AR18007.  With respect to commercial activities, both Alternative 2 and 3 propose thinning in natural stands, but Alternative 3 reduces the amount by 755 acres (664 acres versus 1,419 acres).  *Id.*  The amount of commercial thinning with small gaps (up to a half-acre) in managed stands in mixed conifer and upland moist forests is the same (736 acres), but there are differences in some other managed stands.  *Id.*  Alternative 3 proposes to commercially thin with larger gaps (one to three acres) on 261 acres instead of regeneration harvest activities within managed stands.  AR18006; AR17971.  Thinned areas in managed stands would also favor the retention of larger trees.  AR18289.  Accordingly, Alternative 3 would produce significantly less commercial volume than Alternative 2, generating 42 MMBF instead of 63 MMBF.  AR18013; AR18239–40.

This case is distinguishable from the cases relied on by Plaintiffs.  In *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1039 (9th Cir. 2008), the three action alternatives for a wild and scenic river's visitor experience and resource protection plan were "essentially identical" regarding the interim limits on visitor use.  In *Muckleshoot Indian Tribe v. United*

*States Forest Service*, 177 F.3d 800, 813 (9th Cir. 1999), the two alternatives analyzing a land exchange between the Forest Service and Weyerhaeuser Company were the same, with the only difference between the alternatives was that one alternative re-labeled a portion of the transferred lands as "a donation rather than an exchange, and added 141 acres of donated land."

Here, although the total amount of acres treated is the same (about 6,500 acres), the alternatives significantly differ in the *intensity* of the treatment activities with differences in the amount of non-commercial thinning, the amount of regeneration harvest in managed stands, the use of thinning in managed stands with larger gap creation (Alternative 3 only), and the amount of road decommissioning.  AR17971–73.  Several of the modifications in Alternative 3 were made in response to public comments.  AR17996.

Plaintiffs assert that both alternatives authorize "virtually the same type of treatments." Pls.' Br. at 14 (emphasis omitted).  Not so.  Although both alternatives offer similar treatments within natural stands outside of NSO critical habitat and within younger managed stands within mixed-conifer forests, there are significant differences between the two alternatives.  AR18006. First, Alternative 3 will create late-seral open forests by proposing non-commercial harvest treatments within the NSO's critical habitat and would include non-commercial pine or oak release gaps, hand pile and burn gaps, and underburning.  *Id*.  Second, Alternative 3 proposes a mix of regeneration harvest and thinning with large gaps to create early seral habitat rather than relying on regeneration harvest alone.  *Id*.; AR17971.  As mentioned above, in Alternative 3, about 261 acres of younger managed stands in the upland moist forests would not include regeneration harvest and, instead, would be commercially thinned with one- to three-acre gaps. AR18006.  Thus, the intensity of treatment prescription varies between the two alternatives.

Plaintiffs next conflate Alternative 3's commercial thinning (along with larger gap creation) in managed stands with regeneration harvest in managed stands to suggest Alternative 3's prescription would result in the same amount of canopy cover as Alternative 2 post-treatment. Pls.' Br. at 13 n.5 (claiming that the differences are "primarily the label").  Managed stands currently average about 76 percent canopy cover.  AR18125; AR18164.  Alternative 3's commercial thinning in managed stands would result in 51–58 percent canopy cover and 80 trees per acre.  *Id.*; AR18289.   In contrast, Alternative 2's regeneration harvest would result in 21–38 percent canopy cover and 60–80 trees per acre.  AR18125; AR18164; AR18288.  Alternative 2 would retain at least 15 percent of Matrix lands in managed stands in "clumps," skips, or scattered trees that are at least 2.5 acres.  AR18288.  Under Alternative 3, up to 20 percent of each stand would be in the one- to three-acre gap areas.  AR18006.  Given that constraint in Alternative 3's gap size, there are less open areas under Alternative 3 than Alternative 2 in managed stands.  AR18068–69.

Therefore, Alternatives 2 and 3 significantly differ, as Alternative 3 would provide for more canopy cover in treated areas, focus on treatments in managed stands rather than natural stands, and provide fewer open areas.  AR18125; AR18164; AR17971; AR18068–69.  The Forest Service's alternative analysis satisfies NEPA because the range of alternatives falls within the "broad zone of reasonableness."  *See Seven Cnty.*, 605 U.S. at 182.

### 2.    The Forest Service explained why Plaintiffs' Proposed Alternative was not considered in detail.

Plaintiffs' Proposed Alternative urged the Forest Service to analyze a "[m]odified Alternative 3" that would authorize the following:  (1) thinning the plantations and the dryer forests and deferring treatment in moist forests that lack pine and oak; (2) scaling back harvest activities and treating mainly with prescribed fire; (3) retaining all trees greater than 24 inches at

diameter breast height (dbh) and retaining all trees with old-growth characteristics; (4) protecting high quality NSO habitat; and (5) retaining more trees per acre in all mature forests.  AR16325–26; *see also* AR16319–20.  Plaintiffs' Proposed Alternative seeks to achieve their preferred goal of protecting "late-successional forests" and recovering NSO habitat.  Pls.' Br. at 16.

The Forest Service does not need to consider alternatives that are not feasible, ineffective, or inconsistent with its management objectives.  *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 978 (9th Cir. 2006).  That means the Forest Service need not consider alternatives that do not advance the Project's purposes and needs.  *Native Ecosystems Council*, 428 F.3d at 1247.  Moreover, "NEPA does not require a separate analysis of alternatives which are not significantly distinguishable from alternatives actually considered, or which have substantially similar consequences."  *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 602 (9th Cir. 2010) (internal quotation marks omitted).  Plaintiffs have a duty to show that their Proposed Alternative is viable.  *See Audubon Soc'y of Portland*, 40 F.4th at 983.

