ADAM R.F. GUSTAFSON
United States Department of Justice
Principal Deputy Assistant Attorney General
Environment & Natural Resources Division

SHAUN M. PETTIGREW (CA Bar No. 254564)
Senior Trial Attorney
Natural Resources Section
c/o NOAA, Damage Assessment
7600 Sand Point Way, NE
Seattle, WA 98115
(202) 532-5973
shaun.pettigrew@usdoj.gov

LAWRENCE K. PITTMAN (GA State Bar No. 568134)
Trial Attorney
Natural Resources Section
150 M St. NE
Washington, D.C. 20002
 (202) 305-0420
lawrence.pittman@usdoj.gov

*Attorneys for Federal Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF OREGON**
**EUGENE DIVISION**

| | |
|---|---|
| OREGON WILD, an Oregon nonprofit corporation; and WILDEARTH GUARDIANS, a New Mexico nonprofit corporation, | ) ) ) ) ) |
| | Case No. 6:24-cv-00949-AP |
| Plaintiffs, | ) ) |
| v. | ) ) |
| | FEDERAL DEFENDANTS' REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT |
| DAVID WARNACK, in his official capacity as Supervisor of the Willamette National Forest; and UNITED STATES FOREST SERVICE, a federal agency, | ) ) ) ) |
| | |
| Federal Defendants, | ) ) |
| | |
| and | ) ) |

AMERICAN FOREST RESOURCE    )
COUNTIL,    )
    )
       Defendant-Intervenor.    )
_____ )

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.   ARGUMENT ...................................................................................................... 2

      A.    The FEIS Considered a Reasonable Range of Alternatives..................................... 2

      B.    The FEIS Reasonably Assessed the Project's Potential Impacts........................... 5

            1.    Northern Spotted Owl ................................................................... 5

            2.    Fuel Reduction and Fire Risks .................................................. 12

            3.    Carbon Storage and Emissions ............................................... 19

      C.    Remedy ............................................................................................. 26

III.  CONCLUSION ................................................................................................ 27

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Balt. Gas & Elec. v. Nat. Resources Def. Council, Inc.*,
   462 U.S. 87 (1983) .................................................................................... 9, 12

*Bark v. U.S. Forest Service*,
   958 F.3d 865 (9th Cir. 2020) ......................................................................... 15, 16

*Camreta v. Greene*,
   563 U.S. 697 (2011).......................................................................................... 22

*Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*,
   153 F.4th 869 (9th Cir. 2025) ....................................................... 4, 8, 13, 20

*Center for Biological Diversity v. Culver*,
   No. 21-cv-7171-SI, 2026 WL 184201 (N.D. Cal. Jan. 23, 2026).......................... 26

*Center for Biological Diversity v. U.S. Forest Serv.*,
   687 F. Supp. 3d 1053 (D. Mont. 2023)..................................................... 21, 22, 23

*Conner v. Burford*,
   848 F.2d 1441 ............................................................................................ 7

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
   141 F.4th 976 (9th Cir. 2025) ....................................................................... 11

*Earth Island Inst. v. U.S. Forest Serv.*,
   697 F.3d 1010 (9th Cir. 2012) ....................................................................... 24

*Earth Island Inst. v. U.S. Forest Serv.*,
   87 F.4th 1054 (9th Cir. 2023) ....................................................................... 4

*Earth Island Institute v. Muldoon*,
   82 F.4th 624 (9th Cir. 2023) ....................................................................... 16

*Env'tl Prot. Info. Ctr. v. U.S. Forest Serv.*,
   *(EPIC)*, 451 F.3d 1005 (9th Cir. 2006)............................................................ 15

*Friends of Big Bear Valley v. U.S. Forest Serv.*,
   776 F. Supp. 3d 824 (C.D. Cal. 2025) .......................................................... 16

*Gulf v. Burgum*,
   775 F. Supp. 3d 455 (D.D.C. 2025).............................................................. 12

*Hapner v. Tidwell*,
   621 F.3d 1239 (9th Cir. 2010) ..................................................................... 22

*Lands Council v. McNair*,
   537 F.3d 981 (9th Cir. 2008) ....................................................................... 14

*League of Wilderness Defs. Blue Mountains Biodiversity Proj. v. Allen*,
    615 F.3d 1122 (9th Cir. 2010) ............................................................ 14, 15

*Marsh v. Or. Nat. Res. Council*,
    490 U.S. 360 (1989) ............................................................................... 9

*Monsanto Co. v. Geertson Seed Farm*,
    561 U.S. 139 (2010) ............................................................................. 27

*Seven County Infrastructure Coalition v. Eagle County*,
    605 U.S. 168 (2025) ...................................................................... passim

*Swomley v. Schroyer*,
    484 F. Supp. 3d 970 (D. Colo. 2020) ............................................ 23, 24

*U.S. Dept. of Transp. v. Public Citizen*,
    541 U.S. 752 (2004) ............................................................................... 7

*WildEarth Guardians v. Bucknall*,
    756 F. Supp. 3d 1017 (D. Mont. 2024) ............................................... 12

*Wilderness Society v. U.S. Department of Interior*,
    No. 22-CV-1871 (CRC), 2024 WL 1241906 (D.D.C. Mar. 22, 2024) ................................... 12

**Statutes**

16 U.S.C. § 1536(a)(2) ................................................................................ 7

**Regulations**

40 C.F.R. § 1502.9(b) (1978) ................................................................... 24

50 C.F.R. § 402.02 ..................................................................................... 8

**Other Authorities**

90 Fed. Reg. 10,610 (Feb. 25, 2025) ....................................................... 24

## I.    INTRODUCTION

The Forest Service authorized the Youngs Rock Rigdon Project (Project) in April 2023 following years of public participation and close coordination with the Southern Willamette Forest Collaborative. The nearly 500-page final environmental impact statement (FEIS) supporting the Project provided a thorough and detailed analysis of the potential effects of alternatives that would improve the resiliency of the forest, reduce wildfire intensity and severity, improve wildfire response, and provide sustainable forest products. Plaintiffs now seek to upend years of work by Forest Service experts and good faith engagement with the public by claiming the Forest Service somehow violated the National Environmental Policy Act's (NEPA) procedural requirements. In doing so, Plaintiffs attempt to bring about the precise result the Supreme Court recently foreclosed in its "course correct[ing]" decision *Seven County Infrastructure Coalition v. Eagle County*, 605 U.S. 168, 183-84 (2025), by "invok[ing] NEPA and [seeking] to enlist the courts in blocking or delaying even those projects that otherwise comply with all relevant substantive environmental laws." The Court should reject this attempt.

As set forth below, the FEIS and supporting documents more than met the Forest Service's obligations under NEPA by considering a reasonable range of alternatives and engaging in a reasonably thorough analysis of those alternatives' potential effects on the northern spotted owl (NSO), fuel reduction and wildfire risks, and carbon storage and emissions. Plaintiffs' arguments to the contrary all contest the Forest Service's reasonable and well-supported decisions about the scope of alternatives to consider and the breadth and depth of its inquiry. But as the Supreme Court made clear, "an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry—and also about the length, content, and level of detail of the resulting EIS. Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness."

