# EXHIBIT 1

Memorandum Opinion
*Powder River Basin Res. Council v. U.S. Dep't of Interior*
No. 22-cv-2696 (TSC), 2026 WL 555013 (D.D.C. Feb. 27, 2026)

2026 WL 555013
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.

POWDER RIVER BASIN RESOURCE
COUNCIL, et al., Plaintiffs,
v.
U.S. DEPT. OF THE INTERIOR, et al.,
Defendants.

Case No. 22-cv-2696 (TSC)
|
Filed 02/27/2026

**Attorneys and Law Firms**

Todd C. Tucci, Sarah K. Stellberg, Pro Hac Vice, Advocates for the West, Boise, ID, Hannah A. Goldblatt, Pro Hac Vice, Advocates for the West, Portland, OR, for Plaintiffs.

Michael Keith Robertson, DOJ-ENRD, Washington, DC, for Defendants.

**MEMORANDUM OPINION**

TANYA S. CHUTKAN United States District Judge

**\*1** Plaintiffs Powder River Basin Resource Council and Western Watersheds Project, two environmental advocacy groups, challenge the U.S. Department of the Interior and the U.S. Bureau of Land Management's ("BLM") approval of the Converse County Oil and Gas Project ("Project"), alleging violations of the National Environmental Policy Act ("NEPA"), the Administrative Procedure Act ("APA"), the Federal Land Policy and Management Act ("FLPMA"), and the Mineral Leasing Act ("MLA"). Wyoming intervened, along with private energy companies Continental Resources, Inc., Devon Energy Production Company, L.P., Anschutz Exploration Corporation, and Petroleum Association of Wyoming ("Intervenors"). The court previously denied Plaintiffs' motion for a preliminary injunction, ECF No. 64, granted in part and denied in part Intervenors' motion to dismiss, ECF No. 67, and denied Intervenors' Motion to Transfer, ECF No. 68. *See* ECF Nos. 105–08. The court also granted in part and denied in part Plaintiffs' motion for summary judgment, ECF No. 116, and denied cross motions for summary judgment filed by Defendants, Intervenors, and Wyoming, ECF Nos. 118, 121, 123. *See* ECF No. 130. Before the court are Plaintiffs' remaining claims on summary judgment, as well as Defendants' Motion to Dissolve the Injunction, ECF No. 145, Intervenors' Motion to Dissolve the Interim Injunction, ECF No. 148, and Plaintiffs' Motion for Leave to File a Second Amended Complaint, ECF No. 155.

For the reasons below, the court will GRANT Plaintiffs' motion for summary judgment, DENY as moot Defendants' and Intervenors' motions to dissolve the injunction, and DENY Plaintiffs' motion for leave to file a Second Amended Complaint.

**I. BACKGROUND**

In 2013, energy companies ("Operator Group") submitted a proposed development plan to drill thousands of oil and gas wells in Converse County, Wyoming and amend the 2007 Casper Resource Management Plan ("RMP"). BLM published a draft, supplemental, and final Environmental Impact Statement ("EIS") analyzing the Project's anticipated environmental effects. *See* AR 1183, 1190–93, 1277–78, 1292, 3143–234, 8413–94, 12362–13469. According to the final EIS, 10 percent of the Project area consists of federal surface overlaying federal minerals and 54 percent consists of non-federal surface overlaying federal minerals. *See* AR 46, 12426. As part of its NEPA analysis, the EIS examined three alternatives: Alternative A, a no-action alternative, in which no new drilling would be authorized; Alternative B, the Operator Group's proposed alternative, which would authorize 5,000 new wells on 1,500 new well pads over ten years; and Alternative C, a modified alternative, which would authorize the same number of wells, but would also require some additional mitigation measures such as water recycling and clustering of wells to reduce surface disturbance. *See* AR 1190–93. In December 2020, the Secretary of the Interior issued a Record of Decision ("ROD") selecting Alternative B and approving an amendment to the Casper RMP. AR 16735–38. BLM then began issuing Applications for Permit to Drill ("APDs") pursuant to the ROD. *See* Defs' Opp'n to Pls' Mot. for Prelim. Inj., Ex. 1 ¶ 4, ECF No. 83-1.

**\*2** In September 2022, Plaintiffs filed this action challenging the Project approval. *See* Compl., ECF No. 1. They claim that Defendants violated NEPA, the APA, the FLPMA, and the MLA in approving the Project and issuing hundreds of APDs without taking a "hard look" at various environmental impacts like impacts to groundwater and greenhouse gas emissions, justifying elimination of alternatives from further analysis, mitigating air emissions, and preventing unnecessary or undue degradation of the public lands. 1st Am. Compl. ¶¶ 1, 112, 121–58, ECF No. 44.

