Sara Ghafouri, OSB #111021
American Forest Resource Council
700 N.E. Multnomah, Suite 320
Portland, Oregon 97232
Telephone: (503) 222-9505
Fax: (503) 222-3255
Email: sghafouri@amforest.org

Greg Hibbard, OSB #183602
American Forest Resource Council
924 Capitol Way South, Suite 102
Olympia, WA 98501
Telephone: (360) 352-3910
Fax: (360) 352-3917
Email: ghibbard@amforest.org

*Attorneys for Defendant-Intervenor*

**UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
EUGENE DIVISION**

| | |
|---|---|
| **OREGON WILD**, an Oregon nonprofit corporation; and **WILDEARTH GUARDIANS**, a New Mexico nonprofit corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>**DAVID WARNACK,** in his official capacity as Supervisor of the Willamette National Forest; and **UNITED STATES FOREST SERVICE,** a federal agency,<br><br>Defendants,<br><br>and<br><br>**AMERICAN FOREST RESOURCE COUNCIL,** an Oregon non-profit corporation,<br><br>Defendant-Intervenor. | Civil No. 6:24-cv-00949-AP<br><br>**DEFENDANT-INTERVENOR'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT [ECF No. 51]** |

DEFENDANT-INTERVENOR'S REPLY IN SUPPORT OF CROSS-MOTION FOR
SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................................................. 1

II.  ARGUMENT ................................................................................................................... 2

    A. The Forest Service Considered a Reasonable Range of Alternatives Consistent
       with NEPA ................................................................................................................. 2

       1. The Forest Service's two action alternatives significantly differed ............................ 2

       2. Plaintiffs' Proposed Alternative was not considered in detail because it was
          not viable ............................................................................................................... 6

    B. The Forest Service Took the Requisite Hard Look Under NEPA .................................11

       1. The Forest Service took a hard look at NSO Impacts.................................................11

       2. The Forest Service took the requisite hard look on fire and fuels impacts................ 19

       3. The Forest Service took the requisite hard look at carbon storage
          and emissions ....................................................................................................... 25

          a. The Forest Service's carbon impacts analysis was proportional to its
             significance ...................................................................................................... 25

          b. The Forest Service adequately responded to Plaintiffs' comments ...................... 31

III. REMEDY........................................................................................................................ 33

IV.  CONCLUSION............................................................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*350 Montana v. Haaland*,
50 F.4th 1254 (9th Cir. 2022) ...............................................................25, 28, 29, 30

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
988 F.2d 146 (D.C. Cir. 1993) ...................................................................34

*Bark v. U.S. Forest Serv.*,
958 F.3d 865 (9th Cir. 2020) ........................................................ *passim*

*All. for the Wild Rockies v. Rollins*,
No. 24-CV-10-M-DLC-KLD, 2025 WL 4066514 (D. Mont. Sept. 30, 2025) .......................27

*Cal. Communities Against Toxics v. U.S. E.P.A.*,
688 F.3d 989 (9th Cir. 2012) ...................................................................34

*Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*,
153 F.4th 869 (9th Cir. 2025) .............................................................15, 18

*Ctr. for Biological Diversity v. U.S. Forest Serv.*,
687 F.Supp.3d 1053 (D. Mont. 2023), *aff'd in part and rev'd in part*, 2025
WL 586358 (9th Cir. 2025) ...................................................25, 26, 27, 28

*Conservation Cong. v. U.S. Forest Serv.*,
720 F.3d 1048 (9th Cir. 2013) .................................................................14

*Ctr. for Biological Diversity v. U.S. Forest Serv.*,
No. CV 23-110-M-DWM, 2025 WL 3549515 (D. Mont. Dec. 11, 2025)  .......................27, 29

*Earth Island Inst. v. Hogarth*,
494 F.3d 757 (9th Cir. 2007) ...................................................................34

*Earth Island Inst. v. Muldoon*,
82 F.4th 624 (9th Cir. 2023) .............................................................20, 21

*Earth Island Inst. v. U.S. Forest Serv.*,
87 F.4th 1054 (9th Cir. 2023) ...................................................................9

*Fla. Power & Light Co. v. Lorion*,
470 U.S. 729 (1985).............................................................................33

*Friends of Big Bear Valley v. U.S. Forest Serv.*,
776 F.Supp.3d 824 (C.D. Cal. 2025) .........................................................19, 20, 22

*Friends of the Clearwater v. Dombeck*,
  222 F.3d 552 (9th Cir. 2000) ...............................................................................12

*Graves v. Arpaio*,
  623 F.3d 1043 (9th Cir. 2010) .............................................................................35

*Gulf v. Burgum*,
  775 F.Supp.3d 455 (D.D.C. 2025) ........................................................................16

*Hapner v. Tidwell*,
  621 F.3d 1239 (9th Cir. 2010) ............................................................26, 28, 29, 30

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989) ............................................................................................14

*Nat'l Wildlife Fed'n v. Burford*,
  871 F.2d 849 (9th Cir. 1989) ...............................................................................33

*Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*,
  606 F.3d 1058 (9th Cir. 2010) ...............................................................................4

*Native Ecosystems Council v. U.S. Forest Serv.*,
  428 F.3d 1233 (9th Cir. 2005) .............................................................................24

*Native Ecosystems Council v. Weldon*,
  No. 10-CV-57-M-DWM, 2011 WL 13193257 (D. Mont. June 7, 2011), *aff'd,*
  697 F.3d 1043 (9th Cir. 2012) ...............................................................................3

*Or. Nat. Res. Council Action v. U.S. Forest Serv.*,
  445 F.Supp.2d 1211 (D. Or. 2006) ......................................................................12

*Or. Wild v. U.S. Forest Serv.*,
  No. 1:22-CV-01007-MC, 2026 WL 96908 (D. Or. Jan. 13, 2026) ........................15

*Powder River Basin Res. Council v. U.S. Dep't of the Interior*,
  No. 22-CV-2696-TSC, 2026 WL 555013 (D.D.C. Feb. 27, 2026) ....................9, 10

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
  747 F.3d 581 (9th Cir. 2014) ...............................................................................14

*Seattle Audubon Soc'y v. Moseley*,
  80 F.3d 1401 (9th Cir.1996) ..................................................................................3

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colo.*,
  605 U.S. 168 (2025) ....................................................................................... *passim*

*Treichler v. Comm'r of Soc. Sec. Admin.*,
  775 F.3d 1090 (9th Cir. 2014) .............................................................................33

DEFENDANT-INTERVENOR'S REPLY IN SUPPORT OF CROSS-MOTION FOR
SUMMARY JUDGMENT - iii

*Velasquez-Gaspar v. Barr*,
  976 F.3d 1062 (9th Cir. 2020) .................................................................................................3

*WildEarth Guardians v. Bucknall*,
  756 F.Supp.3d 1017 (D. Mont. 2024)......................................................................................15

*Wilderness Soc'y v. U.S. Dep't of Interior*,
  No. 22-CV-1871 (CRC), 2024 WL 1241906 (D.D.C. Mar. 22, 2024)....................................16

**Statutes**

16 U.S.C. § 1536(a)(2).................................................................................................................4

16 U.S.C. § 1604(g)(3)(B) ......................................................................................................4, 10

**Other Authorities**

40 C.F.R. § 1502.2(b) ...........................................................................................................26, 29

40 C.F.R. § 1502.9(c)(1)(ii) ......................................................................................................11

40 C.F.R. § 1502.14(a)............................................................................................................3, 6

40 C.F.R. § 1503.4(a)...........................................................................................................23, 32

40 C.F.R. § 1503.4(a)(5).............................................................................................................32

90 Fed. Reg. 10610 (Feb. 25, 2025) ............................................................................................3

## I.     INTRODUCTION

The Youngs Rock Rigdon Project (YRR Project or Project) is an important forest health project on the Willamette National Forest. This area has shown signs of decline due to past management activities and fire suppression efforts. With this Project, the Forest Service proposed commercial and non-commercial treatments that are specifically aimed at improving stand and landscape diversity, promoting forest resiliency, reducing hazardous fuels to reduce wildfire risk, and contributing to a sustainable supply of timber. The Forest Service prepared a robust Final Environmental Impact Statement (FEIS) that analyzed three alternatives—a no action and two action alternatives—and took a hard look at various environmental impacts, including impacts to the northern spotted owl (NSO), fire and fuels impacts, and carbon storage and emission impacts.

Plaintiffs challenge the YRR Project solely under the National Environmental Policy Act (NEPA), which is a purely procedural statute that does not mandate substantive results. *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colo.*, 605 U.S. 168, 180 (2025) (*Seven County*). But a substantive result is exactly what Plaintiffs demand in their opening brief and on reply—the Forest Service to endorse Plaintiffs' NSO-focused Proposed Alternative (which was not viable) and to supplant Plaintiffs' near-sighted views on NSO, fire and fuels, and climate impacts over the agency's scientific and technical expertise. That demand is contrary to what the Supreme Court reinforced in *Seven County*. An agency is entitled to "substantial deference" for its "fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its" significant effects and feasible alternatives analyses so long as they fall within "a broad zone of reasonableness." *Id.* at 182–83.

