# EXHIBIT 1

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| CASCADIA WILDLANDS, *an Oregon non-profit organization*; OREGON WILD, *an Oregon non-profit organization*; and UMPQUA WATERSHEDS, *an Oregon non-profit organization*, | Case No. 6:24-cv-01641-MTK **OPINION AND ORDER** |
| Plaintiffs, | |
| v. | |
| UNITED STATES BUREAU OF LAND MANAGEMENT, *a federal agency*, | |
| Defendant, | |
| v. | |
| AMERICAN FOREST RESOURCE COUNCIL; ASSOCIATION OF O&C COUNTIES, | |
| Intervenor-Defendants. | |

**KASUBHAI,** United States District Judge:

Plaintiffs Cascadia Wildlands, Oregon Wild, and Umpqua Watersheds filed this action against Defendant U.S. Bureau of Land Management ("BLM") under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, challenging BLM's approval of the Blue and Gold Harvest Plan. Plaintiffs allege that BLM violated the National Environmental Policy Act ("NEPA") 42 U.S.C. §§ 4321 *et seq.*, and the Federal Land Policy and Management Act

Page 1 — OPINION AND ORDER

Exhibit 1 - Page 1

("FLPMA"), 43 U.S.C. §§ 302 *et seq.* Before the Court are Plaintiffs' Motions to Complete/Supplement the Administrative Record (ECF Nos. 26, 49), Plaintiffs' Motion for Summary Judgment (ECF No. 27), Defendant's Cross-Motion for Summary Judgment (ECF No. 29), and Defendant-Intervenors' Cross-Motion for Summary Judgment (ECF No. 32). For the reasons below, Plaintiffs' motions to complete the record are granted in part and denied in part; Plaintiffs' motion for summary judgment is granted in part and denied in part; and Defendants' cross-motions for summary judgment are granted in part and denied in part.

## BACKGROUND

Plaintiffs allege that Defendant BLM's Blue and Gold Harvest Plan ("Blue and Gold Plan" or "Plan") violates FLPMA and NEPA because BLM failed to adequately consider the presence of old-growth forests in the Plan Area. Plaintiffs allege that the Plan Area, "located in the Coast Range of Western Oregon, is extensive and includes large, contiguous, unlogged, mature and old-growth forest[s]" that "are incredibly rare." First Am. Compl. ¶ 3, ECF No. 7. Plaintiffs allege that BLM's analysis in support of the Plan "was incomplete and cursory and intentionally obscured the presence of ancient trees and forests that, if acknowledged and disclosed, would prevent the logging of these old-growth areas." *Id.* ¶ 8.

The Court begins by summarizing the relevant statutory and regulatory framework and the facts underlying this action.

## I.      Statutory and Regulatory Background

### A.      NEPA

The National Environmental Policy Act requires federal agencies to issue an environmental impact statement for all "major Federal actions significantly affecting the quality of the human environment," considering the environmental impact of the action and its alternatives. *Env't Def. Ctr. v. Bureau Ocean Energy Mgmt.*, 36 F.4th 850, 872 (9th Cir. 2022)

Page 2 — OPINION AND ORDER

Exhibit 1 - Page 2

(quoting 42 U.S.C. § 4332(C)). To determine whether an action will have significant environmental impacts, an agency may first conduct an environmental assessment ("EA"). *Id.* "An EA is a 'concise, public document' providing 'sufficient evidence and analysis' for the agency to determine 'whether to prepare an environmental impact statement.'" *Id.* (citation omitted). If an agency concludes a project has no significant impact, it issues a finding stating so. *See, e.g.*, *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 943 (9th Cir. 2014).

### B.     The O&C Act

The majority of lands in the Plan Area are subject to the Oregon & California Lands Act ("O&C Act"). AR_00354 (noting that 3,406 of the 3,594 acres at issue are O&C lands). Congress instructed federal agencies to manage these lands for "permanent forest production . . . in conformity with the [principle] of sustained yield for the purpose of providing a permanent source of timber supply, protecting watersheds, regulating stream flow, and contributing to the economic stability of local communities and industries, and providing recreational [facilities]." 43 U.S.C. § 2601; *see also Headwaters, Inc. v. Bureau of Land Mgmt.*, 914 F.2d 1174, 1184 (9th Cir. 1990) (upholding a BLM interpretation that the O&C Act establishes timber production as the dominant use on O&C lands). O&C lands are nevertheless subject to later enacted statutes like NEPA. *See Murphy Co. v. Biden*, 65 F.4th 1122, 1134–35 (9th Cir. 2023) (citing *Portland Audubon Soc'y v. Babbitt*, 998 F.2d 705, 709 (9th Cir. 1993)); *Rivers v. Bureau of Land Mgmt.*, 2018 WL 6735090, at *17 n.20 (D. Or. Oct. 12, 2018).

### C.     FLPMA/2016 Resource Management Plan

Under the Federal Land Policy and Management Act, BLM must prepare Resource Management Plans ("RMPs") for its districts. 43 U.S.C. § 1712. RMPs "are designed to guide and control future management actions and the development of subsequent, more detailed and limited scope plans for resources and uses." 43 C.F.R. § 1601.0-2. "Once a land use plan is

Page 3 — OPINION AND ORDER

Exhibit 1 - Page 3

developed, '[a]ll future resource management authorizations and actions . . . shall conform to the approved plan.'" *Or. Nat. Res. Council Fund v. Brong*, 492 F.3d 1120, 1125 (9th Cir. 2007) (quoting 43 C.F.R. § 1610.5–3(a)).

## II.     Factual Background

### A.       2016 RMP & FEIS

The lands in the Blue and Gold Plan Area were allocated for timber harvest in 2016, when BLM issued its Northwestern & Coastal Oregon Record of Decision and Resource Management Plan ("RMP"). AR_07807–8126. The RMP "provides direction for management of resources . . . of BLM-administered lands in the Coos Bay District, Eugene District, Salem District, and the Swiftwater Field Office of the Roseburg District." AR_07809.

The RMP provides for certain land use allocations ("LUAs"), management objectives, and management directions across 1,265,669 acres. AR_07809, 7859. The RMP allocates those acres across five different land use allocations, each of which is subject to different management objectives and directions. AR_07859. The purposes of the RMP were to "[p]rovide a sustained yield of timber," "[c]ontribute to the conservation and recovery of threatened and endangered species," "[p]rovide clean water in watersheds," "[r]estore fire-adapted ecosystems," "[p]rovide recreation opportunities," and "[c]oordinate management of lands surrounding the Coquille Forest with the Coquille Tribe." AR_07817. The RMP's management directions are binding and require BLM to protect forest health, manage fire risks, restore fish habitat, maintain water quality, develop recreation opportunities, limit soil disturbance, and manage habitat for species listed under the Endangered Species Act. AR_07892–918.

