IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, et al., | CV 24–10–M–DLC |
| Plaintiffs, | |
| vs. | ORDER |
| TOM VILSACK, in his official capacity as Secretary of the Department of Agriculture, et al., | |
| Defendants, | |
| and | |
| RAVALLI COUNTY, MONTANA and MONTANA DEPARTMENT OF NATURAL RESOURCES AND CONSERVATION, | |
| Defendant-Intervenors. | |

Plaintiffs are environmental organizations challenging the United States Forest Service's (the "Forest Service") and the United States Fish and Wildlife Service's (the "Fish and Wildlife Service") approval of a forest treatment project in the Bitterroot National Forest (the "Mud Creek Project" or the "Project"). (Doc. 43.) There are also two defendant intervenors, Ravalli County and the Montana Department of Natural Resources and Conservation. (*See* Docs. 21, 34.) At this

1

point in the case, Plaintiffs' claims are three-fold. First, Plaintiffs argue that the Forest Service failed to take a "hard look" at the Project's effects on climate change in violation of National Environmental Policy Act ("NEPA"). Second, Plaintiffs argue that the Project does not meet habitat standards for pine martens in violation of the National Forest Management Act ("NFMA"). Finally, Plaintiffs argue that the Project relied on impermissibly vague mitigation measures to offset impacts in violation of the Endangered Species Act ("ESA").

The parties filed cross-motions for summary judgment, (Docs. 55, 60, 65), and a motion hearing was held before United States Magistrate Judge Kathleen L. DeSoto on August 20, 2025, (*see* Doc. 83 (Min. Entry)). On September 30, 2025, Judge DeSoto entered Findings and Recommendations, recommending that summary judgment be granted in favor of Federal Defendants and Defendant-Intervenors (collectively, "Defendants"). (Doc. 85.) Plaintiffs filed objections, (Doc. 86; *see also* Doc. 89), to which Federal Defendants responded, (Doc. 88; *see also* Doc. 93). Plaintiffs' objections are reviewed *de novo*, 28 U.S.C. § 636(b)(1), and addressed individually below. The Findings and Recommendations are otherwise reviewed for clear error. *See Thomas v. Arn*, 474 U.S. 140, 154 (1985); *United States v. Syrax*, 235 F.3d 422, 427 (9th Cir. 2000) (defining "clear error"). Because Judge DeSoto provided a complete background of the Project, (Doc. 85 at 3–7), it is not restated here.

2

The Forest Service's compliance with NEPA, NFMA, and the ESA is reviewed under the Administrative Procedure Act ("APA"). *See Native Ecosystems Council v. Marten*, 883 F.3d 783, 788 (9th Cir. 2018). The APA authorizes a court to "hold unlawful and set aside agency action, findings and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious if the administrative record demonstrates that "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Where an agency's administrative record is complete and constitutes the whole and undisputed facts underlying agency decisionmaking, summary judgment is appropriate. *See City & Cnty. of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997).

## ANALYSIS

As reflected in both the Findings and the parties' filings, Plaintiffs' claims evolved dramatically as the case proceeded, complicating judicial review and ultimately narrowing to the three issues identified above. Because Plaintiffs'

3

objections related to those issues lack merit, the September 30, 2025 Findings and Recommendations, (Doc. 85) is adopted in full.

## I.    Supplemental Authority

After both the Findings was issued and Plaintiffs' objections were filed, *Center for Biological Diversity v. United States Forest Service ("South Plateau")* was decided. *See* 811 F. Supp. 3d 1206 (D. Mont. 2025). Therein, this Court found that the Forest Service's use of "condition-based management" to approve a logging project in the Custer Gallatin National Forest violated NEPA, NFMA, and the ESA, particularly as it related to road placement decisions and secure habitat for grizzly bears. *See id.* at 1229, 1231. In their citation of supplemental authority, Plaintiffs attempt to bootstrap their arguments in the present case to the successful challenges in *South Plateau*. (*See* Doc. 89.) Plaintiffs did not challenge the conditional management component of the Mud Creek Project. (*See* Doc. 43.) They are not permitted to do so now. To the extent *South Plateau* otherwise bears on the legal issues in this case, that analysis has been incorporated below.

## II.    NEPA

"[NEPA] is a procedural statute that requires federal agencies to take a 'hard look' at the environmental consequences of their actions." *N. Cascades Conserv. Council v. U.S. Forest Serv.*, 136 F.4th 816, 821 (9th Cir. 2025) (internal quotation marks omitted). To satisfy the "hard look" requirement, an agency must provide "a

reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1194 (9th Cir. 2008). In their objections, Plaintiffs argue that the Forest Service failed to take the requisite "hard look" at the Project's impacts on climate change because it relied on a forest-wide carbon assessment, *see* MC10563, and did not consider impacts at a site-specific level. To be sure, "merely discussing carbon impacts and concluding that they will be minor does not equate to a 'hard look.'" *Ctr. for Biological Diversity v. U.S. Forest Serv. ("Black Ram")*, 687 F. Supp. 3d 1053, 1076–77 (D. Mont. 2023), *overruled on other grounds* 2025 WL 586358 (9th Cir. Feb. 24, 2025). "NEPA requires more than a statement of platitudes, it requires appraisal to the public of the actual impacts of an individual project." *Id.* at 1077. But, contrary to Plaintiffs' position, that mandate can be met if the forest-wide assessment is both recent enough and specific enough to reflect the impacts of the particular proposed project activity. *See South Plateau*, 811 F. Supp. 3d at 1218–19 ("Given the nature of th[e] Project and the recency and scope of the tiered analysis, the Forest Service adequately considered the Project's cumulative effects on climate change.") Here, the Forest Service completed the Forest Carbon Assessment for the Bitterroot National Forest in the Forest Service's Northern Region in 2021. *See* MC0012805–33. The Project area falls within the same assessment area and involves the same types of fuel

management activities considered in the Assessment. *See id.* Incorporation of that analysis into the decision documents for the Mud Creek Project therefore meets NEPA's "hard look" mandate. Plaintiffs' NEPA objection is overruled.

## III.   NFMA

"NFMA creates a two-step process for the management of our national forests." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1249 (9th Cir. 2005). First, the Forest Service must develop, maintain, and, as appropriate, revise Forest Plans, which provide a framework for where and how certain activities can occur in national forests. *Id.*; *see also* 16 U.S.C. § 1604(f). Second, the Forest Service must ensure that all individual projects within a forest are "consistent with each forest's overall management plan." *Native Ecosystems Council*, 428 F.3d at 1249; *see also* 16 U.S.C. § 1604(i). "It is well-settled that the Forest Service's failure to comply with the provisions of a Forest Plan is a violation of NFMA." *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 961 (9th Cir. 2005).

Here, Plaintiffs argue that the Project violates NFMA because it fails to comply with the Forest Plan standards for pine marten habitat. Pursuant to Forest Plan Management Standard F.2.e.1,[1] "[t]he amount and distribution of old growth

---

[1] As noted by Federal Defendants, both the parties and Judge DeSoto mistakenly referenced "F.1.e.1" because of how the information was presented in the administrative record. (*See* Doc. 88 at 17 n.4.)

will be used to ensure sufficient habitat for the maintenance of viable populations of existing native and desirable vertebrate species, including two indicator species, the pine marten and the pileated woodpecker." MC0000024. According to Plaintiffs, the Forest Service has failed to establish the presence of sufficient habitat across the Project area to meet this standard for pine marten and lacks the requisite scientific studies and methodology for doing so. Judge DeSoto found that because Plaintiffs' argument was improperly raised for the first time in their reply, it was waived. Judge DeSoto also rejected that claim on the merits. Plaintiffs' objection is overruled on both fronts.

## A.    Waiver

Plaintiffs first argue that their NFMA claim was properly raised because they claimed and then consistently argued the Forest Service violated its Forest Plan species viability standards, specifically as they relate to removing the 40-acre definition of old growth. However, both Judge DeSoto and Defendants are correct that Plaintiffs' claim dramatically evolved from pleading to final reply brief. While Plaintiffs' challenges all relate to the old growth standards, they ranged from Plan amendments impacting stand size and definition, (Doc. 43 at ¶¶ 190–94, 202; Doc. 56 at 23), to population trends for pine martens, (Doc. 73 at 12–13). In doing so, Plaintiffs presented a distinct NFMA claim, not the natural evolution of an existing claim. Plaintiffs' NFMA claim was therefore waived.

7

## B.    Merits

But even if Plaintiffs could pursue their pine marten-based NFMA claim, Judge DeSoto correctly determined that such a claim lacks merit because the Project will not remove any stands from old growth status. MC0015050 ("Implementation of the proposed action is designed to retain old growth status for any stands being treated that meet the Green et al. (1992, errata corrected 2011) criteria."); MC0010532–33. Consistently, the Project will not affect the "amount and distribution of old growth" in the Project area. *See* MC0000024. To the extent the Forest Service has a continuing monitoring duty, the record indicates that the Forest Service has used the "proven methodology" of winter multi-carnivore bait stations to monitor pine marten population trends. MC0006855–57. Accordingly, Plaintiffs' NFMA objection fails on the merits as well.

