IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

OREGON WILD and WILDEARTH GUARDIANS,

Plaintiffs,

v.

DAVID WARNACK and UNITED STATES
FOREST SERVICE,

Defendants,

AMERICAN FOREST RESOURCE COUNCIL,

Defendant-Intervenor.

Case No. 6:24-cv-00949-AP

**FINDINGS &
RECOMMENDATION**

_____

POTTER, United States Magistrate Judge:

Spanning over 1.6 million acres, the Willamette National Forest (WNF) is a vast landscape containing mountains, rivers, lakes, and old growth trees. It provides animals a place to live, people a place to recreate, and a source of trees that are not only used to build things like homes but also to provide revenue to the surrounding area. But these interests do not always align and indeed, one may come at the cost to another. And, of course, there are other threats to the forest like wildfires that pose a danger not only to the forest but often surrounding areas.

This case concerns an attempt by Defendant the U.S. Forest Service to manage those competing interests in a section of the WNF while also trying to reduce fire risk. After almost four years of work, Defendants developed the Youngs Rock Rigdon Project (YRR), "to improve stand and landscape diversity, structure, and resiliency; strategically reduce hazardous fuels; sustainably manage existing trail systems and dispersed recreation while minimizing impacts to

PAGE 1 – FINDINGS & RECOMMENDATION

natural resources; identify a sustainable road system needed for safe and efficient travel and for administration, utilization, and protection of national Forest System Lands; and provide a sustainable supply of forest products on about 6,500 acres." AR 17970.

Plaintiffs Oregon Wild and Wildearth Guardians challenge this proposed project, arguing that Defendants' evaluation and selection of the project did not comply with the National Environmental Policy Act (NEPA) and the Administrative Procedure Act (APA) because Defendants failed to consider a reasonable range of alternative plans and failed to take a "hard look" at YRR's effects on the WNF. Compl., ECF No. 1. Plaintiffs move for summary judgment, asking the Court to find Defendants violated NEPA and return the project to Defendants to evaluate again. Pls.' Mot., ECF No. 41

Defendants and Defendant-Intervenor American Forest Resource Council which "represents forest products manufacturers and affiliated companies who are frequent purchasers of timber sales on National Forest System (NFS) lands that the Forest Service manages in northwest Oregon, including the Willamette National Forest" disagree with Plaintiffs' characterization of Defendants' review of the project and also move for summary judgment. Defs.' Cross-Mot., ECF No. 50; Def.-Intervenor's Cross-Mot., ECF No. 51.

Because Defendants complied with NEPA's procedural requirements, Plaintiffs' Motion for Summary Judgment should be denied, and Defendants' Cross-Motions should be granted.

## BACKGROUND

### I.      The Willamette National Forest

While it officially earned its name as the Willamette National Forest (WNF) in 1933, the WNF began in 1893 as part of the Cascade Range Forest Reserve. The WNF is home to many different kinds of trees including the Douglas-fir, Oregon's state tree, and different species of

PAGE 2 – FINDINGS & RECOMMENDATION

fish and wildlife including the Northern Spotted Owl (NSO), a threatened species. AR 22216–17. Historically, one of the most difficult challenges facing the WNF was the need to strike a balance between logging and protecting old-growth forests and endangered species like the NSO.

The Willamette National Forest Land and Resources Management Plan EIS and the Northwest Forest Plan were adopted to balance those concerns. AR 15847. They provide standards and guidelines for managing both NSO habitation and old-growth forests. AR 15847-48. But neither do away with logging or other commercial activities. Instead, they designated certain parts of the forest for specific purposes. For example, Late-Successional Reserves (LSR) are lands that are specifically reserved for the protection and restoration of ecosystems that serve as habitats for protected species including the NSO. AR 15850. Other areas are designated for potential commercial logging.

The Forest Service is tasked with managing wildfires. Since 1983, the National Interagency Fire Center has tracked the size and number of wildfires in the United States.[1] While the number of fires has remained fairly constant, the amount of land burned each year has been increasing.[2] The WNF has not been immune from those fires; the 2022 Cedar Creek Fire, which was close to the project area at issue in this case, is just one example. AR 22224. These fires not only damage the forest, but they can also spread to nearby homes and impact air quality even states away. Thus, as the fires increased, so have calls to take steps to reduce the spread of future fires.

---

[1] https://www.nifc.gov/fire-information/statistics/wildfires (last visited 8/5/26).
[2] https://science.nasa.gov/earth/explore/wildfires-and-climate-change/ (last visited 8/5/26).

PAGE 3 – FINDINGS & RECOMMENDATION

## II.    The Youngs Rock Rigdon Project

Against that backdrop, the Forest Service developed the Youngs Rock Rigdon Project for a portion of the WNF that covers 33,000 acres south and east of Oakridge along Forest Road 2100 which is also known as Rigdon Road. AR 17974–75.

Because of past management activities and fire suppression, the area has degraded habitat and areas that make it more susceptible to wildfire and flooding events. AR 17974–76. The Project has five purposes:

(1) "Improve stand and landscape diversity, structure, and resiliency;"

(2) "Strategically reduce hazardous fuels;"

(3) "Sustainably manage existing trail system and dispersed recreation while minimizing impacts to natural resources"

(4) "Identify a sustainable road system needed for safe and efficient travel and for administration, utilization, and protection of National Forest System Lands"; and

(5) "Provide a sustainable supply of Forest Products."

AR 17976–82. Because the project area involves a transition area between two forest types—dry and moist forests—efforts in the drier area focus on restoring meadows and oak savanna while efforts in the moist areas focus on treatments designed to mitigate the dangers from closed-canopy forest conditions. AR 17976–17980; AR 18000.

