John S. Persell (OSB # 084400)
Juan Pablo San Emeterio (OSB # 224837)
Oregon Wild
5825 N Greeley Avenue
Portland, OR 97217
(503) 283-6343
jp@oregonwild.org
pablo@oregonwild.org

Erin E. Hogan-Freemole (OSB # 212850)
WildEarth Guardians
213 SW Ash Street, Suite 202
Portland, OR 97204
(971) 417-6851
ehoganfreemole@wildearthguardians.org

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

**EUGENE DIVISION**

| | |
|---|---|
| **OREGON WILD** and **WILDEARTH GUARDIANS**,<br><br>Plaintiffs,<br><br>v.<br><br>**DAVID WARNACK**, in his official capacity as Supervisor for Willamette National Forest; and **UNITED STATES FOREST SERVICE**,<br><br>Defendants,<br><br>and<br><br>**AMERICAN FOREST RESOURCE COUNCIL**,<br><br>Defendant-Intervenor. | Case No. 6:24-cv-949-AP<br><br>**PLAINTIFFS' OBJECTIONS TO THE MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATIONS**<br><br>Oral Argument Requested |

## TABLE OF CONTENTS


TABLE OF CONTENTS …………………………………………………………………….i

TABLE OF AUTHORITIES ………………………………………………………………iii

GLOSSARY OF TERMS ……………………………………………………………..………vi

INTRODUCTION ………………………………………………………………………..1

FACTUAL AND PROCEDURAL BACKGROUND ……………………………...…………2

STANDARD OF REVIEW ………………………………………………………………4

LEGAL BACKGROUND ………………………………………………………………..4

ARGUMENT ……………………………………………………………………………..7

I. The F&R erred by finding the Forest Service adequately evaluated a reasonable range of alternatives. ……………………………………………………...………7

A. The two action alternatives do not meaningfully differ regarding the inherent Conflict between existing suitable NSO habitat and degradation by logging. …...8

B. The Forest Service wrongly failed to consider Oregon Wild's proposed alternative. ………………………………………………………………………..9

II. The F&R erred by determining the Forest Service took a satisfactory "hard look" at the YRR Project's impacts on NSO, fire and fuels, and carbon and climate. ………..14

A. The F&R erred by concluding the Forest Service took a hard look at effects on the northern spotted owl. ……………………………………………………15

1. The Court cannot confine its review to the FEIS and 2019 Consultation. ……………………………………………………………16

2. The Forest Service was obligated to consider information from the 2023 Consultation and receives no deference for its decision not to do so. ...........................................................................................….18

3. The F&R erred in its description of the record and the Forest Service's decisionmaking process. ……………………………………...…20

B. The F&R erred by concluding the Forest Service took a hard look at fuels reduction and fire risk. …………………………………………………...…24

C. The F&R erred by concluding the Forest Service took a hard look at impacts to carbon storage and climate. …………………………………...……..28

CONCLUSION ………………………………………….…………………………………33

## TABLE OF AUTHORITIES

**Cases**

*350 Mont. v. Haaland*, 50 F.4th 1254 (9th Cir. 2022) ........ passim

*Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723 (9th Cir. 1995) ........ 7

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87 (1983) ........ 31

*Bark v. U.S. Forest Serv.*, 958 F.3d 865 (9th Cir. 2020) ........ 26, 28, 31

*Bennett v. Spear*, 520 U.S. 154 (1997) ........ 20

*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971) ........ 4, 6, 18

*City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142 (9th Cir. 1997) ........ 7

*City of Los Angeles v. Fed. Aviation Admin.*, 63 F.4th 835 (9th Cir. 2023) ........ 17, 23

*Ctr. for Biological Diversity v. U.S. Forest Serv.*, 687 F. Supp. 3d 1053 (D. Mont. 2023) ........ 28

*Ctr. for Biological Diversity v. U.S. Forest Serv.*, No. 23-2882, 2025 WL 586358 (9th Cir. Feb. 24, 2025) ........ 28

*Ctr. for Biological Diversity v. U.S. Forest Serv.*, No. 6:24-cv-930-AA, 2026 WL 2287946 (D. Or. Aug. 9, 2026) ........ 6, 10-11

*Earth Island Inst. v. Hogarth*, 492 F.3d 757 (9th Cir. 2007) ........ 6

*Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147 (9th Cir. 2006) ........ 15, 26-27

*Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010 (9th Cir. 2012) ........ 27, 28, 32

*Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850 (9th Cir. 2022) ........ 20

*Friends of the Clearwater v. Dombeck*, 222 F.3d 552 (9th Cir. 2000) ........ 20

*Friends of the Inyo v. U.S. Forest Serv.*, 103 F.4th 543 (9th Cir. 2024) ........ 6

*Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024 (9th Cir. 2008) ........ 7, 8-9

*Greater Yellowstone Coal. v. Servheen*, 665 F.3d 1015 (9th Cir. 2011) ........ 5

*Gulf v. Burgum*, 775 F. Supp. 3d 455 (D.D.C. 2025) ........................................ 23

*Headwaters, Inc. v. Bureau of Land Mgmt.*, 914 F.2d 1174 (9th Cir. 1990) ........................ 9

*Marsh v. Or. Nat. Res. Council*, 490 U.S. 360 (1989) ........................................ 4

*Motor Veh. Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ................ 4, 26, 30

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800 (9th Cir. 1999) .................. 7, 14

*N. Cascades Conservation Council v. U.S. Forest Serv*., 136 F.4th 816 (9th Cir. 2025) ... 5, 14, 30

*N. Plains Res. Council, Inc. v. Surface Transp. Bd*., 668 F.3d 1067 (9th Cir. 2011) .............22-23

*Native Ecosystems Council v. Marten*, 883 F.3d 783 (9th Cir. 2018) ................................ 22

*Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233 (9th Cir. 2005) .................. 5, 7, 8

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372 (9th Cir. 1998) ..............30-31

*Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092 (9th Cir. 2010) .................. 11, 20

*Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562 (9th Cir. 2016) ........................................ 27

*Or. Wild v. U.S. Forest Serv.,* 819 F. Supp. 3d 1185 (D. Or. 2026) ..................................3-4, 6

*Se. Alaska Conservation Council v. Fed. Hwy. Admin.*, 649 F.3d 1050 (9th Cir. 2011) .......... 9, 14

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168 (2025) ................................ passim

*W. Watersheds Project v. Bernhardt*, 543 F. Supp. 3d 958 (D. Idaho 2021) .......................... 9, 11

*WildEarth Guardians v. Bucknall*, 756 F. Supp. 3d 1017 (D. Mont. 2024) ............................ 23

*WildEarth Guardians v. Bureau of Land Mgmt.*,
457 F. Supp. 3d 880 (D. Mont. 2020) ........................................................ 9, 11, 14

*WildEarth Guardians v. USDA APHIS Wildlife Servs.*,
135 F.4th 717 (9th Cir. 2025) ........................................................ 15, 26, 29, 31

*Wilderness Soc'y v. U.S. Dep't of Interior*, No. 22-CV-1871,
2024 WL 1241906 (D.D.C. Mar. 22, 2024) ........................................................ 20, 23

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) .................................................... 15

**Statutes**

28 U.S.C. § 636(b)(1)(C) .................................................................................... 2, 4

42 U.S.C. § 4332(2) ....................................................................................... 5, 7, 8, 9

5 U.S.C. § 706(2)(A)........................................................................................... 4

**Regulations**

40 C.F.R. § 1502.9 ........................................................................ 6, 24, 27, 28, 32

40 C.F.R. § 1502.14 .......................................................................................... 6, 7

40 C.F.R. § 1503.4 ........................................................................ 6, 15, 24, 28, 32

50 C.F.R. § 402.12 ............................................................................................ 19

50 C.F.R. § 402.14 ............................................................................................ 19

**Other Authorities**

Fed. R. Civ. P. 72(b) ...................................................................................... 2, 4

## GLOSSARY OF TERMS

| | |
|---|---|
| 2019 BA | Biological Assessment for Timber Harvest and Routine Activities Likely to Adversely Affect Listed Species and Critical Habitat on the Columbia River Gorge National Scenic Area, Mt. Hood National Forest, Willamette National Forest, and the Northwest Oregon BLM District (Dec. 6, 2019) |
| 2019 BiOp | Biological Opinion for the Willamette National Forest Timber Harvest and Routine Activities (Dec. 30, 2019) |
| 2023 BA | 2023 Revised Biological Assessment for Timber Harvest and Routine Activities that are Likely to Adversely Affect Listed Species and Critical Habitat on the Columbia River Gorge National Scenic Area, Mt. Hood National Forest, Willamette National Forest, and the BLM Northwest Oregon District (April 11, 2023) |
| 2023 BiOp | Biological Opinion on Willamette National Forest Timber Harvest and Routine Activities (June 6, 2023) |
| APA | Administrative Procedure Act |
| BA | Biological Assessment |
| BiOp | Biological Opinion |
| CEQ | Council on Environmental Quality |
| DEIS | Youngs Rock Rigdon Project Draft Environmental Impact Statement |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FEIS | Youngs Rock Rigdon Project Final Environmental Impact Statement |
| Forest Service | Defendants David Warnack and the United States Forest Service |
| FWS | United States Fish and Wildlife Service |
| NEPA | National Environmental Policy Act |
| NSO | Northern spotted owl |
| Oregon Wild | Plaintiffs Oregon Wild and WildEarth Guardians |
| Project | Youngs Rock Rigdon Project |
| Suitable habitat | NSO nesting, roosting, and foraging habitat. Older stands with the structure, size, and adequate food sources to meet most or all life needs of NSO. |
| YRR | Youngs Rock Rigdon |

## INTRODUCTION

Located in the Willamette National Forest along the Middle Fork Willamette River, the Youngs Rock Rigdon Project ("YRR Project" or "Project") area is a diverse landscape, comprising both younger managed stands and mature or old-growth forest, with some stands up to 200 years in age. These stands provide habitat for the federally protected northern spotted owl ("NSO"), which is listed as "threatened" under the Endangered Species Act ("ESA"). Despite the species' bleak outlook, the YRR Project authorizes logging that will remove over 2,000 acres of suitable NSO habitat.