Plaintiffs do not challenge the Forest Service's purposes and needs for the Project. Instead, Plaintiffs claim that its Proposed Alternative is both distinguishable from the action alternatives and viable, such that the Forest Service failed to give it detailed consideration.  The Forest Service clearly explained why each aspect of Plaintiffs' Proposed Alternative was either counter to the Project's purposes and needs, already incorporated in the action alternatives, or infeasible.

The Forest Service responded to each component of Plaintiffs' Proposed Alternative.  *See* AR18411–29.  First, the Forest Service explained how the request to focus on thinning in plantations and dryer forest stands (and deferring treatment in moist forests that lack pine and oak tree species) would not meet the Project's purposes and needs.  Because "mixed conifer

forests have changed in the last 100 years with decreases in species diversity," "[t]here is evidence that ponderosa pine and oaks have been lost due to competition stresses and mortality." AR18414.  There have been additional losses to ponderosa pine and oak species due to a sanitation salvage harvest that occurred several decades ago.  *Id.*  The Forest Service concluded that "[t]o prioritize only those stands that currently have a larger component of pines and oaks would assume the other mixed conifer stands have less of a need to be restored to the targeted landscape of a more open forest."  *Id*.  The Project's purpose and need "is much broader than only saving the current pines and oaks" and includes reducing stand densities, retaining and releasing older trees, and shifting the species composition towards more fire and drought tolerant species.  *Id*.; AR17976–77; AR18014.

Second, the Forest Service explained how the proposal to treat with prescribed fire and scale back harvest activities is inconsistent with the Project's purposes and needs.  AR18420. The Project is primarily located in Matrix lands, AR17985, where timber harvest is the main objective.  AR02911; AR02908.  Thinning activities are also necessary because stands that "currently have an understory of densely stocked trees" can promote crown fires.  AR18060; AR18413.  Thinning will help achieve the Project's goal of a mixed conifer forest by reducing stand densities, retaining older trees, and shifting species composition that is more fire and drought tolerant.  AR18413.  Therefore, the Forest Service provided a rational explanation as to why prescribed fire alone would not reduce the risk of crown fires and achieve the desired conditions for the landscape.

Third, the Forest Service explained how the Project's action alternatives *already* protect legacy trees in a manner consistent with the proposal to retain all trees with old-growth characteristics.  Legacy trees are not based on a minimum dbh but rather "a variety of

morphological and/or physical characteristics of a tree species." AR18421. The Project Design Features ensure the protection of legacy trees. *Id.*; *see* AR18029 (AQU1; AQU2); AR18039 (WIL1); AR18041 (WIL8); AR18048 (FSS3). "NEPA does not require a separate analysis of alternatives which are not significantly distinguishable from alternatives actually considered, or which have substantially similar consequences." *Headwaters, Inc. v. Bureau of Land Mgmt., Medford Dist.*, 914 F.2d 1174, 1181 (9th Cir. 1990). Plaintiffs fail to provide how the Project's protection of legacy trees is distinguishable from their proposal.

Fourth, regarding Plaintiffs' proposal to protect high quality NSO habitat, the Forest Service explained how the Project seeks to provide habitat needs "for a full range of forest associated species," not just the NSO, by "maintaining areas of early, mid, and late seral forest across the landscape." AR18424; AR17976; AR18116. The Forest Service acknowledged that the action alternatives would remove NSO suitable and dispersal habitat, but there would be no incidental take of NSOs due to habitat loss. AR18411–12. Additionally, suitable habitat would be maintained at 40 percent or greater within occupied home ranges; 50 percent or greater within occupied core areas; and no activities would occur within NSO nest patches. *Id.*; AR18126–29. Alternative 3 was expressly designed to address concerns related to NSO habitat, modifying half of the suitable habitat within critical habitat areas by adding gaps and proposing to thin more dispersal habitat. AR17996; AR18125. Accordingly, the Forest Service adequately explained why the NSO-focused proposal was inconsistent with the Project's purposes and needs but, to the extent feasible, was already incorporated into Alternative 3.

Finally, the Forest Service explained why the proposal to retain more trees per acre and retain a higher basal area in mature forest stands was inconsistent with the Project's purposes and needs. AR18423. The retention levels for Alternatives 2 and 3 were "based on stand

examination data and analysis as well as considerations from the Jim's Creek savanna[] restoration project in the area." *Id.* The Forest Service determined that before fire suppression efforts, the average trees per acre were 15 trees, based on data from the Jim's Creek Project that helped inform the YRR Project. *Id.*; *see* AR24004 (the Jim's Creek's Project EA noting that "[a]bout 120 years ago" this area was an open savanna with "tree densities ranging from just a few to 15 trees per acre"); *see* AR18060 (finding that the YRR Project area has "older, legacy trees rang[ing] from about 0 to 20 trees per acre across the stands [and] averaging about 11 trees per acre"). Although the Jim's Creek Project retained an average of 20 tree per acre, the YRR Project's trees per acre are even higher and favor retaining larger and fire-resistant trees to reduce the blowdown risks. AR18423. The Project's late-seral open prescriptions would leave 30 to 60 trees per acre, the late seral connectivity prescriptions would leave 60 to 80 trees per acre, and the complex early seral creation prescriptions would leave 60 to 80 trees per acre. AR18350–54 (Tables 2–6).

The Forest Service considered the need to mitigate blowdown risk by assessing tree stability and wind firmness. AR18413; *see* AR18287 ("Some stands or portions of stands would be thinned to around 60 trees per acre due to windthrow concerns."). The Forest Service relied on a tree height to diameter ratio to evaluate the susceptibility to wind damage and determined that all stands were below that susceptibility threshold. AR18413; AR18060–61. The FEIS also analyzed how the action alternatives—with their proposed tree retention amounts—would impact fuels reduction efforts and invasive weed spread. *See* AR18077–82 (fuels analysis); AR18219–22 (invasive weed analysis).