*Seven Cty.*, 605 U.S. at 182-83. The Forest Service's fact-dependent, context-specific, and policy-laden choices fall well within this broad zone of reasonableness, and the Court should deny Plaintiffs' motion for summary judgment, grant Federal Defendants' cross-motion, and enter judgment for Federal Defendants.

## II.    ARGUMENT

### A.  The FEIS Considered a Reasonable Range of Alternatives.

The FEIS identified the purpose and need for a project to: (1) improve stand and landscape diversity, structure, and resiliency by increasing diversity and structure in mixed conifer and moist forests, restoring meadows and oak savannahs, and restoring and improving the complexity and diversity of riparian areas; (2) strategically reduce hazardous fuels to reduce fire risk and promote wildfire response; (3) sustainably manage recreation; (4) identify a sustainable road system; and (5) provide a sustainable supply of forest products. AR17976-82. The FEIS considered the potential effects of a no-action alternative and two action alternatives that the Forest Service determined would meet the purpose and need for a project. Fed. Defs.'Cross-Mot. for Summ. J. 13-14, Dkt. No. 50 (Fed. Defs.' Br.). The FEIS further explained why other alternatives were not considered in detail because they were not feasible or would not meet the purpose and need for a project. *Id.* at 14. This reasoned approach to identifying alternatives for consideration "is precisely the type of line drawing that the Supreme Court made clear in its recent course correcting decision in *Seven County* is within the sound discretion of the Forest Service and to which court must afford substantial deference." *Id.* at 14 (citing *Seven Cnty.*, 605 U.S. at 181-82).

As explained in Federal Defendants' opening brief, the FEIS considered the potential effects of taking no action that allowed comparison to the potential effects of two action alternatives. Fed. Defs.' Br. 13. The two action alternatives varied the application of specific silvicultural treatments to different areas to improve stand and landscape diversity, structure, and

resiliency in the project area. AR17971-73 (Table 1: Comparison of Alternatives). This includes commercial harvest activities that varied the silvicultural treatments (i.e., thinning in natural stands, thinning in managed stands, and regeneration harvest in managed stands) that would apply and varied the total acres to which such activities would apply from 1,853 acres to 2,608 acres. AR17971. This would result in a substantial difference in the total estimated timber volume, ranging from 63 million board feet (MMBF) under Alternative 2 (preferred alternative) to 42 MMBF under Alternative 3 (to none under the no-action alternative). AR17973.

Plaintiffs continue to insist that such a range of alternatives was somehow insufficient under NEPA. Pls.' Reply in Supp. of Mot. for Summ. J. 7-11, Dkt. No. 52 (Pls.' Reply). In doing so, Plaintiffs ignore the important differences in acreage and silvicultural treatments that would apply under each alternative. *See id.* at 9 (focusing solely on total 4,295 acres for treatment rather than specific treatments and locations to which those treatments would apply). And they misleadingly claim that the potential effects on NSO habitat would be nearly identical. Far from being identical, the two action alternatives substantially differ in their potential effects on NSO suitable, dispersal, and critical habitat, as shown in the below table.

Table 35: Effects to Habitat by Alternative

| Habitat Type in all of YRR and in Critical Habitat only | No Action Alternative 1 Habitat removed (acres) | Alternative 2 Habitat removed (acres) | Alternative 2 Habitat modified but maintained (acres) | Alternative 3 Habitat removed (acres) | Alternative 3 Habitat modified but maintained (acres) |
|---|---|---|---|---|---|
| Suitable | 0 | 2,799 | 0 | 1,914 | 885 |
| Dispersal | 0 | 467 | 997 | 229 | 1,235 |
| Suitable, Critical Habitat | 0 | 1,561 | 0 | 676 | 885 |
| Dispersal, Critical Habitat | 0 | 82 | 377 | 59 | 400 |

AR18124. Plaintiffs' failure to appreciate the alternatives' differences in potential effects to NSO habitat emphasizes the Forest Service's expertise in determining the types of silvicultural

treatments and stands within the project area that would achieve the stated purpose and need for a project and in assessing the potential effects of implementing those treatments. "This is a technical, scientific issue where deference to agency technical expertise is at its apogee." *Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*, 153 F.4th 869, 906 (9th Cir. 2025).

Attempting to overcome this maximum level of deference, Plaintiffs argue the FEIS should have considered in detail a "conservation alternative" that they claim reflects "a middle ground" or "middle road" between the two action alternatives and the no-action alternative that would "strike a different balance" and reduce potential effects to the NSO and its habitat. Pls.' Reply 7-10. As detailed in Federal Defendants' opening brief, this argument is misplaced because the Forest Service reasonably explained that the elements comprising this proposed alternative are included as elements of the action alternatives or are inconsistent with the purpose and need for action. Fed. Defs.' Br. 15-16.

But Plaintiffs' claim also fails for the simple reason that NEPA does not "require agencies to evaluate mid-range alternatives between action and no action." *Earth Island Inst. v. U.S. Forest Serv.*, 87 F.4th 1054, 1065 (9th Cir. 2023) (quotations omitted); *see also* Fed. Defs.' Br. 16 ("NEPA does not require the Forest Service to scale back its project in favor of an arguably more environmentally-friendly alternative that plaintiffs would prefer." (citation omitted)). Thus, contrary to Plaintiffs' arguments, the FEIS had no obligation to consider a "middle ground" or "middle road" alternative. Consideration of two action alternatives (which substantially varied the silvicultural treatments and application of those treatments to different areas to achieve the stated purpose and need for a project) and comparison of the potential effects of those alternatives to a no-action alternative more than satisfied the Forest Service's procedural requirements under NEPA.

Indeed, the FEIS went beyond what NEPA required by already considering a mid-range alternative in Alternative 3. What Plaintiffs really want is a mid-mid-range alternative between Alternative 3 and the no-action alternative. NEPA requires no such thing. Instead, the Forest Service reasonably exercised its expertise to make a "fact-dependent, context-specific, and policy-laden choice" about the range of alternatives for consideration. *Seven Cnty.*, 605 U.S. at 183. This choice is owed substantial deference, and the FEIS's consideration of alternatives satisfied NEPA.

In arguing otherwise, Plaintiffs confusingly reference substantive provisions of the Endangered Species Act (ESA) and National Forest Management Act (NFMA). Pls.' Reply 6. But Plaintiffs have brought no claims under either statute. Instead, reference to these statutes merely reveals that Plaintiffs are improperly attempting to superimpose substantive obligations onto NEPA's purely procedural requirements. But the Forest Service fully complied with the ESA and NFMA, and the Supreme Court could not have been clearer: "Simply stated, NEPA is a procedural cross-check, not a substantive roadblock. The goal of the law is to inform agency decisionmaking, not to paralyze it." *Seven Cnty.*, 605 U.S. at 173. The FEIS's range of alternatives promoted informed decision-making and public participation. NEPA requires nothing more.