In March 2023, Plaintiffs moved for a preliminary injunction, seeking to enjoin the Project and any further APDs pending the court's decision on the merits, ECF No. 64, and Intervenors moved to dismiss, arguing in relevant part that Plaintiffs lacked standing to challenge the APDs, ECF No. 67. The court denied the motion for a preliminary injunction, holding that Plaintiffs failed to demonstrate a likelihood of success on the merits or a likelihood of irreparable harm. *See* Mem. Op. at 18–30, ECF No. 105. The court also granted in part and denied in part Intervenors' motion to dismiss, finding Plaintiffs lacked standing to challenge the APDs. *See id.* at 12. In January 2024, Plaintiffs moved for summary judgment, ECF No. 116, and Defendants, Intervenors, and Wyoming all separately cross moved, ECF Nos. 118, 121, 123. In September 2024, the court entered partial summary judgment in Plaintiffs' favor, holding that BLM's use of an erroneous specific storage value to model groundwater drawdown was arbitrary and capricious. *See* Mem. Op. at 15–16, ECF No. 130. The court did not reach Plaintiffs' remaining claims, and instead requested supplemental remedies briefing and temporarily enjoined further permit approvals based on the deficient EIS. *Id.* at 16–17.

In April 2025, BLM published a White Paper finding no significant changes to groundwater drawdown even accounting for a wider range of specific storage values. *See* Defs.' Mot. to Dissolve Inj. at 2–3, ECF No. 145. In June 2025, based on the White Paper, BLM published a supplemental Environmental Assessment ("EA") of groundwater impacts, and a corresponding Finding of No New Significant Impact ("FONNSI") and Decision Record ("DR") affirming the Converse County ROD. *See id.* at 3–4.

In August 2025, relying on the White Paper, BLM issued an EA, Finding of No Significant Impact ("FONSI"), and DR for the development of 212 horizontal oil and gas wells drilled on non-federal surface land. *See* Defs.' Opp. to Pls.' Mot. for 2d Am. Compl. at 4–5, ECF No. 162. The following month, BLM issued another EA, FONSI, and DR associated with 58 APDs on fee or federally owned surface land. *See id.* at 5. These two EAs provided the basis for BLM's approval of another 60 APDs through 20 Categorical Exclusions that allowed BLM to circumvent further site-specific NEPA analysis. *See* Pls.' Mot. for 2d Am. Compl. at 9, ECF No. 155. Plaintiffs seek to file a Second Amended Complaint challenging BLM decisions that (a) reaffirm the 2020 EIS and ROD based on the June 2025 Supplemental EA, FONNSI, and DR; and (b) authorize 255 new APDs under the two EAs and 20 Categorical Exclusions issued since August 2025. *See id.* at 10.

### II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(a), which typically supplies the legal standard on summary judgment, does not apply to motions for summary judgment in APA cases "because of the court's limited role in reviewing the administrative record." *Coe v. McHugh*, 968 F. Supp. 2d 237, 239 (D.D.C. 2013). Instead, the court must decide, as a matter of law, "whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Id.* at 240. Under this standard, the court is "highly deferential" to agency action, *Env't Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981), setting it aside only if the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2).

**\*3** "To satisfy the APA's 'arbitrary and capricious' standard, an agency must 'articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 203 (D.C. Cir. 2007) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). That means the agency must "explain the assumptions and methodology used in preparing" any models, *id.* at 204 (quoting *U.S. Air Tour Ass'n v. FAA,* 298 F.3d 997, 1008 (D.C. Cir. 2002)), and "provide a full analytical defense" of any challenged aspects, *Eagle–Picher Indus., Inc. v. EPA,* 759 F.2d 905, 921 (D.C. Cir. 1985). In doing so, the court may not "supply a reasoned basis for the agency's action that the agency itself has not given." *State Farm*, 463 U.S. at 43. The plaintiff bears the burden of establishing that the agency's action is invalid. *Fulbright v. McHugh*, 67 F. Supp. 3d 81, 89 (D.D.C. 2014).

The APA standard of review applies to NEPA claims, as NEPA does not provide an independent private right of action. *See*

*Salazar*, 661 F.3d 66, 72 (D.C. Cir. 2011). As part of its "broad national commitment to protecting and promoting environmental quality," *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989), NEPA requires agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C); *see id.* § 4336(b)(1). First, the agency must determine whether its proposed action is the type for which a full EIS is normally required, or whether it falls within a Categorical Exclusion, a category of actions that "normally does not significantly affect the quality of the human environment within the meaning of [NEPA]." 42 U.S.C. § 4336e(1). "If the proposed action falls into neither category, NEPA directs the agency to prepare an EA that provides 'sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.'" *In re Polar Bear Endangered Species Act Listing & 4(d) Rule Litig.*, 818 F. Supp. 2d 214, 238 (D.D.C. 2011) (citation omitted); *see* 42 U.S.C. § 4336(b)(2). If, based on the EA, the agency concludes that the action will not have a significant environmental effect, it may issue a FONSI in lieu of preparing an EIS. *See Sierra Club v. FERC*, 827 F.3d 59, 63 (D.C. Cir. 2016).