DEFENDANT-INTERVENOR'S REPLY IN SUPPORT OF CROSS-MOTION FOR
SUMMARY JUDGMENT - 1

Plaintiffs acknowledge *Seven County* on reply but seek to limit the impact of this seminal Supreme Court decision by asserting that the Ninth Circuit and district courts already afforded this level of deference to agencies before *Seven County*.  Plaintiffs ignore that the Supreme Court observed that "[s]ome courts have strayed and not applied NEPA with the level of deference demanded by the statutory text and this Court's cases." *Id.* at 183.  For that reason, the Supreme Court held that a "course correction" was necessary to bring judicial review "back in line with the statutory text and common sense" to avoid hindering agency action "'under the guise' of just a little more process." *Id*. at 184.

*Seven County* is not a tool to "excuse" any "shortcomings" in the YRR Project's analysis, as Plaintiffs suggest.  Despite Plaintiffs repeated assertions to the contrary, the record reflects that the Forest Service did explain *why* Plaintiffs Proposed Alternative was not viable, *why* the NSO and its habitat were not impacted by the recent wildfire events, *why* Plaintiffs' fire and fuels science does not call into question the agency's project-specific fire analysis, and *how* Plaintiffs' 63-page supplement on climate science is focused on the short-term carbon trade-offs while the agency's analysis balanced both short-term impacts with long-term goals.  Plaintiffs will not settle for any responses from the Forest Service short of the agency substantively agreeing with them.  That is the tactic the Supreme Court sought to limit and correct in *Seven County*.  *Id.* at 173 ("NEPA is a procedural cross-check" and cannot be used as a "substantive roadblock").

## II.     ARGUMENT

### A.     The Forest Service Considered a Reasonable Range of Alternatives Consistent with NEPA.

#### 1.     The Forest Service's two action alternatives significantly differed.

An agency must "evaluate all reasonable alternatives" to the proposed action and for alternatives that the agency eliminated from detailed study, "briefly discuss the reasons for their

DEFENDANT-INTERVENOR'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT - 2

having been eliminated." 40 C.F.R. § 1502.14(a).[1] Any agency need not "consider every possible alternative to a proposed action, nor must it consider alternatives that are unlikely to be implemented or those inconsistent with its basic policy objectives." *Seattle Audubon Soc'y v. Moseley*, 80 F.3d 1401, 1404 (9th Cir.1996). The court's "role" is "to confirm" that the agency has addressed feasible alternatives, and the court's review of an agency's alternatives "must be at its most deferential." *Seven Cnty.*, 605 U.S. at 180, 182 (internal quotation marks omitted).

Plaintiffs criticize the Forest Service's range of alternatives analysis because, setting aside the no action alternative, the two action alternatives (Alternatives 2 and 3) both involve commercial harvest activities. In Plaintiffs' view, these action alternatives are outside the broad "'zone of reasonableness'" because they fail to properly address the Project's "purpose[s] and need[s]." Pls' Reply Br. at 6 (quoting *Seven Cnty.*, 605 U.S. at 183). Not so. The Forest Service identified five purposes and needs for the Project and explained how each component of each action alternative met one or more of the purposes and needs. AR17976–82; AR17982–84 (Table 2); AR18006–08 (Table 5). Moreover, because Plaintiffs' Complaint does not allege that the action alternatives fail to meet the Project's purposes and needs, any such claim made on reply should be deemed waived. *See, e.g.*, *Velasquez-Gaspar v. Barr*, 976 F.3d 1062, 1065 (9th Cir. 2020) (holding that an issue was waived where it was raised only in passing and never meaningfully developed in the plaintiffs' opening brief); *Native Ecosystems Council v. Weldon*, No. 10-CV-57-M-DWM, 2011 WL 13193257, at *15 (D. Mont. June 7, 2011), *aff'd*, 697 F.3d 1043 (9th Cir. 2012) (rejecting the plaintiffs' practice of "conjuring new claims and arguments on

---

[1] The parties do not dispute that the YRR Project was approved under the 1978 version of the Council on Environmental Quality's regulations implementing NEPA. However, since February 2025, CEQ has rescinded all of its NEPA regulations. 90 Fed. Reg. 10610 (Feb. 25, 2025).

DEFENDANT-INTERVENOR'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT - 3

summary judgment" that were not raised during the administrative process or in their complaint); *see* Compl. ¶¶ 142–47.

Next, Plaintiffs imply that the action alternatives are inconsistent with the National Forest Management Act's (NFMA) provisions related to providing for diversity of plant and animal communities and inconsistent with the Endangered Species Act's (ESA) requirements related to endangered and threatened species. Pls.' Reply at 6; *see* 16 U.S.C. § 1604(g)(3)(B) (NFMA requires the Secretary of Agriculture to achieve the goal of "provid[ing] for diversity of plant and animal communities . . . in order to meet overall multiple-use objectives . . . ."); 16 U.S.C. § 1536(a)(2) (ESA requires that each federal agency shall, in consultation with the Secretary, "[e]nsure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species"). Yet Plaintiffs do not raise any claims related to violations under NFMA or the ESA. Nor can they impose substantive obligations onto NEPA's procedural requirements, as Federal Defendants correctly noted. Fed. Defs.' Reply at 5 (ECF No. 55). Plaintiffs' general allegations related to NFMA and ESA, without more, are futile.[2]

---

[2] Plaintiffs cite *National Parks & Conservation Association v. Bureau of Land Management*, 606 F.3d 1058, 1070 (9th Cir. 2010), for the proposition that "an agency should always consider the views of Congress, expressed, to the extent that the agency can determine them, in the agency's statutory authorization to act, as well as in other congressional directives." (Internal quotation marks omitted). In that case, however, the Ninth Circuit found that the Bureau of Land Management's purpose and need statement was unreasonably defined by the private interests of the applicant such that agency only considered alternatives that would have all resulted in the creation of the landfill on the applicant's property and did not consider other alternatives to address the need to meet long-term landfill demand. 606 F.3d at 1071. That is not the case here, as Plaintiffs have not challenged the validity of the Project's purposes and needs under NEPA.

DEFENDANT-INTERVENOR'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT - 4

Finally, Plaintiffs reassert that Alternatives 2 and 3 "are largely indistinguishable" because they "target the exact same number of NSO habitat acres." Pls.' Reply at 7. But Plaintiffs' reply fails to address Intervenor's robust arguments as to how Alternative 2 is distinguishable from Alternative 3. *See* AFRC's MSJ Br. at 12–14 (ECF No. 51); see also AR17971–73 (Table 1: Comparison of alternatives). Intervenor need not repeat those arguments but notes that although the total amount of acres treated for each action alternative is the same (about 6,500 acres), the alternatives significantly differ in the *intensity* of the treatment activities—with differences in the amount of non-commercial thinning, the amount of regeneration harvest in managed stands, the use of thinning in managed stands with larger gap creation (Alternative 3 only), and the amount of road decommissioning. AR17971–73.

Plaintiffs simply disregard how the action alternatives result in differing impacts. For example, even though the action alternatives offer similar treatments within natural stands outside of NSO critical habitat, Alternative 3 proposes a mix of regeneration harvest and thinning with large gaps to create early seral NSO habitat rather than relying on regeneration harvest alone. AR18006; AR17971. Alternative 3's commercial thinning in managed stands would result in 51–58% canopy cover. AR18125; AR18164; AR18289. Alternative 2's regeneration harvest, on the other hand, would result in 21–38% canopy cover. AR18125; AR18164; AR18288. The FEIS Table 35 highlights how Alternatives 2 and 3 differ in the amount of NSO suitable habitat, dispersal habitat, and critical habitat that would be either removed or "modified but maintained." AR18124. Due to the varied treatment intensities, Alternative 3 would result in less open areas in managed stands than Alternative 2. AR18068–69. It is telling that Plaintiffs entirely ignore these key aspects of the administrative record and Intervenor's previous arguments.

## 2. Plaintiffs' Proposed Alternative was not considered in detail because it was not viable.

Plaintiffs' Proposed Alternative urged the Forest Service to analyze a "[m]odified Alternative 3" that would authorize the following: (1) thinning the plantations and the drier forests and deferring treatment in moist forests that lack pine and oak; (2) scaling back harvest activities and treating mainly with prescribed fire; (3) retaining all trees greater than 24 inches at diameter breast height (DBH) and retaining all trees with old-growth characteristics; (4) protecting high quality NSO habitat; and (5) retaining more trees per acre in all mature forests. AR16325–26; *see also* AR16319–20. Plaintiffs claim that *nowhere* does the Forest Service assert that Plaintiffs' Proposed Alternative is "not viable."

As Intervenor's opening brief explained in detail, the Forest Service responded to each component of Plaintiffs' Proposed Alternative. AR18411–29; *see* AFRC's MSJ Br. at 15–19. Plaintiffs summarily ignore the Forest Service's responses and fail to acknowledge Intervenor's arguments as to how the Forest Service thoroughly explained why the Proposed Alternative was not "viable" because it failed to meet the Project's purposes and needs. *See* AFRC's MSJ Br. at 15–19. Plaintiffs do not contend that the Forest Service's explanation in the FEIS's response to comments (Appendix K) fails to satisfy NEPA's requirement to "briefly discuss the reasons for" eliminating the Proposed Alternative from detailed analysis. 40 C.F.R. § 1502.14(a). Nor could they. It is within the Forest Service's discretion to determine what qualifies as a feasible alternative and its determination warrants substantial deference. *Seven Cnty.*, 605 U.S. at 181–82 (noting that "[a]n agency must make predictive and scientific judgments in assessing . . . alternatives (what are the potential alternatives; are they really feasible?)" and courts should be "most deferential" to the agency's determination on what qualifies as feasible (internal quotation marks omitted)).