Portions of the lands in the Blue and Gold Plan were previously designated as Late Successional Reserves ("LSR"). AR_08196, 1250. LSR lands are managed primarily to preserve "stands of older, structurally-complex conifer forest" and the habitats of northern spotted owls

Page 4 — OPINION AND ORDER

Exhibit 1 - Page 4

and marbled murrelets. AR_07880. Under the 2016 RMP, however, former LSR lands are now allocated to the Harvest Land Base ("HLB"), which is managed (1) "to achieve continual timber production," (2) to sell "the declared Allowable Sale Quantity of timber" ("ASQ"), and (3) "[i]n harvested or disturbed areas, ensure the establishment and survival of desirable trees appropriate to the site and enhance their growth." AR_07875.

Most important to this case is the RMP's binding direction to preserve particularly large, old trees. Notwithstanding the RMP's direction to harvest timber on HLB lands, it also directs BLM to "[m]aintain stand densities . . . to promote stand vigor and health." AR_07876. Specifically, BLM must:

> Include among retained trees all trees that are both ≥ 40" DBH [diameter at breast height] and that the BLM identifies were established prior to 1850, except where falling is necessary for safety or operational reasons and no alternative harvesting method is economically viable or practically feasible. If such trees need to be cut for safety or operational reasons, retain cut trees in the stand. The BLM identification of trees established prior to 1850 may be based on any of a variety of methods, such as evaluation of bark, limb, trunk, or crown characteristics, or increment coring, at the discretion of the BLM.

AR_07876. The RMP also requires BLM to restore and maintain habitat for sensitive species, provide complex ecosystems, promote the development of structural complexity, and retain large trees. AR_07875–78. Accordingly, though HLB land is primarily designated for timber production, BLM must act "consistent with management direction" and "may elect to defer harvest . . . for reasons described in the management direction . . . ." AR_07920–21.

Given the large area at issue in the RMP, BLM assured that "[o]n-the-ground projects, such as timber sales . . . will undergo additional analysis and decision-making before implementation." AR_07809; *see also* AR_07819 ("The BLM will carry out additional decision-making, including NEPA compliance . . . as appropriate, before authorizing any future actions and implementation decisions that result in on-the-ground activities.").

Page 5 — OPINION AND ORDER

Exhibit 1 - Page 5

In support of the RMP, BLM issued a Final Environmental Impact Statement ("2016 FEIS") that considered the impacts of both the Northwestern RMP and the RMP for Southwestern Oregon, encompassing a total of 2.5 million acres. AR_08165–66. As Plaintiffs note, "[v]egetation, hydrology, geology, wildlife, fire history, proximity to human development, and past resource use vary widely across this expansive planning area." Pls.' Mot. Summ. J. 7 (citing, *e.g.*, AR_08388, 8687). Accordingly, the 2016 FEIS also acknowledged that the RMP does not directly authorize project implementation and that implementation decisions would require additional NEPA compliance. AR_09386-87.

The 2016 FEIS provided information as to how BLM modeled forest vegetation conditions. AR_08288–89, 9371–435. Within the RMP planning area, "[t]here are approximately 77,000 identified stands that average 32 acres in size." AR_09372. A "stand" is defined as "[a]n aggregation of trees occupying a specific area managed as a discrete operational or management unit. A stand may be composed of trees and groups of trees of a variety of ages, species, and conditions, or it may be relatively uniform. A stand may also contain multiple land use allocations." AR_08120. The 2016 FEIS noted that BLM's Micro*Storms database contains attributes from the Forest Operations Inventory ("FOI"), and "[t]he vegetation classification represents stand average characteristics," including cover condition, canopy layers, tree species, tree diameter, tree size, birthdate of the stand layer, and the ten-year age class. AR_09372. Relying on that data, "BLM declare[d] the Allowable Sale Quantity ("ASQ") [of timber] for the sustained-yield units in the decision area." AR_07821_22.

### B. Blue and Gold Harvest Plan EA and FONSI

Following the Plan Area's allocation as HLB and dedication to timber harvest in 2016, BLM drafted an Environmental Assessment to analyze the environmental impacts of timber

Page 6 — OPINION AND ORDER

Exhibit 1 - Page 6

harvest in the Blue and Gold Plan. The lands in the Blue and Gold Plan account for only 2,625 acres out of the 1,265,669 considered in the RMP and FEIS. AR_00353, 7809.

Throughout the notice and comment process in preparation of the Blue and Gold EA, Plaintiffs and their members submitted comments that raised issues around BLM's stand age calculations and the protection of old-growth trees. AR_05494, 4426, 1212, 1135. Plaintiffs expressed concern that BLM was unable to log the areas in the ways described while maintaining its obligation to retain old-growth trees. Mr. Erich Reeder, a recently retired Biological Science Technician who worked in the Plan Area in Roseburg, Oregon, commented that BLM's forest stand attributes "are inaccurate and misleading" and obscure significant portions of old-growth forest. AR_01203. Additionally, Ms. Janice Reid, on behalf of Plaintiff Umpqua Watersheds, similarly commented that the stands in the Plan Area "are more complex than the stand age classification label depicts," and that "[l]egacy trees are not just anomalies but are the foundational components of the resulting stand." AR_01138.

In August of 2024, BLM published its final EA and identified "a total of 2,625 acres . . . as suitable for silvicultural treatment at this time." AR_00353. "The project area is located on BLM-administered lands within Douglas County, Oregon" and within five miles of the towns of Yoncalla, Sutherlin, and Oakland. AR_00353. The EA "also provides the basis for determining if there are significant impacts not already analyzed in the 2016 [RMP] . . . to which this document tiers, or if a Finding of No Significant Impact (FONSI) is appropriate." AR_00352.[1]

---

[1] With respect to tiering, the applicable regulations provide:

> Whenever a broad environmental impact statement has been prepared (such as a program or policy statement) and a subsequent statement or environmental assessment is then prepared on an action included within the entire program or policy (such as a site specific action) the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and

Page 7 — OPINION AND ORDER

Exhibit 1 - Page 7

The Blue and Gold EA noted that BLM's purpose in conducting silvicultural treatments in the Plan Area "is to implement the HLB LUA management direction to meet the need for ASQ [timber] volume in a manner that provides economically viable sales and efficient timber sale planning[.]" AR_00354. BLM stated that "[t]he stands proposed for silvicultural treatments have reached a condition that makes them suitable for treatments," based on BLM's claims that "[s]tands of Douglas fir in the HLB LUA within the planning area range from 40 to 140 years old," and that "the planning area lies within the highest concentration of potentially available ASQ volume." AR_00354–55.

BLM acknowledged that "[s]tand structure varies throughout the analysis area" but did not describe that variety in any amount of detail. AR_00370. BLM instead proffered that "[m]ature stands in the area exhibit a single, dominant cohort of Douglas-fir, suggesting a stand-replacement disturbance around the turn of the 20th century." AR_00370. BLM recited the RMP's Tree Retention Rule and said it "would retain" the protected trees:

> Within harvest units and where trees are cut for yarding corridors, skid trails, or road construction, maintenance, or renovation, the BLM would retain all trees that are both greater than or equal to 40 inches DBH and that the BLM identifies were established before 1850, except where falling the tree is necessary for safety or operational reasons. When trees are cut for safety or operational reasons, the trees will be retained in the stand or adjacent stand as coarse woody debris in commercial thinning harvest units. Where trees are cut for yarding corridors, skid trails, or road construction, maintenance, and improvements, the cut trees will be retained in adjacent stands as down woody material, moved for placement in streams for fish habitat restoration, or sold at the discretion of the BLM. The BLM identification of trees established prior to 1850 may be based on any of a variety of methods, such as evaluation of bark, limb, trunk, or crown characteristics, or increment coring, at the discretion of the BLM. Per RMP management direction, BLM would include these trees in in the 5-15 percent (MITA) and in the 15-30 percent (LITA) tree stand retention.