## IV.    ESA

Section 7 of the ESA requires agencies proposing actions to engage in consultation with the Fish and Wildlife Service to ensure the action "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species[.]" 16 U.S.C. § 1536(a)(2). An action will result in "jeopardy" if it will "reduce appreciably the likelihood of both the survival and recovery of a listed species." 50 C.F.R. § 402.02. If formal consultation is deemed necessary, the Fish and Wildlife

8

Service issues a biological opinion. 50 C.F.R. § 402.14(g)–(h). Under this consultation process, the Fish and Wildlife Service is required to, *inter alia*, "[e]valuate the effects of the action and cumulative effects on the listed species or critical habitat." 50 C.F.R. § 402.14(g)(3). This analysis must consider the effects on the species from the proposed action as well as the "consequences of other activities that are caused by the proposed action." 50 C.F.R. § 402.02. The "environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation process." *Id.*

Plaintiffs challenge the Fish and Wildlife Service's ESA analysis for bull trout, initially arguing that the Biological Opinion is deficient because it: (1) contains inaccurate analysis regarding road impacts; (2) fails to meaningfully consider climate change impacts; (3) improperly relies on vague and unenforceable "Best Management Practices" ("BMPs"), design features, and mitigation measures; and (4) fails to address bull trout recovery. Judge DeSoto rejected all Plaintiffs' arguments (and sub-arguments). (Doc. 85 at 21–32.) Plaintiffs' objection is limited to Judge DeSoto's analysis of mitigation measures, arguing that she erroneously distinguished *Center for Biological Diversity v. Bernhardt*, 982 F.3d 723 (9th Cir.

9

2020). In *Bernhardt*, the Ninth Circuit rejected mitigation measures included in a

biological opinion on the grounds that they were too vague and, at best, reflected a

"general desire" to mitigate on offshore oil drilling project's impacts on polar

bears. *Id.* at 743–47. The court clarified that

> Mitigation measures relied upon on a biological opinion must constitute a clear, definite commitment of resources, and be under agency control or otherwise reasonably certain to occur. A sincere general commitment to future improvements—without more specificity—is insufficient. The measures must be subject to deadlines or otherwise-enforceable obligations; and most important, they must address the threats to the species in a way that satisfies the jeopardy and adverse modification standards. Binding mitigation measures cannot refer only to generalized contingencies or gesture at hopeful plans; they must describe, in detail, the action agency's plan to offset the environmental damage caused by the project.

*Id.* at 743 (internal quotation marks and citations omitted). The court noted,

however, that mitigation "measures can be made enforceable in a variety of ways,

including by incorporation into the terms and conditions of an incidental take

statement." *Id.* at 744.

Judge DeSoto determined that *Bernhardt* was inapposite to the mitigation

measures at issue here because they had been incorporated into the incidental take

statement ("ITS") for the Mud Creek Project. (Doc. 85 at 29.) While Plaintiffs

agree that such incorporation means the mitigation measures are enforceable, they

maintain that *Bernhardt* also requires such measures be specific. (*See* Doc. 86 at 22

10

(insisting that "the Ninth Circuit requires *both* specificity and enforceability").)

Here, Term and Condition B states:

> The Forest will determine if road conditions are in danger of being degraded to the point where there is a high risk of sediment deposition to streams. The Forest will temporarily suspend haul or other use until corrective actions can be implemented or until natural conditions are again conducive to use without creating sediment inputs to project area streams.

FWS0000054. Term and Condition C states that, "[t]he Forest will devise and implement a long-term solution to minimize the perpetual sediment delivery of the miles of FR 468 within the Nez Perce Fork RHCA prior to initiation of the third implementation unit (Blue Joint)." FWS0000055. Plaintiffs argue that the metric of "high risk of sediment deposition" in Term and Condition B and the undefined "long-term solution" in Term and Condition C are the type of "general contingencies" rejected in *Bernhardt.* (Doc. 86 at 24 (citing 982 F.3d at 743).) That objection is overruled.

Plaintiffs improperly read these Terms and Conditions in isolation. The ITS sets forth three "reasonable and prudent measures," or "RPMs," with nine mandatory implementing Terms and Conditions. FWS0000055. RPM 1 requires identification and implementation of means to reduce potential incidental take of bull trout through sedimentation. FWS0000055. Four Terms and Conditions implement this RPM, including Terms and Conditions B and C. FWS0000055. Compliance with these Terms and Conditions, as well as Terms and Conditions A

and D, is nondiscretionary. FWS0000054. Their execution is then guided by the

design features incorporated into the Biological Assessment, *see* MC0011901–06,

and the National Best Management Practices for Water Quality Management on

National Forest System Lands, *see* MC0062966–3139. While "noncommittal

assurances cannot shoulder the government's burden to identify a clear, definite

commitment of resources," *Bernhardt*, 982 F.3d at 746 (internal quotation marks

omitted), mandatory mitigation measures can permit an agency to exercise its

judgment. Because that is the record here, Plaintiffs' objection lacks merit.

## V.    Conclusion

Based on the foregoing, and finding no clear error in the portions of Judge

DeSoto's Findings and Recommendations that were not objected to,

IT IS ORDERED that:

(1) The Findings and Recommendations, (Doc. 85), is ADOPTED.

(2) Plaintiffs' motion for summary judgment, (Doc. 55), is DENIED.

(3) Defendants' cross-motions for summary judgment, (Docs. 60, 65) are

GRANTED.

(4) The Clerk is directed to enter judgment and close the case.

DATED this 28th day of May, 2026.

Dana L. Christensen, District Judge
United States District Court

12