After an extensive process, on December 8, 2023, the Forest Service decided to implement a plan—known as the modified Alternative 2 plan—which involves treating approximately 6,500 acres; it would involve 2,242 acres of commercial harvest activities, 4,900 acres of non-commercial activities, and 276 of meadow restoration. AR22210–11. The plan location and areas of treatment are illustrated here:

PAGE 4 – FINDINGS & RECOMMENDATION



AR 22213.

PAGE 5 – FINDINGS & RECOMMENDATION

### III.    The Young Rock Rigdon NEPA process

The selection of the modified Alternative 2 plan was the product of years of collaboration with the public and community organizations. AR 17992–95. Discussions with tribal partners began in 2015 with formal consultations occurring in 2019. AR 17992. Between October 2016 and November 2021, the Forest Service participated in 31 field trips, roundtable discussions, joint workshops, and learning sessions led by the Southern Willamette Forest Collaborative. AR 17993–94.

The first major step in the project is seeking public input or scoping. Here, public scoping for the project began in June 2019 with a public field trip. AR 17994. That same month they issued a Notice of Intent for the project which was published in the Federal Register. AR 17994. This Notice alerted the public that a major project review is starting, summarizes the purpose and need for the project as well as the timeline, and seeks public comment. AR 14334–39. Defendants received input from 19 commenters during the scoping period. AR 17994. They used that input to "identify pertinent issues, refine the proposed action, develop action alternatives, and [] analyze the environmental effects of the alternatives." AR 17994.

The next step is the Draft Environmental Impact Statement (EIS) which is the preliminary report that describes proposed plans to meet the project goals and details the positive and negative environmental impacts of those plans. The draft EIS was published in July 2021. AR 17995; AR 15819–16253. It analyzed three plan alternatives—one no-action alternative and two action alternatives. AR 15834. The no action alternative proposed doing no treatment at all in the affected area. AR15861. The two action alternatives—Alternatives 2 and 3—differed in the amount and kind of treatment. AR 15834. Alternative 2 was identified as the plan Defendants proposed be adopted and involved treating 6,500 acres. AR 15834, 15861. As the draft EIS

PAGE 6 – FINDINGS & RECOMMENDATION

described, "Alternative 3 differ[ed] from Alternative 2 by proposing to decommission additional road mileage and commercially harvest fewer acres." AR 15869. Parts of Alternative 3 were developed in response to the previous public comments. AR 15834; AR 17996–97. Specifically, Defendants considered concerns that had been raised about the effects of the proposals on NSO habitats; Alternative 3 "propose[d] non-commercial gap creation acreage within NSO critical habitat as another means to meet the purpose and need." AR 15858.

After the release of the draft EIS, the public had an opportunity to comment on the proposed YRR plan. During the 45-day comment period, Defendants received seven comments, including from Plaintiff Oregon Wild. AR 17995.

After the draft EIS, there is a final EIS which includes responses to public comments and any other updates. The final EIS was published in March 2023. AR 17956–18431. Again, the EIS analyzed three alternatives, with Alternative 2 identified as the proposed action. AR 17971. Defendants addressed the comments—including the comments from Plaintiff—to the draft EIS in Appendix K to the final EIS. AR 18391–18431. The Appendix sets out a chart which includes the comment received, the area of concern, and Defendants' response. As an example, here are two of Plaintiff's comments and Defendants' response:

| | | | |
|---|---|---|---|
| Doug Heiken from Oregon Wild, on behalf of Cascadia Wildlands and Many Rivers Group of the Sierra Club | The agency should reconsider timber targets in light of the fact that the public needs carbon storage to reduce global climate change much more than they need wood products. The NEPA analysis also needs to account for the fact that managing forests for water quality, water quantity, quality of life, and carbon storage for a stable climate will contribute far more to community stability than propping up the timber boom-bust industry with subsidized logging. | Climate Change | This comment it outside the scope of the project. Section 3.10 provides an analysis of project effects on carbon storage. |
| Doug Heiken from Oregon Wild, on behalf of Cascadia Wildlands and Many Rivers Group of the Sierra Club | The FS can do better if they fully develop and adopt an alternative that eliminates commercial logging in mature forests where pines are absent or rare, and focuses on reducing stand density right around old-growth pine and oak trees, while retaining enough trees to maintain suitable spotted owl habitat, except where pine and oak are abundant. | Alternatives and Silviculture | The concern over harvesting natural stands and the effect on northern spotted owl (NSO) habitat was identified as a key issue during public scoping and a portion of Alternative 3 was developed in response to that concern. Alternative 3 proposes non-commercial gap creation and reducing stand density right around legacy trees, pines and oaks within the stands in NSO critical habitat (DEIS page 26). |

PAGE 7 – FINDINGS & RECOMMENDATION

AR 18419. Defendants did not add any alternative plans based on Plaintiff's comments.

After the final EIS is completed, a draft Record of Decision is prepared. The ROD sets out the final selection of the plan and the reasoning behind it. The final EIS and the draft ROD were published in April 2023. AR 18445–18497, AR 21305. The draft ROD indicated that Alternative 2 had been selected. Again, Plaintiffs objected and Defendants responded. AR 21305–21334.

The Forest Service issued its final ROD in December 2023. It decided to implement a modified version of Alternative 2. AR 22210. The modified version of Alternative 2 added non-commercial treatment to maintain NSO habit on 366 acres; this had previously been part of Alternative 3. AR 22210. The modified version of Alternative 2 was selected because, even given the many "competing priorities," it "best meets the needs of restoring terrestrial and aquatic habitats, maintaining older stands for late seral species found in this area, and returning fire to the landscape while also providing for human uses like recreation, special forest product gathering, indigenous uses, and a sustainable supply of timber." AR 22217. The ROD recognized the importance of the area to people but also acknowledged that "frequent fires" were influencing the area and "many of [the] unique habitats are showing signs of decline." AR 22217.