Throughout the administrative process and this suit, Plaintiffs Oregon Wild and WildEarth Guardians ("Oregon Wild") asked the Forest Service to consider feasible but less-destructive alternatives to the agency's all-or-nothing approach, and to take a genuinely hard look at the Project's impacts on NSO, wildfire risk, and carbon and climate. The Forest Service failed to do any of this, violating the National Environmental Policy Act's ("NEPA") long-standing requirements.

The Findings and Recommendations ("F&R"), ECF No. 66, reflexively grant deference to the Forest Service for fear of appearing to "micromanage." But in doing so the F&R fails to require what NEPA actually demands in an environmental impact statement ("EIS"): a rigorous exploration of alternatives and a genuine hard look at impacts. The F&R conspicuously ignores the express markers for what falls within the zone of reasonableness for these obligations. It repeatedly fails to point to any evidence that the Forest Service actually addressed Oregon Wild's comments and adverse science, but merely asserts that the agency did so. The F&R recommends an erosion of the statute's heightened standards for an EIS to below the level required for a more concise environmental assessment ("EA"), ignoring precedent and NEPA's text and congressional

purpose. Because it does not adhere to well-established principles derived from applicable regulations and binding case law, the Court should fully reject the F&R and instead grant Oregon Wild summary judgment on all claims.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b), Oregon Wild respectfully submits the following Objections to the F&R. Oregon Wild respectfully suggests that oral argument would be helpful in resolving these Objections.

## FACTUAL AND PROCEDURAL BACKGROUND

The entire YRR Project area covers approximately 33,000 acres in the Upper Middle Fork Willamette Watershed, and is located roughly 15 miles southeast of the town of Oakridge, Oregon. AR17975. Of these 33,000 acres, the Forest Service authorized about 6,500 acres for cutting and burning, including commercial thinning on 1,053 acres of older natural stands and 735 acres of managed stands, "regeneration harvest" on 453 acres of managed stands, and 7.5 miles of temporary road construction. AR22210-12. The Forest Service also authorized logging on 2,780 acres within mature and old-growth stands that range from 92 to 198 years old. AR17971, 17974, 18056-60. These stands provide suitable NSO habitat, yet the proposed logging would reduce canopy cover to about 28-34 percent,[1] entirely removing NSO habitat and precluding its development for the foreseeable future. AR18123-25, 18130 ("These effects are expected to last … for the foreseeable future in natural stands.").

Oregon Wild consistently supported many of the YRR Project's components, including floodplain and meadow restoration and the reintroduction of fire as a management tool. AR16139. However, throughout the Project's development and during all available administrative processes,

[1] The level of canopy reduction for these "thinning" units (down to 28%) is close to the reduction level (down to 21%) for regeneration logging that the Forest Service authorized on several hundred acres. AR18164.

Oregon Wild expressed alarm at the severity of the Project's impacts on NSOs and the older forest stands that both provide NSO habitat and store countless tons of carbon—impacts that were swept under the rug in the final EIS ("FEIS"). Oregon Wild brought several challenges based on the Forest Service's shoddy NEPA analysis: The Forest Service failed to evaluate a reasonable range of alternatives as required in an EIS, including a viable alternative suggested by Oregon Wild, and failed to take a "hard look" at the impacts of the Project on NSO, fuel reduction and fire risks, and carbon storage and emissions. *See* ECF No. 1 ¶¶ 142-64.

The Forest Service's decisionmaking process was fundamentally undermined by its failure to consider meaningfully different alternatives, particularly as they pertained to removal or degradation of NSO habitat. Either no action would be taken at all, or the same older stands would be subject to aggressive "thinning" that would render over 2,000 acres uninhabitable for NSO for the foreseeable future. *See* AR18124. While Alternatives 2 and 3 contain some differences in terms of the treatments' intensity, the F&R fails to recognize their virtually identical impact to NSO suitable habitat, which is what Oregon Wild challenges. Oregon Wild presented a viable "conservation alternative," a substantially different approach that would nonetheless address the Project's purpose and need, but the Forest Service wrongfully dismissed it without detailed consideration. The F&R errs in finding that the Forest Service satisfied its NEPA obligation concerning evaluation of a reasonable range of alternatives. Further, the Forest Service failed to take the "hard look" required under NEPA at impacts to NSO, wildfire risk, and carbon storage and emissions.

While the Forest Service is entitled to substantial deference for decisions that fall within a zone of reasonableness, such deference is not absolute; this Court must still make a careful, searching review under the arbitrary and capricious standard. *See Or. Wild v. U.S. Forest Serv.,*

819 F. Supp. 3d 1185, 1204 (D. Or. 2026) (citing *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 181-83 (2025)). The F&R errs in concluding that the Forest Service sufficiently met its burden under NEPA.

## STANDARD OF REVIEW

This Court reviews a magistrate judge's findings and recommendations *de novo*. 28 U.S.C. § 636(b)(1)(C). This Court "may accept, reject, or modify, in whole or in part, the findings and recommendations made by the magistrate judge," and "may also receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.*; *see also* Fed. R. Civ. P. 72(b)(3).

Oregon Wild's claims are reviewed under the Administrative Procedure Act ("APA"), which directs courts to hold unlawful and set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). Agency action is unlawful if it "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Veh. Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Although narrow, the court's inquiry must be "searching and careful," "thorough, probing, [and] in-depth" to determine if the agency based its decisions on consideration of relevant factors and articulated rational connections between the facts found and determinations made. *See id.*; *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377-78 (1989); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415-16 (1971).

## LEGAL BACKGROUND

NEPA requires federal agencies to prepare and disclose a "detailed" EIS describing the impacts of and alternatives to any major federal action which may "significantly affect[] the quality

of the human environment." 42 U.S.C. § 4332(2)(C). NEPA commands agencies to "undertake a full and fair analysis" of and a "hard look" at a proposed action's environmental consequences. *350 Mont. v. Haaland*, 50 F.4th 1254, 1265 (9th Cir. 2022). An agency must "make use of reliable data and resources," develop and analyze alternatives to address "unresolved conflicts," and ensure the "scientific integrity" of its analysis. 42 U.S.C. § 4332(2)(C)-(E) & (H).

In reviewing an agency's decision under NEPA, a court must "ensure that the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Greater Yellowstone Coal. v. Servheen*, 665 F.3d 1015, 1023 (9th Cir. 2011). The court's role "is to confirm that the agency has addressed environmental consequences and feasible alternatives as to the relevant project." *Seven Cnty.*, 605 U.S. at 180. In carrying out that role, a court should afford substantial deference to an agency's choices that fall within a "broad zone of reasonableness." *Id*. at 183. Whether an agency's decision falls within that zone, and consequently whether it warrants deference, is determined by NEPA's purpose and text, applicable regulations, case law, and the APA's arbitrary-and-capricious standard of review.

Under NEPA's statutory framework and Ninth Circuit precedent, an agency's obligations when "address[ing] environmental consequences and feasible alternatives" are heightened in an EIS compared to a more concise EA. *See N. Cascades Conservation Council v. U.S. Forest Serv.*, 136 F.4th 816, 829 (9th Cir. 2025) (an EIS requires "more detailed information than an EA"); *see also Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005) ("The rigor with which an agency must consider alternatives is greater when the agency determines that an EIS is required for a particular federal action") (citation omitted). The applicable regulations reiterate the agency's duty to "[r]igorously explore and objectively evaluate all reasonable alternatives," and to expressly respond to public comments, including responsible opposing

scientific viewpoints, in the EIS. 40 C.F.R. §§ 1502.9(b), 1502.14(a), & 1503.4(a) (2019).[2] In sum, an agency must grapple with relevant facts, alternatives, public comments, and opposing scientific viewpoints in a detailed, meaningful way in an EIS.