Plaintiffs misrepresent that the action alternatives fail to protect NSO habitat from wildfire because the treatments "would eliminate existing habitat and prevent its re-development

indefinitely." Pls.' Br. at 17 (citing AR27741–49). Plaintiffs' citations in support of this assertion are to the Fish and Wildlife Service's (FWS) review of the Project's consistency with the 2023 Biological Assessment (BA) and the 2023 Biological Opinion (BiOp). *See* AR27737. FWS identified several units within natural stands that had high estimated trees per acre (ranging from 100 to 220) and determined that those units are capable of becoming NSO habitat post-treatment but "maintenance burning" would delay or prevent habitat from becoming "suitable" in the *near* future. AR27741–50. However, the 2023 BA "does not include actions implemented after Year 2046[] [and] [a]ny planned actions not implemented by 2046 would need to be reconsulted on or tier to updated programmatic consultation if available." AR19851 (emphasis omitted). Regardless, the Forest Service concluded that no habitat in occupied sites would be reduced below the amount of suitable habitat functional thresholds. AR18124–25 (summarizing the effects on 14 sites with treatments within NSO home ranges). Thus, the Forest Service's action alternatives adequately maintain NSO habitat.

Clearly, Plaintiffs would prefer that the Forest Service design the Project differently by scaling back on active management to prioritize late-successional NSO habitat. However, Plaintiffs' preferred desires disregard the Project's location and five purposes and needs. The Forest Service adequately explained why Plaintiffs' Proposed Alternative was either counter to the NWFP's objectives, counter to the Project's purposes and needs, already incorporated in the two action alternatives, or otherwise infeasible. Nothing more is required under NEPA.

### B.    The Forest Service Took the Requisite Hard Look.

Next, Plaintiffs assert that the Forest Service's FEIS violated NEPA because it failed to take a "hard look" at the effects to the NSO, fuels reduction and fire risk, and carbon storage and emissions. Pls.' Br. at 18–36. In determining whether an EIS "complied with NEPA, a court

should afford substantial deference to the agency." *Seven Cnty.*, 605 U.S. at 180. Specifically, courts should defer to the agency's determination of what level of detail is required and the scope of the environmental effects analyzed. *Id.* at 181–82. Deference is necessary because "an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry—and also about the length, content, and level of detail of the resulting EIS." *Id.* at 183. This Court should reject Plaintiffs' attempts to second-guess the agency and conclude that the FEIS complied with NEPA's "hard look" requirement.

### 1.    The Forest Service took a hard look at NSO Impacts.

Plaintiffs assert that the Forest Service failed to take a hard look at the impacts on the NSO and its critical habitat because the FEIS relied on the "outdated" 2019 BA and 2019 BiOp. Pls.' Br. at 21–27. The crux of their argument rests on the Forest Service's purported failure to rely on the 2023 BA and 2023 BiOp. However, the Forest Service was not required under NEPA to incorporate the 2023 BA and BiOp into the FEIS, as the FEIS adequately analyzed the impacts to the NSO and its critical habitat.

### a.    The FEIS took the requisite hard look under NEPA.

The Forest Service engaged with an interagency Level 1 Team and issued a *programmatic* BA in 2019 regarding activities on the Columbia River Gorge National Scenic Area, the Mt. Hood National Forest, the Willamette National Forest, and the Northwest Oregon Bureau of Land Management (BLM) District. AR15209–748. The 2019 BA analyzed the effects of the proposed action—habitat modification activities on BLM and Forest Service lands during a 27-year period—on the NSO and its critical habitat. AR15249 (noting that the proposed action is outlined in Appendix A); AR15608–28 (Appendix A); AR15402. FWS subsequently issued its programmatic BiOp in 2019, determining the proposed action "is not likely to jeopardize" the

NSO or "destroy or adversely modify" NSO critical habitat.  AR14935; *see generally* AR14849–953 (2019 BiOp).

Relying on the 2019 BA, the FEIS disclosed the impacts from the Project on the NSO and its habitat.  The Project area has 45.8 percent suitable habitat and 10.3 percent dispersal habitat.  AR18123.  About 42.2 percent of NSO designated critical habitat overlaps with the Project area.  *Id*.  Within those critical habitat areas, 61.3 percent is suitable habitat and 7.9 percent is dispersal habitat.  *Id*.  Not only did the Forest Service disclose the impacts to suitable, dispersal, and critical habitat under each alternative, AR18124 (Table 35), the Forest Service analyzed the impacts of the harvest treatments on the 14 NSO sites that contain treatments within their home ranges.  AR18126–27 (Table 36); AR18128–29 (Table 37).  The effects on NSO habitat by each alternative are provided below:

Table 35: Effects to Habitat by Alternative

| Habitat Type in all of YRR and in Critical Habitat only | No Action Alternative 1 Habitat removed (acres) | Alternative 2 Habitat removed (acres) | Alternative 2 Habitat modified but maintained (acres) | Alternative 3 Habitat removed (acres) | Alternative 3 Habitat modified but maintained (acres) |
|---|---|---|---|---|---|
| Suitable | 0 | 2,799 | 0 | 1,914 | 885 |
| Dispersal | 0 | 467 | 997 | 229 | 1,235 |
| Suitable, Critical Habitat | 0 | 1,561 | 0 | 676 | 885 |
| Dispersal, Critical Habitat | 0 | 82 | 377 | 59 | 400 |

AR18124.

Plaintiffs claim that the Forest Service's analysis failed to:  (1) address declining NSO's populations and the significance of removing habitat; (2) consider the impacts from barred owls; and (3) address the need to manage for non-territorial or floater owls.  Defendant-Intervenor will address each allegation in turn.