### B. The FEIS Reasonably Assessed the Project's Potential Impacts.

#### 1. Northern Spotted Owl

Federal Defendants' opening brief explained that the FEIS more than met the Forest Service's obligation under NEPA to address the Project's potential effects on the NSO. Defs.' Br. at 17-26; *Seven Cnty.*, 605 U.S. at 180 ("So when reviewing an agency's EIS, the only role for a court is to confirm that the agency has addressed environmental consequences and feasible alternatives to the relevant project." (internal citation omitted)). Nevertheless, Plaintiffs insist that the Forest Service did not adequately assess the Project's impact on the NSO because it did not fully incorporate into the FEIS updated information related to the effects of wildfires contained in

a 2023 BA that the Forest Service prepared during programmatic consultation under the ESA. But this argument improperly confuses and conflates the inquiries under the ESA and NEPA, ignores the programmatic nature of the ESA consultation that the 2023 BA supported, and fails to afford substantial deference required by NEPA to the Forest Service's reasonable explanation that the wildfires that resulted in the reinitiation of programmatic consultation under the ESA did not affect the FEIS's analysis of the Project's potential effects on the NSO.

As explained in Federal Defendants' opening brief, the FEIS (which incorporated the 2019 BA) provided an overview of the NSO and its suitable habitat, discussed home ranges and core areas and the amount of nesting/roosting/foraging (NRF) habitat required in those area, disclosed the historic range-wide loss of suitable NSO habitat, and explained the role of designated critical habitat. Fed. Defs.' Br. 18-20. It then detailed the suitable NSO habitat and known NSO nest sites across the Forest and assessed the alternatives' potential effects to the NSO in the Project area by assessing whether those effects would comply with the limits set forth in the programmatic ESA consultation that prohibited NRF habitat in occupied nest sites from being reduced below functional thresholds (i.e., 40 percent in home ranges and 50 percent in core areas). *Id.* at 20-21. The FEIS then identified the precise number of acres of suitable habitat affected by the alternatives and the effect at each potential NSO nest site. *Id.* at 21. All this more than satisfied NEPA's procedural requirement to examine potential environmental effects. *Id.* at 22.

In claiming otherwise, Plaintiffs no longer argue the FEIS (and 2019 BA) somehow failed to address the potential effects of barred owls and non-territorial owls on the decline of the NSO. *Compare* Pls.' Mot. for Summ. J. 18-20, Dkt. No. 41 ("Pls.' Br.") *with* Pls.' Reply 11-20. Instead, Plaintiffs now recalibrate their argument to focus exclusively on claiming the FEIS should have been modified to address information contained in the 2023 BA. Pls.' Reply at 11. But the FEIS

reasonably explained that the 2020 wildfires did not affect this project-level analysis because they minimally affected the entire critical habitat unit in which the project is located and that the project area itself was not affected. AR18123. Plaintiffs disagree with this conclusion. But Plaintiffs' disagreement merely invites the exact second-guessing the Supreme Court cautioned against in *Seven County*. 605 U.S. at 181 ("So the question of whether a particular report is detailed enough in a particular case itself requires the exercise of agency discretion—which should not be excessively second-guessed by a court."). As the Court made clear, the "agency is better equipped to assess what facts are relevant to the agency's own decision than a court is. As a result, 'agencies determine whether *and to what extent* to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process.'" *Id.* (quoting *Dept. of Transp. v. Public Citizen*, 541 U.S. 752, 767 (2004)).

In seeking to second-guess the Forest Service's reasonable explanation, Plaintiffs suggest that the same information that resulted in the Forest Service reinitiating programmatic consultation under the ESA also required the Forest Service to provide additional information and analysis in the project-specific FEIS. But this argument ignores important differences between NEPA and the ESA. "NEPA is a procedural statute designed merely to bring environmental concerns into the agency decision-making process," while "the ESA, on the other hand, contains the important substantive mandate that threatened and endangered species shall not be placed in jeopardy." *Conner v. Burford*, 848 F.2d 1441, 1457 n.40 (9th Cir. 1988); *see* 16 U.S.C. § 1536(a)(2) (requiring federal agencies "insure that any action authorized, funded, or carried out" by the agency "is not likely to jeopardize the continued existence of any endangered species . . . or result in the destruction or adverse modification of habitat of such species."). Information necessary to the jeopardy or adverse modification inquiry is not coterminous with NEPA's procedural requirement.

Indeed, "[u]nder NEPA, an agency's only obligation is to prepare an adequate report." *Seven Cnty.*, 605 U.S. at 180. "[U]nlike other environmental laws such as the [ESA], NEPA 'is a purely procedural statute' that 'imposes no substantive environmental obligations or restrictions,'" and "although NEPA requires the agency to analyze environmental impacts and prepare documents and make such analyses available for public inspection, 'NEPA does not require the agency to weigh environmental consequences in any particular way.'" *Cascadia Wildlands*, 153 F.4th at 879-80. "NEPA does not require the agency to prioritize environmental concerns over other concerns in determining whether to proceed with a project; instead, all it requires is that the agency consider and disclose environmental impacts. 'NEPA requires no more.'" *Id*.

Plaintiffs' attempt to conflate NEPA and the ESA is particularly inappropriate where, as here, the ESA consultation is programmatic, covering a program of activities over the course of many years on two national forests, a national scenic area, and a district of the Bureau of Land Management. *See* 50 C.F.R. § 402.02 ("*Programmatic consultation* is a consultation addressing an agency's multiple actions on a program, region, or other basis.") (emphasis added). By contrast, the FEIS addressed the potential effects of a discrete project in a small and defined project area. *See Seven Cnty.*, 605 U.S. at 180 ("So when reviewing an agency's EIS, 'the only role for a court' is to confirm that the agency has addressed environmental consequences and feasible alternatives as to the *relevant project*." (emphasis added)). It is self-evident that different considerations would apply to assess the relevancy of new information to such a programmatic action under the ESA than would apply to a site-specific action under NEPA. *See* Fed. Defs.' Br. 8-9. It is the Forest Service that has the expertise and discretion to assess the difference between the ESA and NEPA analysis and the difference between the programmatic and site-specific consultation and to determine whether information from the consultation affected the analysis in the FEIS. The Forest

Service reasonably determined it did not, and that technical determination is subject to the highest level of deference. *See Seven Cnty.*, 605 U.S. at 182, ("Black-letter administrative law instructs that when an agency makes th[ese] kinds of . . . scientific judgments, and decides what qualifies as significant . . . , a reviewing court must be at its 'most deferential.'" (citing *Baltimore Gas & Elec. v. Nat. Resources Def. Council, Inc.*, 462 U.S. 87, 103 (1983)).