### III. ANALYSIS

#### A. Summary Judgment Motions

As discussed above, the court's previous Memorandum Opinion addressing Plaintiffs' motion for summary judgment and Defendants' and Intervenors' cross motions for summary judgment held that Defendants' choice of specific storage value was arbitrary and capricious, but ordered supplemental briefing addressing the appropriate remedy. In doing so, the court left unadjudicated Plaintiffs' remaining summary judgment claims. Having considered the parties' remedies briefing, ECF Nos. 135, 137, 138, 139, 142, as well as Plaintiffs' remaining summary judgment claims, the court finds that vacatur is appropriate based on another NEPA deficiency: Defendants' failure to adequately conduct an analysis of reasonable alternatives.

#### 1. Mootness

As a preliminary matter, Defendants argue that because they have remedied the only error the court identified in the Converse County EIS and ROD, Plaintiffs' remaining claims are moot and any further order on remedy is unwarranted. *See* Defs.' Mot. to Dissolve Inj. at 7. Defendants put the cart before the horse. In focusing on the specific storage value as grounds for determining that the Project approval was deficient, the court did not implicitly hold that Plaintiffs' remaining grounds were meritless. And contrary to Defendants' representation, the June 2025 DR does not "supersede[ ]" the 2020 ROD. Defs.' Opp. to Pls.' Mot. for 2d Am. Compl. at 8. The 2025 supplemental EA makes clear on its face that it does not displace the 2020 EIS: the EA is expressly "limited to the analysis of potential groundwater drawdown impacts" and serves only to "provide additional NEPA analysis using revised specific storage values." U.S. Dep't of the Interior, Bureau of Land Mgmt., *CCOGP Environmental Assessment* 2 (June 6, 2025). The June 2025 DR likewise "incorporates by reference" the 2020 EIS. U.S. Dep't of the Interior, Bureau of Land Mgmt., *CCOGP Decision Record* 1 (June 6, 2025).

**\*4** Moreover, even assuming the June 2025 DR legally displaces the ROD, it would not moot Plaintiffs' claims, as BLM has not corrected the allegedly deficient analysis. Intervening events moot a claim if "the [challenged] decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 901 F.3d 356, 361 (D.C. Cir. 2018) (quoting *Initiative & Referendum Inst. v. USPS*, 685 F.3d 1066, 1074 (D.C. Cir. 2012)). In the case of superseding agency action, the court must ensure that "(1) there is no reasonable expectation that the alleged violation will recur, and (2) interim relief or events have completely or irrevocably eradicated the effects of the alleged violation." *Id.* at 362 (quoting *Nat'l Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 349 (D.C. Cir. 1997)). As noted above, the DR "affirm[ed]" the ROD, "incorporat[ing] by reference" the 2020 EIS. U.S. Dep't of the Interior, Bureau of Land Mgmt., *CCOGP Decision Record* (June 6, 2025). In other words, even assuming the 2025 documents somehow "replaced" the 2020 documents, it is not "correct to say [BLM] has ceased the challenged conduct; instead, [it] has renewed the challenged conduct in a new form." *Am. Freedom Def. Initiative*, 901 F.3d at 362. "In these circumstances, the [new actions] preserve, rather than moot, the original controversy ...." *Pickus v. U.S. Bd. of Parole*, 507 F.2d 1107, 1111 (D.C. Cir. 1974); *see Organic Trade Ass'n v. U.S. Dep't of Agric.*, 370 F. Supp. 3d 98, 111 (D.D.C. 2019) ("Agencies can moot claims against them by promulgating new rules that cure previous procedural defects ....").

*2. NEPA Alternatives Analysis*

"The heart of an EIS is its analysis of a reasonable range of alternatives to the agency's proposed action." *Oceana, Inc. v. Evans*, 384 F. Supp. 2d 203, 240 (D.D.C. 2005). An alternative is "reasonable," and should be considered if it is "technically and economically practical or feasible" and "meet[s] the purpose and need of the proposed action." 43 C.F.R. § 46.420(b). The court evaluates "both an agency's definition of its objectives and its selection of alternatives under the 'rule of reason.' " *Theodore Roosevelt*, 661 F.3d at 73 (quoting *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195–96 (D.C. Cir. 1991)). If an agency's objectives are not "unreasonably narrow," the court "will uphold the agency's selection of alternatives that are reasonable in light of those objectives." *Id.* But "for alternatives [that the agency] eliminated from detailed study," the agency must "briefly discuss the reasons for their ... eliminat[ion]." *Stand Up for California! v. U.S. Dep't of the Interior*, 919 F. Supp. 2d 51, 77 (D.D.C. 2013) (citation omitted).