DEFENDANT-INTERVENOR'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT - 6

Plaintiffs fail to refute the Forest Service's clear explanation as to why each component was infeasible, ineffective or inconsistent with the Project's purposes and needs. Instead, Plaintiffs continue to assert that the Proposed Alternative is viable without any supporting evidence in the administrative record.

First, Plaintiffs contend that the Proposed Alternative proposed "vegetation treatments" which allow "modification of forest diversity, structure, and resiliency" and "restore[] meadows, oak savannahs, and riparian areas." Pls.' Reply at 8. Specifically, the Proposed Alternative's treatments would "[d]rop logging of natural stands that have few if any pine trees" and deprioritize "natural stands of mixed-conifer" trees "with few if any pines or oak[s]." AR18414. The Forest Service explained, however, how the Project's purpose and need "is much broader than only saving the current pines and oaks" and includes reducing stand densities, retaining and releasing older trees, and shifting the species composition towards more fire and drought tolerant species. AR18414; AR17976–77; AR18014. Plaintiffs claim that the Forest Service never explained why "*these* specific stands on *these* specific acres" needed vegetation management treatment. Pls.' Reply at 9. The YRR FEIS provided a robust analysis of the landscape conditions in the Project area, which demonstrated the need for treatment in specific areas. AR18057–62.

Second, Plaintiffs allege that the Proposed Alternative "reduces fuels and fire risk." Pls.' Reply at 8. The Forest Service explained how the Proposed Alternative's proposal to treat with prescribed fire and scale back harvest activities is inconsistent with the Project's purposes and needs. AR18420. Instead, thinning is an important component of reducing fuels and fire risk because it reduces stand densities, retains older trees, and shifts species composition that is more fire and drought tolerant. AR184129; *see also* AR18065. Unlike Plaintiffs' preferred use of only

DEFENDANT-INTERVENOR'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT - 7

prescribed fire, thinning helps reduce densely stocked trees in the understory, which will reduce the risk of a crown fire.  AR18060; AR18413.

Third, Plaintiffs contend that the Proposed Alternative "aligns" with the Project's goals of recreation and "right-sizing the road system."  Pls.' Reply at 8–9.  The Proposed Alternative requests that the Forest Service "[m]inimize road construction and expand non-commercial small tree thinning (which does not require roads) to areas with abundant pine and oak that are not accessible from existing roads."  AR16320.  The Forest Service explained that the "interdisciplinary team did consider an alternative that would only propose non-commercial treatments in the mixed conifer older stands but concluded that the scope and scale of the project would be reduced and many of the elements identified in the purpose and need would not be met."  AR18416.  With respect to improving recreation, Plaintiffs do not explain how their Proposed Alternative better manages recreation, *see* AR16319–20, and the Forest Service properly explained how the action alternatives already ensure that those values are conserved. AR18414; *see* AR18227–44.

Fourth, Plaintiffs allege that the Proposed Alternative would allow commercial harvest activities to "provide a sustainable supply of forest products."  Pls.' Reply at 9 (internal quotation marks omitted).  Plaintiffs do not demonstrate how their Proposed Alternative would be *commercially* viable.  In stark contrast, the Forest Service provided a robust analysis of how Alternatives 2 and 3 are economically viable.  *See* AR18255–59; AR18256 (Table 68: Economic Efficiency Analysis).

Finally, Plaintiffs claim that the Proposed Alternative "more carefully select[s] stands and trees for treatment and ret[ention]" for NSO habitat because it would protect trees greater than 24 inches DBH.  Pls.' Reply at 10.  Plaintiffs misrepresent that this aspect of their Proposed

DEFENDANT-INTERVENOR'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT - 8

Alternative is "significantly distinguishable" from the action alternatives because they only protect "legacy trees" that are 30 inches DBH. *Id.* at 9–10. As explained in Intervenor's opening brief, "legacy trees" are not based on a minimum DBH, and the Forest Service's retention of legacy trees will be based on "a variety of morphological and/or physical characteristics of a tree species" consistent with the Ven Pelt 2007 study "Identifying Mature and Old Growth Forests in Western Washington." AR18421. Plaintiffs' assertion that their proposal is meaningfully distinguishable is not supported by the administrative record.

A fatal flaw with Plaintiffs' "modified Alternative 3" is that it proposes to be a solution to a problem that does not exist. Plaintiffs claim that their Proposed Alternative would be a "middle ground" between a no action alternative and one that achieves their goal of protecting "late-successional forests" and recovering the NSO. The consideration of a "middle range" alternative is not required under NEPA. The Ninth Circuit so held in *Westlands Water District v. U.S. Department of Interior*, reversing the district court's contrary determination that an EIS is needed to consider additional "mid-range" measures. 376 F.3d 853, 871 (9th Cir. 2004). "NEPA does not require the EIS to have considered every conceivable permutation" of a project. *Id.*; *Earth Island Inst. v. U.S. Forest Serv.*, 87 F.4th 1054, 1065 (9th Cir. 2023) (so stating).

In their Notice of Supplemental Authority (ECF No. 56), Plaintiffs identify a D.C. district court case, *Powder River Basin Resource Council v. U.S. Department of the Interior*, No. 22-CV-2696-TSC, 2026 WL 555013 (D.D.C. Feb. 27, 2026) (*PRBRC*), where the district court found that the BLM violated NEPA by failing to analyze in detail a proposed "phased-development" alternative for a development plan to drill oil wells that would limit the total number of wells annually. *Id.*, at *6. The district court found that "[t]he EIS's all-or-nothing approach conflicts

DEFENDANT-INTERVENOR'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT - 9

with the agency's obligation under NEPA to provide legitimate consideration to alternatives that fall between the obvious extremes." *Id*., at *7 (internal quotation marks omitted).

This Court need not address the *PRBRC* decision for several reasons. First, nowhere in this out-of-circuit district court's decision does it cite or acknowledge *Seven County*'s "course correction" under NEPA—making its legal analysis questionable in light of this clear oversight. Second, the development plan's purpose and need at issue in *PRBRC*—to promote the exercise of lease rights and "develop federal mineral resources to meet continuing national needs and economic demand"—is starkly different than the multifaceted purposes and needs at issue in the YRR Project. *Compare id.*, at *4, *with* AR17976–82. Finally, unlike *PRBRC*, the Forest Service did consider an alternative that fell between extremes—Alternative 3.

The Forest Service adequately explained why the NSO-focused proposal was inconsistent with the Project's purposes and needs but, to the extent feasible, was already incorporated into Alternative 3—the *actual middle ground alternative* born out of public concerns about impacts to NSO habitat. AR18424; AR17996; AR18116. Plaintiffs acknowledge that the Project seeks to provide habitat needs "for a full range of forest associated species," but then they criticize the Forest Service's balancing of competing objectives, claiming that the Project needs to prioritize the NSO. Pls.' Reply at 10 n.5 (internal quotation marks omitted). Plaintiffs' argument is entirely inconsistent with their earlier argument that the Project's purposes and needs and action alternatives need to comply with NFMA's goal of "provid[ing] for *diversity* of plant and *animal communities* . . . in order to meet overall multiple-use objectives . . . ." 16 U.S.C. § 1604(g)(3)(B) (emphasis added); *compare* Pls.' Reply Br. at 10 n.5, *with id.* at 6. Plaintiffs cannot have it both ways.

In sum, the Forest Service more than satisfied its obligations under NEPA. The Forest Service's action alternatives are distinguishable and provided an alternative that was in direct response to public concerns about NSO habitat (Alternative 3). The Forest Service considered but did not analyze in detail Plaintiffs' Proposed Alternative and explained why it failed to meet the Project's purposes and needs, was not feasible, or was ineffective.

**B.    The Forest Service Took the Requisite Hard Look Under NEPA.**

**1.    The Forest Service took a hard look at NSO Impacts.**

Plaintiffs claim that the Forest Service did not adequately analyze the impacts to the NSO because the FEIS relied on the 2019 Biological Assessment (BA) and Biological Opinion (BiOp) and ignored "new" data in the 2023 BA/BiOp. In their opening brief, Plaintiffs claim that the Forest Service's analysis failed to address the NSO's declining population and the significance of removing habitat; consider the impacts from barred owls; and address the need to manage for non-territorial or floater owls.[3] On reply, however, Plaintiffs solely focus their arguments on how the FEIS should have considered the significance of removing habitat given the "new" information about the NSO's status and trajectory after wildfire events from 2020–2022. Pls.' Reply at 15–20.

As an initial matter, Plaintiffs acknowledge that they failed to bring a claim that the FEIS should have been supplemented based on "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." *See* 40 C.F.R. §

---

[3]  In a footnote, Plaintiffs argue that "spot check" surveys of NSO in 2019 and 2020 after the agency's two-year survey cycle were "not a protocol-compliant survey." Pls.' Reply at 16 n.10. But the Forest Service explained that in addition to the two-year spot checks prior to implementation, the agency would conduct spot checks "during implementation to assure that incidental take does not occur to resident NSOs. If new northern spotted owl nest sites are found, activities will be modified or cancelled as needed to avoid incidental take." AR18054.