---

incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action.

40 C.F.R. § 1502.20.

Page 8 — OPINION AND ORDER

Exhibit 1 - Page 8

AR_00361 (citations omitted).

The EA discussed six possible alternatives with different acreage, logging treatments, and road construction. AR_00358-66. The EA acknowledged that the purpose of silvicultural treatments in the Plan Area is "to contribute ASQ timber volume of approximately 59 to 158 MMbf [million board feet] of ASQ volume over the next three to eight years." AR_00354. BLM selected Alternative 6, which contemplates 2,405 acres of logging—738 acres of Variable Retention Harvest ("VRH"),[2] 1,667 acres of commercial thinning,[3] 74 miles of road renovation, and 14.6 miles of road construction. AR_00366. BLM slated commercial thinning to occur in stands ranging from 40–140 years of age and VRH in stands ranging from 40–90 years. AR_00366. "Where VRH is proposed, the BLM would retain trees in a variety of spatial patterns including aggregate and dispersed retention," and between five and thirty percent of pre-harvest

---

[2] The 2016 RMP defines VRH as:

> An approach to regeneration harvesting that is based on the retention of structural elements or biological legacies from the harvested stand for integration into the new stand to achieve various ecological objectives. The resultant stand is generally two-aged or multi-aged. The major variables in variable- retention harvest systems are the types, densities and spatial arrangement of the retained structures; (1) aggregated retention is the retention of structures as (typically) intact forest patches within or adjacent to the harvest unit; (2) dispersed retention is the retention of structures or biological legacies in a more or less scattered pattern. Variable-retention regeneration harvest is synonymous with green-tree retention, retention harvest, retention forestry.

AR_08122.

[3] The 2016 RMP defines "commercial thinning" as:

> Stand thinning in which some or all of the cut trees are removed from the stand for timber. 'Commercial thinning' in this context does not include individual tree falling or stand thinning in which all the cut trees are left in the stand or some of the cut trees are moved for restoration purposes, or fuels reduction treatments in which cut trees are burned, chipped, or otherwise disposed of without removal from the stand for timber. 'Commercial thinning' may be implemented through a variety of mechanisms, including timber sale contracts and stewardship agreements or contracts.

AR_08107.

Page 9 — OPINION AND ORDER

Exhibit 1 - Page 9

stand basal areas would be retained. AR_00360. Similarly, commercial thinning "would result in a stand average relative density between 25 percent and 45 percent after harvest." AR_00360.

The Blue and Gold Plan is expected to be implemented over the next 3–10 years. AR_00354. In September of 2024, BLM published its signed Finding of No Significant Impact ("FONSI"). AR_00311, 00323. That same month, BLM issued a Decision Record to implement the Galagher Canyon and Tidy Bowl timber sales, which account for 565 acres of harvest in the Plan Area. AR_00286–310, 00288.

## III.    Procedural Background

Plaintiffs filed this action on September 27, 2024, seeking declaratory and injunctive relief against Defendant BLM. First Am. Compl. 46-47, ECF No. 1. On November 18, 2024, Defendant-Intervenors American Forest Resource Council and Association of O&C Counties moved to intervene in this litigation, which the Court allowed. ECF Nos. 9, 16. Defendant BLM filed the Administrative Record on February 19, 2025. ECF No. 22.

On April 18, 2025, Plaintiffs filed their Motion to Supplement or Complete the Administrative Record and their Motion for Summary Judgment. ECF Nos. 26-27. BLM filed its Cross Motion for Summary Judgment on June 20, 2025. ECF No. 29. The Court heard oral argument on those motions on November 6, 2025. On February 11, 2026, Plaintiffs filed their Second Motion to Supplement the Administrative Record based on newly discovered information.

### STANDARD

Judicial review of agency action is governed by the Administrative Procedure Act. 5 U.S.C. § 706. The reviewing court:

> must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a

Page 10 — OPINION AND ORDER

Exhibit 1 - Page 10

narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (citations omitted), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977). Agency decisions are "entitled to a presumption of regularity." *Id.* at 415. While such review is deferential to the agency action taken, the court must not "rubber-stamp" the agency action as correct. *Lands Council v. Martin*, 529 F.3d 1219, 1225 (9th Cir. 2008); *N. Spotted Owl v. Hodel*, 716 F. Supp. 479, 482 (W.D. Wash. 1988).

A court may set aside an agency's action if the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). "[I]f an agency 'fails to consider an important aspect of a problem . . . [or] offers an explanation for the decision that is contrary to the evidence,' its action is 'arbitrary and capricious.'" *Or. Nat. Res. Council Fund v. Goodman*, 505 F.3d 884, 889 (9th Cir. 2007) (quoting *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005)). "An agency action is also arbitrary and capricious if the agency fails to 'articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Friends of Wild Swan, Inc. v. U.S. Fish & Wildlife Serv.*, 12 F. Supp. 2d 1121, 1131 (D. Or. 1997) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

## DISCUSSION

### I.  Completion or Supplementation of the Record

The Court must resolve several preliminary issues to determine the scope of the record for review in this case. Plaintiffs move the Court to compel BLM to complete the administrative record or, in the alternative, to supplement the record, with three exhibits. Plaintiffs also submit

Page 11 — OPINION AND ORDER

Exhibit 1 - Page 11

the declarations of Mr. Reeder and Ms. Reid for consideration. BLM objects to all of those submissions and submits the Declaration of Sean Jeronimo.

Judicial review under the APA is based on the "whole record." 5 U.S.C. § 706. "The whole administrative record, however, is not necessarily those documents that the agency has compiled and submitted as the administrative record." *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989) (quotation marks and citations omitted). Rather, the whole record "consists of all documents and materials directly or indirectly considered by agency decision-makers and includes evidence contrary to the agency's position." *Id.* (quotation marks and citations omitted). Documents may have been indirectly considered by the agency even if they did not "literally pass[] before the eyes of the decision-makers." *In re United States*, 875 F.3d 1200, 1208 (9th Cir. 2017) (citing with approval district court cases).

An agency is entitled to a presumption that the administrative record it submits is complete, but that presumption may be rebutted with "clear evidence" to the contrary. *Blue Mountains Biodiversity Project v. Jeffries*, 99 F.4th 438, 445 (9th Cir. 2024) (quoting *Goffney v. Becerra*, 995 F.3d 737, 748 (9th Cir. 2021)). Plaintiffs can overcome that presumption if they can "(1) identify reasonable, non-speculative grounds for its belief that the documents were considered by the agency and not included in the record, and (2) identify the materials allegedly omitted from the record with sufficient specificity, as opposed to merely proffering broad categories of documents that are likely to exist." *Audubon Soc'y of Portland v. Zinke*, 2017 WL 6376464, at *4 (D. Or. Dec. 12, 2017) (internal citation omitted).