After the release of the ROD, Plaintiffs then filed this suit contending that Defendants failed to follow NEPA in preparing the final EIS. To date, no work has been done on the YRR.

## STANDARDS

An agency's compliance with NEPA is reviewed under the APA. *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 871 (9th Cir. 2022). The APA provides for limited judicial review of agency decisions. *See* 5 U.S.C. §§ 701-706. Courts reviewing agency

PAGE 8 – FINDINGS & RECOMMENDATION

actions must "hold unlawful and set aside" actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or are unconstitutional, violate a statute, or fail to follow the required procedures. 5 U.S.C. § 706(2)(A)-(D). While the APA requires courts to be deferential to agency policymaking and factfinding, no such deference is owed to agency legal conclusions. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024).

An agency's action is "arbitrary and capricious" when "it is not 'reasonable and reasonably explained.'" *Ohio v. Env't Prot. Agency*, 603 U.S. 279, 292 (2024) (*quoting Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). A court reviewing an agency's action does not "substitute its judgment for that of the agency." *Id.* Instead, a court "must ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Id.* "Under that standard, a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 605 U.S. 168, 180 (2025).

"When a party argues that an agency action was arbitrary and capricious due to a deficiency in an EIS, the reviewing court must account for the fact that NEPA is a *purely procedural statute*. Under NEPA, an agency's only obligation is to prepare an adequate report." *Id*. "So when reviewing an agency's EIS, 'the only role for a court' is to confirm that the agency has addressed environmental consequences and feasible alternatives as to the relevant project. Because an EIS is only one input into an agency's decision and does not itself require any particular substantive outcome, the adequacy of an EIS is relevant only to the question of whether an agency's final decision . . . was reasonably explained." *Id.* (citations omitted).

**DISCUSSION**

"NEPA establishes a 'national policy [to] encourage productive and enjoyable harmony between man and his environment,' and was intended to reduce or eliminate environmental damage and to promote 'the understanding of the ecological systems and natural resources important to' the United States." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756 (2004). "NEPA is at its heart a procedural statute and requires federal agencies to take a 'hard look' at the environmental consequences of their actions." *Env't Def. Ctr.*, 36 F.4th at 872; *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005) ("NEPA imposes procedural requirements, but not substantive outcomes, on agency action."); *see also Bair v. California State Dep't of Transp.*, 867 F. Supp. 2d 1058, 1065 (N.D. Cal. 2012) ("Once the agency does the required hard look, it is free to choose to proceed with action that will have an adverse impact on the environment, at least insofar as NEPA is concerned, the idea being that if we are going to destroy the environment, we should do so with ou[r] eyes wide open and not by accident.").

Plaintiffs argue that Defendants violated NEPA in two ways. First, they argue that Defendants failed to consider a reasonable range of alternatives because they did not analyze Plaintiffs' proposed alternative. Pls.' Mot. 13–18. And second, they argue that Defendants failed to take the requisite "hard look" at the proposed project's impacts on the NSO, fire and fuels treatment, and carbon storage and emissions. Pls.' Mot. 18–36.

## I.    Reasonable Alternatives

Plaintiffs argue that in developing the YRR Project and writing the EIS, Defendants failed to consider a reasonable range of alternatives. Pls.' Mot. 13–18.

"NEPA requires agencies to prepare an EIS for all 'major Federal actions significantly affecting the quality of the human environment.'" *Env't Def. Ctr.*, 36 F.4th at 872 (quoting 42

U.S.C. § 4332(C)). In that EIS, the agency must address "a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal." 42 U.S.C. § 4332(C)(iii).

"NEPA does not require the Forest Service to 'consider every possible alternative to a proposed action, nor must it consider alternatives that are unlikely to be implemented or those inconsistent with its basic policy objectives.'" *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813 (9th Cir. 1999) (quoting *Seattle Audubon Soc. v. Moseley*, 80 F.3d 1401, 1404 (9th Cir. 1996)). However, "if the agency fails to consider a viable or reasonable alternative, the EIS is inadequate." *Se. Alaska Conservation Council v. Fed. Highway Admin.*, 649 F.3d 1050, 1056 (9th Cir. 2011). "An agency must . . . explain its reasoning for eliminating an alternative." *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 978 (9th Cir. 2006). That reasoning can be brief. *City of Los Angeles, California v. Fed. Aviation Admin.*, 63 F.4th 835, 843 (9th Cir. 2023).

The EIS analyzes three alternatives. *See* AR 17971–73. Alternative 1 is the no action alternative, while Alternatives 2 and 3 are action alternatives. AR 17971. The EIS also addresses several alternatives that were initially proposed and considered but later eliminated because they did not meet the goals of the project. AR 18010–11. Appendix K to the EIS also responds to public comments on the draft EIS. AR 18391–431.

Plaintiffs first argue that the two action plans are "virtually identical." Pls.' Mot. 13–14. And, as a result, the EIS reflects a failure to consider actual alternatives. The Court does not agree.

PAGE 11 – FINDINGS & RECOMMENDATION

It is true that the action alternatives both "propose to treat the approximately 6,500 acres in the project area."[3] AR 17971. However, the two action alternatives differ in the scope and type of treatment. AR 17971–73; AR 18006 ("Alternative 3 differs from Alternative 2 by proposing to decommission additional road mileage, commercially harvest fewer acres within USFWS 2012 NSO Critical Habitat Unit (CHU), and relies more on commercial thinning with large gaps instead of regeneration harvest in managed stands."). Alternative 2, the agency's chosen alternative, proposes thinning in natural stands over 1,419 acres and regeneration harvest in managed stands over 453 acres. AR 17971. This would yield an estimated 63 million board feet. AR 18006. By contrast, the more conservative Alternative 3 proposes thinning in natural stands over 664 acres and regeneration harvest in managed stands over 195 acres, yielding an estimated 42 million board feet. AR 18006–07. Alternative 2 would decommission twelve miles of road, while Alternative 3 would decommission twenty miles. AR 17972.