While *Seven County* emphasized substantial deference to agency actions, deference is not absolute. *See* 605 U.S. at 183. No deference is owed "when the agency's decision is without substantial basis in fact," *Earth Island Inst. v. Hogarth*, 492 F.3d 757, 766 (9th Cir. 2007), or not "fully informed and well-considered." *Friends of the Inyo v. U.S. Forest Serv.*, 103 F.4th 543, 551 (9th Cir. 2024). "*Seven County* does not grant an agency discretion to forgo NEPA requirements, nor does it displace arbitrary and capricious review." *Or. Wild*, 819 F. Supp. 3d at 1204; *see also Ctr. for Biological Diversity v. U.S. Forest Serv.*, No. 6:24-cv-930-AA, 2026 WL 2287946, at *20 (D. Or. Aug. 9, 2026) ("*Seven County* did not grant an agency discretion to forego reasoned analysis, nor did it exclude NEPA-related agency decisions from APA review. *Seven County* reaffirms that agency decision-making must be 'reasonable and reasonably explained.'") (citation omitted). Under arbitrary-and-capricious review, a court's duty remains to undertake a "searching and careful," "thorough, probing, [and] in-depth review" when determining whether an agency satisfied its statutory obligations. *See Or. Wild*, 819 F. Supp. 3d at 1196; *see also Volpe*, 401 U.S. at 415-16.

[2] The Forest Service developed and authorized the YRR Project using the regulations promulgated by the Council on Environmental Quality ("CEQ"), previously codified at 40 C.F.R. Parts 1500-1508 (2019). AR17984. Along with the statute's purpose and text and the relevant case law, these regulations govern whether the agency complied with NEPA. These Objections will cite to the 2019 version of the CEQ regulations, available here.

## ARGUMENT

**I. The F&R erred by finding the Forest Service adequately evaluated a reasonable range of alternatives.**

The consideration of alternatives to a proposed action is the "heart" of NEPA. 40 C.F.R. § 1502.14. The Forest Service was required, but failed, to consider "a reasonable range of alternatives to the proposed agency action … that are technically and economically feasible, and meet the purpose and need of the proposal." 42 U.S.C. § 4332(2)(C)(iii); *see also* 40 C.F.R. § 1502.14(a) (an agency must "[r]igorously explore and objectively evaluate all reasonable alternatives."). This "rigorous" standard is at its highest when an agency prepares an EIS. *See Native Ecosystems Council*, 428 F.3d at 1246. An agency fails to consider an adequate range of alternatives when the proposed alternatives are "virtually indistinguishable from each other" and impede the agency making "a real, informed choice." *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1038-39 (9th Cir. 2008); *see also Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813 (9th Cir. 1999) ("The EIS considered only a no action alternative along with two virtually identical alternatives.").

An EIS "need not consider an infinite range of alternatives, only reasonable or feasible ones." *City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997). But under the "rule of reason," "[t]he existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 729 (9th Cir. 1995). "An agency must look at every reasonable alternative, with the range dictated by the nature and scope of the proposed action, and sufficient to permit a reasoned choice." *Id.*

**A. The two action alternatives do not meaningfully differ regarding the inherent conflict between existing suitable NSO habitat and degradation by logging.**

Here, the Forest Service proposed a no-action alternative and two action alternatives, Alternatives 2 and 3, that are "virtually identical" in terms of impacts to acres of existing habitat for NSO. The same exact 2,799 acres of NSO suitable habitat and 1,464 acres of dispersal habitat would be removed or degraded; the only difference is that Alternative 3 would entirely *remove* slightly less suitable NSO habitat, but still degrade that habitat to the lowest possible level at which it could still nominally be deemed "maintained." *See* AR18124.

The F&R erred by concluding the Forest Service evaluated a reasonable range of alternatives. The F&R focuses solely on the acreage of commercial versus noncommercial treatments while ignoring that the same NSO habitat acres will be degraded regardless. F&R at 12-13. The F&R determined that there are "meaningful differences" between the two action alternatives because Alternative 2 "involves more aggressive action" and "[t]he two plans involve significant differences in the acres thinned and ultimate board feet obtained." F&R at 12. But NEPA mandates agencies to consider the *environmental impacts* of their actions, not the commercial output. *See* 42 U.S.C. § 4332(2)(C); *Native Ecosystems Council*, 428 F.3d at 1248 ("[A] commercial component does not affect the project's design because the project focuses on fuels reduction and not on profitability."). The *impact* on NSO habitat is virtually identical for each action alternative, which the F&R did not address.

The F&R also wrongly relies on *Kempthorne* to support its conclusion. F&R at 12 (citing 520 F.3d at 1038). *Kempthorne* supports Oregon Wild's argument here. There, the Ninth Circuit determined that slight differences in maximum use levels and annual visitation limits of a wild and scenic river were *not* sufficiently varied to satisfy NEPA because the federal agency only considered alternatives that "start[ed] with levels of use consistent with current use levels." 520

F.3d at 1039. This precluded the agency from making "a real, informed choice." *Id.* Here, too, impacts to NSO habitat will be virtually identical under both action alternatives, with only slight differences in the degree of degradation on some of the acres. The Forest Service unreasonably failed to rigorously explore or objectively evaluate *other* alternatives that would target fewer or no NSO suitable habitat acres.[3] This did not allow for a real, informed choice, in violation of NEPA. *See id.*; *see also* 42 U.S.C. § 4332(2)(C)(iii).

**B. The Forest Service wrongly failed to consider Oregon Wild's proposed alternative.**

NEPA requires the consideration of alternatives, including those suggested by the public, that are viable (consistent with the project's purpose and need) and "significantly distinguishable" from the agency's identified alternatives. *Se. Alaska Conservation Council v. Fed. Hwy. Admin.*, 649 F.3d 1050, 1056 (9th Cir. 2011); *Headwaters, Inc. v. Bureau of Land Mgmt.*, 914 F.2d 1174, 1180 (9th Cir. 1990). If an agency rejects a suggested alternative, it must explain why the alternative is not significantly distinguishable or viable and may not merely proffer conclusory statements. *See WildEarth Guardians v. Bureau of Land Mgmt.*, 457 F. Supp. 3d 880, 891 (D. Mont. 2020) (agency's response lacked substantive explanation why proposed alternative was not viable).

[3] Two additional alternatives identified but eliminated from detailed consideration included an alternative with no temporary road construction and another with no commercial logging, each dismissed for economic infeasibility. AR18010-11. A third eliminated alternative contemplated more aggressive treatment across a larger area. *Id.* No alternatives meaningfully considered a smaller project footprint, or at the very least, adversely impacting fewer NSO suitable habitat acres. The range of alternatives the Forest Service presented treated the same exact acres (and same 2,799 NSO suitable habitat acres) or nothing. AR17971; AR18124; *see W. Watersheds Project v. Bernhardt*, 543 F. Supp. 3d 958, 983 (D. Idaho 2021) (rejecting EA's analysis of only a proposed action alternative and no-action alternative because the "all-or-nothing approach" ignored an intermediary alternative).

Oregon Wild's comments asked the Forest Service to identify and harmonize trade-offs when it identified action alternatives. AR16324 (asking the agency to "develop a full range of alternatives that resolve trade-offs in different ways … [s]uch as open forest vs closed canopy habitat, roads and logging volume vs snag habitat, carbon storage, etc."). To that end, Oregon Wild suggested a significantly distinguishable and viable alternative that advanced the project's purpose and need while treating a smaller area. AR14515; AR16320. The proposed alternative emphasized the conservation of large trees and those with old-growth characteristics while identifying ways to reduce treatment costs. AR16324-26; AR19388-90. Oregon Wild urged the Forest Service to concentrate treatment efforts on plantations and drier areas rather than moist mature forests, and to limit commercial logging to areas where the agency can ensure that desired conditions can be sustained in the long term with prescribed fire, reducing wildfire risk and lowering future maintenance costs. AR14515. Oregon Wild further suggested focusing logging efforts near current roads to avoid the need for temporary roads, which are costly to construct and decommission and, although "temporary" in use, have long-lasting effects on soil and wildlife. AR16325; AR16339.

Oregon Wild respectfully objects to the F&R's conclusion that the Forest Service satisfied its obligation to consider Oregon Wild's proposed alternative. The F&R fails to grapple with the heightened standard for identifying and evaluating alternatives in an EIS and an agency's obligation to explain why alternatives are not viable. The F&R deemed the Forest Service's range of alternatives reasonable based on a maximalist reading of *Seven County*. F&R at 12-15 (citing 605 U.S. at 173). According to the F&R, "it is clear that [the Forest Service's] ultimate decision would have remained the same" regardless of whether it considered more alternatives (including Oregon Wild's). F&R at 15. Yet "*Seven County* did not grant an agency discretion to forgo reasoned analysis, nor did it exclude NEPA-related agency decisions from APA review." *Ctr. for*

*Biological Diversity*, 2026 WL 2287946, at *20. Courts should defer to an agency's reasoned determination of feasible alternatives, but if the agency has not explained why a proposed alternative is infeasible, there is nothing to which a court can defer. *See Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1121 (9th Cir. 2010) (court "cannot defer to a void.").