Regarding changes to the NSO's population, the 2019 BA provided a robust overview of the NSO's status and critical habitat and provided the environmental baseline. AR15278–91 (NSO); AR15292–94 (critical habitat); AR15299–316 (environmental baseline). There are 817,931 acres of suitable habitat on the Willamette National Forest, of which 53 percent (435,878 acres) are protected by LSRs, Riparian Reserves, or other land use designation where timber harvest activities are restricted. AR15302; AR15304. The 2019 BA acknowledged that the loss of NRF habitat was the major cause of the NSO's population decline during the past century but "[w]ildfire has been the major cause of habitat loss on Federal lands, while timber harvest is the primary cause of habitat loss on non-federal lands." AR15278.

The 2019 BA evaluated the removal or modification of NSO habitat by active management programmatically and by the expected losses through natural disturbances. AR15400–79. The Forest Service concluded that, based on modeling of projected recruitment and losses of habitat, the amount of suitable habitat on the Willamette National Forest would increase by 12 percent by the end of the 27-year period. AR15424. Beyond the 2019 BA's analysis, the FEIS considered the recent changes to the availability of suitable habitat on the Willamette National Forest resulting from the 2020 wildfires. AR18123. The Forest Service concluded that 5.5 percent of suitable habitat was lost forest wide, but the Project area was not affected, and the wildfires had "minimal effect on the critical habitat unit" relevant to the Project. *Id.*

The Forest Service also considered the interplay between barred owl competition and habitat loss. Although the availability of "suitable habitat is a key element in the conservation of spotted owls, it may no longer be the primary factor affecting population stability" given the "rapidly increasing trend of barred owl populations." AR15278–79. The 2019 BA provided a

robust summary of the science addressing the interplay between barred owls and NSO habitat removal. AR15288–91. The Forest Service expressly analyzed whether harvest activities would expand the range of the barred owl, whether thinning or the creation of early seral habitat would favor barred owls, and whether the reduction of older forests would increase competition between the barred owl and the NSO. AR15288–90. The Forest Service concluded that there is no scientific support that the silvicultural treatments would expand the range of the barred owl or that thinning or the creation of early seral habitat would favor barred owls. AR15289. Additionally, the NSO Recovery Plan's Recovery Action 32 already minimizes the threat of the reduction of older forests. AR15290; AR18130 (noting that no harvest activities will occur in Recovery Action 32 areas under either action alternative). Plaintiffs completely ignore this analysis.

Finally, the 2019 BA adequately discussed the importance of non-territorial or floater NSO populations. "Floaters have special significance in spotted owl populations because they may buffer the territorial population from decline"; however, "[l]ittle is known about floaters other than that they exist and typically do not respond to calls as vigorously as territorial birds." AR15634. The 2019 BA analyzed impacts to both dispersal habitat and suitable habitat, which accommodate the "transience phase" and "colonization phase" of floater owls. AR15640; AR15673; AR15405–08.

In the Project area, to protect both territorial and floater owls, all sites had two years of protocol surveys between 2017 and 2018 and spot checks between 2019 and 2020. AR18123. Monitoring will continue throughout Project implementation, AR15441, and these spot checks before Project implementation are designed to avoid "take" of floaters owls that reside in unoccupied territories. AR15262–63; AR15433. Any sites that are found to be occupied must be

maintained.  *Id.*; AR18124.  Plaintiffs criticize the Forest Service's ability to detect floaters due to the impacts from barred owls.  Pls.' Br. at 20.  But the 2019 BA acknowledged this issue, noting that FWS already took into account the effects on floaters considering their lack of response to auditory surveys and, therefore, updated its survey protocol.  AR15646 (referencing the revised January 9, 2012 Northern Spotted Owl Survey Protocol).  Courts have rejected a similar argument that the agency's no occupancy determinations are inaccurate because "spotted owls are less likely to respond to calls" "when barred owls are present."  *Cascadia Wildlands v. Thraikill*, 49 F.Supp.3d 774, 779 (D. Or. 2014), *aff'd*, 806 F.3d 1234 (9th Cir. 2015).

Accordingly, Plaintiffs' arguments that the FEIS's analysis of NSO impacts is deficient neglects to acknowledge the robust analysis in the 2019 BA, which was incorporated by reference in the FEIS.

> **b.    The subsequent 2023 consultation documents do not undermine the FEIS's analysis.**

In response to the habitat losses during the 2020–2022 wildfires, the Forest Service updated its programmatic BA in February 2023, which took 18 months to prepare and was developed with FWS's technical assistance.  AR17157–58.  Shortly thereafter, FWS issued its programmatic 2023 BiOp in June 2023, determining that the proposed action is not likely to jeopardize the NSO or destroy or adversely modify NSO critical habitat.  AR19797.  In June 2023, FWS also conducted a Level 1 consistency review of the YRR Project with the 2023 BA and 2023 BiOp.  AR27737–50.

Plaintiffs do not challenge the 2023 BA or 2023 BiOp under the Endangered Species Act (ESA).  Instead, Plaintiffs claim that the Forest Service was required under NEPA to provide more analysis on the impacts to the NSO based on the 2023 consultation documents.  As an initial matter, Plaintiffs misrepresent that NEPA's and ESA's requirements for analyzing effects

are the same. *Env't Prot. Info. Ctr. v. U.S. Forest Serv*., 451 F.3d 1005, 1012 (9th Cir. 2006) ("NEPA and the ESA involve different standards"); *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 650 (9th Cir. 2014) (noting that NEPA and the ESA "evaluate different types of environmental impacts through processes that involve varying degrees of public participation"). More importantly, Plaintiffs' argument that the FEIS is inadequate based on the subsequent consultation documents is not properly before this Court. Plaintiffs could have—but failed to—raise a claim that the FEIS should have been supplemented based on "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." *See* 40 C.F.R. 1502.9(c)(1)(ii). As the Government's brief correctly noted, by failing to do so, Plaintiffs *concede* that the 2023 BA did not present new information warranting supplementation of the FEIS. Fed. Defs.' Br. at 24.