The record clearly supports the reasonableness of the Forest Service's decision.[1] The 2023 BA documented that although the wildfires removed some suitable and dispersal habitat in the relevant critical habitat subunit (WCS-4), such habitat in that subunit *increased* between 2019 and 2021 (which happens as habitat naturally develops). AR19249 (documenting increase in suitable and dispersal habitat); AR18683, AR18698 (noting loss of critical habitat from wildfires); AR22224 (WCS-4 in Project area); AR18817-18 (explaining natural development of foraging and suitable habitat). Further, the 2023 BA explained that the maximum loss of less than five percent of NSO dispersal habitat from the wildfires in WCS-4 was "insignificant at the [critical habitat] unit and subunit spatial scales," and that the critical habitat subunit would "continue to provide for connectivity as intended in the 2012 and 2021 critical habitat rules—including connectivity within portions of WCS-4." AR18698.  Additionally, the analysis of the vegetation management treatments on NSO habitat did not change between the 2019 BA and the 2023 BA. Both BAs apply the same 40 percent and 50 percent suitable habitat thresholds for assessing impairment of nest sites, AR15241, AR18556-57, both require avoidance of adverse effects to high-quality habitat areas, AR15256, AR18581, and both require surveys of NSO habitat and nest sites prior to and

---

[1] As explained in Federal Defendants' opening brief, it is telling that Plaintiffs do not claim the FEIS should have been supplemented due to "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." Fed. Defs.' Br. 24 (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 372 (1989)).

during implementation. AR15262-63, AR18586-87.[2]

In short, the FEIS explained where the Forest Service drew the line in deciding the scope of the environmental effects analysis. *Seven Cnty.*, 605 U.S. at 182. The Forest Service knew of changed conditions that resulted in the reinitiation of programmatic consultation under the ESA but reasonably determined that those changes did not affect the project-specific analysis in the FEIS. AR18360. As the Supreme Court made clear, "[s]o long as the EIS addresses environmental effects from the project at issue, courts should defer to agencies' decisions about where to draw the line." *Seven Cnty.*, 605 U.S. at 182.

Finally, Federal Defendants' opening brief explained that the Forest Service's pre-decisional objection review process was part of the NEPA process, that Oregon Wild availed itself of that process by submitting voluminous objections that addressed the Forest Service's consultation under the ESA, and that the Forest Service responded to those objections explaining that the 2023 programmatic ESA consultation did not affect the FEIS's project-specific effects analysis. Fed. Defs.' Br. at 24-25. Plaintiffs do not dispute any of this.

Following that process, the ROD noted that "concerns were raised regarding recent wildfires on the Middle Fork Ranger District and their influence on the effects of this project." AR22224. And the ROD included a table detailing the effect of wildfires on NSO habitat across the Forest:

---

[2] The primary change relevant to the Project is the 2023 ESA consultation's addition of design criteria 11c and 11d, which require review by a specialist team where activities could adversely affect habitat in an occupied site and preclude authorization of timber harvest activities that remove or downgrade spotted owl habitat in a core area. AR19651; *see* AR27734-55 (consistency review for Project). The ROD removed 500 acres of commercial harvest treatments in suitable habitat in occupied NSO range from the Project in response to these new design criteria. AR22233. In doing so, the Project fully complied with the ESA, and Plaintiffs do not argue otherwise.

**Table ROD 2: Spotted Owl Habitat on the Willamette National Forest as a result of 2021 and 2022 Fires**

| Habitat Type | 2020 Acres | Loss to Fires in 2021-2022* | 2020 minus Loss | Percent Change |
|---|---|---|---|---|
| Suitable Habitat | 767,417 | 34,371 | 733,046 | -4.5% |
| Dispersal Habitat | 218,355 | 4,994 | 213,361 | -2.3% |
| Habitat for Dispersal | 985,772 | 39,365 | 946,407 | -4.0% |

AR22225. Nevertheless, while recognizing that the wildfires "have impacted the District in many ways," the ROD explained that "none of the recent wildfire[s] have changed the impacts of this project and its proposed actions as they did not occur within the affected area that resource specialists used as the basis of their analysis findings." *Id.*; *see also* AR22224 (explaining one fire was more than eight miles from the Project area and two others were at least twenty miles away). The ROD then detailed effects to "Critical Habitat subunit (WCS-4)" that was affected by one of the fires, explaining that the fire had degraded habitat conditions in a way that "may influence movement patterns throughout the Critical Habitat subunit. However, residual habitat levels and connectivity are such that fire impacts are not expected to adversely affect the function of the Critical Habitat subunit or create a strong filter or barrier to spotted owl landscape movement." AR22225. The ROD concluded that the Project "would not further reduce movement potential or the function of the Critical Habitat subunit." *Id.*

All this shows that the objection-resolution process continued to promote the twin aims of NEPA by fostering public participation about any potential effects of the wildfires on the FEIS's analysis and fully informing the agency decision-making process before a decision was made. *See Ctr. for Biological Diversity v. United States Bureau of Land Mgmt.*, 141 F.4th 976, 993 (9th Cir. 2025) (noting twin aims). And it illustrates the relevance of the Supreme Court's recent admonition that the "ultimate question is not whether an EIS in and of itself is inadequate, but whether the agency's final decision was reasonable and reasonably explained." *Seven Cnty.*, 605 U.S. at 184-85; *see also id.* at 180 ("Because an EIS is only one input into an agency's decision and does not

itself require any particular substantive outcome, the adequacy of an EIS is relevant only to the question of whether an agency's final decision (here, to approve the railroad) was reasonably explained."). The Forest Service's decision clearly meets this standard.

None of the non-binding district court cases predating *Seven County* that Plaintiffs rely on support a different conclusion. Pls.' Br. 18-19. *WildEarth Guardians v. Bucknall*, 756 F. Supp. 3d 1017, 1036 (D. Mont. 2024), faulted an agency for attempting to rely on a biological opinion that "was initiated in 2021 and finalized in 2023, well after the Final EA, Decision, and FONSI at issue [in that case] were complete." *Wilderness Society v. U.S. Department of Interior*, No. 22-CV-1871 (CRC), 2024 WL 1241906, at *17 (D.D.C. Mar. 22, 2024), faulted an agency for not "acknowledging superseding developments calling into question their analysis or explaining how past predictions square with new data that has pushed [the agency] back to the drawing board." And *Gulf v. Burgum*, 775 F. Supp. 3d 455, 481 (D.D.C. 2025), faulted an agency for failing "to address information wholly *omitted* from" its analysis that the agency admitted "could have 'major' implications for energy markets.". By contrast, here, the Forest Service explained why the programmatic ESA consultation did not affect the FEIS's site-specific analysis and provided additional opportunities for public input and consideration during the pre-decisional objection review process following preparation of the 2023 BA that informed its final decision. All this fell well within the agency's broad discretion to decide the scope and content of its environmental analysis under NEPA, and the Court "must be at its 'most deferential'" when assessing that decision. *Seven Cnty.*, 605 U.S. at 181-82 (quoting *Balt. Gas & Elec.*, 462 U.S. at 182).