*a. Paced Development Alternative*

BLM "eliminated from further detailed analysis" an alternative limiting the total number of wells developed annually because "its implementation is remote or speculative, and it is inconsistent with the basic policy objectives for the management of the area." AR 12492. BLM reasoned that implementation was speculative because "[a] reduction in the number of wells drilled in a year may not reduce surface disturbance (i.e., the number of pads may not be reduced)" and any limit on the number of wells "could not be imposed on approximately one-third of the CCPA." *Id.* Similarly, BLM "eliminated from further analysis" an alternative limiting the number of wells per operator because it "would not be consistent with the purpose of the agency action," "would not address a known resource conflict in the CCPA," "could not be imposed on approximately one-third of the CCPA," and because the agency lacks "the authority to infringe upon existing lease rights by imposing limits on the pace of development or selecting which operator(s) are allowed to drill." *Id.*

The court addresses each rationale in turn. Contrary to BLM's representation, a slower pace of development is not inconsistent with the agency's stated purpose and need for agency action. The EIS states the relevant purpose and need as follows:

> The need for [BLM] action is to respond to this proposal while allowing the OG to exercise its valid lease rights under pertinent laws, rules, and regulations. The Federal Land Policy and Management Act of 1976 (Public Law 94 579, 43 United States Code 1701 et seq.) recognizes oil and gas development as one of the "principal" uses of public lands. Federal mineral leasing laws (Mineral Leasing Act of 1920, 30 USC 188 et seq.) and regulations recognize the statutory right of lease holders to develop federal mineral resources to meet continuing national needs and economic demands. The purpose of this EIS is to evaluate potential impacts resulting from implementing future plans and applications related to this proposal; to facilitate the decision-making process to approve, approve with modifications, or disapprove the proposed project or project components based on an evaluation of the expected impacts; and to the extent possible, minimize or avoid environmental impacts.

**\*5** AR 12370.
BLM does not attempt to defend its contention that phased development is inconsistent with these stated objectives. Nor could it, because such a rationale fails to pass muster even under a deferential review for reasonableness. Contrary to Intervenors' representation, BLM's stated purpose is not to "*enact* or *adopt* the Operators' proposal," but rather "to decide *whether* to adopt the proposal at all, and if so, to what degree." *Theodore Roosevelt*, 661 F.3d at 73. "This objective permits a reasonable range of alternatives that either reject the proposal or adopt it to varying degrees or with alterations." *Id.* And while Intervenors stress that a reduced rate of development runs contrary to the "main" purpose and need for agency action, which they assert is to promote the exercise of lease rights and development of federal mineral resources, Intervenors' Cross Mot. Summ. J. at 23–24, ECF No. 121, the statement of purpose expressly contemplates that BLM should "minimize or avoid environmental impacts" when "possible" based on its "evaluation of [ ] expected impacts," AR 12370. It is also "past doubt" that the FLPMA "does not require BLM to prioritize [oil and gas] development over other [land] uses," which include "conservation to protect environmental values." *New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 710 (10th Cir. 2009). Similarly, the MLA requires BLM to include in each lease provisions to ensure "the safeguarding of the public welfare" and regulate "surface-disturbing activities ... in the interest of conservation of surface resources." 30 U.S.C. §§ 187,

226(g); see *Copper Valley Mach. Works, Inc. v. Andrus*, 653 F.2d 595, 601 (D.C. Cir. 1981) ("[S]uspending operations to avoid environmental harm is definitely a suspension in the interest of conservation in the ordinary sense of the word."); *Nat. Res. Def. Council, Inc. v. Berklund*, 458 F. Supp. 925, 936 n.17 (D.D.C. 1978) (interpreting "safeguarding of [ ] public welfare" to provide "broad authority to set lease terms to prevent environmental harm"). Because, as BLM recognized, "a reduction in the number of wells drilled in a year may result in a reduction in air emissions and a potential reduction in air quality impacts," it is consistent with its statement of need and purpose to examine that alternative. AR 12492.

BLM also eliminated this alternative on the basis that it lacks "authority to infringe upon existing lease rights." *Id.* Again, Intervenors alone defend this rationale, which is irreconcilable with statutory authority. Under the MLA, the Secretary of the Interior "has discretion to determine where, when, and under what terms and conditions oil and gas development should occur." *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 52 (D.D.C. 2019) (citing 30 U.S.C. § 226); *cf.* 43 U.S.C. § 1732(b) (requiring BLM to "take any action necessary to prevent unnecessary or undue degradation of the lands"). "Accordingly, the federal government may impose a broad range of stipulations on oil and gas leases for federal land, including concerning the timing, pace, and scale of development." *Zinke*, 368 F. Supp. 3d at 52.