DEFENDANT-INTERVENOR'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT - 11

1502.9(c)(1)(ii); Pls.' Reply at 11–12. [4] Plaintiffs contend, however, that their failure to bring such a claim does not mean they concede that the information in the 2023 BA/BiOp was not significant. But that is exactly the result of Plaintiffs failure to raise the appropriate challenge in this case—they have conceded that there was no significant new information that would warrant supplementing the FEIS.

Given this clear failure on their part, Plaintiffs pivot and argue that information in the 2023 BA/BiOp was not "new" because the Forest Service was aware of the data "throughout the Project's development, but chose to ignore it." Pls.' Reply at 12. As Intervenor already explained, although the Forest Service did not rely on the 2023 BA or BiOp because they were finalized *after* the FEIS, they did not ignore this information before approving the Project. First, although recent wildfires had removed NSO habitat, the FEIS noted that the Project area "was not affected by fires in 2020. Within the Project area, 45.8% of the area is suitable NSO habitat and 10.3% is dispersal habitat." AR18123. The FEIS also noted that "[c]ritical habitat for NSOs exists in the project area and covers 42.2% of the land." *Id.*

Second, in light of additional fires in 2021–2022, in the Consistency Review of the YRR Project with the 2023 BA/BiOp, FWS explained that the Project FEIS relied on the 2019 BA/BiOp but "[i]ncorporation [of] the [2023 BA], updated NSO survey information since 2020,

---

[4] Confusingly, Plaintiffs point to *Friends of the Clearwater v. Dombeck*, 222 F.3d 552 (9th Cir. 2000), and *Oregon Natural Resources Council Action v. U.S. Forest Serv.*, 445 F.Supp.2d 1211 (D. Or. 2006). Pls.' Reply at 18. Both cases have no relevance here because they involved a *failure to supplement* claim under NEPA. In *Friends of the Clearwater*, the plaintiffs alleged that the Forest Service failed to supplement the EIS in light of seven new sensitive species designations and a recognition that its snag and old-growth standards were inadequate. 222 F.3d at 558. In *Oregon Natural Resources Council Action*, the plaintiff argued that the Forest Service failed to consider the contemporary effects of proposed logging on the NSO. 445 F.Supp.2d at 1226. Because Plaintiffs neglected to raise a failure to supplement claim, those cases are inapposite.

DEFENDANT-INTERVENOR'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT - 12

and any changes due to this Level 1 review [would] be documented in the Final Record of Decision." AR27741. Consistent with that explanation, the Forest Service's Record of Decision (ROD), in turn, provided an assessment of the recent wildfires' effect on NSO habitat, finding that there was a 4.5% loss in suitable habitat and 2.3% loss in dispersal habitat. AR22225 (Table ROD 2: Spotted Owl Habitat on the Willamette National Forest as a result of 2021 and 2022 Fires).[5] The Forest Service analyzed the impacts of the habitat loss on the WCS-4 Critical Habitat Subunit, noting that because of the current "residual habitat levels and connectivity," the fire impacts "are not expected to adversely affect the function of the Critical Habitat subunit or create a strong filter or barrier to spotted owl landscape movement." AR22225. The Forest Service concluded that the Project "would not further reduce movement potential or the function of the Critical Habitat subunit."[6] *Id*. Plaintiffs do not acknowledge this analysis in the ROD nor dispute its validity. Thus, Plaintiffs' contention that the Forest Service was somehow claiming "ignorance of information" in the 2023 BA/BiOp or relied on "flawed assumptions," Pls.' Reply at 13 (internal quotation marks omitted), is belied by the administrative record.

Plaintiffs continue to argue—albeit indirectly—that the Forest Service was required to incorporate the 2023 BA/BiOp in the FEIS. That argument rests on this misrepresentation that the reinitiation of consultation under the ESA per se requires the Forest Service to update its NEPA analysis. Pls.' Reply at 12–13. "NEPA and ESA call for different regulatory review, and

---

[5] The ROD's percentages for loss of NSO habitat differ from the 2023 BA because the ROD compared the loss of NSO habitat from 2021–2022 to the NSO habitat acres in 2020 as the baseline; whereas the 2023 BA compared the loss of NSO habitat from 2020–2022 to NSO habitat acres in 2019 as the baseline. *Compare* AR22225, *with* AR17831 (noting a 10.4% loss in suitable habitat and a 14.5% loss in dispersal habitat).

[6] Notably, the Forest Service's modified Alternative 2 selected in the ROD dropped 500 acres of commercial treatment in natural stands to reduce the amount of NSO suitable habitat removed. AR22233; AR22211.

DEFENDANT-INTERVENOR'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT - 13

[courts] must defer to the procedural mechanisms established by the implementing agency." *Conservation Cong. v. U.S. Forest Serv.*, 720 F.3d 1048, 1055 (9th Cir. 2013); *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 650 (9th Cir. 2014) (noting that NEPA and the ESA "evaluate different types of environmental impacts through processes that involve varying degrees of public participation"). Not only do NEPA's and ESA's procedural requirements differ, but the scope of analysis between the YRR Project's NEPA-related documents and the corresponding ESA-related documents significantly differ. The 2023 BiOp is a programmatic decision regarding activities during a 27-year period on the Columbia River Gorge National Scenic Area, the Mt. Hood National Forest, the Willamette National Forest, and the Northwest Oregon Bureau of Land Management (BLM) District. *See* AR19613–841; AR19626 ("USFS proposed action in this Opinion includes the timber harvest and routine actions from 2020-2046 on USFS on the Willamette National Forest"). The scope of the YRR FEIS is much narrower, as it is a project-level analysis. Therefore, it was reasonable for the Forest Service to conclude that, irrespective of the reinitiation of consultation for the programmatic 2019 BiOp, the FEIS need not be updated because the wildfires did not affect the Project's impacts analysis and the relevant updated information regarding NSO suitable habitat would be incorporated into the ROD. AR18123; AR21311; AR22225.

"[A]n agency need not supplement" or update "an EIS every time new information comes to light after the EIS is finalized." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 373 (1989). "To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." *Id.* Instead, courts "must afford 'substantial deference' to an agency's final determinations, as well as its decisions regarding the level of detail and scope of environmental analysis to provide in its

DEFENDANT-INTERVENOR'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT - 14

NEPA-mandated documentation." *Or. Wild v. U.S. Forest Serv.*, No. 1:22-CV-01007-MC, 2026 WL 96908, at *10 (D. Or. Jan. 13, 2026) (citing *Seven Cnty.*, 605 U.S. at 180–83). And "the role that the judicial branch plays in policing NEPA compliance is 'a limited one.'" *Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*, 153 F.4th 869, 903 (9th Cir. 2025) (quoting *Seven Cnty.*, 605 U.S. at 185). Despite Plaintiffs' statements on reply, the Forest Service does not claim that it was unaware of the data in the draft and final 2023 BA/BiOp, Pls.' Reply at 15 n.8; instead, the agency did consider that information, determined that the information did not impact the Project, and appropriately incorporated its conclusions in the ROD. NEPA requires nothing more.

Plaintiffs point to several non-Oregon district court cases in support of their contention that the Forest Service was required to include the 2023 BA/BiOp in the FEIS, but all of those cases are easily distinguishable. In *WildEarth Guardians v. Bucknall*, 756 F.Supp.3d 1017, 1036 (D. Mont. 2024), the plaintiffs challenged the Forest Service's effects analysis that was based on a 2012 BiOp, which was later updated in 2023 in response to the litigation, but the subsequent 2023 BiOp was published well *after* the Final EA, Decision, and Finding of No Significant Impact were completed in 2021. The district court held that "the existence of a post-decisional no-jeopardy finding by USFWS [did] not remedy the deficiencies" in the relevant EA's "finding of no significant impact under NEPA." *Id.* (internal quotation marks omitted). Unlike *Bucknall*, the Forest Service did not purport to rely on the 2023 BA/BiOp, which post-dated the FEIS.[7]

---

[7] Plaintiffs argue that the Forest Service did originally rely on the 2023 BA/BiOp in support of their hard look analysis for the NSO, pointing to the Forest Service's response to objections for support. Pls.' Reply at 19 n.13 (citing AR21324–25). The Forest Service's response to Plaintiffs' objections merely demonstrates that the agency had acknowledged the reconsultation effort but further noted that "the YRR project area was not affected by these fires and therefore, the determinations made in the YRR analysis remain unchanged." AR21325.

DEFENDANT-INTERVENOR'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT - 15

Next, Plaintiffs also rely on *Gulf v. Burgum*, 775 F.Supp.3d 455 (D.D.C. 2025), and *Wilderness Society v. U.S. Department of Interior*, No. 22-CV-1871 (CRC), 2024 WL 1241906 (D.D.C. Mar. 22, 2024), which both involved situations where the agency relied on outdated or incorrect information. In *Gulf,* the plaintiffs alleged that the agency's greenhouse gas emissions wholly omitted information, that by the agency's own admission, could have "'major' implications for energy markets." 775 F.Supp.3d at 481. The court held that the agency failed to explain why the agency could not employ "some degree of forecasting to account for legal and regulatory developments postdating" its modeling efforts but before the EIS was in effect. *Id*. Next, the plaintiffs challenged the agency's geographic scope of its impact analysis to the Rice whale, an endangered species under the ESA to only core habitat, despite the National Marine Fisheries Service's determination that the species' habitat range is broader. *Id*. at 485. The district court faulted the agency for declining "to acknowledge—let alone explain—its difference of opinion in the 2023 Supplemental EIS." *Id.* at 488.