### A.    Jensen Declaration Exhibit 3: Marbled Murrelet Habitat Spreadsheet

The first exhibit at issue is Exhibit 3 to the Declaration of Peter Jensen, submitted by Plaintiffs. ECF No. 25-3 ("Ex. 3"). BLM provided Exhibit 3 to Mr. Jensen in response to a Freedom of Information Act ("FOIA") request for "Information Related to BLM Marbled

Page 12 — OPINION AND ORDER

Exhibit 1 - Page 12

Murrelet Data for Western Oregon BLM Lands." Jensen Decl. ¶ 1, ECF No. 25. Exhibit 3 is a

BLM-generated spreadsheet containing wildlife habitat layers for marbled murrelets, including a

column showing the "Stand Age 1" for timber units in the Blue and Gold Plan Area. Jensen

Decl. ¶ 3, ECF No. 25; Ex. 3. That spreadsheet "show[s] stand ages far older than those disclosed

in the EA, with numerous polygons/subunits within the project with a 'Stand Age 1' identified as

239 years old." *Id.* ¶ 5. BLM disputes the significance of this spreadsheet but does not dispute its

veracity. *See* Def.'s Resp. Pls.' Mot. Complete 7, ECF No. 31 (arguing that "Exhibit 3 does not

address overall stand age, but instead lists the ages of the oldest trees in each survey polygon").

Plaintiffs present sufficient non-speculative grounds to rebut the presumption that the

administrative record submitted by BLM is complete with regard to Exhibit 3. Plaintiffs'

evidence shows the specific data BLM possessed that related to marbled murrelet habitat and

stand ages that directly pertain to BLM's decisions and the merits of this case. BLM necessarily

had before it its own information pertaining to marbled murrelet habitat when analyzing effects

to marbled murrelets in the Plan Area. *See, e.g.*, AR_00391–400 (EA discussing how proposed

actions would affect marbled murrelets and their habitat), AR_01027–36 (Biological Assessment

discussing effects to marbled murrelets); *Cnty. of San Miguel v. Kempthorne*, 587 F. Supp. 2d

64, 76–77 (D.D.C. 2008) (citation omitted) (noting that "it is axiomatic that documents created

by an agency itself . . . were before it"). Though Defendants argue that Exhibit 3 is subject to the

deliberative process privilege, that privilege does not extend to "[p]urely factual material" such

as that contained in Exhibit 3. *F.T.C. v. Warner Comms. Inc.*, 742 F.2d 1156, 1161 (9th Cir.

1984). Plaintiffs' motion to complete the record is granted as to Exhibit 3.

**B.     Jensen Declaration Exhibit 4: Emails and Northern Spotted Owl Survey Data**

Next at issue is Exhibit 4 to the Jensen Declaration. BLM produced Exhibit 4 in response

to Jensen's FOIA request seeking "Data and Survey Results for Northern Spotted Owls in the

Page 13 — OPINION AND ORDER

Exhibit 1 - Page 13

BLM's Blue & Gold Project Area over the Last 5 Years (2019– present)." Jensen Decl. ¶¶ 1, 7. Exhibit 4 includes a 261-page PDF and emails between BLM staff discussing survey efforts and northern spotted owl habitat. *Id.* ¶ 7; Jensen Decl. Ex. 4 ("Ex. 4"). The PDF contains data on northern spotted owl surveys conducted by BLM. *Id.*

To start, BLM notes, and Plaintiffs do not dispute, that pages 10–72 of Exhibit 4 are already in the administrative record. *Compare* Ex. 4, 10–72, *with* AR_01048–1110. Plaintiffs' motion is denied as moot as to those pages.

For the same reasons described as to Exhibit 3, Exhibit 4 is part of the "whole record" except to the extent it is privileged, as discussed below. Plaintiffs submit specific evidence that the information in Exhibit 4 was created by BLM and was before the agency with regard to the exact project and considerations at issue. As with the marbled murrelet data, BLM necessarily had this information before it when analyzing effects to northern spotted owls in the Plan Area. *See* AR_00372 (EA discussing how proposed actions would affect northern spotted owls and their habitat), AR_00998 (Biological Assessment discussing effects to northern spotted owls).

Defendants argue that Exhibit 4 is also protected by the deliberative process privilege. Again, to the extent that Exhibit 4 contains "[p]urely factual material," the privilege does not apply. *Warner Comms.*, 742 F.2d at 1161. Significant amounts of Exhibit 4 are purely factual and were before BLM when it authorized the Blue and Gold Plan—those portions include charts and maps showing data from survey results for northern spotted owls in the Blue and Gold Plan Area. Plaintiffs' motion to complete the record is granted as to the purely factual information in Exhibit 4. *See, e.g.*, *Pac. Fisheries, Inc. v. United States*, 539 F.3d 1143, 1148 (9th Cir. 2008) ("Factual portions of documents covered by the deliberative process privilege must be segregated

Page 14 — OPINION AND ORDER

Exhibit 1 - Page 14

and disclosed unless they are so interwoven with the deliberative material that they are not segregable") (quotation marks, alterations, and citation omitted).

Other portions of Exhibit 4, however, contain various emails and messages between BLM staff members. At least some of these emails appear to support Plaintiffs' claims that BLM relied on inaccurate data in the Blue and Gold EA. *See, e.g.*, Ex. 4, at 80 (Mr. Reeder writing to Lead Wildlife Biologist Elizabeth Gayner that the stand age data on hand was "wildly wrong"); *Id.* at 79 (Gayner responding that there is "[n]o doubt there are many stands misclassified" and that "many of these stands are not aged correctly because they are based on the younger cohort if they were logged at all. Remnant trees were not considered for the stand age."); *Id.* (Reeder replying that the data was "unreliable because it [was] also based on an unreliable FOI…my oh my, what a mess!"). Nonetheless, the messages between BLM staff are subject to the deliberative process privilege because they contain "subjective documents which reflect the personal opinions of the writer rather than the policy of the agency" and could "inaccurately reflect or prematurely disclose the views of the agency." *Nat'l Wildlife Fed'n v. U.S. Forest Serv.*, 861 F.2d 1114, 1118–19 (9th Cir. 1988) (quotation marks and citation omitted).

Plaintiffs argue that BLM's disclosure of those documents in response to Mr. Jensen's FOIA request waived BLM's privilege. The Court disagrees and instead, finds persuasive the reasoning in *Yellowstone to Uintas Connection v. Bolling*, 2021 WL 5702158 (D. Idaho Dec. 1, 2021), cited by Defendants. There, the Forest Service did not waive its right to claim deliberative process privilege over documents it provided in response to FOIA requests, because the "case involve[d] a FOIA request that the Forest Service was bound by law to respond to, not a voluntary sharing of information to an outside party." *Id.* at *8. The same reasoning applies here. BLM did not waive its right to invoke deliberate process privilege in this litigation when it

Page 15 — OPINION AND ORDER

Exhibit 1 - Page 15

responded to Mr. Jensen's FOIA requests. Plaintiffs' motion is denied as to the portions of Exhibit 4 that are not purely factual.