The Court finds that there are meaningful differences between the two action alternatives. The two plans involve significant differences in the acres thinned and ultimate board feet obtained. *Cf. Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1038 (9th Cir. 2008) (finding that the three action alternatives were "virtually indistinguishable" when the different interim limits on visitor use were all "consistent with current use levels"). It is not an attempt to use different labels on the same plan to make them look distinct. *Cf. Muckleshoot Indian Tribe*, 177 F.3d at 813 (finding the two action alternatives "virtually identical" because "Alternative 3[] differed from Alternative 2 only in that it re-labeled a portion of the lands Weyerhaeuser

---

[3] Because Plaintiffs' argument focuses on the amount of logging in the project area, the Court focuses on the differences in the amount of logging in the proposed alternatives. *See* Pls.' Mot. 13–14. The two action alternatives are identical in terms of meadow restoration, floodplain restoration, understory fuel treatments, and recreation management. AR 17972.

PAGE 12 – FINDINGS & RECOMMENDATION

transferred to the Forest Service a donation rather than an exchange, and added 141 acres of donated land"). These are simply not identical plans; one involves more aggressive action (Alternative 2).

Plaintiffs then argue that Defendants should have considered Oregon Wild's alternative. Pls.' Mot. 14–18. Plaintiff Oregon Wild submitted 121 pages of comments that included a more conservative action alternative. AR 16318–438. Their alternative, which they suggested as a modified Alternative 3, asked Defendants to:

- "Focus on thinning the plantations and the dryer forests. Defer the moist mature forests that lack pine and oak;"

- "Scale back the logging to treat only what can be maintained over time with prescribed fire;"

- "Retain all trees >24" dbh" and "all trees with old growth characteristics;"

- "Protect high quality owl habitat;"

- "Conduct red tree vole surveys in suitable habitat;" and

- "Retain significantly more trees per acre and higher basal area in all mature forests to reduce the risk of blowdown, retain carbon, mitigate impacts on late successional wildlife."

AR 16325.

Nineteen pages in Appendix K of the EIS are devoted to responding to Plaintiffs' comments and proposed alternative. AR 18411–18429. Here, Defendants responded to Plaintiffs' concerns and explained how Plaintiffs' proposed alternative was not consistent with the scope and purpose of the project.

PAGE 13 – FINDINGS & RECOMMENDATION

As to the thinning in forests that lack pine and oak trees, Defendants cited the project's purpose and need, noting that "the mixed conifer forests have changed in the last 100 years with decreases in species diversity." AR 18414. "The intent of the project is much broader than only saving the current pines and oaks. The proposed actions are designed to reduce stand densities, retain and release older trees, and begin to shift composition toward fire- and drought-tolerant species." AR 18414.

Defendants also explained why scaling back logging is inconsistent with the project's purpose and need. Mixed conifer stands "currently have an understory of densely stocked trees . . . that can promote crown fire. To achieve the target landscape pattern in the mix conifer forests, thinning is designed to reduce stand densities, retain and release older trees, and shift composition." AR 18420.

Defendants also clarified their plan to identify and retain what they call "legacy trees." AR 18421. This definition "does not rely on a minimum diameter" but instead focuses on many of the same characteristics that Plaintiffs' alternative focuses on, such as "bark and lower crown characteristics as well as crown form." AR 18421.

Defendants acknowledged that "suitable and dispersal [NSO] habitat will be removed in the project area," but they also note that "no incidental take would occur because of habitat loss." AR 18411. While Plaintiffs ask that Defendants prioritize NSO habitat, Defendants noted that this is inconsistent with the project's goal to "provide habitat needs for a full range of forest associated species." AR 18424.

Finally, Defendants addressed Plaintiffs' request that they retain more trees per acre. "The retention levels proposed . . . were determined based on stand examination data and analysis as well as considerations from the Jim's Creek savannah restoration project in the area."

PAGE 14 – FINDINGS & RECOMMENDATION

AR 18423. Defendants also noted that "[t]his project proposes a higher retention level and evaluated blowdown risks even further." AR 18423.

The Court finds that Defendants did consider Plaintiffs' proposed alternative. They simply chose not to adopt or spend additional time on that plan which is permitted under the law. To the extent that Plaintiffs' comments proposed that "[t]he purpose and need for this project … be adjusted," this further supports Defendants' argument that Plaintiffs' proposed alternative was not a viable alternative that addressed the project's stated goals and purpose. AR 18417.

If Plaintiffs' argument here rests on the fact that any consideration of their proposed alternative was in the appendix, rather than in the "Alternatives Considered but Eliminated" section, that is not sufficient to give rise to a NEPA violation. *Seven Cnty.*, 605 U.S. at 173 ("NEPA is a procedural cross-check, not a substantive roadblock. The goal of the law is to inform agency decisionmaking, not to paralyze it."). Of the two action alternatives that Defendants considered, Defendants chose the less conservative alternative. This was not a decision made in the absence of information; Defendants received and responded to Plaintiffs' concerns. Even if Defendants had pasted their responses to Plaintiffs' proposed alternative onto a different page of the EIS, it is clear that Defendants' ultimate decision would have remained the same. *Cf. id.* at 185 ("Even if an EIS falls short in some respects, that deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the EIS.").

## II.      NEPA's "Hard Look" Requirement

Finally, Plaintiffs argue that Defendants did not take the requisite "hard look" at the environmental impacts of the project, specifically regarding the Northern Spotted Owl, fuels

reduction and fire risks, and mature and old-growth forests and carbon storage and emissions. Pls.' Mot. 18–36.