The F&R wrongly asserted that the Forest Service adequately responded to Oregon Wild's comments across 19 pages of an FEIS. F&R at 13 (citing AR18411-29). However, those "responses" merely reiterated why the Forest Service believed its *own* action alternatives meet the Project's purpose and need, rather than demonstrating why Oregon Wild's suggested alternative was not viable.[4] *See* AR18411-29; *see also W. Watersheds Project*, 543 F. Supp. 3d at 983 ("[T]he Court takes no issue with the amount of detail that BLM provided here in rejecting Plaintiffs' proposed alternative; instead, it takes issue with the substance of those responses and finds it lacking.").

The Project's purpose and need statement does not establish acreage targets or minimums for treatment, nor does it specify a degree to which treatments must modify conditions. AR17976-82. The purposes and needs for the YRR Project are to 1) improve stand and landscape diversity, structure, and resiliency; 2) strategically reduce hazardous fuels; 3) sustainably manage the existing trail system and dispersed recreation; 4) identify a sustainable road system; and 5) provide a sustainable supply of forest products. AR17976-82. The Forest Service's aims are broadly stated,

[4] The assertion that "[t]hinning is designed to reduce stand densities, retain and release older trees, and shift composition toward fire- and drought tolerant tree species," citing to page 95 of the draft EIS, appears 6 times in those 19 pages of "responses." AR18413-15, AR18419-20, AR18429. The F&R, in turn, cites the same passage twice in concluding that the Forest Service adequately explained both why it was thinning outside mixed conifer forests and why commercial logging could not be further scaled back. F&R at 14, 25. But mere repetition of this conclusory statement is not enough to satisfy NEPA. *See W. Watersheds Project*, 543 F. Supp. 3d at 984 ("BLM cannot satisfy NEPA without some explanation beyond the conclusory one that it provided[.]")) (quoting *WildEarth Guardians*, 457 F. Supp. 3d at 891).

and Oregon Wild's suggestions align with and advance each of these components. *See* ECF No. 52 at 8-9.

The F&R erred by adopting a constrained reading of the Project's purpose and need that simply is not found within the text. The F&R accepts without scrutiny statements by the Forest Service that neither respond to Oregon Wild's suggestions nor explain why they warranted no further consideration. For example, the Forest Service never explained why more targeted treatments that "deprioritize" stands with few or no pines and oaks would not still adequately "reduce stand densities, retain and release older trees, and begin to shift composition toward fire- and drought-tolerant species[.]" AR18414. Despite the Forest Service's failure to provide a reasoned explanation, the F&R accepts its "response" as adequate. F&R at 14 (citing AR18414).

Similarly, the F&R deemed Oregon Wild's suggestion of "scaled back logging" to also be inconsistent with the purpose and need. F&R at 14 (citing AR18420). But in the response cited, the Forest Service merely restates that thinning is proposed to meet the purpose and need, not that more limited logging is inherently *inconsistent* with and would not still advance its components. AR18420. The F&R again erred by conflating Oregon Wild's request to retain more large, older trees through a 24-inch diameter limit with the Forest Service's less-protective commitment to retain only "legacy trees" averaging 30 inches. F&R at 14 (citing AR18421). The Forest Service never explained why Oregon Wild's more-protective diameter limit warranted no further consideration, let alone why it would not still serve the Project's purpose and need. AR18421.

The F&R yet again erred regarding Oregon Wild's request to prioritize NSO habitat protection. The F&R asserts that the Forest Service "noted [prioritization of NSO habitat] is inconsistent with the project's goal to 'provide habitat needs for a full range of forest associated species.'" F&R at 14 (citing AR18424). First, the Forest Service merely stated that "provid[ing]

habitat needs for a full range of forest associated species" is one of the Project goals, not that NSO habitat prioritization is *inconsistent* with that goal. AR18424. Second, absent from this "response" is any reasoned explanation why the two are mutually exclusive—why can the Forest Service not *both* prioritize NSO habitat and still provide for the habitat needs of other species that are *not* listed under the ESA? The agency does not say. *See id.*

Next, regarding Oregon Wild's request that the Forest Service retain more trees per acre, the Forest Service again failed to explain why doing so would not still "improve stand and landscape diversity, structure, and resiliency," "strategically reduce hazardous fuels," or "provide a sustainable supply of forest products," even if to different degrees than the agency's proposed alternatives. AR18423. Instead, the Forest Service conceded that retention levels were pre-determined based on "stand examination data" and considerations from a nearby logging project rather than necessitated by purpose and need. *Id.* Again, the Forest Service failed to provide a reasoned explanation why Oregon Wild's suggestion merited no further consideration, and again, the F&R wrongly accepted the agency's conclusory "response" without question. F&R at 14-15 (citing AR18423).

Finally, the F&R wrongly implied that Oregon Wild's alternative is not viable because Oregon Wild also proposed adjusting the Project's purpose and need. F&R at 15 (citing AR18417). Proposing suggestions regarding the purpose and need elsewhere in its comments does not render Oregon Wild's proposed alternative unviable or relieve the Forest Service of its obligation to give it due consideration. The F&R then incorrectly suggested that Oregon Wild merely challenged the Forest Service's failure to address its proposed alternative in the main body of the FEIS rather than in an appendix. F&R at 15. But the relevant section's location within the FEIS is not the issue and never has been.

The issue is that nowhere in Appendix K nor elsewhere in the FEIS did the Forest Service ever assert that Oregon Wild's suggested alternative was not "viable," nor could it. By failing to "examine" Oregon Wild's "viable and reasonable alternative" and by failing to provide "adequate justification for its omission," the Forest Service shirked its NEPA obligations under the rigorous standard required for an EIS. *Se. Alaska Conservation Council*, 649 F.3d at 1059; *see also WildEarth Guardians*, 457 F. Supp. 3d at 891 ("[A]gencies ha[ve] failed to satisfy NEPA's alternatives requirement where the agency provided an inadequate explanation for not considering the proposed alternative[.]") (citing *Muckleshoot Indian Tribe*, 177 F.3d at 813). In sum, based on specious reasoning and mischaracterizations of Oregon Wild's claim, the F&R wrongly deemed the Forest Service's conclusory and repetitive statements to sufficiently explain the agency's failure to consider Oregon Wild's proposed alternative. The Court should reject the F&R's conclusions and should grant Oregon Wild summary judgment on this claim.

## II. The F&R erred in determining the Forest Service took a satisfactory "hard look" at the YRR Project's impacts on NSO, fire and fuels, and carbon and climate.

Under NEPA, agencies must take a "hard look at environmental consequences of their proposed actions." *350 Mont.*, 50 F.4th at 1265 (citation modified). This "hard look" must be "full and fair," and an agency runs afoul of the hard look requirement if it does not provide "a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Id.* (citation omitted). Although courts should not "micromanage" an agency's "choices about the depth and breadth of its inquiry—and also about the length, content, and level of detail of the resulting EIS"—those choices must fall within the "zone of reasonableness." *Seven Cnty.*, 605 U.S. at 183.

The scope of "reasonableness" is context-dependent; in an EIS, the hard-look requirement is at its most demanding. *See N. Cascades Conservation Council*, 136 F.4th at 829 (EIS "requires

more detailed information than an" EA). It is unreasonable for an agency to fail to "assess and consider comments … [and] stat[e] its response in the [FEIS]," 40 C.F.R. § 1503.4(a), which "must respond explicitly and directly to conflicting views[.]" *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1172 (9th Cir. 2006), *abrogated on other grounds by Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008). If the agency declines to make changes in response to public comments, it is unreasonable for the agency to fail to explain why the opposing views did not merit a revision and why it chose not to engage with contrary scientific evidence. *See WildEarth Guardians v. USDA APHIS Wildlife Servs.* ("*APHIS*"), 135 F.4th 717, 737-38 (9th Cir. 2025).

**A. The F&R erred by concluding the Forest Service took a hard look at effects on the northern spotted owl.**

As Oregon Wild has explained, the Forest Service ignored inconvenient data from its own experts showing that the Project would have more significant impacts on NSO than discussed in the FEIS. *See* ECF No. 41 at 18-24, 27-79; ECF No. 52 at 11-17. In excusing the Forest Service's NEPA violations, the F&R first focused on the amount of NSO habitat within the 33,000-acre project area that would be removed or modified/degraded. F&R at 17. Comparing these figures to the much larger project area conveniently masks the severity of the Project's impacts in the stands where treatments will actually occur, and the F&R never grappled with the Forest Service's failure to include the information necessary to actually evaluate and disclose those impacts. *See* AR18123-30.[5] The FEIS glibly predicted that NSO will "continue to be viable" in the expansive 100,000-acre Rigdon area, despite the YRR Project's "likely" adverse effects on NSO. AR18130; F&R at 18. But what does removal of 2,799 acres of existing suitable habitat along the Middle

[5] The FEIS does not disclose where suitable and dispersal NSO habitat is located in relation to proposed treatment areas, it only indicates where designated critical habitat is located within the area. *See* AR18009.