Regardless, the Forest Service did not rely on stale or outdated information. The Forest Service confirmed that the 2020–2022 wildfires did not affect the Project area, AR22224–25, and that the FEIS analysis remained unchanged. AR21311. Although the Forest Service did not rely on the 2023 BA or BiOp in the FEIS, the agency did not completely ignore this updated information before approving the Project. In the Consistency Review, FWS explained that "[i]ncorporation to the [2023 BA], updated NSO survey information since 2020, and any changes due to this Level 1 review will be documented in the Final [ROD]." AR27741. In the ROD, the Forest Service provided an assessment of the effects of the wildfires on NSO habitat but concluded that it "would not further reduce movement potential or the function of the Critical Habitat subunit." AR22225. Ultimately, the Forest Service determined that the recent wildfires reaffirmed the need to move forward with the Project's activities, as the "need has never been more prevalent" to ensure the project area is more resilient to the impacts of wildfires.

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 25

AR22224.  This is not the same situation as *WildEarth Guardians v. Bucknall*, 756 F.Supp.3d

1017, 1036 (D. Mont. 2024), where the updated biological opinion was published *after* the

project was approved and, therefore, not considered by the action agency.[2]

Plaintiffs' arguments suggest that the reinitiation of consultation under the ESA per se

requires the Forest Service to update its NEPA analysis.  Again, Plaintiffs fail to properly raise

that claim.  As the Supreme Court has stated, "an agency need not supplement an EIS every time

new information comes to light after the EIS is finalized."  *Marsh v. Or. Nat. Res. Council*, 490

U.S. 360, 373 (1989); *W. Watersheds Project v. Salazar*, 993 F.Supp.2d 1126, 1142 (C.D. Cal.

2012) (finding that the need for reinitiation of consultation under the ESA did not mandate

supplemental NEPA analysis).  The Forest Service's factual determination that the new

information in the 2023 BA and BiOp did not warrant updating the FEIS is entitled to deference.

*Seven Cnty.*, 605 U.S. at 181–82 (courts should be "most deferential" to the agency's "scientific

judgments in assessing relevant impacts").

Plaintiffs also contend that the Forest Service failed to address the adverse expert

opinions provided in Plaintiffs' comments.  Pls.' Br. at 27–29.  However, the Forest Service

adequately addressed Plaintiffs' comments on suitable habitat, barred owls, and the decline of the

NSO species in its response to comments and during the objection period.  AR18398–400;

AR18411–29; AR21304–34.  Despite Plaintiffs' mischaracterization, the Forest Service's

responses to comments and objections discussed Plaintiffs' central NSO concerns related to the

conservation of suitable habitat and to the impacts from barred owls.  *See, e.g.*, AR18411–12;

AR18424; AR21320.

---

[2]  Plaintiffs' reliance on *Hawaii Longline Association v. National Marine Fisheries Service*, 281 F.Supp.2d 1, 30 (D.D.C. 2003), is also misplaced because that case involved ESA not NEPA claims.

In sum, the Forest Service's FEIS complied with NEPA's "hard look" requirement because it reasonably analyzed the impacts to the NSO and its critical habitat and reasonably determined that the subsequent 2023 BA and BiOp did not change its impacts analysis.

   **2.    The Forest Service took a hard look at fuels reduction and fire risks.**

Plaintiffs argue that the Forest Service's fuel reduction and fire risk analysis is insufficient.  Plaintiffs appear less concerned with ensuring that the agency took a hard look at that issue and are more concerned with requiring the Forest Service to undergo unnecessary additional analysis or with supplanting the Project's analysis altogether.  However, "[t]he goal of [NEPA] is to inform agency decisionmaking, not to paralyze it."  *Seven Cnty.*, 605 U.S. at 173. NEPA does not "require the agency to weigh environmental consequences in any particular way" but allows the agency to weigh them "as the agency reasonably sees fit."  *Id.*

The FEIS's analysis of the impacts from the fuels reduction activities on fire risk is robust.  *See generally* AR18072–83; AR18076 (map of the Project's fire regime condition class). The Forest Service's analysis of the impacts of the various treatment activities—commercial thinning with small gaps, commercial thinning with large gaps, regeneration harvest, and fuels treatments (underburning, pile burning, and mastication)—was based on a combination of fire and fuels modeling and analysis tools.  AR17998; AR18073; AR18079–81 (analyzing the impacts to specific stand type based on fire behavior modeling of sampled stands).  The Forest Service also relied on its expertise from past pilot projects—like the Jim's Creek Savanna Restoration and Pinegrass Restoration projects—that aimed to increase forest resiliency. AR17974.  The Forest Service concluded that commercial harvests, noncommercial fuel treatments, and prescribed underburning would increase forest health and reduce the severity of future wildfires.  AR18072–73.

According to Plaintiffs, the Forest Service did not fully discuss or acknowledge science supporting that the adverse "trade-offs" from thinning are worse than presented in the FEIS and that the Project's activities would actually increase fire risk.  Pls.' Br. at 29.  Plaintiffs claim that the Forest Service "ignore[ed] contrary science … that did not fit its narrative[.]"  *Id.* at 31.  Plaintiffs' opposition to thinning and their disagreement with the Forest Service about its consequences is well-noted in the record.  *See id.* at 29 (citing comments and objections).  However, Plaintiffs are incorrect that "the Forest Service never grappled with the adverse trade-offs and responsible opposing science brought to its attention."  *Id.* at 30.  The record demonstrates that the Forest Service acknowledged, considered, and disagreed with the conclusions put forth by Plaintiffs.  The Forest Service directly responded to Plaintiffs' comments:

> We understand that thinning can have beneficial and adverse impacts on the landscape and this is addressed in the EIS . . . .  The project was designed to minimize and avoid potential adverse impacts where possible with the inclusion of Project Design Features which include buffers and restrictions on what can happen or when it can happen.