### 2. Fuel Reduction and Fire Risks

Federal Defendants' opening brief explained how the action alternatives would promote forest diversity and structure, increasing the resiliency of the forest by shifting its composition "toward fire- and drought-tolerant species," moving "stands toward late-successional conditions

in the long-term," and generally increasing the "diversity and structure of both mixed conifer and moist forests in the project area." Fed. Defs.' Br. 26 (quoting AR18056). Plaintiffs do not dispute that the action alternatives would have such effects on forest diversity and structure. Instead, they continue to misguidedly claim that the FEIS did not sufficiently address what Plaintiffs characterize as "opposing science" on the action alternatives' potential effects on fire and fuels. Pls.' Reply 20.

In doing so, however, Plaintiffs fail to acknowledge (much less dispute) that the forest in the project area departs from the natural fire regime and that complex modeling detailed in the FEIS shows that the action alternatives will result in patterns of vegetation that reduce the severity and intensity of wildfire. *See* Fed. Defs.' Br. 27 (citing AR18073-82). This detailed analysis satisfied the Forest Service's procedural obligations under NEPA to consider the potential effects of the alternatives. This should end the inquiry, as these "fact-dependent, context-specific, and policy-laden choices about the depth and breadth of [the Forest Service's] inquiry," *Seven Cty.*, 605 U.S. at 183, are within the agency's technical expertise and are subject to the highest level of deference, *Cascadia Wildlands*, 153 F.4th at 906.

Rather than engage with the substance of the FEIS's detailed modeling and effects analysis, Plaintiffs nevertheless insist that NEPA required the Forest Service to respond in more detail to their voluminous comments. AR16318-438 (Oregon Wild comments). But the FEIS responded to all those comments, AR18411-29, and the agency's decision about the "length, content, and level of detail" of responses is entitled to "substantial deference." *Seven Cty.*, 605 U.S. at 183. Indeed, even before *Seven County*, the Ninth Circuit explained that "the Forest Service is only required to acknowledge and respond to comments by outside parties that raise *significant scientific uncertainties and reasonably support that such uncertainties exist.*" *League of Wilderness Defs.*

13

*Blue Mountains Biodiversity Proj. v. Allen*, 615 F.3d 1122, 1137 (9th Cir. 2010) (quoting *Lands Council v. McNair,* 537 F.3d 981, 1001 (9th Cir. 2008) (en banc) (emphasis in original)). Whether something "rise[s] to the level of significant" is within the "substantial discretion" of the agency and "a reviewing court must be at its most deferential." *Seven Cty.*, 605 U.S. 181-82.

In challenging the Forest Service's substantial discretion, Plaintiffs focus on two issues.[3] First, Plaintiffs claim their comments during the administrative process suggesting "there is a low likelihood that the treatments will interact with wildfire" deserved a more fulsome response. Pls.' Reply 22. But the Forest Service expressly acknowledged Oregon Wild's comment that "[t]here is a very low likelihood that fuel treatments will interact with fire, so the benefits are unlikely, while the trade-offs on habitat and carbon are virtually certain to occur," and responded by referencing the FEIS's analysis of fireshed and air quality and explaining that regardless of interaction with fire, the proposed treatments would "start the process of restoration toward a more healthy and resilient landscape that includes different forms of disturbance." AR18426. And as the FEIS's assessment of fireshed details, the Project area "has averaged about 23 known fires per decade" since 1970 and "[r]ecent fire history information collected in the mixed conifer forest site indicate average fire return intervals from five to 14 years." AR18074.

Ignoring this reality, Plaintiffs cite only to a few fleeting references submitted in Oregon Wild's comments about carbon storage, noting a "generally low" probability of treated areas burning. *See* Pls.' Reply 22 (citing AR16391). But those comments contain no reference to the fire history or vegetation patterns in the Project area (which the FEIS contains), no discussion of the

---

[3] Plaintiffs' opening brief addressed these two issues only. *See* Pls.' Br. 29 (focusing on likelihood of fire interacting with treated area and potential for removal of vegetation to make fires worse). Plaintiffs' response broadens this focus but continues to ignore that the FEIS responded extensively to all of Oregon Wild's comments. *See* Pls.' Reply 22.

specific silvicultural and fuels treatments proposed by the alternatives (which the FEIS contains), and no analysis of the contribution of those treatments to improving the resiliency of the forest and reducing wildfire severity and intensity (which the FEIS contains). This falls far short of establishing significant scientific uncertainties.

Second, Plaintiffs maintain the FEIS's response to Oregon Wild's comments about the potential for timber harvest and fuels treatments to increase fire hazard somehow fell short. Pls.' Reply 22. But as explained in Federal Defendants' opening brief, the FEIS expressly noted that "[i]mmediately following harvest there would be an increased fire risk in stands until fuel reduction activities can take place due to the creation of post-harvest activity generated fuels." Fed. Defs.' Br. 29 (quoting AR18080); *see also* AR18080 ("Risk of undesirable fire behavior in areas proposed for strategic understory fuel treatments would temporarily increase until completion of treatments."); AR21331-32 ("[T]he project does not propose thinning alone. The proposed action includes post-harvest fuel treatments including underburning, pile burning, and mastication to manage activity generated fuels."). As the Ninth Circuit has made abundantly clear, the Forest Service's acknowledgment that "short-term fuel loading increases will occur but long-term loading will be reduced" satisfies NEPA in this context. *Env'tl Prot. Info. Ctr. v. U.S. Forest Serv. (EPIC)*, 451 F.3d 1005, 1011, 1016-17 (9th Cir. 2006); *see also Allen*, 615 F.3d at 1137 (finding the Forest Service adequately addressed "opposing views" that "logging older trees would *increase* the risk of fire because of debris"). Plaintiffs do not mention *EPIC*, much less try to distinguish it. Instead, Plaintiffs continue to insist that *Bark v. U.S. Forest Service*, 958 F.3d 865 (9th Cir. 2020) supports their misguided claim. They are wrong.

*Bark*'s import is limited to the very narrow circumstances in which an agency is found to have ignored "considerable contrary scientific and expert opinion" about the efficacy of "variable

density thinning on fire suppression" in assessing whether a project's potential effects are "highly controversial," such that an environmental impact statement must be prepared. *See id.* at 871. As explained in *Earth Island Institute v. Muldoon*, 82 F.4th 624, 639 (9th Cir. 2023), *Bark* does not apply to projects that contemplate prescribed burning to reduce fuels following timber harvest. *Id.* at 639-40 ("Indeed, the fact that the *Bark* thinning would not be followed by a prescribed burn was one of the reasons why we concluded that the scientific evidence demonstrated that a significant controversy existed."); *see also Friends of Big Bear Valley v. U.S. Forest Serv.*, 776 F. Supp. 3d 824, 832 (C.D. Cal. 2025).

Further, Plaintiffs have identified no "considerable contrary scientific and expert opinion" challenging the efficacy of the action alternatives on reducing wildfire severity or intensity. Instead, they cite generically to Oregon Wild's "extensive comments," which simply summarize and provide hyperlinks to a variety of references. Pls.' Reply 22. But the comments point to no specific study or other expert opinion to establish that the silvicultural and fuels reduction treatments (including prescribed fire) would not have the effects analyzed in the FEIS. *See* Pls.' Reply 22. This falls far short of establishing significant scientific uncertainties or reasonably supporting that such uncertainties exist.