**\*6** BLM also stated that a paced development alternative "would not address a known resource conflict," AR 12492, presumably in reference to NEPA's requirement that agencies "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources," 42 U.S.C. § 4332(H). Again, Intervenors alone defend this rationale, arguing that BLM need only consider conflicts between oil and gas development and "recovery of other *mineral* resources," not air quality. Intervenors' Cross Mot. Summ. J. at 25 (emphasis added) (quoting 43 C.F.R. § 3162.1(a) (setting forth general operating requirements for oil and gas lessees and operators on public lands)). But nowhere does § 4332(H) exempt BLM from examining alternatives that mitigate general environmental harms. It is beyond doubt that NEPA requires consideration of reasonable alternatives to a contemplated action that minimize or reduce the environmental effects of its decision. *See Citizens Action Coal. of Ind., Inc. v. FERC*, 125 F.4th 229, 235 (D.C. Cir. 2025).

BLM further reasoned that the fact that it could limit the pace of development in only about two-thirds of the Project area rendered a phased development alternative overly "remote or speculative." AR 12492. Taken at face value, this rationale does not withstand scrutiny: it is not obvious to the court why a slower rate of development in well over half of the Project area renders implementation "speculative." In its briefing, BLM explains that because the areas it controls are interspersed with areas under state and private control, state and private actors could offset any reduction in the pace of development in federally controlled areas. Defs.' Cross Mot. Summ. J. at 37. But this explanation was absent from the EIS, and neither the court nor BLM may "fill in critical gaps in the [agency]'s reasoning" at this stage. *Point Park Univ. v. NLRB*, 457 F.3d 42, 50 (D.C. Cir. 2006). The court "look[s] only to what the agency said at the time of the rulemaking—not to its lawyers' post-hoc rationalizations." *Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. NLRB*, 57 F.4th 1023, 1049 (D.C. Cir. 2023) (quoting *Good Fortune Shipping SA v. Comm'r*, 897 F.3d 256, 263 (D.C. Cir. 2018)).

Finally, BLM reasoned that it need not further investigate a paced development alternative because Alternative C "already considered reduced effects by limiting the number of well pads." AR 16758; *see* Defs.' Reply Supp. Cross Mot. Summ. J. at 15 n.11, ECF No. 125. But the record suggests otherwise. BLM's own "analysis does not suggest that the impacts would be identical"—or even comparable to—commenters' proposed phased-development alternatives. *Union Neighbors United, Inc. v. Jewell*, 831 F.3d 564, 577 (D.C. Cir. 2016). While Alternative C contemplated fewer well pads than Alternative B, AR 12374, "development under Alternative C would occur at the same rate as Alternative B, and the overall level of production would remain the same," AR 12961. BLM estimated that Alternative C would therefore "vary only slightly from Alternative B" in terms of air quality impacts. AR 12377; *see* AR 4180 (noting that Alternative C is "basically indistinguishable from the preferred action when it comes to air emissions and resulting air quality impacts because it assumes the same degree of oil and gas development in the same area" and that Alternative C might even "result in greater emissions compared to Alternative B"); AR 6331 ("Alternative C does not reduce the impacts from the Project, especially for air, land, and wildlife resources.").

*b. Greenhouse Gas Mitigation Alternative*

BLM noted that commenters had proposed three distinct layers of greenhouse gas control: an outcome-based

carbon-neutral operations requirement, a categorical prohibition on venting and flaring, and source-level direct mitigation measures designed to reduce methane emissions across drilling, completion, and production activities. AR 12491. In eliminating an alternative involving greater greenhouse gas mitigation, BLM stated that "it is not technically feasible to conduct full carbon-neutral processes" and that "venting and flaring are conducted for safety reasons and cannot be fully avoided." AR 12492.

**\*7** In focusing only on the feasibility of carbon-neutral operations and total elimination of venting and flaring, BLM omitted any consideration of the feasibility of *reducing* greenhouse gas emissions. Commenters had suggested adopting measures such as more efficient flaring practices, high-efficiency compressor technologies and practices, and more advanced leak detection and repair protocols to reduce greenhouse gas emissions. *See, e.g.*, AR 4181, 4207, 4208, 4438, 4449. BLM's EIS Scoping Report acknowledged comments requesting alternatives "designed to *reduce or eliminate* greenhouse gas emissions." AR 400 (emphasis added). The EIS's all-or-nothing approach conflicts with the agency's obligation under NEPA to "provide legitimate consideration to alternatives that fall between the obvious extremes." *High Country Conservation Advocs. v. U.S. Forest Serv.*, 951 F.3d 1217, 1224 (10th Cir. 2020) (quoting *Colo. Env't Coal. v. Dombeck*, 185 F.3d 1162, 1175 (10th Cir. 1999)); *see Nat. Res. Def. Council, Inc. v. Morton*, 458 F.2d 827, 836 (D.C. Cir. 1972) (holding that an agency should not "disregard alternatives merely because they do not offer a complete solution to the problem").