In *Wilderness Society*, the BLM proposed a lease sale, that would have impacts on the sage grouse, but the lease's EA tiered to the soon to be outdated sage grouse Resource Management Plans (RMPs) which were being revamped because of "new science and rapid changes affecting the [agency's] management of the public lands[.]" 2024 WL 1241906, at *17. The court held that the agency "must do more to justify its conclusion that the effects would be the same as those outlined in the RMPs and Plan Amendments (whatever those predictions were) in light of intervening events that appear to have shaken the [agency's] confidence in those plans." *Id*.

Unlike in *Gulf* and *Wilderness Society*, the Forest Service did not omit significant new information. Instead, the Forest Service adequately explained why the subsequent 2023

DEFENDANT-INTERVENOR'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT - 16

BA/BiOp did not require supplementation of the FEIS and included *relevant* updated information about NSO habitat in the ROD.

The Forest Service's determination that habitat loss from wildfires identified in the 2023 BA/BiOp did not warrant updating the FEIS was reasonable. The 2023 BA noted that habitat loss from wildfires in 2021 affected 2% of suitable habitat and 1.1% of dispersal habitat within WCS-4 Critical Habitat Subunit. AR18683. The Forest Service concluded that "[b]ecause this amount of habitat loss in any distribution is insignificant at the CH unit and subunit spatial scales, this subunit would continue to provide for connectivity" within WCS-4 and to other subunits. *Id.* (emphasis omitted). The Forest Service also concluded, in the 2023 BA, that there would be a 6.6% habitat loss per decade from natural disturbances and management activities over the 27-year period. AR18816. However, the Forest Service expected that there would be a 10,299-acre gain in suitable habitat and a 98,698-acre gain in dispersal habitat by 2046, even after considering the habitat losses from management actions and natural disturbances. AR18819. Although Plaintiffs want to focus on NSO habitat losses in the short-term due to natural disturbances coupled with management activities, even the updated analysis in the 2023 BA acknowledges the NSO habitat will increase in the long-term on the Willamette National Forest.

Plaintiffs also claim that the 2019 BiOp omits "important information" that NSO survival and recovery will require the preservation of "*all* suitable" habitat, including unoccupied habitat. Pls.' Reply at 16 (citing AR19692; AR19764; AR22416; and AR22507 for support); *see, e.g.*, AR19692 (the 2023 BiOp's status and background section stating that habitat availability also influences the likelihood of spotted owl population persistence); AR19764 (the 2023 BiOp noting that range-wide analysis found that spotted owl sites with greater amounts of spotted owl

DEFENDANT-INTERVENOR'S REPLY IN SUPPORT OF CROSS-MOTION FOR
SUMMARY JUDGMENT - 17

habitat supported increased colonization and decreased spotted owl site extinction); AR22416[8]

(Dugger et al. (2015) study stating that there are positive associations between habitat

characteristics and territory colonization rates by the NSO).  The 2023 BiOp explained, however,

that there are long-term beneficial effects associated with habitat modification in unoccupied

suitable habitat.  *See* AR19726 (noting long-term benefits from "treatments designed to mitigate

certain diseases, to remove non-native vegetation, to restore site-appropriate tree species" or

encourage tree growth and late-successional forest characteristics).  And although Plaintiffs make

waves that the average amount of suitable habitat that may be reduced annually was lower in the

2023 BA[9] (AR17896–97), and that the 2023 BiOp contained new constraints under project

design criteria 11c and 11d (AR19651–52), both the Consistency Review and ROD demonstrated

that the Forest Service would drop acres of commercial treatments in suitable habitat, consistent

with the 2023 BA/BiOp.  AR27735; AR22233.

In sum, Plaintiffs simply disagree with the Forest Service's ultimate conclusion that the

loss of NSO overall habitat from the 2020–2022 wildfires did not warrant additional analysis in

the FEIS because those fires did not impact the Project area.  The Forest Service's determination

that the FEIS's impacts analysis for the NSO remains unchanged should not be second-guessed

and is entitled substantial deference.  *See Cascadia Wildlands*, 153 F.4th at 905 ("[T]he question

of how detailed a report must be 'requires the exercise of agency discretion—which should not

be excessively second-guessed by a court.'" (quoting *Seven Cnty.*, 605 U.S. at 181)).

---

[8] Because this citation implicates an overlap in the pagination of the record, Intervenor clarifies that this citation refers to the AR22416 included in the documents lodged on July 15, 2025 (ECF No. 35-2).

[9] Plaintiffs misrepresent Table K-49 as identifying the amount of suitable habitat permissible for removal within WCS-4, as the footnotes clearly explain that removal amounts were for both WCS-4 and WCS-3.  AR17896–97.

### 2.    The Forest Service took the requisite hard look on fire and fuels impacts.

Plaintiffs' arguments concerning the Forest Service's fire and fuels analysis seek to supplant the Forest Service's reasoned analysis—which warrants substantial deference—rather than ensure that the agency took a hard look at the issue.  Plaintiffs presume that just because they provided numerous comments on fire and fuels impacts, the Forest Service was required to change its analysis in the FEIS.  But the Forest Service' decision not to wholesale adopt Plaintiffs' myopic view that timber harvest activities somehow increase fire hazard impacts does not mean that the agency's impacts analysis was lacking.  Accordingly, Plaintiffs' arguments under NEPA do not warrant relief.

Faced with persuasive argument to the contrary, Plaintiffs nevertheless maintain that *Bark v. United States Forest Service*, 958 F.3d 865 (9th Cir. 2020), is controlling here.  Pls.' Reply at 21.  In attempting to rehabilitate *Bark*'s applicability following the Federal Defendants' and Intervenor's opening briefs, Plaintiffs fail to respond to arguments or otherwise mischaracterize the controlling law.  *Bark* is distinguishable for two primary reasons.  First, the Forest Service action in *Bark* was factually distinguishable from the Project here.  Second, and most importantly, the Forest Service adequately responded to Plaintiffs' comments on fire and fuels.

There are two important factual differences between *Bark* and this case that Plaintiffs fail to persuasively refute.  Both Federal Defendants and Intervenor highlighted that *Bark* is inapposite because it concerned whether the agency should have prepared an EIS in light of opposing science.  Fed. Defs.' MSJ at 29 (ECF No. 50); AFRC's MSJ at 29–30.  Plaintiffs' attempt to draw a different conclusion from that distinction is a red herring.  Pls.' Reply at 21 (citing *Friends of Big Bear Valley v. U.S. Forest Serv.*, 776 F.Supp.3d 824, 833 (C.D. Cal. 2025)).  The obligation to disclose and respond to dissenting viewpoints only applies when an agency

DEFENDANT-INTERVENOR'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT - 19

prepares an EIS. *Friends of Big Bear Valley*, 776 F.Supp.3d at 833. In cases involving an EA, like *Bark*, the relevant inquiry is whether the agency considered the scientific evidence to inform whether a project was highly controversial and, therefore, may require the preparation of an EIS. *Id.* As addressed in detail below, the Forest Service considered Plaintiffs' comments and science in much greater detail than the agency did in *Bark*. Therefore, *Bark* is uninformative and offers no insight into whether the Forest Service took the requisite "hard look" under NEPA.

Additionally, both Federal Defendants and Intervenor highlighted that the YRR Project includes prescribed burning on top of the proposed thinning treatments. Fed. Defs.' MSJ at 29–30; AFRC's MSJ at 30. This is a key factual distinction that the Ninth Circuit has previously recognized to limit the applicability of *Bark*. *See Earth Island Inst. v. Muldoon*, 82 F.4th 624, 639–40 (9th Cir. 2023). In *Muldoon*, the Ninth Circuit recognized that the science at issue in *Bark* concerned a lack of effective fuels reduction from thinning that was not followed by prescribed burns. *Id.*; *see also Friends of the Big Bear Valley*, 776 F.Supp.3d at 832 (highlighting *Muldoon*'s analysis limiting the *Bark* decision). Here, it is undisputed that the areas treated with thinning harvests will later be treated with prescribed low-intensity underburning to further address fire risks. *See* AR17971; AR17977; AR18073. Plaintiffs perplexingly discard this Ninth Circuit precedent, arguing that "it is irrelevant that the Project entails burning as well as logging." Pls.' Reply at 21. Plaintiffs argue that Defendants' reliance on *Muldoon* is misplaced because it pertained to the agency's extraordinary review analysis for a categorical exclusion rather than whether an EIS was required because the project was "highly controversial." Pls.' Reply at 21 n.14. However, *Muldoon* concerned the adequacy of the Forest Service's extraordinary review analysis which *included* whether the project's thinning activities may have "highly controversial" environmental effects (the very question at issue in *Bark*).