### C.      Blumstrom, Reid, and Reeder Declarations

Plaintiffs also ask the Court to consider the Declarations of Erich Reeder, Janice Reid, and Greg Blumstrom.[4] Defendants object to each under the Ninth Circuit's bar on consideration of post-decision information.

Courts may allow supplementation of the record to "consider such evidence relevant to the substantive merits of the agency decision only for the limited purpose of background information or to determine whether the agency considered all relevant factors." *Thompson*, 885 F.2d at 555 (citations omitted). Information that post-dates the agency's decision, however, is not admissible. *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1130–31 (9th Cir. 2012). Specifically, "post-decision information may not be advanced as a new rationalization for sustaining or attacking an agency's decision because it inevitably leads the reviewing court to substitute its judgment for that of the agency." *Id.* (quotation marks and citation omitted).

Plaintiffs contend that their declarations do not provide new rationalizations for attacking BLM's analysis, but rather, re-state and elaborate on facts and arguments already considered by the agency. Plaintiffs are correct that Mr. Reeder and Ms. Reid submitted comments to BLM that included some of the facts contained in their declarations. AR_01203–07 (Mr. Reeder's August 22, 2024 comment). But any additional facts or opinions contained therein or in the Blumstrom Declaration were not before the agency and are accordingly prohibited as post-decisional information. *Ctr. for Bio. Diversity*, 450 F.3d at 943. The Court need not look to additional

---

[4] Plaintiffs also submit the Declarations of Madeline Cowen and Janice Reid to establish that they have standing in this case. ECF Nos. 27-1, 27-3. These declarations are sufficient to establish Plaintiffs' standing, but the Court will not consider the declarations to the extent they attack BLM's decision.

Page 16 — OPINION AND ORDER

Exhibit 1 - Page 16

declarations to determine whether BLM adequately considered the information before it. Plaintiffs' motions are denied as to the Declarations of Reid, Reeder, and Blumstrom, except to the extent Ms. Reid's declaration is offered to establish Plaintiffs' standing.

### D.    Jeronimo Declaration

Finally, BLM argues that if the Court considers Plaintiffs' Exhibit 3, the Court should also consider the Declaration of Sean Jeronimo, ECF No. 30. In that declaration, BLM Forest Analyst Sean Jeronimo "discuss[es] BLM's process for aging stands" and provides analysis and evidence against Plaintiffs' claims. *Id.* at ¶ 3. The Court rejects BLM's argument that consideration of Exhibit 3 warrants consideration of the Jeronimo Declaration and declines to consider it as part of the record in this case. *See, e.g.*, *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014) ("[W]e will not allow the agency to supply post-hoc rationalizations for its actions . . . ."). Plaintiffs allege that BLM failed to adequately consider information before it and explain its decision in the EA and FONSI to authorize the Blue and Gold Plan. Additional information submitted by BLM after the fact does not have any relevance to those claims, much less support them. To the contrary, the fact that BLM offers additional explanation now indicates that its explanation in the EA does not sufficiently stand on its own. *See Alvarado Cmty. Hosp. v. Shalala*, 155 F.3d 1115, 1124 (9th Cir. 1998) ("[E]xplanatory materials cannot be used to offer new rationalizations for agency action. . . . [The agency's supporting affidavit] offers explanations for the Secretary's decision that easily could have been part of the administrative record had they been a basis for the Secretary's decision.") (citation omitted).

In conclusion, Plaintiffs' motion to complete or supplement the record is granted in part and denied in part. BLM is ordered to complete the record with Plaintiffs' Exhibit 3 and the factual material in Exhibit 4 that was not already part of the record. Plaintiffs' motions are

Page 17 — OPINION AND ORDER

Exhibit 1 - Page 17

otherwise denied. The Court also denies BLM's request to supplement the record with the Jeronimo Declaration.

## II.     FLPMA

Turning to the merits, Plaintiffs allege that BLM violated FLPMA by mis-aging and mischaracterizing the stands of trees in the Plan Area and by failing to demonstrate compliance with the Resource Management Plan's direction requiring retention of protected old-growth trees. Defendants argue that BLM is entitled to deference and that it was not obligated to consider individual trees in its efforts to manage the stands for timber harvest.

### A.     Legal Standard

Under FLPMA, BLM must prepare RMPs for its districts, which  "guide and control future management actions and the development of subsequent, more detailed and limited scope plans for resources and uses." 43 C.F.R. §§ 1601.0-2, 1712. "Once a land use plan is developed, '[a]ll future resource management authorizations and actions . . . shall conform to the approved plan.'" *Brong*, 492 F.3d at 1125 (quoting 43 C.F.R. § 1610.5–3(a)).

Though this Court's review is deferential, the Court does not defer to an agency interpretation that is "plainly inconsistent with the regulation at issue." *Id.* (quotation marks and citations omitted). Rather, the Court must "engage in a substantial inquiry" and a "thorough, probing, in-depth review" to determine if BLM's conduct satisfied its obligations under FLPMA and the APA. *Id.* (quotation marks and citations omitted). An agency violates FLPMA where it authorizes a plan governed by an RMP but fails to "present a rational connection between the facts found and the conclusions made." *Id.* (quoting *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005)); *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 42–45 (9th Cir. 2025).

Page 18 — OPINION AND ORDER

Exhibit 1 - Page 18

B.        Whether BLM Violated FLPMA

As noted above, the Tree Retention Rule in the 2016 RMP requires that BLM "[i]nclude among retained trees all trees that are both ≥ 40" DBH and that BLM identifies were established prior to 1850, except where falling is necessary for safety or operational reasons and no alternative harvesting method is economically viable or practically feasible." AR_07876. The parties do not dispute the meaning of the Rule or that it applies to the Blue and Gold Plan. They dispute only whether BLM complied with FLPMA when issuing a FONSI based on the EA and then authorizing logging in the Plan Area.

The Court agrees with Plaintiffs that BLM's interpretation of the RMP's old-growth tree retention rule, as evidenced by its conclusions in the EA and FONSI, is specious. In the Blue and Gold EA, BLM determined that stands of trees in the Plan Area are "suitable for treatments" based on its conclusion that "[m]ature stands in the area exhibit a single, dominant cohort of Douglas-fir" that "range from 40 to 140 years old." AR_00370, 00355. BLM cited a table in Appendix I of the EA to support its conclusions. AR_00325, 00527. In Appendix I, BLM stated that "[s]tand structure varies throughout the analysis area due to differences in management and disturbance history as well as site characteristics." AR_00527. BLM did not elaborate on that statement, but provided a table listing "Current Forest Stand Attributes for all trees greater than 4.5 feet in height by EA Harvest Unit." AR_00527. That table shows a "10 Year Age Class"[5] for each Plan unit between 60–140 years. Those numbers apply to *stands* of trees and necessarily involve averaging the measurements and ages of a wide variety of trees within each stand. Nowhere are individual protected trees mentioned, nor are the measures that BLM will take to

---

[5] "The 10-year age class for the standard is derived from the birth year using the most recent source stand layer designated for management in the stand attributes. Stand ages 0-4 are assigned an age class of 5, stand ages 5-14 are assigned an age class of 10, stand ages 15-24 are assigned an age class of 20, and so on." AR_02915.