NEPA's procedural requirements "force agencies to take a 'hard look' at environmental consequences." *Lands Council*, 395 F.3d at 1027. "[A]dverse environmental effects of the proposed action [must be] adequately identified and evaluated." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

In creating an EIS, an agency has a "duty to assess, in some reasonable way, the actual baseline conditions." *Oregon Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 569 (9th Cir. 2016). This means addressing the cumulative effects of past, current, and potential future projects. *Lands Council*, 395 F.3d at 1028. The EIS must also discuss "steps that can be taken to mitigate adverse environmental consequences." *Robertson*, 490 U.S. at 351.

Courts "use the 'rule of reason' standard to decide whether the agency's discussion of environmental impacts is sufficiently thorough." *City of Los Angeles*, 63 F.4th at 842 (quoting *Audubon Soc'y of Portland v. Haaland*, 40 F.4th 967, 980 (9th Cir. 2022)). This "'is essentially the same as an abuse of discretion analysis.' In other words, under the rule of reason, an agency acts arbitrarily and capriciously 'only when the record plainly demonstrates that the agency made a clear error in judgment in concluding that a project meets the requirements of NEPA.'" *Id.* (citation omitted).

### A. *Northern Spotted Owls*

The EIS addresses the potential environmental impacts to the NSO. AR 18123–31. In discussing the baseline, the EIS incorporates the 2019 BA[4] and notes, as an update, that "the

---

[4] Biological Assessment for Timber Harvest and Routine Activities that are Likely to Adversely Affect Listed Species and Critical Habitat on the Columbia River Gorge National Scenic Area,

PAGE 16 – FINDINGS & RECOMMENDATION

September 2020 fires resulted in an estimated 5.5% loss of suitable owl habitat forest wide [but] had a minimal effect on the critical habitat unit within which is the project area . . . [because] [t]he project area was not affected by fires in 2020." AR 18123.

The EIS compares the environmental consequences of the three alternatives. AR 18124–30. The EIS notes that under Alternative 1, the no action alternative, there would be "no direct effect because no northern spotted owl habitat would be impacted. However, no dense managed stands would be thinned to promote future suitable habitat conditions." AR 18124. By contrast, "Alternative 2 would remove 19% of suitable habitat, remove 14% of dispersal habitat, and modify but maintain 29% of dispersal habitat in YRR project area [and] Alternative 3 would remove 13% and modify but maintain 6% of suitable habitat and remove 7% and modify but maintain 36% of dispersal habitat in YRR project area." AR 18124. "For critical habitat, Alternative 2 would remove 18% of suitable habitat, remove 7% of dispersal habitat, and modify but maintain 34% of dispersal habitat [while] Alternative 3 would remove 8% and modify but maintain 10% of suitable habitat and remove 5% and modify but maintain 36% of dispersal habitat." AR 18124.

The EIS addresses potential disturbance and disruption effects. AR 18130. To mitigate any possible disruption effects, the project would implement seasonal restrictions to avoid disruption. AR 18130. Spot checks and surveys for NSOs would also be ongoing during the project. AR 18130.

The EIS also addresses potential cumulative effects from foreseeable projects in the area, noting that "[c]umulative effects of all harvests in the area would not lead to take of occupied

---

Mt. Hood National Forest, Willamette National Forest, and the Northwest Oregon BLM District. *See* AR 15209–15748.

owl sites. NSO are expected to continue to be viable from the amount of habitat existing within the Rigdon area." AR 18130.

Finally, the EIS concludes by predicting that "[b]ecause suitable and dispersal habitat would be removed, the YRR project **may affect and is likely to adversely affect** northern spotted owls." AR 18130. The EIS predicts that the project "**may affect but is not likely to adversely affect** NSO due to disturbance" but that the project "**may affect and is likely to adversely affect critical habitat**" because of the removal of suitable and dispersal habitat. AR 18131.

Plaintiffs argue that the EIS "lacks any meaningful analysis of NSO impacts." Pls.' Mot. 18–20. Specifically, Plaintiffs argue that the EIS does not contain a sufficiently detailed discussion of the NSO's "rapid descent toward extinction" and the Project's impacts on the NSO. *Id.* The fact that the EIS concluded that there would be an impact on the NSOs but Defendants decided to proceed anyway is not evidence of a lack of meaningful analysis.

In support, Plaintiffs cite to the fact that the EIS does not mention barred owls, which are "widely recognized as the current primary driver of NSOs' decline." *Id.* at 19. But saying that the EIS does not reference barred owls is disingenuous. The EIS incorporates the 2019 BA which extensively addresses the pressure from increased Barred Owl populations. AR 18123 (citing AR 15278–90 and 15299–307). The 2019 BA notes that "[s]ince barred owls are more aggressive and more habitat generalists but also use the same habitats and prey as spotted owls, they are believed to be out competing spotted owls for habitat and food." AR 15288. The 2019 BA addresses studies showing that "extinction rates for spotted owls increased with decreasing amounts of old forest in the core area, and that the effect was 2-3 times greater when barred owls were detected." AR 15288. "[B]arred owl presence similarly decreased the rate of colonization

PAGE 18 – FINDINGS & RECOMMENDATION

of spotted owl pairs. They concluded that conserving large blocks of contiguous old-forest habitat was important for reducing interference competition between the two owl species." AR 15288. The 2019 BA also specifically addresses the effects of logging, thinning treatments, and reduction in older forests on competition between barred and spotted owls. AR 15289–90. The EIS, combined with the 2019 BA, gives a meaningful analysis of potential impacts to the NSO.