Fork corridor mean for the recovery of the species and the integrity of the critical habitat unit in light of the rapid, range-wide decreases in both NSO population and barred owl-free habitat? Neither the FEIS nor the F&R say. *See* F&R at 17-19; *see also* AR18124; AR18648 (accelerated rates of population declines since 2014 meta-analysis); AR22507 (importance of retaining unoccupied NSO suitable habitat in light of barred owl competition); AR27741 ("All territories evaluated are assumed to have barred owls present.").

The F&R also omits or misstates several crucial points, beginning with the nature of Oregon Wild's "hard look" argument, which the Forest Service has successfully misrepresented as a "significant new information" claim. But the relevant, updated information was not new—it was before the agency while it developed the Project. The Forest Service admitted that the older documents on which it relied were inaccurate and outdated. But the Forest Service refused to consider its own experts' most recent analyses and incorporate them into the FEIS. This willful ignorance does not constitute a "hard look" at impacts on the NSO, and this Court owes no deference to the agency's choice to *ignore* its own experts' scientific and technical determinations. It must instead review the Forest Service's decision based on the entire administrative record.

**1. The Court cannot confine its review to the FEIS and 2019 Consultation.**

Since 2021, the Forest Service had known that the 2019 programmatic consultation[6] no longer reflected conditions on the ground and did not accurately capture the status of the NSO and the impacts of activities such as the Project. *See* AR19621-22. Yet the agency chose to rely entirely

[6] U.S. Forest Serv. & U.S. Bur. Land Mgmt., *Biological Assessment for Timber Harvest and Routine Activities that are Likely to Adversely Affect Listed Species and Critical Habitat on the Columbia River Gorge National Scenic Area, Mt. Hood National Forest, Willamette National Forest, and the Northwest Oregon BLM District* (Dec. 13, 2019), AR15209-748 ("2019 BA"); U.S. Fish & Wildlife Serv., *Biological Opinion for the Willamette National Forest Timber Harvest and Routine Activities* (Dec. 30, 2019), AR14849-953 ("2019 BiOp") (collectively, "2019 Consultation").

on the outdated 2019 Consultation for its NSO analysis. *See* AR18123-30. The Forest Service and the Intervenor replicated this error in their briefing, focusing almost exclusively on the 2019 Consultation and ignoring the agencies' subsequent conclusion that this analysis was invalid. *See* ECF No. 50 at 17-23; ECF No. 51 at 20-24. The F&R, in turn, adopted this artificially narrow scope, analyzing the contents of the FEIS and the 2019 Consultation it incorporates rather than considering the entire administrative record, which significantly undercuts the Forest Service's conclusions. *See* F&R at 18-19.

The Forest Service defended its cursory treatment of NSO in the FEIS on grounds that it "incorporates the 2019 BA," which the F&R concluded "gives a meaningful analysis of potential impacts to the NSO." F&R at 18-19.[7] Oregon Wild never argued that the 2019 Consultation was not incorporated into the FEIS or that it did not mention "logging, thinning treatments, and … competition between barred and spotted owls." *Id.* at 19. The issue is not whether the Forest Service looked at the 2019 Consultation. It is whether the 2019 Consultation contained the *accurate* information needed for a meaningful impacts analysis. *See* ECF No. 52 at 12-20; *contra* F&R at 18-19. It did not.

Because the Forest Service knew that it was outdated and inaccurate, relying on the 2019 Consultation was arbitrary. *See City of Los Angeles v. Fed. Aviation Admin*., 63 F.4th 835, 849-50

[7] The Forest Service implied that the 2023 Consultation was essentially the 2019 Consultation plus a discussion of recent wildfires. Not so. The 2023 Consultation also included new or revised information on habitat requirements; population estimates; conservation recommendations; barred owls and removal programs; nonterritorial owls; current levels of suitable, dispersal, and critical habitat; climate change; mandatory project design features; reporting and consultation requirements; future habitat projections; allowable levels of logging and thinning, both Forest-wide and in the relevant critical habitat unit; and the species' overall outlook (which is grim). *See* ECF No. 52 at 15-17; *see also*, *e.g.*, AR14993-97; AR15047, 15064-65, 15072-73; AR15223-24, 15239-42, 15303-08, 15415, 15422-25; AR17621-743, 17823-952; AR18525-31, 18554-57, 18568, 18610, 18620-27, 18641-48; AR18657-80, 18798-828, 18830-35, 18840-43, 18860, 19229-314; AR19628-38, 19645-52, 19668, 19723, 19730-31, 19743-49.

(9th Cir. 2023); *contra* F&R at 18-19. To correct these errors, the Court must look at the updated data and analyses, which should have been but were not disclosed and considered in the FEIS. *See Volpe*, 401 U.S. at 420 ("[Judicial] review is to be based on the full administrative record that was before the Secretary[.]").

**2. The Forest Service was obligated to consider information from the 2023 Consultation, and receives no deference for its decision not to do so.**

The Forest Service misstated Oregon Wild's argument, the facts, and the law in several related ways. It persistently conflated the 2023 Biological Opinion ("2023 BiOp")[8] with the information on which it was based, confusing Oregon Wild's "hard look" claim with a phantom "significant new information" claim. *Compare* ECF No. 50 at 24-25; ECF No. 51 at 25-26; ECF No. 55 at 9 n.1; ECF No. 58 at 11-17 *with* ECF No. 1 ¶¶ 162-64; ECF No. 41 at 23-27; ECF No. 52 at 11-20. The F&R echoes this confusion, describing the process for deciding whether a supplemental EIS is needed to address new information. *See* F&R at 21. But the relevant information was not "new" and thus should have appeared in the existing EIS.

The F&R's explanation is belied by the agency's role in the ESA consultation process, which entails a lengthy back-and-forth between the action agency and, as relevant here, the U.S. Fish and Wildlife Service ("FWS"). The action agency is primarily responsible for gathering and analyzing information and making the initial assessment of how its proposal will impact listed species. It first prepares a biological assessment ("BA") to "evaluate the potential effects of the

---

[8] U.S. Fish & Wildlife Serv., *Biological Opinion on Willamette National Forest Timber Harvest and Routine Activities* (June 6, 2023), AR19613-841; *see also* U.S. Forest Serv. & U.S. Bur. Land Mgmt., *2023 Revised Biological Assessment for Timber Harvest and Routine Activities that are Likely to Adversely Affect Listed Species and Critical Habitat on the Columbia River Gorge National Scenic Area, Mt. Hood National Forest, Willamette National Forest, and the BLM Northwest Oregon District* (Feb. 15, 2023) ("2023 BA"), AR17139-952 (collectively, "2023 Consultation").

[proposed agency] action" on protected species. 50 C.F.R. § 402.12(a). The BA must contain "the best scientific and commercial data available or which can be obtained" in its "analysis of the effects of the action on the species and habitat, including consideration of cumulative effects[.]" *Id.* §§ 402.12(f); 402.14(d). The action agency then shares the BA with FWS, which often returns it with feedback at least once before formal consultation is initiated. *See id.* § 402.12(j); *see also* AR19621-22 (describing 2023 Consultation timeline). FWS will then review the BA and, based on "all relevant information provided by the [action] agency or otherwise available," prepare a biological opinion ("BiOp") stating whether the action will jeopardize the species. *Id.* § 402.14(g). Consequently, the action agency—here, the Forest Service—generally has the relevant data months or years before the BiOp issues.

The Forest Service first met with FWS in April of 2021 to determine whether the 2019 Consultation was still valid. AR19621-22. The Forest Service spent the next two years gathering and analyzing the data that eventually appeared in the 2023 BA and BiOp. *See id.*; *see also* AR17139-952; AR18510-19344; AR19613-841; ECF No. 52 at 12-13. The Forest Service cannot plausibly claim that it did not have this information until it received the 2023 BiOp, because the 2023 BiOp was based on the data provided by the Forest Service.

The Forest Service's arguments largely depend on the Court misunderstanding this basic point. Its briefing treats the 2023 Consultation like a last-minute development in which it had no part. The Forest Service suggested that when the 2023 BiOp was issued, the agency properly considered it as "new information" and "ultimately determined it did not need to prepare an updated EIS" because the 2020 wildfires "did not occur within the affected area," which the F&R characterizes as a "policy decision which is entitled to deference." F&R at 21. But the question is not whether publication of the 2023 BiOp should have triggered a supplemental EIS, which would

not have been a "policy decision" in any case.[9] *Contra* F&R at 21. The question is what information the Forest Service should have used in its original analysis. The F&R reviewed the wrong agency decision under the wrong standard.