AR18428.  The Forest Service repeatedly explained that Plaintiffs' opinions or preferences— even if credible—were insufficient to substantively alter the Project, given the scientific support for the agency's decision.

For example, Plaintiffs place great emphasis on the Campbell et al. 2011 study that generically addresses thinning and opines that there is "'a low likelihood that treated forests will be exposed to fire.'"  Pls.' Br. at 29 (quoting AR16397); *id.* at 31.  Plaintiffs' contention that there is a low likelihood that wildfire will occur in the Project area is an attempt to undermine the Project's purpose and need, which they have not challenged.  In any event, the Forest Service addressed Plaintiffs' concerns about the need for fuels treatments with information about the Project area's specific characteristics and needs.  AR18426 (citing the FEIS's fireshed analysis).

DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT - 28

The Forest Service explained that the Project area currently exhibits increased stand density and decreased species diversity and health. AR17976. Therefore, the Forest Service concluded that treatments were needed to address "[t]he risk of habitat loss from high intensity wildfires [that has] increased because fire can easily spread in these closed canopy forest conditions." *Id.* The Forest Service emphasized its desire to return the area to its more resilient historical conditions, with species diversity and open forest conditions. AR17977; AR17979–80; AR18072–73. The Forest Service also identified prescribed fire, after the fuel reduction treatments, as an important component of returning the forest to a more resilient condition. AR17977; *see also* AR18073 ("[A]pplication of low intensity underburning would return fire's natural disturbance process to parts [of] the ecosystem, increase forest health, and reduce the severity of future wildfires."). Notably, even the Campbell et al. 2011 study agrees that "fuel-reduction treatments may be necessary to restore historical functionality to fire suppressed ecosystems." AR16397.

Plaintiffs concede that the Forest Service acknowledged the "'good points'" about fire resiliency raised by two of the scientific studies referenced by Plaintiffs. Pls.' Br. at 30 (quoting AR21325). Plaintiffs allege that the Forest Service nevertheless "fail[ed] to reconcile those points with analysis or decision." *Id*. The record reflects otherwise. The Forest Service noted that other scientific articles relied on in the FEIS "make a strong case" for conducting the proposed treatment to promote the forest's fire resiliency, despite Plaintiffs' concerns. AR21325 (citing the FEIS).

Plaintiffs rely on *Bark v. United States Forest Service*, 958 F.3d 865 (9th Cir. 2020), in support of their argument that the Forest Service ignored the recent scientific studies on fire severity. Pls.' Br. at 30. But *Bark* involved the issue of whether the Forest Service should have prepared an EIS because the impact of variable density thinning to reduce fire risk was "highly

controversial" or highly "uncertain." *Bark*, 958 F.3d at 870.  The Ninth Circuit found that the

Forest Service failed to "engage" with the plaintiffs' science and drew "general conclusions" that

there would be no negative effects from the project's thinning activities.  *Id*. at 871; *see also*

*WildEarth Guardians v. U.S. Dep't of Agric. Animal & Plant Health Inspection Serv. Wildlife*

*Servs.*, 135 F.4th 717, 737–38 (9th Cir. 2025) (holding that the agencies failed to adequately

explain why it would not consider or engage with scientific studies that were contrary to its

position).

    Here, the FEIS acknowledged Plaintiffs' science but explained why the Plaintiffs'

perspective did not demand a different result.  AR18411–13; AR18417–20; *see Friends of Big*

*Bear Valley v. U.S. Forest Serv.*, 776 F.Supp.3d 824, 833 (C.D. Cal. 2025) (noting that agencies

identified "disagreements in the scientific literature" and discussed opposing viewpoints).

Unlike in *Bark*, the Forest Service did not merely allege that there are "no negative effects" from

treatments.  *Compare Bark*, 958 F.3d at 871 (internal quotation marks omitted), *with* AR18080

(noting the increase in fire risk until fuels reduction activities occur).  Moreover, the Project

includes fuels reduction treatments *after* the harvest activities—an important distinction from

*Bark*, which was limited to thinning only.  *See Earth Island Inst. v. Muldoon*, 82 F.4th 624, 639–

40 (9th Cir. 2023) ("[T]he fact that the *Bark* thinning would not be followed by a prescribed burn

was one of the reasons why [the Ninth Circuit] concluded that the scientific evidence

demonstrated that a significant controversy existed.").  Therefore, *Bark* is limited to its facts and

distinguishable from the circumstances here.

    Plaintiffs discount the Forest Service's legitimate concerns of the likelihood of a wildfire

event to support their belief that the Project should be designed differently.  It is unclear what

Plaintiffs would consider a sufficient "hard look" short of the Forest Service agreeing with their

myopic view that, despite the agency's site-specific fire analysis, the Project's activities will not reduce fire risk and severity. Plaintiffs' desire for a specific result runs afoul of NEPA. *See Seven Cnty.*, 605 U.S. at 177 (explaining that "NEPA does not demand particular results" (internal quotation marks omitted)). To the extent that Plaintiffs seek more explanation from the Forest Service, that would only serve to paralyze the process. *See id.* at 173. The record reflects the Forest Service took the requisite hard look at the Project's fuels reduction and fire risk impacts.

### 3. The Forest Service took a hard look at carbon storage and emissions.

Plaintiffs' arguments that the Forest Service failed to take a hard look at the Project's carbon storage and emissions also lack merit. Plaintiffs assert that the Forest Service's analysis of climate impacts should have contained a more in-depth *quantitative* analysis. Pls.' Br. at 34-35. Subsumed in their hard look argument is Plaintiffs' desire for the Forest Service to refocus the Project's purposes and needs in a manner that stores more carbon by retaining mature and old-growth trees. Pls.' Br. at 32, 33.