Indeed, even a cursory review of those references makes clear that, far from raising significant scientific uncertainties, they show the Forest Service's approach is based on strong scientific agreement. For example, Plaintiffs point to Oregon Wild's comments citing (and providing the hyperlink for) Harold S. J. Zald, Christopher J. Dunn. *Severe fire weather and intensive forest management increase fire severity in a multi-ownership landscape*. 2018.

Ecological Applications, attached as Exhibit 1,[4] for the proposition that "logging can increase fire hazard" and "regeneration logging increases fire hazard for many decades." Pls.' Br. 22 (citing AR16350). But that summary is misleading. An actual review of Zald & Dunn (2018) shows that it supports the approach considered by the FEIS's action alternatives. It specifically notes that "[t]here is strong scientific agreement that fire suppression has increased the probability of high severity fire in many fire-prone landscapes (Miller et al. 2009, Calkin et al. 2015, Reilly et al. 2017), and thinning as well as the reintroduction of fire as an ecosystem process are critical to reducing fire severity and promoting ecosystem resilience and adaptive capacity (Agee and Skinner 2005, Raymond and Peterson 2005, Earles et al. 2014, Krofcheck et al. 2017)." Ex. 1 at 10. In other words, the article explains that the approach proposed in the FEIS's alternatives to reduce the severity of wildfire is based on "strong scientific agreement."

The article also explains that the study's "findings suggest challenges and opportunities for managing intensive plantations in ways that reduce potential fire severity. Increasing the age (and therefore size of trees) and promoting spatial heterogeneity of stands and fuels is a likely means to reducing fire severity, as are fuel reduction treatments in plantations." *Id.* That is precisely what the action alternatives in the FEIS would do by authorizing activities in "managed stands," which are "previously clear-cut stands that were replanted to ensure the site was fully stocked with conifers" 37 to 65 years ago. AR18060. "Today, these plantations are densely stocked with limited understory species and structure." *Id.* The actions considered in the alternatives would increase the size of trees and spatial heterogeneity of these stands through a mix of thinning and regeneration harvest. AR18066-67 (assessing effects of thinning in managed stands to "accelerate[] the

---

[4] Plaintiffs previously argued that these types of references cited in their comments are part of the administrative record for judicial review. *See* Dkt. No. 27 at 8-9.

development of large diameter trees and promote[] vigorous growing, healthy stands (Tappeiner et al 21012) with a more diverse, multilayered understory."); AR18068-69 (assessing effects of regeneration harvest in managed stands to create "stands that are more open, have an increased horizontal complexity and provide early seral forest habitat."). Far from authorizing clearcuts to establish plantations as Plaintiffs misleadingly suggest, the alternatives in the FEIS assessed actions that would increase the size of the trees and the spatial heterogeneity of stands and fuels in managed stands (i.e., plantations), just as Zald & Dunn (2018) recommends.

Plaintiffs also cite Oregon Wild's comments referencing "USDA 2018. Synthesis of Science to Inform Land Management Within the Northwest Forest Plan Area. General Technical Report. PNW-GTR-966 Vol. 1. June 2018" (Technical Report), attached as Exhibit 2, to ostensibly support their position. Pls.' Reply 22 (citing AR16391). But Plaintiffs' comments quote one paragraph from that 1,062-page document that in no way establishes significant scientific uncertainty as to the FEIS's approach. Instead, those comments (and Plaintiffs' brief) simply ignore that the document in fact supports the scientific consensus behind the FEIS's approach. The Technical Report explains that "[a] general principle for thinning to reduce fire severity at the stand scale includes maintaining older trees of fire-tolerant species, reducing understory density, and increasing height to live crowns (Agee and Skinner 2005)." Ex. 2 at 72. It then recommends reducing surface fuels by using prescribed fire and explains that "[l]andscape-scale treatments that restore structural heterogeneity in places where historical fire regimes have been interrupted are proposed as a way to reduce vulnerability to high-severity fire and extensive pathogen and insect outbreaks in the future (Hessburg et al. 2015)." *Id.*

And one more example. Plaintiffs cite Damon B. Lesmeister et al., *Mixed-Severity Wildfire and Habitat of an Old-Forest Obligate*, 10 ECOSPHERE, Apr. 2019, attached as Exhibit 3, to

challenge the FEIS's analysis. Pls.' Reply 22 (citing AR16367). But just as with the above examples, far from establishing scientific disagreement with the Forest Service's approach, this study notes:

> Fuel-reduction treatments such as mechanical thinning can effectively reduce fire severity in the short term, but these treatments, by themselves, may not effectively mitigate long-term dynamics of fire behavior under severe weather conditions and may not restore the natural complexity of historical stand and landscape structure (Schoennagel et al. 2004). On the other hand, prescribed fire that mimics severity and return intervals of natural fire regimes in forests that historically experienced fire can result in landscapes that are both self-regulating and resilient to fire (Parks et al. 2015). Prescribed fire is generally considered the most effective way to reduce the likelihood of high-severity fire in combination with mechanical treatments (Stephens et al. 2009).

Ex. 3 at 16. Again, this article fully supports the FEIS's analysis. *See* AR18073 ("Within fuels treatment areas the application of low intensity underburning would return fire's natural disturbance process . . . .").

Plaintiffs' selective quotations from these articles do not establish significant scientific uncertainties with the FEIS's analysis. Instead, it reinforces the wisdom of the substantial deference owed to the expert agency in its assessment of matters within its area of expertise and its determination of what rises to the level of significant. Plaintiffs would disregard the details of the references it cites and have the Court second-guess the agency's informed decision-making. But that is not the law. The Forest Service reasonably considered the potential effects of the action alternatives on improving forest resiliency and reducing wildfire severity. And it more than fulfilled its obligations under NEPA by responding to Oregon Wild's comments.

### 3. Carbon Storage and Emissions

Federal Defendants' opening brief explained that the FEIS's action alternatives would improve forest resiliency and reduce the intensity and severity of wildfires through the application of targeted silvicultural treatments, including commercial thinning on up to 1,419 acres in natural

stands. Fed. Defs.' Br. 30 (citing AR17971). This is a small project in a small project area (33,000 acres) within a larger national forest (1.7 million acres). *Id.* at 2, 6, 30. There will be no effects on below-ground carbon stocks, which store fifty percent or more of ecosystem carbon, and only about twenty percent of the Project area would be affected by other activities. And far from denuding the Project area, the Project applies targeted silvicultural prescriptions and underburning that Forest Service experts have determined will improve the resiliency of the forest and reduce the severity and intensity of wildfire by returning it to its natural fire regime. *See* Fed. Defs.' Br. 26-28. It is within this context that the Court must consider the FEIS's assessment of potential carbon impacts. In doing so, the Court must give "substantial deference" to the Forest Service's "fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry—and also about the length, content, and level of detail of the resulting EIS." *Seven Cty.*, 605 U.S. at 173. Indeed, this type of analysis requires the highest level of deference because it involves the agency's technical and scientific expertise. *Cascadia Wildlands*, 153 F.4th at 906.