BLM responds that certain measures to reduce greenhouse gas emissions *were* included in Alternative B, and that further measures were not feasible. *See* Defs.' Cross Mot. Summ. J. at 39. But while Alternative B includes a set of air-quality mitigation measures, those measures are primarily aimed at criteria pollutants—particularly nitrogen oxides—rather than greenhouse gases such as methane and carbon dioxide. *See* AR 13366, 13370–71. The EIS makes clear that measures to reduce criteria pollutants and improve compliance with ozone-related air quality standards have only secondary or incidental benefits with respect to greenhouse gas reduction. *See, e.g.*, AR 12248, 13295–96 (outlining measures primarily aimed at volatile organic compounds, particulate matter, and nitrogen oxides). Although BLM correctly observed that "[m]any control strategies and mitigation measures that reduce criteria pollutants and hazardous pollutants also reduce greenhouse gas emissions," AR 12248, incidental climate benefits from criteria-pollutant controls are analytically distinct from direct mitigation of greenhouse gas emissions, particularly methane, the dominant climate pollutant from oil and gas development.

By contrast, Plaintiffs' proposed greenhouse gas reduction alternative would have imposed mandatory, performance-based measures specifically designed to reduce methane and carbon dioxide emissions, including limits on venting and flaring as well as direct methane-control technologies. *See* AR 400–01, 4181, 4864–65. Allowing incidental mitigation measures embedded in the preferred alternative to serve as a substitute for consideration of direct greenhouse-gas control measures would undermine NEPA's core function of ensuring "the agency's presentation of 'the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public.' " *City of Grapevine v. Dep't of Transp.*, 17 F.3d 1502, 1506 (D.C. Cir. 1994) (citation omitted). The agency's determination that there may be incidental spillover effects from controls aimed at other pollutants cannot satisfy its duty to "[r]igorously explore and objectively evaluate" targeted greenhouse gas reduction measures as a standalone alternative. *Oceana*, 384 F. Supp. 2d at 240 (citation omitted).

Applying the rule of reason, the court concludes that in eliminating reduced rate of development and greenhouse gas reduction alternatives without further analysis, BLM violated its obligation to rigorously evaluate a reasonable range of alternatives to its proposed action. *See* 42 U.S.C. § 4332(2)(C).

### B. Remedy

Having determined that the Converse County Project approval violated NEPA, the court must decide whether to vacate the EIS and ROD or remand without vacatur. The APA requires a reviewing court to "hold unlawful and set aside" agency action it determines to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Accordingly, the "ordinary practice ... is to vacate unlawful agency action, and district courts in this circuit routinely vacate agency actions taken in violation of NEPA." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1050 (D.C. Cir. 2021) (citation omitted).

**\*8** "Although vacatur is the typical remedy for an APA violation, it is not inevitable." *Gulf Restoration Network v. Haaland*, 47 F.4th 795, 804 (D.C. Cir. 2022). In limited circumstances, courts may decline to vacate an agency's action if equity so requires. *Id.* at 804–05. The choice depends on two factors: the "seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change." *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993). "Put otherwise, this Court must determine whether there is 'at least a serious possibility that the [agency] will be able to substantiate its decision on remand,' and whether vacatur will lead to impermissibly disruptive consequences in the interim." *Zinke*, 368 F. Supp. 3d at 84 (quoting *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 97 (D.D.C. 2017)).

Both factors militate in favor of vacating the Project approval before remanding it to the agency. The errors here were the type that prompts "substantial doubt" that the agency chose correctly. *Standing Rock Sioux Tribe*, 985 F.3d at 1052. With an informed look at the alternatives involving a slower pace of development and greenhouse gas reduction measures, BLM could reasonably change course. "[T]he Court cannot be sure that the agency will arrive at the same conclusion after further consideration—let alone whether, on further judicial review, this or a similar [agency action] will withstand challenge under the APA." *Humane Soc'y of U.S. v. Kempthorne*, 579 F. Supp. 2d 7, 21 (D.D.C. 2008).