DEFENDANT-INTERVENOR'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT - 20

*Muldoon*, 82 F.4th at 637–40.  Accordingly, the Ninth Circuit's recognized limitations to its holding in *Bark* are controlling.

The crux of Plaintiffs' arguments is whether the Forest Service addressed the "extensive scientific research" cited in Plaintiffs' comments.  *See* Pls.' Reply at 24.  Plaintiffs continue to allege that the Forest Service "ignore[ed] inconvenient" comments and science presented by Plaintiffs.  Pls.' Reply at 20.  There should be no dispute—the Forest Service did not ignore Plaintiffs' comments or arguments.  The record reflects that the Forest Service directly acknowledged and responded to Plaintiffs' comments.  *See* AR18420–29 (responses to comments to draft EIS); AR21314–32 (responses to objections to the draft ROD).

That effort also renders *Bark* inapposite.  In *Bark*, the Ninth Circuit held that the Forest Service failed to adequately "engage" with the plaintiffs' contrary science that questioned the efficacy of variable density thinning because it merely drew "general conclusions."  958 F.3d at 871.  The Ninth Circuit explained that the Forest Service's conclusion that there were "no negative effects" from the variable density thinning treatments failed to consider all important aspects of the issue because the agency had not engaged with the numerous expert studies that demonstrated that thinning activities did not improve fire outcomes.  *Id.* (Internal quotation marks omitted).  In essence, in *Bark*, the Forest Service completely ignored the competing conclusions.

Here, the Forest Service's engagement and conclusions about well-known silvicultural practices employed by the YRR Project are a far cry from the "general conclusions" presented in *Bark*.  958 F.3d at 871.  The Forest Service not only acknowledged the competing conclusions, it actually conceded the legitimacy of some of the conclusions.  AR21325 (acknowledging the "good points" raised by articles identified by Plaintiffs).  However, the Forest Service explained

DEFENDANT-INTERVENOR'S REPLY IN SUPPORT OF CROSS-MOTION FOR
SUMMARY JUDGMENT - 21

why it elected to move forward with the YRR Project as-is despite those differing perspectives. *Id.* (citing FEIS to explain that other scientific articles "make a strong case" for conducting the treatments proposed by the Project despite Plaintiffs' concerns).  Unlike *Bark*, the Forest Service did not ignore opposing science in a manner that would cast doubt on the reasonableness of its conclusion.  Even the caselaw relied on by Plaintiffs supports recognizing this distinction.  *See Friends of Big Bear Valley*, 776 F.Supp.3d at 833 ("This case is further distinguishable from *Bark* because… the Forest Service addressed the opposing viewpoints raised during the administrative process[.]").  Although Intervenor raised this stark departure from *Bark* in its opening brief, AFRC MSJ at 29–30, Plaintiffs declined to respond.

Instead, seemingly admitting that the Forest Service did respond to their comments, Plaintiffs also argue that the Forest Service did not "fully respond[]" to the "extensive comments" offered by Plaintiffs.  Pls.' Reply at 22.  Plaintiffs highlight a list of sources in the record that purportedly support their opposition to the proposed fuel treatments.  *Id.*  Federal Defendants demonstrate on reply that Plaintiffs are selectively reading these sources which, when read in their entirety, demonstrate that the Forest Service's decision "is based on strong scientific agreement."  Fed. Defs.' Reply at 16.[10]

For example, one repeated argument made by Plaintiffs reflects the selective nature of their comments.  Plaintiffs double down on their belief that "wildfire is unlikely to interact with effective fuel treatments."  Pls.' Reply at 22.  As Intervenor already explained, this argument is premised on the Campbell et al. 2011 study—which was not specific to this Project—opining that there is "a low likelihood that treated forests will be exposed to fire."  AFRC's MSJ at 28

---

[10] Intervenor incorporates by reference Federal Defendants' discussion of these scientific sources.  Fed. Defs.' Reply at 16–19.

(internal quotation marks omitted).  Based on that statement, Plaintiffs seem to question whether this Project is unnecessary to address fire risks.  However, the Forest Service addressed that issue by explaining that, because the Project area currently exhibits increased stand density and decreased species diversity and health, the Project is needed to address "[t]he risk of habitat loss from high intensity wildfires [that has] increased because fire can easily spread in these closed canopy forest conditions." AR17976.[11]  This argument demonstrates that, Plaintiffs' preferences for the Project aside, the Forest Service tailored the Project area to the needs of this forest.[12]

The substance of Plaintiffs' comments aside, Plaintiffs seek relief that is not appropriate under NEPA.  Plaintiffs fault the Forest Service for neither changing its analysis nor agreeing with their substantive conclusions.  Pls.' Reply at 20 (alleging that the Forest Service "changed neither its analysis nor its conclusions by one word" in response to Plaintiffs' competing views); *id.* at 22 (alleging the Forest Service "did not change its analysis whatsoever").  The Forest Service was not required to take such action under NEPA, and Plaintiffs offer no authority in support of their arguments.  At most, the Forest Service *could* have altered its analysis in response to Plaintiffs' comments.  *See* 40 C.F.R. § 1503.4(a).  However, "NEPA imposes no

---

[11] Notably, the Campbell et al. 2011 study appears to agree that the Project will serve some of the stated purposes of this Project to improve health and resiliency in the ecosystem.  *See* AR16397 (Plaintiffs' excerpt of the Campbell et al. 2011 abstract which acknowledges that "fuel-reduction treatments may be necessary to restore historical functionality to fire suppressed ecosystems"); AR17977 (purpose and need discussion in FEIS identifying desire to move existing condition from years of fire suppression to historical pattern of vegetation); AR18073 (fire and fuels analysis in the FEIS discussing the use of fuel treatment to "increase forest health" and "reduce the severity of future wildfires").

[12] Plaintiffs attempt to call into question the general conclusions made by the Forest Service by highlighting AFRC's acknowledgement of potential short-term impacts in the context of Plaintiffs' proposed alternative.  *See* Pls.' Reply at 23 n.18 (citing AFRC Br. at 19).  Plaintiffs fail to explain why its generic scientific observation overrides the specific needs and determination for this Project.

DEFENDANT-INTERVENOR'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT - 23

substantive environmental obligations or restrictions" because it is "a purely procedural statute." *Seven Cnty.*, 605 U.S. at 173.

Plaintiffs also make repeated references to the extent of their comments and express frustration that the Forest Service "broadly summarized these comments" and omitted specific references in its responses. *See* Pls.' Reply at 22. Again, it is undisputed that the Forest Service directly responded to Plaintiffs. AR18420; AR18428–29; AR21314–15; AR21317; AR21325–27; AR21329–32. Plaintiffs cite little authority about the required scope of the agency's response, let alone that NEPA required the Forest Service to produce a response that matched the length of Plaintiffs' comments or referenced every single study or nuance raised by Plaintiffs. The Forest Service must be afforded deference in how it chose to respond to Plaintiffs. It is inappropriate for a court to "micromanage" such a "fact-dependent, context-specific, and policy-laden choice[] about the depth and breadth of [the agency's] inquiry—and also about the *length, content, and level of detail* of the resulting EIS." *Seven Cnty.*, 605 U.S. at 183 (emphasis added).

The Ninth Circuit has held that courts do not "take sides in a battle of the experts." *Bark*, 958 F.3d at 871; *see also Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1244 (9th Cir. 2005) (declining to take sides "in a battle of the experts" (internal quotation marks omitted)). The Forest Service's fire and fuels analysis is the very type of informed decision making that warrants deference. *Seven Cnty*, 605 U.S. at 184 ("[C]ourts should and must defer to the informed discretion of the responsible federal agencies" (internal quotation marks omitted)). Accordingly, the Forest Service took an appropriate "hard look" at the fire and fuels under NEPA.

DEFENDANT-INTERVENOR'S REPLY IN SUPPORT OF CROSS-MOTION FOR
SUMMARY JUDGMENT - 24

3.    **The Forest Service took the requisite hard look at carbon storage and emissions.**

Plaintiffs fail to substantiate their requested relief regarding carbon storage and emissions on reply for two reasons. First, Plaintiffs misapply the relevant caselaw. Plaintiffs allege that their requested relief is appropriate under two decisions: *Center for Biological Diversity v. United States Forest Service*, 687 F.Supp.3d 1053 (D. Mont. 2023), *aff'd in part and rev'd in part*, 2025 WL 586358 (9th Cir. 2025) (*Black Ram*), and *350 Montana v. Haaland*, 50 F.4th 1254 (9th Cir. 2022). As explained below, the out-of-district *Black Ram* decision is an outlier because it is the only case to find a forest resiliency project's NEPA decision insufficient for taking the requisite hard look at climate impacts. Plaintiffs also fail to appreciate the key distinctions between *Black Ram* and *350 Montana* and this matter.[13] Second, the Forest Service adequately analyzed carbon storage and emissions in proportion to their significance *and* responded to Plaintiffs' comments on opposing "science" on the carbon trade-offs for thinning projects. Plaintiffs may disagree with the Forest Service's policy choices, but the agency satisfied NEPA's procedural requirements by taking the requisite hard look.

a.    **The Forest Service's carbon impacts analysis was proportional to its significance.**

Plaintiffs maintain that Forest Service's analysis cannot be upheld in light of the *Black Ram* decision. That decision predates *Seven County*, is not controlling precedent, is factually distinguishable, and has been limited by the *same court* (even the same judge) in subsequent decisions.