Page 19 — OPINION AND ORDER

Exhibit 1 - Page 19

identify and protect them. *See* AR_00733 (FWS noting that "there are *no* project design features for the protection of individual platform trees") (emphasis in original).[6] BLM estimated that the Plan will contribute "approximately 59 to 158 [million board feet] of ASQ over the next three to eight years." AR_00354, 371.

Significant evidence both created by BLM and submitted by Plaintiffs during the comment process establishes the existence of protected old-growth trees throughout the Plan Area and contradicts BLM's simplistic representations that support its interpretation of the RMP. Plaintiffs can show a FLPMA violation if BLM "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Haaland*, 127 F.4th at 36 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Plaintiffs do so here.

### 1.    BLM's Evidence Contradicts Its Representations

To start, BLM was aware that stands targeted in the Blue and Gold Plan were previously classified as LSR, known for their "stands of older, structurally-complex conifer forest." AR__08196, 7880. BLM's data further evidences significant numbers of old-growth trees in the Plan Area. Merchantable Tree Plot Summaries show plots in the Plan Area where almost every tree listed is over 40" DBH. *E.g.*, AR_04452 (the majority of Plot 18 ranges between 43.4–81.1" DBH), 4455 (the majority of Plot 31 ranges between 47.2–56.4" DBH), 4457 (Plot 42 contains only trees with DBHs between 46.7–78"), 4621 (the majority of Plot 1 ranges between 44.2–61" DBH). Other plots that are not dominated by protected trees nonetheless contain substantial

---

[6] The Court notes that documents prepared in support of individual timber sales advise harvesters that "[a]ll retention trees marked with orange paint above and below stump height within the cutting areas" are "reserved from cutting and removal under the terms of this contract." AR_00010, 00125. That contract provision, however, does not help to sufficiently explain BLM's conclusions.

Page 20 — OPINION AND ORDER

Exhibit 1 - Page 20

numbers of trees with 40" or greater DBH. *E.g.*, AR_04444 (showing 5 trees with > 40" DBH), 4446 (showing 9 trees with > 40" DBH), 4451 (showing 5 trees with > 40" DBH), 4453 (showing 6 trees with > 40" DBH), 4456 (showing 11 trees with > 40" DBH), 4500 (showing 6 trees with > 40" DBH). Additionally, Plaintiffs' Exhibit 3, which contains BLM's marbled murrelet habitat data, shows several areas within the Blue and Gold Plan Area with a "stand age 1" as high as 240 years.

### 2. Plaintiffs' Evidence Rebuts BLM's Representations

Further, the comments by Plaintiffs, Mr. Reeder, and Ms. Reid repeatedly highlighted the inaccuracy of BLM's data and representations regarding the characteristics of the Plan Area.

Mr. Reeder, for example, contested BLM's data and noted that "forests throughout this large contiguous area . . . are the result of natural regeneration from an old fire, or fires, that burned 120-150 years ago in a mosaic pattern that left many individual old-growth trees, many groves of old-growth trees, and many larger intact old-growth stands." AR_01203. Mr. Reeder further noted that "[t]his significant and substantial amount of remnant old-growth forest is located throughout this large contiguous forested area . . . and is made up of primarily Douglas-fir trees ranging from 200-600 years old or older (in a recently cut forest on private land a couple miles away, the annual growth rings from a cut 6-foot DBH Douglas-fir established it was over 600 years old." AR_01203; *see also, e.g.*, AR_01249–50 (Cascadia Wildlands' and Oregon Wild's comment that "BLM's descriptions of stand age and conditions are inaccurate" such that "BLM is logging forests that are older than 1850 and far exceed the diameter limits") ("[U]nits listed as 140 years old are actually far older. Our field checking verified this. The agency's inventory is flawed and BLM is violating RMP old-growth restrictions."); AR_01225 ("Blue and Gold . . . targets some of the last remaining intact mature and old-growth forest in the region[.]"); AR_01226 ("How would BLM reconcile logging in old-growth forest with national policy that

Page 21 — OPINION AND ORDER

Exhibit 1 - Page 21

explicitly directs federal land managers to conserve old-growth forest?"); AR_01227–49

(making site-specific observations of "intact old growth forest ecosystem"; "trees and groves of

forests that were not killed during [previous] fire events and thus contain trees many hundreds of

years old"' "legacy old growth trees exceeding 40" DBH"; "trees[] likely exceeding ages

upwards of 400 years old" that "measured 82" DBH"; "a continuous ridge of never been logged,

intact, old growth forest"; "large sections of forest . . . and substantial percentages of the trees in

the 40-60" range"; "an important and historic nesting area for the northern spotted owl";

"Douglas Fir and Incense cedar . . . in the 55-60" range . . . scattered throughout the unit"; "roads

. . . would cross through several legacy trees over 40" inches"; "[a]ll of the trees in this grove are

around 40"-51" in diameter"; "there is no way to log this area without taking out old growth

trees"); AR_01203–04 (Mr. Reeder's comments that "[c]urrent Forest Stand Attributes, as

represented in . . . the EA are inaccurate and misleading, and consequently cannot be used to

accurately account for the environmental effects of the proposed Blue & Gold timber sale";

"[t]he majority of the forest acres proposed for treatment in the Blue & Gold project are in the

contiguous, previously unlogged mature and old-growth forests . . . [and] account for . . . 53% of

the proposed unit acres of the project"; proposed units' Stand Structural Class of 120–130 years

old "is factually inaccurate"; and BLM's Stand Structural Class and stand age calculations

"misrepresent and conceal these very significant ecological attributes").

Additionally, Ms. Reid emailed BLM with specific data from Oregon State University

that showed stand ages in Blue and Gold units are significantly older than shown in the EA, with

substantial areas of 200–400-year-old forest. AR_01208–11. Ms. Reid noted the exact stands at

issue and cross-referenced them with the contradictory data. Ms. Reid told BLM she had

Page 22 — OPINION AND ORDER

Exhibit 1 - Page 22

confirmed that data with on-the-ground observations, and alerted BLM that "[l]egacy trees are not just anomalies but are the foundational components of the resulting stand." AR_01138.

Based on the variety within the stands they surveyed, Plaintiffs suggested that "[n]ative stands need to be distinguished from previously-harvested second-growth" and "[s]tand structure . . . needs to be evaluated with site-specific surveys." AR_01248.

### 3.    BLM Did Not Adequately Explain Its Decision

BLM did not adequately respond to or discuss any of that contradictory data. BLM did not acknowledge the existence of protected trees in the Plan Area or provide any information as to how it would protect them. BLM did not describe how its plan to extract millions of board feet from the Plan Area would affect the protected trees. BLM did not describe any process by which it would measure the trees' DBH or determine whether they were established prior to 1850. BLM did not describe the patterns of old-growth in the Plan Area or their effect on the average stand ages it relied on. Instead, BLM referred back to its conclusory statement that "[m]ature stands in the area exhibit a single, dominant cohort of Douglas fir" that "range from 40-140 years old." AR_00325, 355, 527. To support that conclusion, BLM relied on data that averages the values of trees in a stand and did not consider the effects to individual trees, many of which it is obligated to retain under the RMP rule. Based on those findings, BLM issued a FONSI and authorized segments of the Blue and Gold Plan to begin. AR_00323, 286.