Plaintiffs also argue that Defendants "relied on documents [they] knew to be outdated and accurate." Pls.' Mot. 21–27. It is true that "the hard look standard is not satisfied when an agency relies 'on incorrect assumptions or data in an EIS.'" *City of Los Angeles*, 63 F.4th at 849–50. A revised BA was published in May 2023. AR 18510–19344. Here, Plaintiffs argue Defendants should have incorporated any updated information from the 2023 consultation into the EIS because the 2019 consultation was outdated. Pls.' Mot. 22–24. But separately they argue that Defendants could not rely on the 2023 consultation because the 2023 BA and BiOp postdate the final EIS. Pls.' Mot. 24–27. This appears to present a no-win situation for Defendants. But the problem for Plaintiffs is that Defendants did review and consider the information to the best of their ability. This is precisely the type of "fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry—and also about the length, content, and level of detail of the resulting EIS" that the Supreme Court has made clear is entitled to substantial deference. *Seven Cnty.*, 605 U.S. at 183.

There is no dispute that wildfires change the forest. Nor is it disputed that since the 2019 BA, several fires have impacted the WNF. As a result, "[r]evisions were made to update and examine the environmental baseline after wildfires since 2019." AR 18525. While the EIS could not incorporate the 2023 BA because the revised BA was published after the final EIS, Defendants did perform a consistency review after the 2023 BA was released. Here, Defendants

PAGE 19 – FINDINGS & RECOMMENDATION

noted that there was "new information on the effect of barred owls on northern spotted owls" and that "there is some uncertainty that exists concerning the amount of habitat loss spotted owls can tolerate without further reductions in an environment with barred owl competition." AR 27737. However, Defendants noted that "loss of habitat by catastrophic wildfire is also a major threat. Therefore, treatments for forest restoration and increased fire resiliency are particularly needed." AR 27737. Ultimately, Defendants found "that the proposed treatments are consistent with all [Project Design Criteria] of the 2023 Revised Biological Assessment . . . and associated Biological Opinion." AR 27737.

Plaintiffs argue that Defendants "[m]isrepresent[ed] the 2023 consultation" by suggesting that it "was inapplicable because the 2020 fires did not occur in the Project area. Pls. Mot. 22 (citing AR 21310–11). Plaintiffs cite to a response to an objection that argued Defendants had not met their obligation to consult with the FWS. AR 21310–11. In response, Defendants confirm they have consulted and reviewed the opinion and that it was being used for the project but concluded that the assessment does not change their analysis of the YRR project because fires did not impact those areas. AR 21311. Saying that they reviewed the 2023 consultation (and were using it for purposes of project implementation) but it did not change their analysis is not the same as saying it is inapplicable.

Plaintiffs then ask the Court to disregard any explanation of the 2023 consultation because it came after the final EIS and, per the Plaintiffs, Defendants claimed it was "irrelevant." Plaintiffs claim any attempt "to backfill its NEPA analysis with a document that the agency did not consider in its decisionmaking" must be rejected. Pls. Mot. at 26. And because of this, the Court must conclude that the reliance on the existing 2019 BA for the final EIS means the requisite "hard look" was not conducted and NEPA was violated. The Court disagrees.

PAGE 20 – FINDINGS & RECOMMENDATION

The role of the Court here is to determine whether the agency "addressed environmental consequences and feasible alternatives" in the final EIS. *Seven Cty.*, 605 U.S. at 180. Here it did, using the 2019 BA. When the new 2023 consultation was released, Defendants considered it, agreed to use it as the project was implemented, and ultimately determined it did not need to prepare an updated EIS. This is precisely the type of decision that the agency was entitled to make in preparing the EIS and the Court affords it substantial deference as required. *Id.* at 180.

The Final Record of Decision (ROD) addresses the recent wildfires. It concluded that "none of the recent wildfire have changed the impacts of this project and it proposed actions as they did not occur within the affected area that resource specialists used as the basis of their analysis findings." AR 22224. The ROD also addresses the NSO habitat loss from the 2021 and 2022 fires in the Willamette National Forest. AR 22225. Defendants incorporated new information and findings as available. And, notably, the ROD adopted a modified version of Alternative 2 that included treatment on 366 acres to maintain NSO habitat, which reflects a willingness to review and consider all information. AR 22210. The plan itself also includes multiple design features including surveys to identify NSO so activities can be modified to avoid incidental take and seasonal restrictions to avoid disruption during breeding season. AR 22248–49.

This reflects a reasonable attempt by Defendants to consider all new relevant information before deciding to proceed with the existing EIS; this is a policy decision which is entitled to deference. *Seven Cnty.*, 605 U.S. at 183 ("As the Court has emphasized on several occasions, and we doubly underscore again today, inherent in NEPA ... is a rule of reason, which ensures that agencies determine whether and to what extent to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process." (internal quotations omitted)). Courts

PAGE 21 – FINDINGS & RECOMMENDATION

"should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Id*.

Finally, Plaintiffs argue that Defendants "failed to address adverse expert opinion" that they contend "undercut its conclusions regarding the Project's effects on NSO" and "failed to address, or even acknowledge. . . . Oregon Wild's comments regarding NSOs." Pls.' Mot. 27–28. Here, Plaintiffs take issue with how Defendants responded to their comments. *Id.* The final EIS does not support their argument that alternative expert opinions or comments were ignored.

When preparing a final EIS, "the agency shall discuss any responsible opposing view that was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised." 40 C.F.R. § 1502.9 (2020).[5] "[F]ailure to disclose and analyze these opposing viewpoints violates NEPA." *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1167 (9th Cir. 2003). However, the Court "must 'defer to agency decisions so long as those conclusions are supported by studies that the agency deems reliable.'" *Cascadia Wildlands v. United States Bureau of Land Mgmt.*, 153 F.4th 869, 906 (9th Cir. 2025) (quoting *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1053 (9th Cir. 2012)).