The Forest Service receives substantial deference for its predictive and scientific judgments and its choice of methodology. *See Or. Nat. Desert Ass'n*, 625 F.3d at 1121. The Forest Service exercised its expertise and made those judgments by determining that the 2019 Consultation was outdated and by collecting and analyzing the information presented in the 2023 Consultation. *See* AR19621-22. The Court should defer to the technical determinations made during this process. But the agency merits no deference for its decision to *ignore* its own scientific conclusions and instead rely on an analysis it had acknowledged was invalid. *See Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 882 (9th Cir. 2022) (agency may not rely on "flawed assumptions"); *Wilderness Soc'y v. U.S. Dep't of Interior*, No. 22-CV-1871, 2024 WL 1241906, at *15-18 (D.D.C. Mar. 22, 2024) (agency could not rely on programmatic analysis it had concluded was invalid).

**3. The F&R erred in its description of the record and the Forest Service's decisionmaking process.**

The Forest Service's improper decision had consequences. As Oregon Wild has explained, the omission of current, accurate information led the agency to design and choose a course of action that did not comply with the ESA. *See* ECF No. 52 at 16-17. The F&R brushed this aside,

---

[9] Rather, an agency must make a "reasoned determination" whether new information is "of such significance as to require [a supplemental EIS]." *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 558-59 (9th Cir. 2000). Unlike with a policy choice, the reviewing court must then determine, with reference to the record, whether this decision was reasonable and supported by substantial evidence. Whether information is significant, and whether an agency must comply with NEPA, are not "policy decisions." *See Bennett v. Spear*, 520 U.S. 154, 172 (1997) ("[D]iscretion as to the substance of the ultimate decision does not confer discretion to ignore the required procedures of decisionmaking.").

but in doing so it misstated the record. *See* F&R at 20-21.

Despite its possession of updated, accurate information, the Forest Service did not revisit its analysis of NSOs, nor change its proposed action, between the release of the draft EIS ("DEIS") in 2021 and the FEIS in 2023. *See* ECF No. 52 at 13; AR18390. As a result, the Project as analyzed and described to the public in the FEIS and adopted in the draft decision did not reflect the new conditions on the Forest, the best science regarding NSOs, or the current status and trajectory of the species.

To ameliorate Oregon Wild's concerns on this point, the Forest Service committed to "provid[ing] updated information regarding the conclusion of the [ESA] consultation process and issuance of a final Biological Opinion and project review," as required under the 2023 Consultation, in the final Record of Decision ("ROD"). AR21225. As the F&R tells it, the Forest Service "perform[ed] a consistency review after the 2023 BA was released" which incorporated new information from the 2023 Consultation, and "[u]ltimately, Defendants found that the proposed treatments are consistent with all [requirements] of the 2023 Revised Biological Assessment … and associated Biological Opinion." F&R 19-20 (quoting AR 27737) (cleaned up). This is incorrect.

FWS, not the Forest Service, conducted the consistency review. *See* AR27734. FWS ultimately concluded that the treatments proposed by the FEIS and draft ROD were *not* consistent with the requirements of the 2023 Consultation.[10] *See* AR27737-38, 27755. As FWS put it, the amount of proposed NSO habitat removal did not "pass[] the red face test, not given the current

[10] FWS's consistency review, which postdated the FEIS, arguably constituted significant new information that might have warranted supplemental analysis. *See* AR27734. But despite its earlier commitment to provide updated information (AR21225), the Forest Service concealed the results until long after this lawsuit was filed, finally including them in its second installment of the administrative record. ECF No. 26 (Dec. 23, 2024).

status of NSO individuals and populations with stress and reduced foraging due to barred owl competition." AR27755.

In response, the Forest Service authorized a "modified version" of its chosen alternative which "drop[ped] commercial [timber] harvest treatments that would remove suitable habitat from occupied [NSO] home ranges." AR22210, 22233. This "remove[d] an estimated 500 acres of natural and managed stands from harvest… Instead, non-commercial treatment that would maintain suitable habitat would be conducted on about 180 of these acres[.]" AR22233. The agency did not disclose the basis for this decision in its objection resolution or in the final ROD, nor did it update its NSO analysis beyond stating that the 2023 Consultation was complete and noting the change in NSO habitat on the Willamette National Forest from the 2021 and 2022 fires. AR22224-25, 22229.

In short, having previously refused to incorporate its own updated data in the FEIS, Project design, or draft decision, the Forest Service significantly altered the Project at the last minute between the draft and final ROD. The F&R describes this as the agency's decision to "adopt[] a modified version of Alternative 2 that included treatment on 366 acres to maintain NSO habitat, which reflects a willingness to review and consider all information." F&R at 21. Oregon Wild respectfully disagrees with this characterization.

The Forest Service did not incorporate updated information and findings into its NEPA analysis "as available" or "to the best of [its] ability." *Contra* F&R at 19, 21. Rather, the agency actively chose to ignore its own data and rely instead on inaccurate and invalid prior analyses. This violated NEPA. *See Native Ecosystems Council v. Marten*, 883 F.3d 783, 795 (9th Cir. 2018) ("[T]he data the Forest Service provides to the public to substantiate its analysis and conclusions must also be accurate."); *see also N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d

1067, 1086-87 (9th Cir. 2011) ("faulty reliance" on stale data "does not constitute the 'hard look' required under NEPA"); *WildEarth Guardians v. Bucknall*, 756 F. Supp. 3d 1017, 1035-36 (D. Mont. 2024) (EA's reliance on outdated BiOp violated NEPA); *Wilderness Soc'y*, 2024 WL 1241906, at *15-18.

The F&R acknowledges that "the hard look standard is not satisfied when an agency relies 'on incorrect assumptions or data in an EIS.'" F&R at 19 (quoting *City of Los Angeles*, 63 F.4th at 849-50). This well-established rule did not create "a no-win situation for Defendants" here. *Contra* F&R at 19. The Forest Service already had the updated information on which the 2023 Consultation was based. *See supra* at 19; *see also* ECF No. 52 at 11-15. As Oregon Wild explained, it was therefore incumbent upon the agency to disclose and consider that information in the FEIS—which, after all, is where an agency's NEPA analysis is generally found. *See* ECF No. 41 at 26-27 (agency must "independently provide[] a full, accurate, and up-to-date NSO analysis in the FEIS" because it could not rely on the 2019 or 2023 BiOps). The Forest Service was not relieved of its NEPA obligations simply because it could not rely on preexisting documents. *Cf. Gulf v. Burgum*, 775 F. Supp. 3d 455, 481 (D.D.C. 2025) ("The mere fact that BOEM lacked data compatible with its chosen model does not mean BOEM lacked data suitable for purposes of an emissions analysis. Nor does it demonstrate BOEM's inability to reasonably obtain such information.").

The F&R states that "Plaintiffs have failed to identify any adverse expert opinion that is not disclosed or analyzed." F&R at 23. But the Forest Service neither disclosed nor analyzed the information its own experts had been gathering since 2021. As Oregon Wild flagged in its comments and objection, the agency failed to conduct a thorough review, instead relying on information it knew to be inaccurate and outdated. *See* AR16326-28; AR19366-79, 19410-11. And as a result, the FEIS described, and the draft decision adopted, a project proposal that violated the

ESA. *See* AR27755 (FWS stating amount of NSO habitat removal fails red-face test); *see also* AR22233 (dropping removal of NSO suitable habitat in occupied home ranges to comply with 2023 Consultation). FWS's last-minute intervention did not remedy the Forest Service's NEPA violations. But it does demonstrate that proper analysis based on complete and accurate information can indeed "change the ultimate decision." *Contra* F&R at 28; *see infra* at 33. The Court should reject the F&R's conclusion and grant Oregon Wild summary judgment on this claim.

**B. The F&R erred by concluding the Forest Service took a hard look at fuels reduction and fire risk.**

A key part of an agency's "hard look" obligation is the requirement to expressly respond to public comments, including responsible opposing scientific viewpoints, in an EIS. 40 C.F.R. §§ 1502.9(b), 1503.4(a). Oregon Wild brought to the Forest Service's attention that "[s]ignificant reduction of canopy cover can increase fire hazard by making the stand hotter/dryer/windier, generating more hazardous slash, [and] stimulating the growth of future surface and ladder fuels." AR16331; *see also* ECF No. 41 at 29. This risk of increased fire intensity is a "probable environmental consequence[]" of the Project that warranted "reasonably thorough consideration" by the Forest Service. *350 Mont.*, 50 F.4th at 1265.