This dynamic is captured in the Forest Service's response to Plaintiffs' NEPA comments. Plaintiffs requested an additional alternative that "avoid[ed] GHG emissions by keeping carbon stored in forests[.]" AR18411; *see* AR16320. In addition to explaining that such an alternative is inconsistent with the Project's purposes and needs, the Forest Service acknowledged that "[r]estoration activities like thinning and prescribed fire incur a short-term carbon trade off" and that the impacts from the trade-off "are currently not settled science" and there is no scientific "consensus." AR18412; *see* AR18253 (finding that "[t]he relatively small quantity of carbon released to the atmosphere and the short-term nature of the effect of the proposed action on the forest ecosystem are justified"). However, the Forest Service explained that the "agency does

not presume that short-term carbon maximation is the wisest approach to sustainable forest management." AR18412; *see* AR18412-13 (noting that the short-term approach is not consistent with "national and international guidance" or "with the agency's carbon policy" which is directed at "emphasiz[ing] ecosystem function and resilience"). AR18412. Therefore, Plaintiffs' contention that the Forest Service ignored Plaintiffs' "64-page supplement consisting of expert literature on the subject" of carbon storage and emissions does not tell the whole story. Pls.' Br. at 32. Although Plaintiffs certainly preferred a more detailed response to their comments, the Forest Service satisfied its obligation under NEPA. *See* 40 C.F.R. § 1503.4(a)(5) (allowing an agency to "[e]xplain why the comments do not warrant further agency response").

Plaintiffs improperly promote form over substance in arguing that the Forest Service's analysis was too limited considering Plaintiffs' extensive comments. The Forest Service was not required to match the length of the Plaintiffs' comments and, instead, is required to analyze the Project's carbon impacts "'in proportion to their significance.'" *Hapner v. Tidwell*, 621 F.3d 1239, 1245 (9th Cir. 2010) (quoting 40 C.F.R. §1502.2(b)). To that end, the Forest Service provided a detailed qualitative assessment of its long-term focus on reducing carbon emissions. AR18251–53; *see* AR18253 (noting that severe disturbances result in greater carbon emissions). The Forest Service's analysis was supported by a wide array of scientific literature. AR18345–47.

The Forest Service's carbon assessment provided crucial context to understand the Project's impacts (or lack thereof). Treatment activities will occur on only 20 percent of the 33,000-acre Project area and will only concern the above-ground carbon stocks. AR18251 (explaining that more than half of the ecosystem carbon is stored in the soil). Any short-term carbon emissions from thinning would be partially limited by the carbon stored in wood

products.  AR18253.  Therefore, the Forest Service concluded that the Project's emissions makes "an extremely small contribution to overall emissions" and its direct and indirect contributions to climate change would be "negligible."  AR18252.

The Forest Service's conclusions were further supported by the Intergovernmental Panel on Climate Change's (IPPC) findings.  The IPCC identified deforestation as the largest source of emissions in the forestry sector.  AR18252*.*  Crucially, the Project does not authorize the removal of all trees and, instead, "forest stands are being retained" and the "thinned, harvested, and prescribed burned" areas will "mimic natural fire effects," "contributing to the long-term carbon uptake and storage."  *Id.*  Treating to increase resiliency is consistent with the IPPC's mitigation practices and the recognized adaptation practices to increase forest resiliency (Joyce et al. 2014), meeting the "objectives for both adapting to climate change and mitigating GHG emissions."  AR18253.  Accordingly, the Forest Service reasonably concluded that "any initial carbon emission" "would be balanced and possibly eliminated as the stand recovers and regenerates because the remaining trees and newly established trees typically have higher rates of growth and carbon storage."  AR18253.

The Forest Service's qualitative analysis provides a "reasonably thorough discussion of the significant aspects of probable environmental consequences," in a manner that is proportional to the significance of the impacts.  *See Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir. 1998).  Plaintiffs' reliance on *Center for Biological Diversity v. United States Forest Service*, 687 F.Supp.3d 1053 (D. Mont. 2023), *aff'd in part and rev'd in part*, 2025 WL 586358 (9th Cir. 2025) (*Black Ram*), for the proposition that a quantitative analysis is always required, is misplaced.  *See* Pls.' Br. at 35.  In *Black Ram*, the Forest Service provided a qualitative analysis of the carbon impacts, finding that the project would only affect a "tiny

percentage" of the forest carbon stocks on the National Forest and an "infinitesimal amount" of carbon stocks of the United States. 687 F.Supp.3d at 1075. The District of Montana found that the Forest Service's climate-impacts analysis relied "almost entirely on [a] cookie-cutter and boilerplate" report, which was copied from another project on another national forest, rather than utilizing "high quality and accurate information." *Id.*

*Black Ram* is an outlier. Federal Defendants reasonably explain why the *Black Ram* decision is inconsistent with Ninth Circuit caselaw, Fed. Defs.' Br. at 33–35, and Defendant-Intervenor incorporates those arguments by reference. More importantly, *Black Ram* is factually distinguishable because the FEIS's climate analysis was not a derivate or copy of another forest's carbon analysis. Rather, the Forest Service determined that the Project's impacts were small at the forest-scale based on relevant qualitative and quantitative information. *See* AR18251–53.