Plaintiffs claim the FEIS's reasonable analysis was somehow deficient, but they never meaningfully engage with the FEIS's analysis or identify how it is deficient other than by generically claiming it "failed to articulate any criteria against which to gauge" the Project's potential carbon impacts "at either the local or global scale," or failed "to fully assess the Project's carbon implications." Pls. Reply 29-30. Such broad assertions unmoored from the actual analyses in the FEIS do nothing to overcome the substantial deference afforded the agency.

Plaintiffs ignore that the FEIS noted that climate change "is a global phenomenon," detailed global and national greenhouse gas emissions, and reasonably explained that "a project of this size makes an extremely small contribution to overall emissions." AR18251-52. Indeed, the FEIS explained that not only would the Project negligibly contribute to overall emissions, but it is

also "consistent with options proposed by the [International Panel on Climate Change] for minimizing the impacts of climate change on forests, thus meeting objectives for both adapting to climate change and mitigating [greenhouse gas] emissions. (McKinley et al. 2011)." AR18253. In short, the FEIS explained:

> The relatively small quantity of carbon released to the atmosphere and the short-term nature of the effect of the proposed action on the forest ecosystem are justified, given the overall change in condition increases the resistance to wildfire, drought, insects and disease, or a combination of disturbance types that can reduce carbon storage and alter ecosystem functions (Millar et al. 2007, Amato et al. 2011). Furthermore, any initial carbon emissions from this proposed action would be balanced and possibly eliminated as the stand recovers and regenerates because the remaining trees and newly established trees typically have higher rates of growth and carbon storage (Hurteau and North 2009, Dwyer et al. 2010, McKinley et al. 2011).

AR18253.

Rather than engage with the substance of the FEIS's analysis, Plaintiffs suggest that it is insufficient because of its brevity. Pls.' Reply 28 (arguing analysis inadequate because it is "under three pages"). This ignores that the FEIS's analysis relied on an extensive bibliography of relevant references. *See* AR18345-47. But more fundamentally, it misunderstands NEPA. "Brevity should not be mistaken for lack of detail. A relatively brief agency explanation can be reasoned and detailed." *Seven Cnty.*, 605 U.S. at 181. And that is especially true when the proposed agency action will have little to no effect on the resource being analyzed.

In arguing to the contrary, Plaintiffs rely almost exclusively on *Center for Biological Diversity v. U.S. Forest Serv. (Black Ram)*, 687 F. Supp. 3d 1053 (D. Mont. 2023). Pls.' Reply 27-31. And that is understandable since *Black Ram* is the *only* case in which a court has found an assessment of climate impacts for a forest restoration project insufficient under NEPA. But that case is easily distinguishable, as it relied on a "cookie-cutter" analysis in which an analysis for a project on one forest was copied and pasted into an analysis for a different project on another

forest. *Black Ram*, 687 F. Supp. 3d at 1074 n.7. And the same court has refused to extend its holding. *See Ctr. for Biological Diversity v. U.S. Forest Serv.*, --- F. Supp. 3d ---, No. 23-cv-M-DWM, 2025 WL 3549515, at *5 (D. Mont. Dec. 11, 2025).

Further, as explained in Federal Defendants' opening brief, *Black Ram* is no longer good law under *Seven County* and, even if it were, the case lacks any persuasive force because it failed to apply the substantial deference required under NEPA and misapplied *Hapner v. Tidwell*, 621 F.3d 1239 (9th Cir. 2010).[5] *See* Fed. Defs.' Br. 32-35. In response, Plaintiffs fail to even mention *Seven County* or address the substantial deference that must be afforded the FEIS's analysis. *See* Pls.' Reply 24-31. Further, having nowhere mentioned *Hapner* in their opening brief, Plaintiffs now seek to distinguish it by claiming "the Forest Service has authorized much more extensive and intensive logging than was at issue in *Hapner*." Pls.' Reply 28. In doing so, Plaintiffs seek to perpetuate *Black Ram*'s error of second-guessing the Forest Service's reasonable "fact-dependent, context-specific, and policy-laden choice[] about the depth and breadth of its inquiry." *Seven County*, 605 U.S. at 183; *see* Fed. Defs.' Br. 33-35.

*Hapner* upheld an environmental assessment under NEPA that did not discuss climate impacts for a project that authorized "logging on up to 810 acres." 621 F.3d at 1242. Here, the FEIS considered potential climate impacts when considering action alternatives that would commercially harvest trees on up to 2,608 acres.[6] AR17971. The issue then is whether this

---

[5] Plaintiffs seem to suggest the United States is precluded from challenging the poor reasoning in *Black Ram*. *See* Pls.' Reply 27. But even if *Black Ram* remains good law following *Seven County*, it is not binding on the judge who issued the decision or in the judicial district in which the decision was issued, much less on a court outside that judicial district. *See Camreta v. Greene*, 563 U.S. 697, 709 n.7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case.").

[6] Alternative 2 considered 2,608 acres of total commercial harvest (with 1,419 acres of thinning in natural stands) while Alternative 3 considered 1,853 acres (with 664 acres of thinning in natural

difference is enough to find that no analysis of climate impacts is required for the project in *Hapner* while a more fulsome analysis is required for the Project than the FEIS provided here. Plaintiffs would say it is, but they cannot say why it is. *See* Pls.' Reply 28. Similarly, the court in *Black Ram* said a project authorizing 3,902 acres of commercial harvest required more than the qualitative climate impacts analysis in that case. 687 F. Supp. 3d at 1076. But just like Plaintiffs, the court in *Black Ram* could not say why the size of that project was meaningfully different than the size of the project in *Hapner*. *See id.* (noting difference in size of projects and concluding without explanation that *Hapner* did not support the "limited carbon impacts analysis here"). And that is for the reason the Supreme Court clearly articulated in *Seven County*:

> When assessing significant environmental effects and feasible alternatives for purposes of NEPA, an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry—and also about the length, content, and level of detail of the resulting EIS. Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness. As the Court has emphasized on several occasions, and we doubly underscore again today, inherent in NEPA is a rule of reason, which ensures that *agencies determine whether and to what extent to prepare an EIS based on the usefulness of any new potential information to the decisonmaking process*. A reviewing court may not substitute its judgment for that of the agency as to the environmental consequences of its actions.

605 U.S. at 182-83 (emphasis added) (internal citations omitted). In short, such decisions are committed to the sound discretion of the expert agency.

This is what *Swomley v. Schroyer*, 484 F. Supp. 3d 970, 973 (D. Colo. 2020), written by the then chief judge of the U.S. Court of Appeals for the Tenth Circuit, got exactly right when considering whether the Forest Service sufficiently assessed the potential effect to climate change of a forest resiliency project that authorized "logging on 1,631 acres of land in the White River

---

stands). AR17971. The Project authorized 2,242 acres of commercial harvest (with 1,053 acres of thinning in natural stands). AR22211.