Defendants and Intervenors also fail to carry their burden of showing "that vacatur would be so disruptive as to justify a departure from [the] normal course." *Cboe Futures Exch., LLC v. SEC*, 77 F.4th 971, 982 (D.C. Cir. 2023). Plaintiffs ask the court to vacate only the EIS and ROD, not existing permitting decisions made in reliance on them. *See* Pls.' Reply Supp. Mot. Summ. J. at 72–73, ECF No. 124. That modest relief would not enjoin development of existing drilling permits or require BLM to unwind completed wells or infrastructure. And as the Government and Intervenors concede, "vacatur of the EIS and ROD will not prevent BLM from approving new APDs or other authorizations" in the Converse County area that are independent of the deficient EIS. Intervenors' Remedy Br. at 13, ECF No. 138. The only relevant disruption is the cost to the Government of supplementing its NEPA analysis and any delays in issuing new permits during that reconsideration. While the Government and Intervenors project significant economic consequences from such delay, these are ordinary consequences of NEPA compliance, and not ones that establish sufficient prejudice to merit withholding vacatur. *See Standing Rock Sioux Tribe*, 985 F.3d at 1051 (explaining that economic harm "is not commonly a basis, standing alone, for declining to vacate agency action"). The court must also consider the environmental harm of keeping the deficient EIS in place. The Project is already emitting and will continue to emit significant levels of greenhouse gases that will contribute to climate change and impart other significant environmental harm, impacting human health, sensitive natural resources, landscapes, and wildlife. Vacatur is necessary to ensure that the Project proceeds with the benefit of a fully fleshed out consideration of the issues under NEPA.

### C. Second Amended Complaint

Plaintiffs now seek to file a Second Amended Complaint realleging their pending claims against the 2020 Converse County EIS, ROD, and RMP Amendment, and introducing new claims against several more recent NEPA documents and associated permit approvals. Specifically, in Counts 1 to 3, Plaintiffs reallege their pending NEPA, APA, FLPMA, and MLA claims against the 2020 EIS.[1] Proposed 2d Am. Compl. ¶¶ 380–99, ECF No. 155-1. In Counts 11 to 13, Plaintiffs allege new claims against the 2025 Supplemental EA, FONNSI, and DR. *Id.* ¶¶ 458–81. In Counts 4 to 10, Plaintiffs seek to challenge the 22 new BLM decisions approving the 255 APDs for oil and gas wells in Converse County between August and October 2025, as well as the NEPA documents used to approve those APDs, including two new EAs and 20 Categorical Exclusions that rely on the 2025 White Paper's groundwater analysis. *Id.* ¶¶ 400–57.

**\*9** Under Federal Rule of Civil Procedure 15, an addition to a pleading may take one of two forms: it may be an "amendment" under Rule 15(a), or a "supplement" under Rule 15(d). *Clean Water Action v. Pruitt*, 315 F. Supp. 3d 72, 79 (D.D.C. 2018). An amendment "typically rest[s] on matters in place *prior to* the filing of the original pleading," while a supplement "sets forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented." *United States v. Hicks*, 283 F.3d 380, 385 (D.C. Cir. 2002) (quoting Fed. R. Civ. P. 15(d)). Rule 15(a) provides that unless permitted as a matter of course, "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). "The court should freely give leave when justice so requires." *Id.* Rule 15(d) provides that "[o]n motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading" and "may order that the

opposing party plead to the supplemental pleading." *Id.* 15(d).

Leave to amend or supplement "should be denied" when "the complaint, as amended, would radically alter the scope and nature of the case and bears no more than a tangential relationship to the original action." *Miss. Ass'n of Cooperatives v. Farmers Home Admin.,* 139 F.R.D. 542, 544 (D.D.C. 1991); *see also Nat'l Treasury Emps. Union v. Helfer,* 53 F.3d 1289, 1295 (D.C. Cir. 1995) ("[T]he district court did not abuse its discretion in denying the amendment, which bore 'only tangential relationship' to the original claim."). "Delay and prejudice are precisely the matters to be addressed in considering whether to grant motions for supplemental pleadings; such motions are to be 'freely granted when doing so will promote the economic and speedy disposition of the entire controversy between the parties, will not cause undue delay or trial inconvenience, and will not prejudice the rights of any of the other parties to the action.' " *Hall v. CIA,* 437 F.3d 94, 101 (D.C. Cir. 2006) (quoting 6A Wright & Miller, *Federal Practice & Procedure* § 1504, at 186–87 (2d ed. 1990)).

While both the decision whether to allow amendment and supplementation are within the discretion of the district court, *see WildEarth Guardians v. Kempthorne,* 592 F. Supp. 2d 18, 23 (D.D.C. 2008), the plain text of Rule 15(d) suggests the district court has wider discretion to deny supplementation than leave to amend, *compare* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires") *with id.* 15(d) ("[T]he court may, on just terms, permit a party to serve a supplemental pleading ..."); *see Pruitt,* 315 F. Supp. 3d at 80 ("The plain text of Rule 15(d) ... permits a court to grant leave to supplement, but imposes no standard requiring a court to do so."). Plaintiffs acknowledge that whether they should be permitted to add BLM decisions post-dating the existing Complaint—(1) the June 2025 EA, FONNSI, and DR, and (2) the approval of 255 new APDs from August through October 2025 and their supporting NEPA documents—is appropriately analyzed under Rule 15(d) governing motions to supplement. *See* Pls.' Mot. for 2d Am. Compl. at 12.