---

[13] Intervenor incorporates by reference the Federal Defendants' argument that *Black Ram* is not good law after *Seven County*. Fed. Defs.' Reply at 21–23.

DEFENDANT-INTERVENOR'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT - 25

In *Black Ram*, the district court rejected the Forest Service's qualitative climate change analysis, which determined that the project "would not have a discernable impact on atmospheric concentrations of greenhouse gases or global warming." 687 F.Supp.3d at 1074 (internal quotation marks omitted); *see id.* at 1073–77. In finding the climate analysis inadequate, the court also attempted to distinguish *Hapner v. Tidwell*, 621 F.3d 1239, 1245 (9th Cir. 2010), a seminal case where the Ninth Circuit upheld the Forest Service's EA for a project that did not even contain a discussion of climate change, but included a discussion of climate change in response to comments, because the analysis was in proportion to its significance.[14] The court in *Black Ram* limited the applicability of *Hapner* because it only involved logging activities on 810 acres instead of the 3,902 acres at issue in the Black Ram Project.[15] 687 F.Supp.3d at 1076. More importantly, the district court found that the Forest Service effectively did not rely on "accurate information" because it relied "almost entirely" on "cookie-cutter and boilerplate" language from another project on another national forest. *Id.* at 1075, *see id.* at 1074 n.7. That factual distinction is key here, where the Forest Service *did* undertake an analysis specific to the YRR Project.

To the extent that Plaintiffs read *Black Ram* to require a quantitative analysis or something more than what the Forest Service did here, it is crucial to note that the same district

---

[14] In *Hapner*, the Ninth Circuit's holding regarding proportionality was based on what is required in an EIS. 621 F.3d at 1245 (citing 40 C.F.R. § 1502.2(b)).

[15] This Court need not engage in an acre-by-acre comparison, because not all projects and their treatment of acres are alike. For example, in *Black Ram*, the court noted that 45% of the 3,902 acres to be treated were "set to be clearcut." 687 F.Supp.3d at 1076. The YRR Project, on the other hand, authorizes 2,242 acres of commercial harvest but only 453 acres involve regeneration harvest in managed stands and would also require that 15% of the Matrix lands to be in clumps, skips, or scattered trees. AR 22210–12. Irrespective of whether a project involves 810 acres, 3,902 acres or 2,242 acres of commercial activities, it is the Forest Service—not Plaintiffs or the courts—that is best suited to determine the level of significance that projects will have on carbon storage and emissions.

DEFENDANT-INTERVENOR'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT - 26

court has twice limited its own application of *Black Ram*.  First, in a case challenging the South Plateau Project, the same judge acknowledged the *Black Ram* ruling but upheld that the agency's qualitative determination that "the [p]roject would result in a short-term release of carbon but, over the long term, was likely to increase carbon storage and reduce emissions by reducing disturbance risk and storing carbon in wood products, as well as recapturing carbon as forests regrow."  *Ctr. for Biological Diversity v. U.S. Forest Serv.*, No. CV 23-110-M-DWM, 2025 WL 3549515, at *5 (D. Mont. Dec. 11, 2025) (internal quotation marks omitted) (*South Plateau*).  Although Plaintiffs correctly identify that the Forest Service tiered its analysis to a broader forest-wide carbon analysis in *South Plateau*, Pls.' Reply at 28, Plaintiffs fail to identify any information from that tiered analysis that materially differed from what the Forest Service presented in the YRR FEIS.  *Compare South Plateau*, 2025 WL 3549515, at *5 (noting that in the forest-wide analysis found that projects, like the South Plateau Project, "would affect up to less than 0.25 percent of the forested area and result in less than 1 teragram[ ] of carbon annually" (internal quotation marks omitted), *with* AR18251–53 (explaining that treatments will occur on only a fraction of the Project area, let alone the entire forested area in the Willamette National Forest, and listing reasons why carbon emissions from the Project would be limited and mitigated).  Second, the same district court refused to disavow an agency's qualitative climate analysis under *Black Ram*, where the analysis was not "cookie-cutter" and a "verbatim reproduction of [an] analysis from another forest" like in *Black Ram*.  *All. for the Wild Rockies v. Rollins*, No. 24-CV-10-M-DLC-KLD, 2025 WL 4066514, at *7 (D. Mont. Sept. 30, 2025) (internal quotation marks omitted).

Unlike the cookie-cutter analysis in *Black Ram*, the Forest Service's qualitative analysis in the FEIS and response to comments demonstrated the limited and indeed mitigated carbon

DEFENDANT-INTERVENOR'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT - 27

impacts. This carbon analysis was proportional to its significance, consistent with *Hapner*, and provided exactly what Plaintiffs request in this litigation—"'an accurate picture of what impacts the Project may have.'" Pls.' Reply at 30 (quoting *Black Ram*, 687 F.Supp.3d at 1076–77) (internal brackets omitted).

Plaintiffs next attempt to minimize NEPA's requirement that impacts must be analyzed in proportion to their significance, highlighting that, even post-*Hapner*, the Ninth Circuit has held that, "'[w]ithout some articulated criteria for significance in terms of contribution to global warming that is grounded in the record and available scientific evidence, [the agency's] conclusion that [the project's carbon] emissions will be 'minor' is deeply troubling and insufficient to meet [the agency's] burden.'" Pls.' Reply at 29 (quoting *350 Montana*, 50 F.4th at 1266) (alterations in original). Plaintiffs fail to appreciate the context of that holding, which does not support Plaintiffs' arguments here.

In *350 Montana*, the agency addressed a coal mine expansion that would "generate more [greenhouse gases] annually than the largest single point source of [greenhouse gas] emissions in the United States," totaling 0.44 percent of the annual global greenhouse emissions. 50 F.4th at 1265–66 (internal quotation marks omitted). The agency summarily concluded that the coal mine's "contribution *relative to other global sources [of GHGs] would be minor* in the short-and long-term on an annual basis." *Id.* at 1266 (internal quotation marks omitted). The Ninth Circuit found the agency failed to "cite any scientific evidence supporting the characterization of the project's emissions as 'minor' compared to global emissions." *Id.* The Ninth Circuit ultimately observed that the agency's description of the impacts from expanding a coal mine merely left an impression that the mine's contribution of greenhouse gas emissions would "be smaller than the

DEFENDANT-INTERVENOR'S REPLY IN SUPPORT OF CROSS-MOTION FOR
SUMMARY JUDGMENT - 28

worldwide total of all other sources of [greenhouse gas emissions]," without explaining how or why. *Id*. at 1266.

*350 Montana* cannot be applied in a vacuum. The agency's analysis in that case was called into question because the broader impacts of the project were much more obvious. The expanded coal mine was expected to result in 190 million tons of greenhouse gas emissions—a measurable share of annual *global* emissions. *Id.* at 1258. Where the impacts are much less significant and regional, the Ninth Circuit is clear that NEPA only requires an agency to discuss carbon impacts "'in proportion to their significance.'" *Hapner*, 621 F.3d at 1245 (quoting 40 C.F.R. §1502.2(b)); *see also Seven Cnty.*, 605 U.S. at 183 ("[I]nherent in NEPA ... is a rule of reason, which ensures that agencies determine whether and to what extent to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process." (Internal quotation marks omitted).

Even though *Hapner* is not explicitly discussed in every case referenced by the parties, the cases reflect NEPA's proportionality requirement. On the one hand, in *Hapner*, no climate analysis was required beyond the response to comments provided in the Forest Service's final decision. 621 F.3d at 1245. On the other hand, the court required more analysis in *350 Montana*, when the limited quantitative analysis contradicted the agency's conclusion that there would only be a "minor" impact from the high level of emissions. 50 F.4th at 1266. *South Plateau* falls somewhere in between, where the district court upheld the Forest Service's qualitative carbon analysis because it only impacted a small portion of the national forest. 2025 WL 3549515, at *5. Similarly, in *Swomley v. Schroyer*, the district court explicitly relied on *Hapner*—and distinguished other cases in the oil and gas context—to uphold the Forest Service's limited climate change analysis for a forest management project that involved a "clearcut with

DEFENDANT-INTERVENOR'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT - 29

leave tree" method.  484 F.Supp.3d 970, 973, 975–77 (D. Colo. 2020), *aff'd*, No. 20-1335, 2021 WL 4810161 (10th Cir. 2021) (internal quotation marks omitted).

Here, the Youngs Rock Project is much more akin to *Hapner*, *Swomley*, and *South Plateau* than *350 Montana*.  The Project authorizes 2,242 acres of commercial harvest activities, with 1,789 acres of thinning and 453 acres of regeneration harvest.  AR22211.  The FEIS explained that the emissions from this Project would be negligible in light of the gigatons of carbon dioxide emissions, globally and nationally.  AR18251–52.