The Court finds that BLM's conclusions based on average stand ages runs "counter to the evidence before the agency" and "entirely failed to consider an important aspect of the problem." *Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 493 (9th Cir. 2011) (quotation marks and citation omitted). The record here does not establish the necessary "rational connection between the facts found and the conclusions made." *Brong*, 492 F.3d at 1125 (quotation marks and citations omitted).

Page 23 — OPINION AND ORDER

Exhibit 1 - Page 23

The parties dispute whether BLM properly aged the stands in the Plan Area. Defendants correctly argue that the RMP does not require BLM to age the stands in any particular way. As BLM notes that "[t]here are no timber harvest restrictions in the HLB relating to general stand age and/or retaining stands above a particular average age or size." Def.'s Mot. 15. But that does not mean that BLM can side-step its obligation under the RMP to protect old-growth trees by relying on average stand ages and DBH that, frankly, obscure the full picture of on-the-ground data. *See, e.g.*, AR_01475 (noting that the "vegetation classification" based on Forest Operations Inventory and Micro*Storms data "represents stand average characteristics," including birthdate and ten-year age class of the stand layer); AR_00007–8, 123 (Tidy Bowl and Galagher Canyon timber sales expected to result in the harvest of over 80,000 trees with an *average* DBH of 15–15.4"). Of course, stands are "an aggregation of trees," so the ages and DBHs of individual trees influence the calculations of stand averages. AR_08120. BLM's decision to authorize specific amounts of harvest based on average stand ages and average DBH measurements, without identifying protected trees or describing how its plan is consistent with the binding RMP Tree Retention Rule, is arbitrary. BLM has failed to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

Additionally, Defendants cite to various data and surveys from the Plan Area, but those citations do not support the agency's assertions of a "single, dominant cohort" or otherwise justify extensive logging without consideration of how BLM would comply with the Tree Retention Rule. Defendants also argue that, far from violating the RMP, BLM explicitly assured it would retain the protected trees as required. Defendants contend that Plaintiffs' argument misses the mark because the RMP contains no requirement as to how BLM must age stands and

Page 24 — OPINION AND ORDER

Exhibit 1 - Page 24

instead requires only that BLM protect individual trees, which BLM has agreed to do. But, as Plaintiffs note, "[m]erely reciting the statutory language is not enough to satisfy the statute's explicit requirement. An agency acts contrary to law when it gives mere lip service or verbal commendation of a standard but then fails to abide the standard in its reasoning and decision." *Nat. Res. Defense Council, Inc., v. Pritzker*, 828 F.3d 1125 (citing *Conner v. Burford*, 848 F.2d 1441, 1453) (9th Cir. 1988)). That is the case here.

In sum, Plaintiffs and their members inspected the public lands at issue and filed comments detailing on a unit-by-unit basis, with accompanying photos, their on-the-ground observations that BLM's data was factually inaccurate and that BLM was not accounting for substantial percentages of protected old-growth trees. BLM acknowledged that "[s]tand structure varies throughout the analysis area" but did not describe that variety in any sufficient detail. AR_00370. BLM did not mention the existence of protected trees or old-growth forests in the EA. BLM did not discuss how it would determine whether a tree was protected. BLM did not grapple with any of the data before it that contradicted its simplistic description of the stands in the Plan Area.

Accordingly, BLM has failed to demonstrate its compliance with binding RMP direction to retain trees greater than or equal to 40" DBH and established prior to 1850. BLM's discussion of environmental effects does not provide any information beyond its bald assurances of compliance that allows the Court to find that the Plan will comply with BLM's obligations under FLPMA. Summary judgment is granted in favor of Plaintiffs on their FLPMA claim.

## III. NEPA

As discussed above, BLM did not prepare an Environmental Impact Statement ("EIS") for the Blue and Gold Plan and instead issued an Environmental Assessment ("EA") and a Finding of No Significant Impact ("FONSI"). Plaintiffs argue that BLM violated NEPA by

Page 25 — OPINION AND ORDER

Exhibit 1 - Page 25

failing to take the requisite "hard look" at the environmental impacts caused by the Blue and Gold Plan and by failing to prepare an EIS.

### A.     Legal Standard

"NEPA requires that a federal agency consider every significant aspect of the environmental impact of a proposed action and inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005); 42 U.S.C. § 4332(2)(C). NEPA's purpose is to require agencies to disclose "relevant environmental considerations that were given a 'hard look' by the agency, and thereby to permit informed public comment on proposed action and any choices or alternatives that might be pursued with less environmental harm." *Lands Council v. Powell*, 395 F.3d 1019, 1027 (9th Cir. 2005). It "does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

To that end, NEPA requires agencies proposing "major Federal actions significantly affecting the quality of the human environment" to prepare a detailed statement—an EIS—discussing environmental impacts of the proposed action and a range of alternatives to avoid adverse impacts. 42 U.S.C. § 4332(C). To determine whether a proposed action will significantly affect the quality of the human environment (and therefore require an EIS), regulations in place during the time of the challenged Blue and Gold Plan allowed an agency to prepare an Environmental Assessment (EA). 40 C.F.R. § 1501.5.[7] "If an agency decides not to prepare an EIS, it must supply a 'convincing statement of reasons' to explain why a project's impacts are insignificant." *Cascadia Wildlands v. Bureau of Indian Affs.*, 801 F.3d 1105, 1111 (9th Cir. 2015) (citation omitted).

---

[7] The NEPA regulations in this chapter were rescinded as of April 11, 2025. 90 Fed. Reg. 10,610 (Feb. 25, 2025). Defendants do not dispute that they nonetheless apply to this case.

Page 26 — OPINION AND ORDER

Exhibit 1 - Page 26

**B.      Whether BLM Violated NEPA by Failing to Take a Hard Look**

Plaintiffs argue that BLM failed to take the requisite hard look at the Plan's impacts on old-growth trees and stands and on carbon storage and climate change.

### 1.      Old-Growth Trees

For many of the same reasons described with regard to Plaintiffs' FLPMA claim, this Court finds that BLM failed to take a hard look at the Blue and Gold Plan's effects on old-growth trees that BLM is explicitly required to retain.

As described above, BLM possessed significant, site-specific data that forest conditions were not as simple and uniform as its average stand data may have suggested, and BLM failed to use or disclose it to the public during the NEPA process. Neither the EA nor the FONSI mention the contradictory data or even the presence of protected trees in the Plan Area. Rather, those documents are "based primarily on [BLM's] conclusory assertion—contradicted by evidence in the record—" that the Plan Area is suitable for logging based on its average stand data. *Ctr. for Bio. Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1220 (9th Cir. 2008). BLM failed to consider relevant factors or provide a convincing statement of reasons to support its finding of no significant impacts as to protected old-growth trees. *350 Montana v. Haaland*, 50 F.4th 1254, 1265 (9th Cir. 2022). Accordingly, BLM failed to take a hard look at the existence of protected old-growth trees in the Plan's stands and the Plan's effects on those trees. Summary judgment is granted for Plaintiffs on this theory.