In their comments, Oregon Wild urged Defendants to "do more to conserve suitable habitat for spotted owls and their prey, such as red tree voles, as part of the Youngs Rock Rigdon project." AR 16326. They cited to a 2010 draft report discussing the competitive pressure from increased Barred Owls which "makes the protection of habitat even more important, since any loss of habitat will likely increase competitive pressure and result in further reductions in Spotted

---

[5] The NEPA regulations in this chapter were rescinded as of April 11, 2025. 90 Fed. Reg. 10610 (Feb. 25, 2025).

PAGE 22 – FINDINGS & RECOMMENDATION

Owl populations." AR 16327. They also cited to a 2019 journal that indicated that "maintaining or improving habitat condition could be an important factor in promoting persistence of NSO populations over longer time spans" and lead to less reliance on Barred Owl removal. AR 16328.

Defendants did respond to various comments related to "spotted owl habitat maintenance" and alternatives that Plaintiffs believed would better serve the NSOs. AR 18411–13, 18419, AR 18424. The EIS also addresses red voles. AR 18422. Plaintiffs criticize the summary of their comments, Defendants' responses, and what they see as the omission of specific NSO issues. Pl. Mot. 27–28. But Plaintiffs have failed to identify any adverse expert opinion that is not disclosed or analyzed.

As discussed above, the EIS incorporates the 2019 BA which recognizes competition from the barred owl as "the most pressing threat to species' recovery." AR 15288. The EIS also recognizes that NSO may be adversely affected by habitat removal. AR 18130–31. However, as discussed in Defendants' response to Plaintiffs' comments, one of the goals of the project is to improve stand and landscape diversity, structure, and resiliency. AR 17970. Defendants note that "[o]pen forests, oak stands, and savannahs are an extremely limited habitat in the western Cascades and into the Willamette valley (99% of this habitat type has been lost)" and converting habitat into savannah will provide habitat needs for some sensitive species and some vulnerable migratory bird species. AR 18424. Defendants are permitted to make that decision after a thorough review and that is what happened here.

### B.  Fuels Reduction and Fire Risks

The EIS contains an analysis of predicted fire behavior in the project area, including the potential effects of treating fuels. AR 18072. The proposed treatments in Alternatives 2 and 3 "would reduce canopy density and increase spacing between crowns, creating forest stands less

PAGE 23 – FINDINGS & RECOMMENDATION

susceptible to a sustained crown fire." AR 18079–80. Because Alternative 2 includes commercial thinning and more non-commercial gaps, the risk of crown fire would remain higher in Alternative 3. AR 18081. The EIS notes that immediately following these treatments, there would be an increased fire risk "due to the creation of post-harvest activity generated fuels." AR 18080. Underburning would be used to reduce fuels and then maintenance burning would be conducted every 10-15 years. AR 18080. "The goal of the fuels treatment plan is to reduce fuel loadings to levels that would decrease the intensity and severity of future wildfires in the project area." AR 18080.

Plaintiffs argue that Defendants did not fully analyze or disclose any adverse trade-offs associated with the fuels reduction thinning of the project. Pls.' Mot. 29–31. Here, again, Plaintiffs argue that Defendants did not sufficiently respond to their comments and opposing science. *Id.*

In their comments, Oregon Wild recommended that Defendants "maintain[] canopy cover that helps suppress ladder fuels and maintain fire resilience." AR 16320. They expressed concern that Defendants will not follow through on their plans to maintain the treated areas. AR 16324 ("If the FS does not follow through…, there is a significant risk that surface and ladder fuels will flourish and pose a greater fire hazard than retaining the existing dense mature forests."); AR 16325 ("Scale back the logging to treat only what can be maintained over time with prescribed fire. This will reduce the cost of maintenance and avoid the risk that hazardous ladder fuels will develop."). They cited to studies showing that "reduction of canopy cover can increase fire hazard by making the stand hotter/dryer/windier, generating more hazardous slash, [and] stimulating the growth of future surface and ladder fuels" and that '[r]oads also increase roadside ladder fuels and fire ignition risk." AR 16331, 16350.

PAGE 24 – FINDINGS & RECOMMENDATION

In response, Defendants noted that their proposed thinning would "reduce stand densities, retain and release older trees, and shift composition toward fire- and drought-tolerant tree species." AR 18413. They reiterated their design "to maintain healthy and resilient forests in this landscape . . . and reduce risk of crown fire by reducing ladder fuels." AR 18413. Defendants also directly addressed Oregon Wild's comments regarding adverse trade-offs: "We understand that thinning can have beneficial and adverse impacts on the landscape . . . The project was designed to minimize and avoid potential adverse impacts where possible with the inclusion of Project Design Features which include buggers and restrictions on what can happen or when it can happen." AR 18428.

Defendants analyzed the impacts of fuels reduction and fire risk. They responded to Plaintiffs' comments and pointed to areas in the EIS that address Plaintiffs' concerns. As above, Plaintiffs have not identified any adverse expert opinion that was not disclosed or analyzed. Defendants took the requisite hard look at fuels reduction and fire risk.