Here, though, the Forest Service entirely failed to respond to Oregon Wild's comments that reduced canopy cover can increase wildfire intensity due to increased heat, aridity, and wind. AR16331. While conceding that Oregon Wild cited to relevant scientific studies, the F&R fails to point to anywhere in the record where the Forest Service reckoned with Oregon Wild's heat/aridity/wind concern—and indeed, the record lacks any adequate response. *See* F&R at 24-25; AR18079-82 (Project's effects on fireshed conditions), 18082 (Project's effects on air quality), 18082-83 (Project's cumulative effects), 18411-13, 18417-20, 18428 (Forest Service's response to public comments regarding fire risk). Mere acknowledgement that "thinning can have beneficial

and adverse impacts" is not an adequate response to such a complex, substantive issue central to the YRR Project's premise. *See* F&R at 25; *see also* AR18428.[11]

Stating that "[t]he impacts from thinning … have [] been distilled into the summary provided at the start of each section in Chapter 3" is also insufficient because Chapter 3 fails to discuss any effects borne from increased heat, aridity, and wind. *Compare* AR18428 *with* AR18079-83 (discussion of Project effects on fireshed and air quality). Pointing to the Project's design features that were purportedly "designed to minimize and avoid potential adverse impacts where possible" is also insufficient because no design features address minimizing or avoiding increased heat, aridity, and wind in thinned stands. F&R at 25; *compare* AR18428 *with* AR15914-15 (project design features related to fire and fuels).

The F&R contends that the Forest Service did respond to Oregon Wild's concerns and adequately assessed the Project's effects on fire risk. F&R at 25. Yet Oregon Wild's concerns about increased heat, aridity, and wind were lumped in with another consequence of reduced canopy cover—increased ladder fuels. *See* F&R at 24-25 (citing AR18413, 18428). The probable effects of increased heat, aridity, and wind are separate from the effects of increased ladder fuels, and required their own "reasonably thorough consideration." *350 Mont.*, 50 F.4th at 1265.

The F&R also concluded that the Forest Service "addressed Oregon Wild's comments regarding adverse trade-offs," pointing to AR18428. F&R at 25. But, again, the Forest Service did not address concerns about increased heat, aridity, and wind at AR18428 or anywhere else in the record. This constituted a failure to consider "an important aspect of the problem," and the Forest

---

[11] This record citation was chosen as exemplary of the Forest Service's responses in general because it is the closest the agency came to addressing Oregon Wild's heat, aridity, and wind concern, and because the F&R relied on it in concluding that the Forest Service adequately responded to this issue. F&R at 25; *see also* AR18411-29 (all responses to Oregon Wild's comments, failing to address heat, aridity, and wind).

Service's analysis thus cannot fall within the "zone of reasonableness." *See State Farm*, 463 U.S. at 43; *see also Seven Cnty.*, 605 U.S. at 183; *APHIS*, 135 F.4th at 736 ("NEPA generally requires the agency to 'engage with … contrary scientific and expert opinion' and uncertainty as part of its duty to 'consider all important aspects' of a proposed agency action") (citing *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 871 (9th Cir. 2020)).

The Forest Service also failed to consider the low likelihood of a wildfire interacting with treated stands when determining the Project's "probable environmental consequences" related to, among other things, fireshed and air quality. *350 Mont.*, 50 F.4th at 1265; *see also*, *e.g.*, AR16390. In its comments, Oregon Wild brought to the Forest Service's attention that it needed to discuss this very low risk and weigh the adverse effects of the Project against its entirely speculative benefits in the unlikely event that a wildfire occurs during the Project's effective lifetime. AR16331, 16390-402; *see also* ECF No. 41 at 29, 31; ECF No. 52 at 22-23. As Oregon Wild explained, the Forest Service cannot accurately predict where a wildfire will occur, but it must manage its lands broadly in anticipation of a possible fire. AR16390. Crucially, however, the risk of a wildfire occurring in any particular treated area is very low. *See* AR16391 (citing Barnett et al. 2016), 16397 (citing Campbell et al. 2011).

Oregon Wild supported this assertion with substantial scientific information that called the agency's assumptions and conclusions about the Project's probable effects into question. AR16331, 16391-400. Neither the FEIS nor the F&R dispute that Oregon Wild's citations constitute "substantial expert opinion" requiring a response. *See Bark*, 958 F.3d at 870. Yet the Forest Service dismissed this concern by pivoting to the Project's purpose and need, then pointing back to its "Fireshed and Air Quality" section without further explanation or discussion. AR18426. This violated the agency's duty to "respond explicitly and directly to conflicting views." *Earth*

*Island Inst.*, 442 F.3d at 1172; *see also Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1020 (9th Cir. 2012) (citing 40 C.F.R. § 1502.9(b)) ("In the context of environmental impact statements, NEPA requires agencies to respond explicitly and directly to "responsible opposing view[s].").

The F&R never acknowledges Oregon Wild's point about the unlikelihood of fire interacting with treated areas. To the extent that the F&R collapsed this argument into Oregon Wild's broader concerns about how the agency balanced adverse trade-offs, that was error. *See* F&R at 24-25. To be sure, Oregon Wild's concern about the improbability of fire interacting with treated areas does relate to its concern about how the Forest Service weighed the Project's beneficial and adverse trade-offs; had the Forest Service acknowledged the low likelihood of wildfire interacting with treatments during the relevant time period rather than assuming such interaction was certain, the agency would likely have weighed the pros and cons of proposed activities differently and might have then determined that less canopy reduction—and less degradation of NSO habitat—was warranted. But regardless, NEPA separately requires the Forest Service respond to Oregon Wild's comment about the low likelihood of fire interacting with treated areas explicitly and directly.

In an EIS, the Forest Service must "assess, in some reasonable way, the actual baseline conditions." *Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 569 (9th Cir. 2016). The Forest Service cannot presume that wildfire is imminent and inevitable within specific windows of time without responding to or distinguishing Oregon Wild's proffered science. The agency's failure to respond to Oregon Wild's responsible opposing view constitutes failure to consider an important aspect of the problem before it. In sum, the Forest Service failed to present a "full and fair" assessment of the Project's "probable environmental consequences," running afoul of the agency's "hard look" obligation. *350 Mont.*, 50 F.4th at 1265 (citation modified). The Forest Service's failure to address

these issues does not fall within the "zone of reasonableness" or warrant deference, but is arbitrary and capricious. *See Seven Cnty.*, 605 U.S. at 183. The Court should reject the F&R's erroneous conclusions and instead grant Oregon Wild summary judgment on this claim.

### C. The F&R erred by concluding the Forest Service took a hard look at impacts to carbon storage and climate.

As part of its hard look requirement, NEPA required the Forest Service to assess the Project's direct effects on carbon and climate, which the agency identified as a "specific issue of concern" for the YRR Project. AR22222-24; *see Ctr. for Biological Diversity v. U.S. Forest Serv.* ("*Black Ram*"), 687 F. Supp. 3d 1053, 1073 (D. Mont. 2023), *affirmed in part, reversed in part on other grounds by Ctr. for Biological Diversity v. U.S. Forest Serv.*, No. 23-2882, 2025 WL 586358 (9th Cir. Feb. 24, 2025). "NEPA requires more than a statement of platitudes, it requires appraisal to the public of the actual impacts of an individual project," especially for "an increasingly serious national and global problem" like climate change. *Black Ram*, 687 F. Supp. 3d at 1077. Deeming a project's climate impacts to be minor "[w]ithout some articulated criteria for significance … grounded in the record and available scientific evidence" is "insufficient to meet [an agency's] burden" under NEPA. *350 Mont.*, 50 F.4th at 1266.

Here, the Forest Service failed to take a hard look at climate impacts in two ways. First, the Forest Service failed to consider and respond to Oregon Wild's responsible opposing views "explicitly and directly." *Earth Island Inst.*, 697 F.3d at 1020; 40 C.F.R. § 1502.9(b); *see also* 40 C.F.R. § 1503.4; *Bark*, 958 F.3d at 871. Second, the Forest Service failed to even attempt to forecast "probable environmental consequences" related to climate impacts, or to rationally explain why it could not conduct this analysis. *350 Mont.*, 50 F.4th at 1265.

Oregon Wild submitted extensive, scientifically supported comments emphasizing the importance of thoroughly analyzing carbon storage and emissions, and identifying available ways

to do so. *See* AR16342-47, 16389-438. These included a 64-page supplement consisting of expert literature which directly undercut many of the Forest Service's conclusions on the subject. AR16375-438. The Forest Service never denied that Oregon Wild's comments and sources constituted responsible opposing viewpoints, but also never acknowledged or responded to them. *See* AR18411-29 (responses to Oregon Wild's comments failing to engage with climate and carbon issues). The Forest Service did not alter its analysis of climate impacts in response to any of Oregon Wild's concerns or science, adopting almost entirely without change the DEIS's cursory analysis.[12] *Compare* AR16114-16 (DEIS) *with* AR18251-53 (FEIS).

Fittingly, judicial intervention was needed to compel the Forest Service to include Oregon Wild's proffered scientific literature in the administrative record for the Project. *See* ECF No. 32 (July 1, 2025); ECF No. 35 (July 15, 2025). This science largely contradicted the Forest Service's cursory conclusions in the FEIS and warranted a response, and the Forest Service's failure to do so renders its "hard look" at climate impacts incomplete and outside any zone of reasonableness. *See APHIS*, 135 F.4th at 737-38 (if agency declines to make responsive changes, it must explain why opposing views did not merit revision and why it did not engage with contrary scientific evidence); *350 Mont.*, 50 F.4th at 1265 (agency's analysis must be "full and fair," and provide "a reasonably thorough discussion of the significant aspects of the probable environmental consequences") (citation omitted).