Recently, the District of Montana distinguished the *Black Ram* decision and upheld the Forest Service's qualitative climate analysis. *Ctr. for Biological Diversity v. U.S. Forest Serv.*, No. 23-CV-110-M-DWM, 2025 WL 3549515, at *5 (D. Mont. Dec. 11, 2025). In that case, the Forest Service concluded that "the Project would result in a short-term release of carbon but, over the long term, was likely to increase carbon storage and reduce emissions by reducing disturbance risk and storing carbon in wood products, as well as recapturing carbon as forests regrow." *Id.* (internal quotation marks omitted). Therefore, *Black Ram* does not stand for the proposition that a quantitative analysis is always required to satisfy NEPA's hard look requirement. *Id.*

Plaintiffs also demand that the Forest Service should have relied on their proposed quantitative approach. *See* Pls.' Br. at 35. Plaintiffs resort to out-of-circuit caselaw in support of their argument that an accepted quantitative methodology was reasonably available to the Forest

Service and that the agency should have relied on that available tool. *See id.* Plaintiffs' caselaw is distinguishable on crucial facts.

In *WildEarth Guardians v. United States Bureau of Land Management*, the agency approved four coal leases that would extend the life of two coal mines that, together, accounted for "approximately 19.7% of the United States's annual domestic coal production." 870 F.3d 1222, 1227 (10th Cir. 2017). In the agency's DEIS, it concluded that there would be no appreciable difference in the carbon impacts from granting the leases or denying the leases because, in the latter situation, "the same amount of coal would be sourced from elsewhere." *Id.* at 1228. The plaintiffs argued that because the agency relied on a perfect substitution, it failed to take into account the climate impacts and failed to rely on an available computer modeling system. *Id.* at 1238. The Tenth Circuit found the FEIS to be inadequate but rejected the plaintiffs' modeling argument because "NEPA does not require agencies to adopt any particular internal decisionmaking structure." *Id.* (internation quotation marks omitted).

Plaintiffs also rely on *Dine Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1024 (10th Cir. 2023) (*Dine CARE*), which concerned 370 applications to drill for oil and gas in New Mexico. In that case, the Tenth Circuit held that the agency acted arbitrarily and capriciously "by choosing not to address the cumulative impacts of GHG emissions based on there being no method for doing so, without explaining why [the method presented by the plaintiffs] was deficient for these purposes." *Id.* at 1043. That is not the situation here.

Plaintiffs' reliance on *WildEarth Guardians*, *Dine CARE*, and *350 Montana v. Haaland*, 50 F.4th 1254, 1258–59 (9th Cir. 2022), all concerned drastically more carbon intensive actions than the forest resiliency project at issue here. As the Forest Service emphasized, the Project concerns thinning on 20 percent of the 33,000-acre Project area—a far cry from the 20 percent of

all U.S. coal production in *WildEarth Guardians*, the 370 leases to drill in *Dine CARE*, or the 190

million tons of greenhouse gas emissions in *350 Montana*.  Additionally, the Forest Service did

not resort to a qualitative analysis because it believed a quantitative analysis was impossible.

Rather, the Forest Service followed Ninth Circuit precedent and reviewed the Project in

proportion to its significance.  *See Hapner*, 621 F.3d at 1245 (upholding an EA that did not

contain a discussion of climate change in its analysis but included a discussion in its response to

comments).

     In sum, the Forest Service reasonably analyzed the Project's carbon emission impacts and

adequately explained that Plaintiffs' desire to retain mature and old-growth stands for carbon

benefits strayed from the Project's purposes and needs and served a short-term mindset.  Because

the Forest Service satisfied its obligations to consider competing views and take a hard look at

the carbon emission impacts, the Court should reject Plaintiffs' request to second guess the

agency's weighing of the environmental consequences.  *See Seven Cnty.*, 605 U.S. at 183.

Courts should "not micromanage those agency choices so long as they fall within a broad zone of

reasonableness").

## VI.    REMEDY

     The foregoing demonstrates that the YRR Project complies with the procedural

requirements under NEPA.  This Court thus need not reach the issue of remedy.  But in the

unlikely event this Court were to conclude otherwise, Defendant-Intervenor requests an

opportunity to provide the Court with remedy briefing.  Remedy briefing would demonstrate that

neither vacatur nor an injunction should issue on the facts of this case, particularly because the

YRR Project's activities will help improve the stand conditions and resilience to wildfire events.

The Supreme Court recently clarified that vacatur is not the presumptive remedy in NEPA cases: "Even if an EIS falls short in some respects, that deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the EIS." *Seven Cnty.*, 605 U.S. at 185. Therefore, the Supreme Court's recent decision further bolsters Defendant-Intervenor's position that Plaintiffs' broad requests for vacatur would be inappropriate, given that nothing suggests that the Forest Service might disapprove the YRR Project once additional NEPA analysis is conducted.

## VII.    CONCLUSION

This Court should uphold the YRR Project by granting Defendant-Intervenor's Cross-Motion for Summary Judgment, granting Federal Defendants' Cross-Motion for Summary Judgment, and denying Plaintiffs' Motion for Summary Judgment.

Respectfully submitted this 19th day of December, 2025.

*/s Sara Ghafouri*
Sara Ghafouri, OSB #111021
American Forest Resource Council
700 N.E. Multnomah, Suite 320
Portland, Oregon 97232
Telephone: (503) 222-9505
Fax: (503) 222-3255
sghafouri@amforest.org

Greg Hibbard, OSB #183602
American Forest Resource Council
924 S. Capitol Way South, Suite 102
Olympia, WA 98501
Telephone: (360) 352-3910
Fax: (360) 352-3917
Email: ghibbard@amforest.org

*Attorneys for Defendant-Intervenor*

### CERTIFICATE OF COMPLIANCE

The preceding memorandum complies with the applicable word-count limit under LR 7-2(b), because it comprises 10,997 words, based on the word-count of the word processing system used to prepare the memorandum. This word count includes headings, footnotes, and quotations, but excludes the caption, table of contents, table of authorities, acronym list, motion, signature block, and any certificates of counsel.

Dated this 19th day of December, 2025.


*/s/ Sara Ghafouri*
Sara Ghafouri