National Forest." The court explained that the plaintiffs "do little to show why the emissions from the Project are sufficiently significant to require detailed analysis under NEPA" other than citing "a bevy of cases" that are easily distinguishable because they "involve[] projects, plans, or rules associated with the combustion or extraction of fossil fuels, such as coal, natural gas, or oil," in which "the significance of emissions was often beyond doubt." *Id.* at 976. Rather than rely on those cases, the court correctly found *Hapner* to be a "more apt comparison," concluding that "the Forest Service did not run afoul of NEPA or act arbitrarily or capriciously in not analyzing the effects of these impacts further." *Id.* at 977. So too here.

Attempting to avoid this conclusion, Plaintiffs cast their argument as a failure by the Forest Service to adequately respond to their comments rather than a failure to sufficiently consider the issue in the FEIS. Pls.' Reply 24-27. But this gets them no further. The NEPA regulations that applied to the Project required an EIS to "respond to comments" and "discuss at appropriate points in the final statement any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised." 40 C.F.R. § 1502.9(b) (1978).[7] But this does not require an agency to "respond to every single scientific study or comment. Furthermore, even if Plaintiffs disagree with the agency's responses, that disagreement does not render the Forest Service's review and comment process improper." *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1021 (9th Cir. 2012).

Oregon Wild's climate-related comments to the DEIS were sprawling, including dozens of

---

[7] The Council on Environmental Quality (CEQ) promulgated regulations implementing NEPA in 1978. These regulations were amended in 2020. *See* 85 Fed. Reg.43,305 (July 16, 2020). Following additional amendments in 2022 and 2024, the CEQ regulations were rescinded in February 2025. *See* 90 Fed. Reg. 10,610, 10,612-13 (February 25, 2025). The 1978 regulations apply to this matter because scoping began in January 2019, before the 2020 regulations took effect. AR22230 (noting 1978 CEQ regulations applied).

hyperlinks to materials such as articles from various news outlets, blogposts, Wikipedia entries, YouTube videos, comments to state administrative agencies, and opinions of the Hague Court of Appeal. *See, e.g.*, AR16377, AR16430, AR16381-82, AR16415, AR16427 (news outlets), AR16381, AR16384, AR16396 (blogposts), AR16390 (Wikipedia), AR16415 (YouTube), AR16385 (comments to state agency), AR16378 (Hague Court of Appeal). Rather than responding to the individual points or citations, the FEIS responded by summarizing and responding to categories of issues. In the case of carbon storage and greenhouse gas emissions, the FEIS responded by acknowledging the "short-term carbon trade-off" of thinning and prescribed fire, clarifying that "no full or partial land-use change occurs as a result of the proposed management action that would permanently affect the project area's carbon carry capacity," and explained the high likelihood that the remnant trees following treatment would likely be healthier and that carbon stores would return to maximum levels within a few decades. AR18412. After this discussion, the FEIS squarely acknowledged in response to Plaintiffs' comments that "[t]here is no consensus in the literature on whether thinning to reduce disturbance severity is a net climate benefit or not (McKinley et al. 2011)." *Id.* But the FEIS noted the Forest Service, consistent with national and international guidance, would manage the forest to improve long-term resiliency and ecosystem function rather than to maximize potential short-term carbon benefits. AR18412-13.

Plaintiffs clearly disagree with that policy choice, but such a disagreement does not establish a NEPA violation. Instead, the overriding inquiry is whether the agency's choices as to the depth and breadth of its inquiry, including its response to comments, fall within a broad zone of reasonableness. The FEIS considered potential climate impacts and responded to comments regarding those impacts in proportion to their significance. This approach was reasonable, is subject to substantial deference, and should be upheld.

### C.  Remedy

For the reasons noted above and in Federal Defendants' opening brief, the Forest Service fully complied with NEPA, and the Court need not reach the issue of remedy. Nevertheless, even if the Court were to find a procedural violation under NEPA, the proper remedy would not be vacatur. Having addressed the issue in three *sentences* in their opening brief, Pls.' Br. 36, Plaintiffs now spend three *pages* trying to avoid the Supreme Court's clear statement that "[e]ven if an EIS falls short in some respects, that deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the EIS." *Seven Cty.*, 605 U.S. at 184-85; Pls.' Reply 31-34.

Plaintiffs cannot make such a showing. As explained above, the Project applies well-established and well-understood silvicultural treatments to improve the resiliency of the forest by improving its structure and diversity, return the area to its natural fire regime, reduce the severity and intensity of wildfire, and improve wildfire response. And it does all this in full compliance with the substantive mandates of the ESA, including those that apply to the NSO, and all other laws. This presents the precise scenario the Supreme Court contemplated when it explained that a NEPA deficiency does not presumptively lead to vacatur of the challenged agency action.

Plaintiffs cite *Center for Biological Diversity v. Culver*, No. 21-cv-7171-SI, 2026 WL 184201 (N.D. Cal. Jan. 23, 2026), to support their argument. Pls.' Reply 33. But that case illustrates why vacatur would be improper here. There, the court found the agency had violated not only NEPA but also the ESA, Clean Air Act, and Federal Land Policy and Management Act (FLPMA). *Id.* at *1; *see also id.* at *3 ("The Court's 2024 summary judgment order did not identify merely 'procedural' violations, but also found multiple substantive FLPMA and ESA violations."). And it involved a challenge to the approval of a designated route for off-highway vehicles. *Id.* This is

far different from this NEPA-only case that involves a Project that will confer substantial benefits on the environment while fully complying with all substantive laws. Thus, there is no reason to believe that the agency might disapprove of the project if it added more to the FEIS, and vacatur of the Project is not warranted.[8]

## III.    CONCLUSION

For the reasons stated above and in Federal Defendants' opening brief, Plaintiffs' motion for summary judgment should be denied, Federal Defendants' cross-motion granted, and judgment entered in favor of Federal Defendants.


Respectfully submitted this 6th day of March, 2026.

<div style="margin-left: 40%;">

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment & Natural Resources Division


*/s/ Shaun M. Pettigrew*
SHAUN M. PETTIGREW
Senior Trial Attorney, CA Bar No. 254564
c/o NOAA Damage Assessment
7600 Sand Point Way, NE
Seattle, WA 98115
(202) 532-5973
shaun.pettigrew@usdoj.gov

LAWRENCE K. PITTMAN (GA State Bar No. 568134)
Trial Attorney
Natural Resources Section
150 M St. NE
Washington, D.C. 20002
(202) 305-0420
lawrence.pittman@usdoj.gov

</div>

---

[8] Plaintiffs also alternatively request injunctive relief without even attempting to satisfy their burden of showing such relief is warranted. Pls.' Reply 33-34; *see Monsanto Co. v. Geertson Seed Farm*, 561 U.S. 139, 156-57 (2010) (noting "traditional four-factor test "applies when a plaintiff seeks a permanent injunction to remedy a NEPA violation," with no "thumb on the scales" in favor of an injunction). The Court should reject this unsupported request.

*Attorneys for Federal Defendants*