Plaintiffs' proposed new claims are "factually and legally distinct from the current claims." *Pruitt,* 315 F. Supp. 3d at 85. Count 13, for example, alleges that BLM personnel lacked the requisite authority to issue the June 2025 DR, a claim wholly unrelated to Plaintiffs' original NEPA, MLA, and FLPMA claims against the 2020 ROD. *See* Proposed 2d Am. Compl. ¶¶ 477–81. While the 2025 EAs, Categorical Exclusions, and APDs are "superficially similar" to the 2020 EIS and ROD in that they all concern proposed drilling in Converse County and allegedly rely on the same flawed groundwater analysis, they are otherwise separate agency actions concerning a new set of projects. *Pruitt,* 315 F. Supp. 3d at 85. None of the post-August 2025 documents ties to the 2020 EIS or purport to implement or carry out the land-use planning decisions embodied in the ROD. Each EA is accompanied by its own FONSI and DR, marking the consummation of BLM's decision-making process for those projects and conferring direct legal consequences. The Categorical Exclusions were likewise issued through a distinct, more streamlined NEPA process that authorizes drilling without preparation of an EA or EIS.

**\*10** Because the 2025 approvals rest on separate procedures, administrative records, and decision documents independently authorizing development, they constitute new, final agency actions subject to separate NEPA and APA review, rather than extensions of the 2020 EIS or ROD. *See Pruitt,* 315 F. Supp. 3d at 85 (rejecting supplementation seeking to challenge "different type[s] of agency action" that were "promulgated based on a different administrative record, pursuant to different authority"). Adding these claims after years of dispositive motions that have narrowed the case would "radically alter the scope and nature of the case," *Wolf v. CIA,* 569 F. Supp. 2d 1, 11 (D.D.C. 2008), and force Defendants and Intervenors "to respond to ever-changing targets," *Howard v. Blank,* 891 F. Supp. 2d 95, 102 (D.D.C. 2012).

"Additionally, one of the 'most important factor[s]' to consider is 'the possibility of prejudice to the opposing party.' " *Lawrence v. Lew,* 156 F. Supp. 3d 149, 174 (D.D.C. 2016) (quoting *Djourabchi v. Self,* 240 F.R.D. 5, 13 (D.D.C. 2006)). Plaintiffs will suffer comparatively minimal prejudice because they can readily file their claims in a separate action. Any inconvenience from not being able to assert new causes of action in this litigation is not "the type of inconvenience that implicates the principles of fairness and judicial economy that justify application of the standard that leave to file a supplemental pleading should 'be liberally granted.' " *Cause of Action Inst. v. U.S. Dep't of Just.,* 282 F. Supp. 3d 66, 76 (D.D.C. 2017). By contrast, to allow amendment now would protract this litigation and thus prejudice Defendants and Intervenors. *See id.* The parties have already completed multiple rounds of briefing on various dispositive motions, including the pending motion for summary judgment that predates Plaintiffs' request to supplement the complaint. Allowing supplementation would necessitate yet another round of briefing based on a different administrative record before a final ruling on Plaintiffs' fully briefed Converse County ROD claims could be obtained. *See Pruitt,* 315 F. Supp. 3d at 84.

In sum, because Plaintiffs' proposed claims "would unduly delay and alter the scope of this litigation," denial of leave to supplement is appropriate. *Id.* at 85.

### IV. CONCLUSION

For the foregoing reasons, the court will GRANT Plaintiffs' Motion for Summary Judgment. ECF No. 116. Accordingly, the 2020 Converse County EIS and ROD will be vacated and remanded to the agency for further consideration consistent with this Memorandum Opinion.

The court will DENY as moot Defendants' Motion to Dissolve the Injunction, ECF No. 145, Intervenors' Motion to Dissolve the Injunction, ECF No. 148, and Wyoming's Motion for Joinder, ECF No. 147. The court will also DENY Plaintiffs' Motion for Leave to File a Second Amended Complaint. ECF No. 155. A separate order will accompany this Memorandum Opinion.

**All Citations**

Slip Copy, 2026 WL 555013

### Footnotes

1   Vacating the Converse County EIS and ROD moots Plaintiffs' unaddressed claims challenging those decisions. Therefore, leave to amend would be futile as to Counts 1 to 3.

---

**End of Document**                                                              © 2026 Thomson Reuters. No claim to original U.S. Government Works.