However, the Forest Service did not end its analysis there.  The Forest Service pointed to multiple criteria explaining that the Project would not have a significant impact from a climate change perspective.  The Forest Service explained that the treatments will occur on only one fifth of the Project area.  AR18251.  Fifty percent of the carbon stock associated with that acreage is attributable to soils and will not be disturbed by the aboveground activities proposed in the Project.  *Id.*  The Forest Service explained that the increase in emissions would take place in the short term, and the Project would minimize and mitigate effects over time by continuing to remove carbon from the atmosphere as the forest regrows.  AR18252.  The Forest Service relied on the Fifth Assessment Report of the Intergovernmental Panel on Climate Change (IPCC) as evidence that the primary threat of emissions from forests is through deforestation—removing all trees and converting to another land use that does not support regrowth.  *Id.*  This Project prevents deforestation for the acres at issue and the Forest Service noted that the forested area of the Willamette National Forest has remained stable or increased since the 1990s.  *Id.*  The Project was further designed consistently with the IPCC's proposed actions to adapt to climate change and mitigate emissions by reducing stand density to increase fire-resilience.  AR18252–53.

The Forest Service explicitly designed this Project to have a "relatively small" short-term release of carbon to obtain a long-term carbon benefit from more resilient forests that are less prone to release carbon through mortality. A18253. The Forest Service also highlighted that the wood products generated from the proposed thinning will help mitigate carbon emission impacts from the Project by storing carbon and displacing more carbon-intensive building materials (such as concrete and steel). *Id.* Therefore, the Forest Service did much more than merely claim that impacts will be minor, it relied on various metrics and scientific studies to analyze the short-term release of carbon and long-term impacts of carbon storage. Accordingly, the Forest Service took the requisite hard look under NEPA.

> **b.** **The Forest Service adequately responded to Plaintiffs' comments.**

Underlying Plaintiffs' "hard look" arguments is another attempt to supplant the agency's discretionary management decisions with their own policy preferences. Plaintiffs concede that the Forest Service responded to their comments. Pls.' Reply at 25–26. However, like their fire and fuels arguments, Plaintiffs fault the Forest Service for not sufficiently responding to or grappling with their proffered science on climate change contained in their lengthy supplement. *Id.* at 24–26. Again, the record reflects that the Forest Service's response was sufficient under NEPA.

The Forest Service summarized Plaintiffs' comments on carbon storage and emissions in the FEIS. *See* AR18411; AR18417. As with their fire and fuels arguments, Plaintiffs seek to hold the Forest Service to an unworkable standard of explicitly responding to every aspect of its comments. Pls.' Reply at 25–26 (criticizing the Forest Service for lack of direct response to 63-page supplement on carbon impacts and specific scientific studies submitted by Plaintiffs). Again, Plaintiffs allege that the Forest Service failed to satisfy NEPA by failing to alter its

DEFENDANT-INTERVENOR'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT - 31

climate analysis in response to Plaintiffs' comments. *Id.* at 25. As noted above, the relevant NEPA regulations did not require the agency to alter its analysis in response to comments. *See* 40 C.F.R. § 1503.4(a) (identifying modifying an analysis as one of the "[p]ossible responses" to consider comments on an EIS). Requiring more would run afoul of the "purely procedural" nature of NEPA. *Seven Cnty.*, 605 U.S. at 177.

The FEIS identified that Plaintiffs' comments focused on reducing carbon emissions by keeping carbon stored in the forests and alleged a lack of need for wood products. AR18411; AR18417; AR18419. In response, the Forest Service acknowledged a "short-term carbon trade-off" that would result from harvest activities and prescribed fire in this Project and that "[t]here is no consensus in the literature" on net climate benefits of thinning treatments. AR18412. Given that lack of consensus, the Forest Service refused to "presume that short-term carbon maximization is the wisest approach to sustainable forest management." *Id.* The Forest Service noted that its preference for a long-term management focus is in "line with national and international guidance as stated in the EIS" and "the agency's carbon policy articulated in its carbon principles which include emphasiz[ing] ecosystem function and resilience, and recogniz[ing] carbon sequestration as one of many ecosystem services." AR18412–13; *see also* AR18417–18 (same).

The Forest Service's explanation that Plaintiffs' comments focus on a different management approach than what the agency determined was the more favorable approach (managing the Project area for resiliency) is a sufficient explanation for why no further agency response was required under 40 C.F.R. § 1503.4(a)(5). Plaintiffs offer no argument to the contrary other than the standalone assertion that such explanation "did not occur here." Pls.' Reply. at 26 n.19.

DEFENDANT-INTERVENOR'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT - 32

Plaintiffs' attempt to impose their preferred management direction on the agency through this challenge violates the teachings of *Seven County*.  The Forest Service must be afforded deference in weighing the impacts of the different management options.  "NEPA does not require the agency to weigh environmental consequences in any particular way" and "an agency may weigh environmental consequences as the agency reasonably sees fit." *Seven Cnty.*, 605 U.S. at 173.  "In ultimately deciding whether to … approve a project, an agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Id*. at 177.  Here, the Forest Service made a reasoned judgment that differed from Plaintiffs' preferred outcome because it weighed the environmental costs differently than Plaintiffs would have preferred.  In this circumstance, Plaintiffs have no recourse under NEPA.

## III.    REMEDY

As explained above, this Court need not address remedy because the Forest Service's YRR Project complied with NEPA.  However, if the Court is inclined to rule otherwise, vacating the Project would be inappropriate in this instance.  *See* AFRC MSJ at 36–37.  Plaintiffs posit that vacatur is effectively automatic because it is the "presumed remedy" if this Court finds a NEPA violation.  Plaintiffs are incorrect.

When an agency action is found inadequate in whole or part, the presumptive remedy, and "'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Nat'l Wildlife Fed'n v. Burford*, 871 F.2d 849, 855 (9th Cir. 1989) (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)); *accord Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014).  In an environmental case, the Ninth Circuit emphasized that "the ordinary remedy when a court finds an agency's action to be arbitrary and capricious is to remand for further administrative proceedings," but "a court can

DEFENDANT-INTERVENOR'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT - 33

order equitable relief or remand with specific instructions in 'rare circumstances.'" *Earth Island Inst. v. Hogarth*, 494 F.3d 757, 770 (9th Cir. 2007). Given that remand is the standard remedy, the determination of whether vacatur accompanies a remand is a matter of equity. The Ninth Circuit recognizes vacatur is improper when equities favor leaving the agency decision in place. In deciding whether to vacate an agency action, courts weigh (1) "how serious the agency's errors are" against (2) "'the disruptive consequences'" that would result from vacatur. *Cal. Communities Against Toxics v. U.S. E.P.A.*, 688 F.3d 989, 992 (9th Cir. 2012) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)).

In the NEPA context, the Supreme Court clarified in *Seven County* that "[e]ven if an EIS falls short in some respects, that deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the EIS." 605 U.S. at 185. Plaintiffs unpersuasively attempt to disregard this precedent as "dicta." Pls.' Reply at 32.

In the event that remedy is a relevant issue before this Court, separate remedy briefing should be allowed before the Court determines the appropriate remedy. Plaintiffs' reply demonstrates the need for standalone remedy briefing. Plaintiffs criticize Federal Defendants for "fail[ing] to carry," let alone "attempt[ing] to meet its burden of showing that its errors were not serious, or that disruptive consequences would result from vacatur." Pls.' Reply at 32–33. But, as stated above, whether agency action should be vacated depends on how serious the agency's errors are and the disruptive consequences that would result from a vacatur. *Cal. Communities Against Toxics*, 688 F.3d at 992. That analysis must be informed by the Court's forthcoming merits ruling and the scope of the errors (if any) under NEPA. Simply put, Plaintiffs are putting the cart before the horse on its remedy request.

DEFENDANT-INTERVENOR'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT - 34

Lastly, Plaintiffs' request for an injunctive in the alternative—a request that was not raised in its opening brief and spans all of *one* sentence on reply—should be disregarded. The request should be deemed waived because it was raised for the first time on reply. *Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th Cir. 2010) (holding that "arguments raised for the first time in a reply brief are waived"). Beyond that procedural flaw, Federal Defendants are correct that Plaintiffs have failed to attempt to meet their burden for obtaining such relief. Fed Defs.' Reply at 27 n.8. There is no procedural or substantive basis to consider Plaintiffs' request for injunctive relief.

## IV.    CONCLUSION

For the foregoing reasons, this Court should uphold the YRR Project by granting Defendant-Intervenor's Cross-Motion for Summary Judgment, granting Federal Defendants' Cross-Motion for Summary Judgment, and denying Plaintiffs' Motion for Summary Judgment.

Respectfully submitted this 20th day of March, 2026.

*/s Sara Ghafouri*
Sara Ghafouri, OSB #111021
American Forest Resource Council
700 N.E. Multnomah, Suite 320
Portland, Oregon 97232
Telephone: (503) 222-9505
Fax: (503) 222-3255
sghafouri@amforest.org

Greg Hibbard, OSB #183602
American Forest Resource Council
924 Capitol Way South, Suite 102
Olympia, WA 98501
Telephone: (360) 352-3910
Fax: (360) 352-3917
Email: ghibbard@amforest.org

*Attorneys for Defendant-Intervenor*

## CERTIFICATE OF COMPLIANCE

The preceding memorandum complies with the applicable word-count limit under LR 7-2(b), because it comprises 10,966 words, based on the word-count of the word processing system used to prepare the memorandum.  This word count includes headings, footnotes, and quotations, but excludes the caption, table of contents, table of authorities, acronym list, motion, signature block, and any certificates of counsel.

Dated this 20th day of March, 2026.


*/s/ Sara Ghafouri*
Sara Ghafouri