### 2.      Carbon Storage and Climate Change

Defendants contend, and this Court agrees, that BLM's analysis of the Plan's effects on carbon storage and climate change was sufficient to satisfy NEPA.

"Ordinarily, an agency can avoid some of the burdens of the NEPA process by 'tiering' to a prior document that has itself been the subject of NEPA review." *All. for the Wild Rockies v.*

Page 27 — OPINION AND ORDER

Exhibit 1 - Page 27

*United States Forest Service*, 907 F.3d 1105, 1118 (9th Cir. 2018). "Tiering . . . is expressly permitted by federal regulation . . . Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review." *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1073 (9th Cir. 2002) (quoting 40 C.F.R. § 1502.20).

Here, BLM tiered the Blue and Gold EA analysis of carbon storage and climate change to the 2016 FEIS. AR_00499–500. In the EA, "BLM considered this issue but did not analyze it in detail because there would be no reasonably foreseeable significant effects of the proposed action regarding carbon storage, greenhouse gas emissions, climate change, and the social cost of carbon beyond those disclosed in the [2016 FEIS]." AR_00500. The 2016 FEIS analyzed the ways in which timber harvest on HLB would impact carbon storage and climate change. AR_08329–75.

The Court finds that the EA sufficiently tiered to the 2016 FEIS with regard to carbon storage and climate change and satisfied BLM's requirement to take a hard look at those environmental effects. In the 2016 FEIS, BLM estimated the amounts of carbon stored in each Oregon BLM district and the environmental consequences of the proposed timber harvest. AR_08329–75. BLM made specific climate change projections involving tree species, insect outbreaks and pathogen spread, wildfire, streamflow and temperature, and wildlife and habitat. AR_08355–66. The EA, in tiering to the FEIS, accordingly "involve[d] a discussion of adverse impacts" and did not improperly minimize negative side effects. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240–41 (9th Cir. 2005).

The case Plaintiffs cite in support of this claim, *Ctr. for Bio. Diversity v. U.S. Forest Serv.*, 687 F. Supp. 3d 1053 (D. Mont. 2023), is not persuasive. There, the Forest Service failed

Page 28 — OPINION AND ORDER

Exhibit 1 - Page 28

to take a hard look at climate impacts by "merely discussing carbon impacts and concluding that they will be minor." *Id.* at 1073. Because the Forest Service discussed the project's impacts on carbon emissions "only in general terms," it violated NEPA. *Id.* at 1075. The Forest Service in that case did not issue a comprehensive FEIS like the one BLM issued here. Tiering BLM's analysis of carbon storage and climate change in the 2016 FEIS was sufficient to satisfy its obligations under NEPA and the APA. The Court grants summary judgment to Defendants on this theory.

### C. Whether BLM Violated NEPA by Failing to Prepare an EIS

Finally, Plaintiffs claim that BLM erred in failing to prepare an EIS for the Blue and Gold Plan because BLM did not provide a convincing statement of reasons why the Plan's potential effects are insignificant. Defendants argue that BLM is entitled to substantial deference under *Seven County Infrastructure Coal. v. Eagle Cnty., Colo.*, 605 U.S. 168 (2025), and acted reasonably in declining to prepare an EIS.

As noted above, NEPA requires agencies to issue an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). NEPA regulations provide factors for agencies to consider in deciding whether an action is "significant," depending on the context and intensity of the plan at issue. 40 C.F.R. §§ 1501.3(d)(2), 1508.27. To prevail on a claim that the agency violated NEPA by failing to prepare an EIS, it is enough to raise "substantial questions" whether a project may have a significant effect on the environment. *See Greenpeace Action v. Franklin*, 14 F.3d 1324, 1332 (9th Cir. 1992). As the Ninth Circuit has consistently held, this is a "low standard." *See, e.g.*, *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 562 (9th Cir. 2006). The presence of even one factor may be sufficient to require the preparation of an EIS. *Ocean Advocates v. Army Corps. Of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2004). At the same time, courts must exercise deference

Page 29 — OPINION AND ORDER

Exhibit 1 - Page 29

when evaluating agencies' determinations of whether effects are significant, so long as that determination falls within the "broad zone of reasonableness." *Seven County*, 605 U.S. at 182.

Here, applying NEPA's context and intensity factors, Plaintiffs have raised substantial questions that the Blue and Gold Plan may have significant effects on the environment. To start, the Court finds that "the potential effects on the human environment are highly uncertain." 40 C.F.R. § 1501.3(d)(2)(iv). As discussed above, BLM's findings leave much uncertainty as to the presence of old-growth trees in the Plan Area and how BLM will abide by its legal obligation to retain them. *See Nat'l Parks & Conservation Ass'n*, 241 F.3d at 731–32 ("Preparation of an EIS is mandated where uncertainty may be resolved by further collection of data[.] The purpose of an EIS is to obviate the need for speculation."). Similarly, BLM's failure to explain how the Plan will impact old-growth trees raises substantial questions about how the Plan will adversely affect northern spotted owls and marbled murrelets, whose habitat is dependent on such trees. 40 C.F.R. § 1501.3(d)(2)(vi). Additionally, as discussed *infra*, the Blue and Gold Plan is contrary to federal law, which further indicates that an EIS is necessary. 40 C.F.R. § 1501.3(d)(2)(iii).

In sum, BLM failed to provide "a convincing statement of reasons" as to why the potential effects of the Blue and Gold Plan are insignificant. *Blackwood*, 161 F.3d at 1211. Summary judgment is granted to Plaintiffs on this claim.

## IV.    Remedy

Because the Court finds that BLM violated FLPMA and NEPA, it must determine the appropriate relief. The presumptive remedy for NEPA and APA violations is *vacatur* and remand. 5 U.S.C. § 706 ("The reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."); *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121–22 (9th Cir. 2018). Accordingly, this Court vacates the Blue and Gold Project EA,

Page 30 — OPINION AND ORDER

Exhibit 1 - Page 30

FONSI, and associated Decision Record, and remands to BLM to comply with FLPMA and NEPA.

## CONCLUSION

For the reasons above, Plaintiffs' Motions to Complete/Supplement the Administrative Record (ECF Nos. 26, 49) are GRANTED in part and DENIED in part; Plaintiffs' Motion for Summary Judgment (ECF No. 27) is GRANTED in part and DENIED in part; Defendant's Cross-Motion for Summary Judgment (ECF No. 29) is GRANTED in part and DENIED in part; and Defendant-Intervenors' Cross-Motion for Summary Judgment (ECF No. 32) is GRANTED in part and DENIED in part. The Blue and Gold Project EA, FONSI, and Decision Record for associated timber sales, are VACATED.

DATED this 14th day of May 2026.

s/ Mustafa T. Kasubhai
MUSTAFA T. KASUBHAI (he/him)
United States District Judge

Page 31 — OPINION AND ORDER

Exhibit 1 - Page 31