### C. *Mature and Old-Growth Forests and Carbon Storage and Emissions*

Finally, Plaintiffs argue that Defendants failed to consider the project's impacts on carbon and climate. Pls.' Mot. 31–36. Plaintiffs argue that Defendants performed only a "cursory analysis" in the mere three pages devoted to the issue. *Id.* Again, Plaintiffs argue that Defendants failed to respond to their comments and opposing science. *Id.*

The EIS recognizes that "[c]limate change is currently affecting the Willamette National Forest and is expected to intensify in the future." AR 18251. The project aims to "help adapt the landscape to . . . climate change vulnerabilities." AR 18251. The EIS directly addresses carbon emissions: "The relatively small quantity of carbon released to the atmosphere and the short-term nature of the effect of the proposed action on the forest ecosystem are justified, given the overall

PAGE 25 – FINDINGS & RECOMMENDATION

change in condition increases the resistance to wildfire, drought, insects and disease, or a combination of disturbance types that can reduce carbon storage and alter ecosystem functions." AR 18253. The EIS also notes that "any initial carbon emissions from this proposed action would be balanced and possibly eliminated as the stand recovers and regenerates, because the remaining trees and newly established trees typically have higher rates of growth and carbon storage." AR 18253. And it notes that even if no action were to be taken, "the forest where this proposed action would take place would thin naturally from mortality-inducing natural disturbances and other processes resulting in dead trees that would decay over time, emitting carbon to the atmosphere." AR 18253.

The EIS addresses climate change and the effects of a relatively small release of greenhouse gases from the proposed treatments.[6] While this analysis is only three pages long, the Court recognizes that Defendants "invariably ma[de] a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry—and also about the length, content, and level of detail of the resulting EIS." *Seven Cnty.*, 605 U.S. at 183. The Court will not "micromanage those agency choices [because] they fall within a broad zone of reasonableness." *Id.*

Oregon Wild's comments focus on "nature-based carbon storage" in mature and old-growth stands. AR 16342. They argue that "[l]ogging will reduce carbon storage, increase GHG

---

[6] The ROD also addresses the issue of climate change. It was identified as one of the "specific areas of concern" and the ROD discusses how that concern played into the ultimate decision. AR 22222. It noted that "[o]ne of the main drivers of this project is to make the landscape more resilient to changes in climate, including wildfire and shifts in plant communities." AR 22223. And it explains some of the reasoning behind the decisions, noting that while there will be a small amount of emissions, "[t]hese emissions are necessary to achieve the objectives of the project, which will support climate change adaptation." AR 22224.

PAGE 26 – FINDINGS & RECOMMENDATION

emissions, and future forest growth will never catch up with the carbon storage in the unlogged alternative and never fully mitigate for the warming caused by the extra $CO_2$ in the atmosphere caused by the logging." AR 16384. They cite numerous studies to support their assertions. AR 16484–86.

Defendants addressed Plaintiffs' comments and concerns, recognizing that "[r]estoration activities like thinning and prescribed fire incur a short-term carbon trade-off." AR 18412. Defendants also addressed any competing scientific opinions. "Although there is evidence of carbon benefits to treatments, the Forest Service acknowledges that how these trade-offs work in the real world are not currently settled science. There is no consensus in the literature on whether thinning to reduce disturbance severity is a net climate benefit or not." AR 18412. To explain why they have made certain choices, Defendants cited to the project's purpose and need statements that include "increasing stand and landscape diversity, structure, and resilience." AR 18417. That is sufficient.

**CONCLUSION**

Defendants prepared a detailed EIS and issued a final ROD. In that process, it addressed Plaintiffs' concerns and comments. The Court does not see any "attempt[] to sweep all adverse scientific opinion under the rug." Pl.'s Mot. 34. Defendants had to consider and address Plaintiffs' concerns, but it was not required to change course. The record reflects that Defendants did consider the issues. In fact, even between the draft ROD and the final ROD, Defendants showed a willingness to consider the issues and added additional protections for the NSOs.

At the end of the day, Defendants, in evaluating the YRR and preparing the EIS, made a number of policy choices that are owed substantial deference. Plaintiffs' complaints about those documents are not sufficient to support the conclusion that the EIS is inadequate. This Court's

PAGE 27 – FINDINGS & RECOMMENDATION

"only" role "is to confirm that the agency has addressed environmental consequences and feasible alternatives as to the relevant project." *Seven Cnty*, 605 U.S. at 180.

Here, the Court concludes the Defendants did address the environmental consequences and the feasible alternatives. Plaintiffs disagree with some of Defendants' reasoning and explanations, but that is not sufficient to support a NEPA violation. *Cf. id.* at 185 ("NEPA's procedural mandate helps 'to insure a fully informed and well-considered decision, not necessarily a decision the judges of the Court of Appeals or of this Court would have reached had they been members of the decisionmaking unit of the agency.'" (citation omitted)).

Even if this Court could conclude more information could have been added or placed in a different location—and it does not—there is also simply nothing to show that additions to the EIS would change the ultimate decision. *See id.* ("Even if an EIS falls short in some respects, that deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the EIS."). Returning this to the agency to complete more review of scientific studies and required more detailed responses to all objections would further stall a project that has been pending for five years; the Court does not believe further "[d]elay upon delay" in this case is consistent with NEPA. *Id.* at 184. NEPA requires Defendants to prepare an adequate report, they did so. *Id.* at 180. That ends the inquiry.

## RECOMMENDATION

Plaintiffs' Motion for Summary Judgment (ECF No. 41) should be denied. Defendants' Cross-Motion for Summary Judgment (ECF No. 50) should be granted. Defendant-Intervenor's Cross-Motion for Summary Judgment (ECF No. 51) should be granted.

PAGE 28 – FINDINGS & RECOMMENDATION

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

A party's failure to timely file objections to any of these findings will be considered a waiver of that party's right to de novo consideration of the factual issues addressed herein and will constitute a waiver of the party's right to review of the findings of fact in any order or judgment entered by a district judge. These Findings and Recommendation are not immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment.

DATED this _5th_ day of August, 2026.

　　　　　　　　　　　　　　　　　　_/s/Amy E. Potter_____
　　　　　　　　　　　　　　　　　　AMY E. POTTER
　　　　　　　　　　　　　　　　　　United States Magistrate Judge

PAGE 29 – FINDINGS & RECOMMENDATION