The F&R wrongly concluded that the Forest Service adequately addressed competing scientific information. The only "response" the F&R points to is the following statement made in

[12] The FEIS added only two paragraphs to the draft climate discussion. AR16114-16 (DEIS); AR18251-53 (FEIS). This additional "analysis" does not concern the effects of the Project itself, but broadly describes existing and predicted climate conditions on the Forest and a departmental climate "action plan," unidentified aspects of which the agency suggests the Project incorporates. *See* AR18251.

the context of Oregon Wild's suggestion to incorporate carbon storage into an alternative: "[T]he Forest Service acknowledges that how these trade-offs work in the real world are not currently settled science. There is no consensus in the literature on whether thinning to reduce disturbance severity is a net climate benefit or not." F&R at 27 (quoting AR18412); *see also* AR18411-12. The F&R dangerously recommends that the Court accept this blanket invocation of uncertainty as a reasonable treatment of extensive scientific literature directly contradicting the agency's position. But such an insubstantive, cursory retort is not a reasonable response to Oregon Wild's comments and proffered science, and does not comport with the "hard look" requirement, especially given the heightened standard for an EIS. *See N. Cascades Conservation Council*, 136 F.4th at 829.

Science, by its nature, is never settled, and rarely reaches a "consensus" as research develops and challenges previous assumptions. To support its contention that the relevant climate science is "not currently settled," the Forest Service pointed to a single study—one that actually undercuts the agency's conclusions. *See* AR18412 (citing McKinley et al. 2011, AR24984-25006). In contrast, Oregon Wild provided an array of sources, several more recent, to support its assertions that the thinning proposed has significant adverse consequences on carbon storage and climate. *See* ECF No. 41 at 33-34 (discussing and citing to Oregon Wild's scientific assertions); *see also* AR16375-438 (Oregon Wild's climate-related supplement); AR22319-489[13] (selected climate sources). Under these circumstances, NEPA obligated the Forest Service to dig deeper into the literature and "articulate a satisfactory explanation" of its conclusion that the planned logging will have negligible effects on carbon and climate, "including a rational connection between the facts found" and the determination made. *State Farm*, 463 U.S. at 43; *Neighbors of Cuddy Mountain v.*

[13] Citations in this sub-section (II.C) with page numbers between AR22319 and 22477 are to the documents added on July 15, 2025 (ECF No. 35-2).

*U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998) ("General statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided.") (citations omitted).

Scientific uncertainty may always exist, but when confronted with it NEPA requires an agency to respond, or at least provide an explanation "why [contrary] studies do not merit consideration or … change [the agency's] analysis substantively." *APHIS*, 135 F.4th at 738 (citing *Bark*, 958 F.3d at 871). In light of Oregon Wild's "considerable contrary scientific and expert opinion," the Forest Service was required to do more than draw a "general conclusion" that "how trade-offs work in the real world are not a currently settled science." *Compare Bark*, 958 F.3d at 871 *with* AR18412. The Forest Service cannot throw its hands in the air and vaguely declare that uncertainty justifies its decision to forgo more detailed analysis under these circumstances. *See Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 103-04 (1983) (even when "making predictions, within its area of special expertise, at the frontiers of science," agency must still act "within the bounds of reasoned decisionmaking required by the APA.").

The F&R also concluded that the Forest Service sufficiently forecasted the Project's climate-related impacts, but this was also an error. F&R at 26-27. The F&R observed that "[t]he EIS [] notes that 'any initial carbon emissions from this proposed action would be balanced and possibly eliminated as the stand recovers and regenerates, because the remaining trees and newly established trees typically have higher rates of growth and carbon storage.'" *Id.* at 26 (quoting AR18253). Again, Oregon Wild challenged this assertion, and the Forest Service did not explain why the contradictory science presented to it could or should be disregarded. AR16392; AR22353 (proposed fuel treatments will not result in increased carbon sequestration); AR16386; AR22461; AR19489; AR19597 (existing trees sequester more carbon more rapidly than newly planted young

trees); AR16430-31; AR22368, 22370 (Project's thinning will not even be carbon-neutral for at least four decades post-logging); AR16393; AR22319; AR22346; AR22451 (reducing carbon lost in a wildfire "requires the removal of a much greater amount of [carbon]," since most stored carbon "remains unconsumed even by high-severity wildfires"); AR18253, 16413 (it is unclear whether wood products actually reduce emissions or effectively stores carbon, and prior estimates may have been exaggerated). The Forest Service's failure to acknowledge or attempt to reconcile Oregon Wild's science in the FEIS violated NEPA.

Finally, to the extent that the F&R found the Forest Service fulfilled its "hard look" responsibility merely by pointing to the Project's purpose and need, that was in error. *See* F&R 25-27 (describing Project's purpose and stating that it justified the proposed actions). Even assuming that the proposed actions are justified by the Project's purpose and need, that has no bearing on whether the Forest Service satisfied its duty to provide "a reasonably thorough discussion of the significant aspects of the probable environmental consequences" or a direct and explicit response to comments, including responsible opposing viewpoints. *350 Mont.*, 50 F.4th at 1265; 40 C.F.R. §§ 1502.9(b), 1503.4(a).

Ultimately, the F&R concluded that the Forest Service's analysis of carbon and climate is a "fact-dependent, context-specific, and policy-laden choice" subject to substantial deference under *Seven County*. F&R at 26. Yet the F&R completely failed to acknowledge, let alone adhere to, binding Ninth Circuit precedent concerning what constitutes a "hard look" in the face of opposing viewpoints, and on carbon and climate issues specifically. *See*, *e.g.*, *Earth Island Inst.*, 697 F.3d at 1020; *see also 350 Mont.*, 50 F.4th at 1266. The Court should reject the F&R's erroneous conclusions and grant Oregon Wild summary judgment on this claim.

**CONCLUSION**

The F&R recommends that this Court endorse an erosion of NEPA's heightened obligations when an agency prepares an EIS. The Court should not accept such a sharp deviation from binding Ninth Circuit precedent and the purpose and text of NEPA. The Court should instead reject the F&R; hold that the Forest Service failed to consider all reasonable alternatives and failed to take the requisite hard look at impacts to NSO, fire and fuels, and carbon and climate; and grant Oregon Wild summary judgment on all claims.

This is a clear instance in which additional analysis could—and in fact already did—change the ultimate decision. *Contra* F&R at 28. As Oregon Wild has explained, the Forest Service chose to base its decision on information regarding NSO impacts that it knew to be inaccurate and out-of-date. *See supra* at 17; *see also* ECF No. 41 at 21-24; ECF No. 52 at 11-14. Contrary to the agency's assertions, this information was so critical that its omission led them to choose an alternative that violated the ESA, necessitating a significant modification between the draft and final decision. *See* AR22210; AR27737-38, 27755; *cf.* F&R at 20-21 (mischaracterizing agency's actions). Had the Forest Service actually considered and disclosed accurate, up-to-date information during the NEPA process, it likely would have developed different alternatives and made different choices. A full, NEPA-compliant analysis based on accurate information—rather than a last-minute, unilateral snap decision—could further refine the YRR Project and improve the ultimate outcome.

Moreover, there is no reason to believe that this analysis would "further stall a project that has been pending for five years[.]" *Contra* F&R at 28. Oregon Wild filed suit roughly two years ago, on June 13, 2024. It has never sought preliminary relief. On June 25, 2026, the Forest Service informed Oregon Wild that it planned to begin implementation of noncommercial restoration

work. Oregon Wild's actions have not "stalled" the YRR Project, much less for five years, and the Forest Service can likely proceed with many of its proposed activities. Compliance with the law would not frustrate the Project's restoration goals. Rather, it would assist the agency in making transparent, well-informed management decisions to the benefit of the Project area and the species that live there.

Respectfully submitted this 19th day of August, 2026.

*/s/ John S. Persell*
John S. Persell
Oregon Wild
5825 N Greeley Avenue
Portland, OR 97217
(503) 283-6343
jp@oregonwild.org

Juan Pablo San Emeterio
Oregon Wild
5825 N Greeley Avenue
Portland, OR 97217
(503) 283-6343
pablo@oregonwild.org

Erin E. Hogan-Freemole
WildEarth Guardians
213 SW Ash Street, Suite 202
Portland, OR 97204
(971) 417-6851
ehoganfreemole@wildearthguardians.org

*Attorneys for Plaintiffs*

**CERTIFICATE OF COMPLIANCE**

These Objections comply with the applicable word-count limitation under LR 7-2(b) because they contain 10,806 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, and certificate of compliance.

*/s/ John S. Persell*
John S. Persell
Oregon Wild
5825 N Greeley Avenue
Portland, OR 97217
(503) 283-6343
jp@oregonwild.org