ADAM R.F. GUSTAFSON
United States Department of Justice
Principal Deputy Assistant Attorney General
Energy & Natural Resources Division

SHAUN M. PETTIGREW (CA Bar No. 254564)
Senior Trial Attorney
Natural Resources Section
c/o NOAA, Damage Assessment
7600 Sand Point Way, NE
Seattle, WA 98115
(202) 532-5973
shaun.pettigrew@usdoj.gov

*Attorneys for Federal Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF OREGON**
**EUGENE DIVISION**

| | |
|---|---|
| OREGON WILD, an Oregon nonprofit corporation; and WILDEARTH GUARDIANS, a New Mexico nonprofit corporation,<br><br>Plaintiffs,<br><br>v.<br><br>DAVID WARNACK, in his official capacity as Supervisor of the Willamette National Forest; and UNITED STATES FOREST SERVICE, a federal agency,<br><br>Federal Defendants,<br><br>and<br><br>AMERICAN FOREST RESOURCE COUNCIL,<br><br>Defendant-Intervenor. | Case No. 6:24-cv-00949-AP<br><br>FEDERAL DEFENDANTS' RESPONSE TO OBJECTIONS TO FINDINGS AND RECOMMENDATIONS |

## TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. BACKGROUND .......... 2

III. STANDARD OF REVIEW .......... 7

IV. ARGUMENT .......... 8

A. The FEIS Considered a Reasonable Range of Alternatives .......... 10

B. The FEIS Reasonably Assessed the Project's Potential Impacts. .......... 15

1. Northern Spotted Owl .......... 15

2. Fuel Reduction and Fire Risks .......... 23

3. Carbon Storage and Emissions .......... 28

V. CONCLUSION .......... 34

## TABLE OF AUTHORITIES

**Cases**

*350 Montana v. Haaland*,
50 F.4th 1254 (9th Cir. 2022) ........................................ 47, 48

*All. for the Wild Rockies v. Vilsack*,
No. 24-cv-10-DLC, 2026 WL 1493808 (D. Mont. May 28, 2026) ........................................ 45

*Ariz. Mining Reform Coal. v. U.S. Forest Serv.*,
172 F.4th 641 (9th Cir. 2026) ........................................ 15, 16, 22, 45

*Baltimore Gas & Elec. v. Nat. Resources Def. Council, Inc.*,
462 U.S. 87 (1983) ........................................ 30

*Barnes v. U.S. Dep't of Transp.*,
655 F.3d 1124 (9th Cir. 2011) ........................................ 44

*Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*,
153 F.4th 869 (9th Cir. 2025) ........................................ passim

*City of Los Angeles v. FAA*,
63 F.4th 835 (9th Cir. 2023) ........................................ 17, 20

*Conner v. Burford*,
848 F.2d 1441 (9th Cir. 1988) ........................................ 27

*Ctr. for Biological Diversity v. U.S. Forest Serv.,*
687 F. Supp. 3d 1053 (D. Mont. 2023) ........................................ 44, 46, 47

*Ctr. for Biological Diversity v. U.S. Forest Serv.*,
811 F. Supp. 3d 1206 (D. Mont. 2025) ........................................ 45

*Ctr. for Biological Diversity v. United States Bureau of Land Mgmt.*,
141 F.4th 976 (9th Cir. 2025) ........................................ 33

*Dept. of Transp. v. Public Citizen*,
541 U.S. 752 (2004) ........................................ 27

*Earth Island Inst. v. Gibson*,
834 F. Supp. 2d 979 (E.D. Cal. 2011) ........................................ 44

*Earth Island Inst. v. Muldoon*,
82 F.4th 624 (9th Cir. 2023) ........................................ 39

*Earth Island Inst. v. U.S. Forest Serv.*,
697 F.3d 1010 (9th Cir. 2012) ........................................ 49

*Earth Island Inst. v. U.S. Forest Serv.*,
87 F.4th 1054 (9th Cir. 2023) ........................................ 20

*Env'tl Prot. Info. Ctr. v. U.S. Forest Serv.,*
451 F.3d 1005 (9th Cir. 2006) ........................................ 38

*Friends of Big Bear Valley v. U.S. Forest Serv.*,
776 F. Supp. 3d 824 (C.D. Cal. 2025) .......... 39

*Hagberg v. Astrue,*
No. CV-09-01, 2009 WL 3386595 (D. Mont. Oct. 14, 2009) .......... 9

*Hapner v. Tidwell*,
621 F.3d 1239 (9th Cir. 2010) .......... 43, 47

*Lands Council v. McNair*,
537 F.3d 981 (9th Cir. 2008) .......... 9, 37

*League of Wilderness Defs. Blue Mountains Biodiversity Proj. v. Allen*,
615 F.3d 1122 (9th Cir. 2010) .......... 37, 38

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360 (1989) .......... 26

*N. Cascades Conserv. Council v. U.S. Forest Serv.*,
136 F.4th 816 (9th Cir. 2025) .......... 16

*N. Cascades Conserv. Council v. U.S. Forest Serv.*,
No. 2:20-cv-1321-RAJ-BAT, 2021 WL 8344155 (W.D. Wash. May 28, 2021) .......... 21

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*,
475 F.3d 1136 (9th Cir. 2007) .......... 10

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.*,
957 F.3d 1024 (9th Cir. 2020) .......... 10

*Seven County Infrastructure Coalition v. Eagle County*,
605 U.S. 168 (2025) .......... passim

*Swomley v. Schroyer*,
484 F. Supp. 3d 970 (D. Colo. 2020) .......... 43, 48, 49

*Thomas v. Arn*,
474 U.S. 140 (1985) .......... 9

*Westlands Water Dist. v. U.S. Dep't of Interior*,
376 F.3d 853 (9th Cir. 2004) .......... 16

*Wilson v. Poor*,
No. C19-5920, 2023 WL 3480845 (W.D. Wash. May 4, 2023) .......... 8, 9

**Statutes**

16 U.S.C. § 1536(a)(2) .......... 19

28 U.S.C. § 636(b)(1) .......... 7

42 U.S.C. § 4332(2)(C) .......... 8

42 U.S.C. § 4332(2)(C)(i) .......... 8

42 U.S.C. § 4332(2)(C)(iii) ........ 8

42 U.S.C. § 4336e(6) ........ 8

5 U.S.C. § 706(2)(A) ........ 8

**Regulations**

40 C.F.R. § 1502.2(b) ........ 30

50 C.F.R. § 402.02 ........ 6, 19

## I. INTRODUCTION

The Forest Service authorized the Youngs Rock Rigdon Project (Project) in December 2023 following years of public participation and close coordination with the Southern Willamette Forest Collaborative. The nearly 500-page final environmental impact statement (FEIS) supporting the Project provided a thorough and detailed analysis of the potential effects of alternatives that would improve the resiliency of the forest, reduce wildfire intensity and severity, improve wildfire response, and provide sustainable forest products. Plaintiffs now seek to upend years of work by Forest Service experts and good faith engagement with the public. Rather than alleging any substantive claims under the Endangered Species Act, National Forest Management Act, or any other statute, however, Plaintiffs rely solely on the National Environmental Policy Act (NEPA) to attempt to block this important Project. In doing so, Plaintiffs attempt to bring about the precise result the Supreme Court recently foreclosed in its "course correct[ing]" decision *Seven County Infrastructure Coalition v. Eagle County*, 605 U.S. 168, 183-84 (2025), by "invok[ing] NEPA and [seeking] to enlist the courts in blocking or delaying even those projects that otherwise comply with all relevant substantive environmental laws."

Magistrate Judge Potter issued a Findings & Recommendation (F&R) correctly rejecting Plaintiffs' misguided claims. Dkt. 66. The F&R found that the FEIS considered a reasonable range of alternatives and reasonably assessed the Project's potential impacts on northern spotted owls, fuels reduction and fire risks, and mature and old-growth forests and carbon storage and emissions. *Id.* at 16-27. The F&R recommended that Plaintiffs' motion for summary judgment be denied and that Federal Defendants' and Defendant-Intervenor's cross-motions be granted. *Id.* at 28. Despite the F&R's well-reasoned and fully supported analysis, Plaintiffs now argue the F&R got *everything* wrong. *See* Pls.' Obj. to Mag. J. F&R (Obj.), Dkt. 69. But it is Plaintiffs who get everything wrong by contesting the Forest Service's reasonable and well-supported decisions

about the range of alternatives to consider and the breadth and depth of its inquiry. As the Supreme Court made clear, "an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry—and also about the length, content, and level of detail of the resulting EIS. Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Seven Cty.*, 605 U.S. at 182-83. As the F&R recognized, the Forest Service's fact-dependent, context-specific, and policy-laden choices fall well within this broad zone of reasonableness. The Court should therefore adopt the F&R.

## II. BACKGROUND

The Forest Service authorized the Project in December 2023 to (1) improve stand and landscape diversity, structure, and resiliency by increasing diversity and structure in mixed conifer and moist forests, restoring meadows and oak savannahs, and restoring and improving the complexity and diversity of riparian areas; (2) strategically reduce hazardous fuels to reduce fire risk and promote wildfire response; (3) sustainably manage recreation; (4) identify a sustainable road system; and (5) provide a sustainable supply of forest products. AR22232-34, AR17976-82. The Project does this within a 33,000-acre area on the 1.7-million-acre Forest through up to 2,242 acres of commercial harvest (thinning in natural stands, thinning with gaps in managed stands, and regeneration harvest in managed stands) and various non-commercial activities, such as thinning around pine and oaks, skips in harvest stands, and fuel treatments (i.e., piling, mastication, and burning). AR22211, AR00238-40.

Although authorized in 2023, the Project was many years in the making. The Project area is in a portion of the Rigdon landscape, a 104,000-acre area in the southern part of the Forest, where it has been extensively documented that nearly a century of fire suppression has resulted in a substantial departure from natural conditions. AR12298-99. Grassy spaces between old and fire-

resistant trees were filled in primarily with Douglas-fir, leading to a dense overstory that shaded out forest floor vegetation, created intense below-ground competition, prevented pine regeneration, and indirectly led to the mortality of old-growth trees. AR1229-301; *see also* AR17974. The Rigdon landscape is displayed below in relation to the Forest:




*Figure 1 Vicinity map of the Rigdon landscape*

AR14224.

Starting as far back as 2006, the Forest Service began "tentative restoration efforts in this area" to serve "as a test case for a potentially more ambitious and effective restoration effort." AR12297. These efforts "included extensive public outreach and work with the local academic communities," and the results were met with broad approval based on "several public and internal reviews." *Id.* This led to a detailed analysis of the Rigdon landscape through extensive

coordination with the Southern Willamette Forest Collaborative (Collaborative), which includes "community organizations, agencies, conservation groups, small businesses and community members" devoted to promoting "local forest management solutions that foster ecological resiliency and promote socioeconomic health in the southern Willamette Forest area and communities." AR14228-30. The Collaborative "convenes diverse stakeholders to increase the pace and scale of restoration on the [Forest] by developing social agreement, building trust, and exploring innovative ways to do business." AR14228.

The resulting Rigdon Landscape Analysis identified valued resources, assessed ecosystem components, function, and stressors, and developed a restoration blueprint for the area to inform conservation strategies and restoration efforts, decisions about where resiliency can be enhanced, and opportunities for integrating "restoration goals to increase landscape health and function." AR14225. The RLA did this by detailing the historic and current conditions across the Rigdon landscape, AR14231-55, explaining the landscape's natural processes and succession, AR14256-65, disclosing management objectives from the Forest Plan and Northwest Forest Plan, AR14266-77, and summarizing goals and target landscape patterns to inform desired future landscape conditions that would provide the basis for project level activities, AR14282-89. The RLA then began the effort of "transition[ing] from a landscape level analysis into project design," by suggesting the Youngs Rock Rigdon Project in a 33,000-acre area in the northeast portion of the Rigdon area (illustrated below) that focused on "mixed conifer forest areas as well as restoration activities in and near the mainstem of the Upper Middle Fork Willamette River." AR14289-90.




AR14291.

In May 2019, shortly after issuing the RLA, the Forest Service convened an eighteen-member interdisciplinary team to consider the RLA's "important information regarding local current condition" and to integrate that information into developing a proposed action that would "restore and enhance the ecological, social and economic aspects of the landscape." AR14303-04. In June 2019, the Forest Service published a scoping notice indicating the Forest Service intended to prepare an environmental impact statement (EIS) for the proposed Youngs Rock Rigdon project in a 33,000-acre project area. AR14376. After receiving and considering comments on the scoping notice, along with other public outreach, the Forest Service issued a Draft EIS in July 2021. AR15819-16253; *see* AR15856-57 (public outreach and scoping comments). Release of the Draft EIS triggered another public comment period that overlapped with a public meeting

and field trip to the project area coordinated by the Forest Service and the Collaborative. AR16254-256; AR16283-284; AR17995. The Forest Service then released the FEIS in March 2023. AR17956-8431. The nearly 500-page FEIS set forth the purpose and need for the proposed action, AR17973-82, identified the no-action alternative and two action alternatives that would meet the purpose and need for action, AR17998-8009, explained why other alternatives were considered but eliminated from detailed analysis, AR18010-11, and assessed the potential environmental effects of the three alternatives on thirteen resources, AR18055-270.

The Forest Service released a draft Record of Decision (ROD) in April 2023, considered objections to the draft ROD, and issued a final ROD approving the Youngs Rock Rigdon Project (Project) in December 2023. *See* AR22232-34. The Project is a modified version of Alternative 2 in the FEIS. AR22210. As summarized in the ROD, there are "many competing priorities in the project area," but "careful consideration of public and agency comments" revealed that the Project "best meets the needs of restoring terrestrial and aquatic habitats, maintaining older stands for late seral species found in this area, and returning fire to the landscape while also providing for human uses like recreation, special forest product gathering, indigenous uses, and a sustainable supply of timber." AR22217.

Before approving the Project, the Forest Service completed programmatic consultation with the U.S. Fish and Wildlife Service (FWS) under the Endangered Species Act (ESA), analyzing the effects of two decades of potential projects consisting of a "suite of timber harvest activities as well as routine land management activities proposed for implementation within the Willamette and North Coast Planning Provinces of Oregon that have been designed to avoid the incidental take of spotted owls." AR15247; *See* 50 C.F.R. § 402.02 ("Programmatic consultation is a consultation addressing an agency's multiple actions on a program, region, or other basis.").

The programmatic consultation covered over 5 million acres on the Willamette National Forest, the Mt. Hood National Forest, the Columbia River Gorge National Scenic Area, and much of the Northwest Oregon BLM District. AR15249; AR15277. As part of the programmatic consultation process, the Forest Service issued a 2019 biological assessment (BA) considering, among other things, the status of northern spotted owls (NSO), NSO critical habitat, and effects of the program of activities on the NSO and its critical habitat. AR15278-94, AR15299-326, AR15400-80. In December 2019, FWS issued a concurrence letter and a biological opinion (BiOp), finding that the proposed actions were not likely to jeopardize the continued existence of the NSO or adversely modify its critical habitat. AR14849-953; AR14935. After wildfires in 2020, 2021, and 2022, the agencies prepared a revised BA in May 2023. AR18510-19344. In June 2023, FWS issued a revised BiOp finding the programmatic suite of activities were not likely to jeopardize the continued existence of the NSO or adversely modify critical habitat. AR19613-841; AR19797.

## III. STANDARD OF REVIEW

A court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). "Nevertheless, objections to [findings and recommendations] are not an appropriate vehicle to rehash or re-litigate the points considered and resolved by the magistrate judge." *Wilson v. Poor*, No. C19-5920, 2023 WL 3480845, at *2 (W.D. Wash. May 4, 2023) (citations omitted). Congress created magistrate judges to provide district judges "additional assistance in dealing with a caseload that was increasing far more rapidly than the number of judgeships." *Thomas v. Arn*, 474 U.S. 140, 153 (1985). There is no benefit to the judiciary "if the district court[] is required to review the entire matter de novo because the objecting party merely repeats the arguments rejected by the magistrate [judge]." *Hagberg v. Astrue,* No. CV-09-01, 2009 WL 3386595, at *1 (D. Mont. Oct. 14, 2009). "In short,

an objection to a magistrate judge's findings and recommendations is not a vehicle for the losing party to relitigate its case." *Wilson*, 2023 WL 3480845, at *2 (quotation omitted).

Plaintiffs' NEPA claims are reviewed under the Administrative Procedure Act. *See Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc). A court may set aside an agency action only if it determines the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under this standard, "a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained." *Seven Cnty.*, 605 U.S. at 180. An agency action is arbitrary and capricious only where "the agency has relied on factors which Congress has not intended it to consider," failed to consider important factors, offered an explanation inconsistent with the record, or the decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 957 F.3d 1024, 1033 (9th Cir. 2020). This standard of review is "highly deferential, presuming the agency action to be valid." *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (citation modified).

## IV. ARGUMENT

Plaintiffs assert NEPA claims only. NEPA requires a federal agency to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *see also id.* § 4336e(6) (defining EIS as "a detailed written statement that is required by section 4332(2)(C) of this title."). An EIS must assess the "reasonably foreseeable environmental effects of the proposed agency action" and "a reasonable range of alternatives to the proposed agency action . . . that are technically and economically feasible, and meet the purpose and need of the proposal." *Id.* § 4332(C)(i), (iii) . "NEPA imposes no substantive environmental obligations or restrictions. NEPA is a purely procedural statute that [in some instances] . . . requires

an agency to prepare an EIS—in essence, a report." *Seven Cnty.*, 605 U.S. at 173. And in preparing that report, "an agency may weigh environmental consequences as the agency reasonably sees fit under its governing statute and any relevant substantive environmental laws." *Id.* "NEPA is a procedural cross-check, not a substantive roadblock. The goal of the law is to inform agency decisionmaking, not to paralyze it." *Id.*

"The limited scope of NEPA also circumscribes the scope of judicial review." *Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*, 153 F.4th 869, 880 (9th Cir. 2025). The Supreme Court recently emphasized that "[a] course correction of sorts is appropriate to bring judicial review under NEPA back in line with the statutory text and common sense." *Seven Cnty.*, 605 U.S. at 184. To do this, judicial review of an agency's EIS "must account for the fact that NEPA is a *purely procedural statute*." *Id.* at 180. "So when reviewing an agency's EIS, the only role for a court is to confirm that the agency has addressed environmental consequences and feasible alternatives as to the relevant project." *Id.* (citation modified). In engaging in this review, "a court should afford substantial deference" to an agency's identification and analysis of "significant environmental impacts and feasible alternatives" because such decisions require an agency to "make predictive and scientific judgments in assessing the relevant impacts (what are the likely impacts; do they rise to the level of 'significant'?) and alternatives (what are the potential alternatives; are they really 'feasible'?)." *Id.* at 180-81. If they "fall within a broad zone of reasonableness," courts must defer to an agency's "fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry—and also about the length, content, and level of detail of the resulting EIS." *Id.* at 183. "The bedrock principle of judicial review in NEPA cases can be stated in a word: Deference." *Id.* at 185.

The F&R thoroughly considered Plaintiffs' claims and correctly found them to be meritless. Plaintiffs' objections now improperly attempt to relitigate the issues that were previously addressed in over 200 pages of prior briefing. As explained below, the Forest Service more than met its obligations under NEPA to consider a reasonable range of alternatives and examine the reasonably foreseeable effects of the proposed action. The Court should adopt the F&R's well-reasoned and fully supported conclusions.

**A. The FEIS Considered a Reasonable Range of Alternatives**

As explained in the FEIS, the "degraded portions of the landscape in need of restoration" identified by the RLA "provided the basis for the project purpose and need." AR17976. This included improving stand and landscape diversity, structure, and resiliency in mixed conifer and moist forest, restoring meadow and oak savannahs, restoring aquatic resources and floodplains, strategically reducing hazardous fuels, and providing a sustainable supply of forest products. AR17976-81. Plaintiffs rightfully do not challenge this purpose and need statement. *See Ariz. Mining Reform Coal. v. U.S. Forest Serv.*, 172 F.4th 641, 661 (9th Cir. 2026) (explaining first step in "determining whether an EIS appropriately considered alternatives" is to assess purpose and need statement). Plaintiffs instead challenge the reasonableness of the range of alternatives considered. *See id.* (noting second step assesses range of alternatives).

A court affords "substantial deference" to an agency's range of alternatives determination, *Seven Cnty.*, 605 U.S. at 180, employing a "rule of reason" under which an "EIS need not consider an infinite range of alternatives, only reasonable or feasible ones," *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004). "Nor does NEPA require a discussion of alternatives that are unlikely to be implemented or that are inconsistent with the agency's basic policy objectives." *Ariz. Mining Reform Coal.*, 172 F.4th at 661-62 (quotation omitted). An agency need only briefly discuss the basis for eliminating an alternative from detailed examination. *Id.* at

662. A plaintiff bears the "burden to show that" another alternative is feasible or viable. *N. Cascades Conserv. Council v. U.S. Forest Serv.*, 136 F.4th 816, 828 (9th Cir. 2025); *see also City of Los Angeles v. FAA*, 63 F.4th 835, 846-47 (9th Cir. 2023) (noting party "challenging an agency's failure to consider an alternative" must show "alternative is viable").

The FEIS considered the potential effects of three alternatives in detail: Alternative 1 (no-action alternative); Alternative 2 (preferred alternative); and Alternative 3. The no-action alternative considered "what effects would occur to forest ecosystems and resources in the project area if no action is taken." AR17998. This permitted comparison of those effects to the two action alternatives, which considered specific silviculture and other activities that the Forest Service determined would meet the purpose and need for action. *See* AR17971-73; AR17998-8009. Alternative 2 would treat about 6,500 acres. AR17998. Among other activities, it would create "late seral open forest by thinning, underburning, and leaving skips across 2,780 acres of older natural stands in mixed conifer forest," accelerate "the development of late seral patch connectivity by thinning and leaving skips across 984 acres of younger managed stands in mixed conifer and upland moist forest," and create "complex early seral habitat by regeneration harvesting and leaving skips across 453 acres of younger managed stands in mixed conifer and upland moist forest." *Id.* The preferred alternative would also decommission around 12 miles of roads to move "towards a sustainable road system in the project area." AR18001. In contrast to the preferred alternative, Alternative 3 "would yield an estimated 42 million board feet (MMBF) compared with 63 MMBF under Alternative 2." AR18006; AR17973. This 33 percent reduction in volume would come from changes in treatments to focus "more on commercial thinning with large gaps instead of regeneration harvest in managed stands," as well as commercially harvesting fewer acres in NSO critical habitat, resulting in a reduction of commercial harvest in natural stands from 1,420

acres to 660 acres. *Id.*; AR17971; AR18011. Alternative 3 would also decommission 8 more miles of roads. AR18006.

In addition to considering these three alternatives in detail, the FEIS explained why other alternatives were considered but eliminated from detailed consideration. AR18010-11. First, an alternative eliminating temporary road construction would result in "certain environmental effects" being greater, reduce funds for environmental restoration activities, compromise another purpose of the project to store and decommission roads, and be economically unfeasible. AR18010. Second, an alternative eliminating commercial harvest in natural stands would "reduce the amount and effectiveness of creating late seral open forest in the mixed conifer habitat," foreclose restoration of "fire resiliency to portions of the landscape," eliminate funds that would be used to implement the non-commercial treatments, and result in "many of the elements identified in the purpose and need" statement not being met. AR18011. Third, an alternative treating more acres in dry mixed conifer forest was not feasible because it "would be inconsistent with the standards and guidelines of the Northwest Forest Plan." *Id.*

This approach to identifying and considering alternatives is precisely the type of line drawing that the Supreme Court made clear in *Seven County* is within the sound discretion of the Forest Service and to which courts must afford substantial deference. *Seven Cnty.*, 605 U.S. at 181-82. In arguing otherwise, Plaintiffs first recycle their myopic argument that the two action alternatives are "virtually identical" because they considered treating the same acres as a whole. Pls' Obj. 8-9. As the F&R explained, however, Plaintiffs are wrong because "the two action alternatives differ in the scope and type of treatment," varying the application of specific silvicultural treatments to different areas to improve stand and landscape diversity, structure, and resiliency in the project area. F&R 12 (citing AR17971-73; AR18006). This includes commercial

harvest activities that varied the silvicultural treatments (i.e., thinning in natural stands, thinning in managed stands, and regeneration harvest in managed stands) that would apply and varied the total acres to which such activities would apply from 1,853 acres to 2,608 acres. AR17971.

And far from having the same effects on the NSO, as Plaintiffs' erroneously claim, these important differences in acreage and treatments would substantially differ in their potential effects on NSO suitable, dispersal, and critical habitat, as shown in the below table.

Table 35: Effects to Habitat by Alternative

| Habitat Type in all of YRR and in Critical Habitat only | No Action Alternative 1 Habitat removed (acres) | Alternative 2 Habitat removed (acres) | Alternative 2 Habitat modified but maintained (acres) | Alternative 3 Habitat removed (acres) | Alternative 3 Habitat modified but maintained (acres) |
|---|---|---|---|---|---|
| Suitable | 0 | 2,799 | 0 | 1,914 | 885 |
| Dispersal | 0 | 467 | 997 | 229 | 1,235 |
| Suitable, Critical Habitat | 0 | 1,561 | 0 | 676 | 885 |
| Dispersal, Critical Habitat | 0 | 82 | 377 | 59 | 400 |

AR18124. Plaintiffs' failure to appreciate the alternatives' differences in potential effects to NSO habitat emphasizes the Forest Service's expertise in determining the types of silvicultural treatments and stands within the project area that would achieve the stated purpose and need for a project and in assessing the potential effects of implementing those treatments. "This is a technical, scientific issue where deference to agency technical expertise is at its apogee." *Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*, 153 F.4th 869, 906 (9th Cir. 2025).

Attempting to overcome this maximum level of deference, Plaintiffs argue the FEIS should have considered another alternative that they proposed. Obj. 9-14. Plaintiffs previously referred to this as "a middle ground" or "middle road" alternative but have conspicuously dropped that vernacular in their objections. Pls.' Reply in Supp. of Mot. for Summ. J. (Pls.' Reply) 7- 10, Dkt. 52. And that is likely because they now realize "there is no minimum number of alternatives that must be discussed in an EIS," *City of Los Angeles v. FAA*, 63 F.4th 835, 847 (9th Cir. 2023), and

NEPA does not "require agencies to evaluate mid-range alternatives between action and no action," *Earth Island Inst. v. U.S. Forest Serv.*, 87 F.4th 1054, 1065 (9th Cir. 2023) (quotations omitted). Thus, contrary to Plaintiffs' arguments, the FEIS had no obligation to consider their proposed mid-range alternative. Consideration of two action alternatives (which substantially varied the silvicultural treatments and application of those treatments to different areas to achieve the stated purpose and need for a project) and comparison of the potential effects of those alternatives to a no-action alternative more than satisfied the Forest Service's procedural requirements under NEPA.

Indeed, the FEIS went beyond what NEPA required by already considering a mid-range alternative in Alternative 3. What Plaintiffs really want is a mid-mid-range alternative between Alternative 3 and the no-action alternative. NEPA requires no such thing. Instead, the Forest Service reasonably exercised its expertise to make a "fact-dependent, context-specific, and policy-laden choice" about the range of alternatives for consideration. *Seven Cnty.*, 605 U.S. at 183. This choice is owed substantial deference, and the FEIS's consideration of alternatives satisfied NEPA. As another court explained, "the Forest Service, in the exercise of its discretion, has properly determined that it is an appropriate purpose for the agency to improve habitat in forest stands in the Project area, including those that contain merchantable timber. NEPA does not require the Forest Service to scale back its project in favor of an arguably more environmentally-friendly alternative that plaintiffs would prefer." *N. Cascades Conserv. Council v. U.S. Forest Serv.*, No. 2:20-cv-1321-RAJ-BAT, 2021 WL 8344155, at *22 (W.D. Wash. May 28, 2021), *adopted by* No. 2:20-cv-1321-DGE, 2022 WL 1043930 (W.D. Wash. April 7, 2022), *aff'd by* No. 22-35430, 2023 WL 2642930 (9th Cir. Mar. 27, 2023).

Further, the Forest Service did consider Plaintiffs' proposed alternative and explained that

the elements comprising Plaintiffs' "conservation alternative" are either included in elements of the action alternatives or are inconsistent with the purpose and need for action because they would not be effective at creating late seral open forest and restoring fire resiliency to the landscape and would foreclose implementation of other activities necessary to meet the purpose and need for action. *See* AR18411-21; AR21314-16; AR21319. As the F&R correctly found, the Forest Service "responded to Plaintiffs' concerns and explained how Plaintiffs' proposed alternative was not consistent with the scope and purpose of the project." F&R 13. Plaintiffs disagree with the Forest Service's response. But "the heart of this claim is a disagreement with the Government's scientific conclusions as to the feasibility and appropriateness of potential alternative . . . approaches." *Ariz. Mining Reform Coal.*, 172 F.4th at 662. Such a disagreement does not establish a NEPA violation. Instead, the Forest Service's reasonable explanation "is sufficient under NEPA, and under the highly deferential scheme the Supreme Court set out in *Seven County*," these determinations must be afforded "significant deference." *Id.* The F&R correctly found that the FEIS considered a reasonable range of alternatives, and the Court should adopt that finding.

**B. The FEIS Reasonably Assessed the Project's Potential Impacts.**

**1. Northern Spotted Owl**

The FEIS provided a thorough and detailed analysis of the Project's potential effects on the NSO. *See* AR18123-31. In doing so, the FEIS incorporated the 2019 BA's "full description of the northern spotted owl in the province and on the Forest," as well as "its life history, ecology, and use of forest stands." AR18123; *see* AR15278-90, AR15299-316, AR15630-83 (2019 BA). As explained in the FEIS and 2019 BA, the NSO is a species that resides in mature and old-growth forests that was listed as a threatened species under the ESA in 1990. AR18123; AR15278; AR15631. The NSO's range extends from British Columbia south through Washington and Oregon and into northern California and is divided into twelve physiographic provinces "based on

recognized landscape subdivisions exhibiting different physical and environmental features." AR15632. The five Oregon provinces are: Oregon Coast Range, Willamette Valley, Western Oregon Cascades, Eastern Oregon Cascades, and Oregon Klamath. *Id.*; *see also* AR15633 (map of NSO range by province).

NSOs range widely for prey but are anchored to a nest site. AR15634. Assessment of NSO habitat typically occurs at the home range and core area spatial scales. *Id.* The home range is the area NSO individuals use for normal activities of food gathering, mating, and rearing young. *Id.* A core area is a smaller area within the home range that receives concentrated use, "typically surrounding the nest site and favored foraging areas." AR15634. The scientific literature suggests "that when spotted owl home ranges have less than 40 to 60 percent nesting/roosting/foraging (NRF), they were likely to have lower occupancy and fitness." AR15635. "A reduction in the amount of suitable habitat [i.e., NRF] reduces spotted owl abundance and nesting success." AR15636. In assessing whether timber harvest activities result in an incidental take of NSO under the ESA, FWS "has used a 40 percent incidental take avoidance guideline at the scale of a spotted owl home range to determine if death or injury of the spotted owl is likely to occur when suitable habitat is removed by a timber harvest action." AR15284. Stated differently, "if post treatment suitable habitat drops below around 40 percent, then impacts to breeding spotted owls at that scale is considered to have impacts to the spotted owl pair's ability to use the site to support their life history needs." AR15284-85. Similarly, FWS "has used a 50 percent rule at the scale of a spotted owl core area (500 acres – 0.5 mile radius circle around nest tree) to determine if timber harvest actions are likely to cause death or injury of the spotted owl." AR15285.

The FEIS detailed the potential effect of the alternatives on NSO nest sites and habitat in the Project area. AR18123-31. In doing so, the FEIS assessed whether the alternatives would be

consistent with the limitations set forth in the programmatic consultation under the ESA that prohibited "incidental take of NSO through habitat removal" on the Forest. AR18124. "This means that no occupied sites' habitat may be reduced below the amount of suitable habitat functional thresholds or, if already below thresholds, may not be reduced any further by the removal of suitable habitat, and occupied nest patches cannot be adversely affected. All occupied sites must be maintained." *Id.*

The FEIS then detailed the potential effects of the no-action alternative and the two action alternatives. The no-action alternative would not directly affect NSO because no habitat would be modified, but "no dense managed stands would be thinned to promote future suitable habitat conditions." *Id.* As to the two action alternatives, the FEIS detailed the acres of suitable, dispersal, and designated critical (containing suitable and dispersal) habitat that would be removed or modified but maintained. AR18124. Beyond the total acreage affected by the alternatives in suitable, dispersal, and critical habitat, the FEIS provided a detailed summary of each potential NSO nest site, disclosing whether it was occupied, the amount of suitable and dispersal habitat in the core areas and home ranges, the activities from the two action alternatives within that habitat, and the effects of those proposed actions on the NSO. *See* AR18126-27 (Table 36 detailing effects of preferred alternative), AR18128-29 (Table 37 detailing effects of other action alternative).

This detailed analysis more than satisfied the Forest Service's procedural obligations under NEPA to "ensure[] that the agency and the public are aware of the environmental consequences of proposed projects." *Seven Cnty.*, 605 U.S. at 177. The F&R found as much and should be adopted. *See* F&R 16-23. In claiming otherwise, Plaintiffs point to the 2023 BA and erroneously claim "the Forest Service ignored inconvenient data." Obj. 15. But Plaintiffs' misguided argument improperly confuses and conflates the inquiries under the ESA and NEPA, ignores the programmatic nature

of the ESA consultation that the 2023 BA supported, and fails to afford substantial deference required by NEPA to the Forest Service's reasonable explanation that the wildfires that resulted in the reinitiation of programmatic consultation under the ESA did not affect the FEIS's analysis of the Project's potential effects on the NSO.[1]

The FEIS reasonably explained that the 2020 wildfires did not affect the FEIS's project-level analysis because they minimally affected the entire critical habitat unit in which the project is located and that the project area itself was not affected. *See* AR18123; AR22224. Plaintiffs disagree with this conclusion. But Plaintiffs' disagreement merely invites the exact second-guessing the Supreme Court cautioned against in *Seven County*. 605 U.S. at 181 ("So the question of whether a particular report is detailed enough in a particular case itself requires the exercise of agency discretion—which should not be excessively second-guessed by a court."). As the Court made clear, the "agency is better equipped to assess what facts are relevant to the agency's own decision than a court is. As a result, 'agencies determine whether *and to what extent* to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process.'" *Id.* (quoting *Dept. of Transp. v. Public Citizen*, 541 U.S. 752, 767 (2004)).

In seeking to second-guess the Forest Service's reasonable explanation, Plaintiffs suggest that the same information that resulted in the Forest Service reinitiating programmatic consultation under the ESA also required the Forest Service to provide additional information and analysis in the project-specific FEIS. Obj. 16-20. But this argument ignores important differences between NEPA and the ESA. "NEPA is a procedural statute designed merely to bring environmental

---

[1] It is telling that Plaintiffs do not claim the FEIS should have been supplemented due to "significant new circumstances or information relevant to environmental concerns *and bearing on the proposed action or its impacts*." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 372 (1989) (emphasis added).

concerns into the agency decision-making process," while "the ESA, on the other hand, contains the important substantive mandate that threatened and endangered species shall not be placed in jeopardy." *Conner v. Burford*, 848 F.2d 1441, 1457 n.40 (9th Cir. 1988); *see* 16 U.S.C. § 1536(a)(2) (requiring federal agencies "insure that any action authorized, funded, or carried out" by the agency "is not likely to jeopardize the continued existence of any endangered species . . . or result in the destruction or adverse modification of habitat of such species."). Information necessary to the jeopardy or adverse modification inquiry is not coterminous with NEPA's procedural requirement.

Indeed, "[u]nder NEPA, an agency's only obligation is to prepare an adequate report." *Seven Cnty.*, 605 U.S. at 180. "[U]nlike other environmental laws such as the [ESA], NEPA 'is a purely procedural statute' that 'imposes no substantive environmental obligations or restrictions,'" and "although NEPA requires the agency to analyze environmental impacts and prepare documents and make such analyses available for public inspection, 'NEPA does not require the agency to weigh environmental consequences in any particular way.'" *Cascadia Wildlands*, 153 F.4th at 879-80. "NEPA does not require the agency to prioritize environmental concerns over other concerns in determining whether to proceed with a project; instead, all it requires is that the agency consider and disclose environmental impacts. 'NEPA requires no more.'" *Id*.

Plaintiffs' attempt to conflate NEPA and the ESA is particularly inappropriate where, as here, the ESA consultation is programmatic, covering a program of activities over the course of many years on two national forests, a national scenic area, and a district of the Bureau of Land Management. *See* 50 C.F.R. § 402.02 ("Programmatic consultation is a consultation addressing an agency's multiple actions on a program, region, or other basis."). By contrast, the FEIS addressed the potential effects of a discrete project in a small and defined project area. *See Seven Cnty.*, 605

U.S. at 180 ("So when reviewing an agency's EIS, 'the only role for a court' is to confirm that the agency has addressed environmental consequences and feasible alternatives as to the *relevant project*." (emphasis added)). It is self-evident that different considerations would apply to assess the relevancy of new information to such a programmatic action under the ESA than would apply to a site-specific action under NEPA. It is the Forest Service that has the expertise and discretion to assess the difference between the ESA and NEPA analysis and the difference between the programmatic and site-specific consultation and to determine whether information from the consultation affected the analysis in the FEIS. The Forest Service reasonably determined it did not, and that technical determination is subject to the highest level of deference. *See Seven Cnty.*, 605 U.S. at 182, ("Black-letter administrative law instructs that when an agency makes th[ese] kinds of . . . scientific judgments, and decides what qualifies as significant . . . , a reviewing court must be at its 'most deferential.'" (citing *Baltimore Gas & Elec. v. Nat. Resources Def. Council, Inc.*, 462 U.S. 87, 103 (1983)).

The record clearly supports the reasonableness of the Forest Service's decision. The 2023 BA documented that although the wildfires removed some suitable and dispersal habitat in the relevant critical habitat subunit (WCS-4), such habitat in that subunit *increased* between 2019 and 2021 (which happens as habitat naturally develops). AR19249 (documenting increase in suitable and dispersal habitat); AR18683, AR18698 (noting loss of critical habitat from wildfires); AR22224 (WCS-4 in Project area); AR18817-18 (explaining natural development of foraging and suitable habitat). Further, the 2023 BA explained that the maximum loss of less than five percent of NSO dispersal habitat from the wildfires in WCS-4 was "insignificant at the [critical habitat] unit and subunit spatial scales," and that the critical habitat subunit would "continue to provide for connectivity as intended in the 2012 and 2021 critical habitat rules—including connectivity within

portions of WCS-4." AR18698. Additionally, the analysis of the vegetation management treatments on NSO habitat did not change between the 2019 BA and the 2023 BA. Both BAs apply the same 40 percent and 50 percent suitable habitat thresholds for assessing impairment of nest sites, AR15241, AR18556-57, both require avoidance of adverse effects to high-quality habitat areas, AR15256, AR18581, and both require surveys of NSO habitat and nest sites prior to and during implementation. AR15262-63, AR18586-87.[2]

In short, the FEIS explained where the Forest Service drew the line in deciding the scope of the environmental effects analysis. *Seven Cnty.*, 605 U.S. at 182. The Forest Service knew of changed conditions that resulted in the reinitiation of programmatic consultation under the ESA but reasonably determined that those changes did not affect the project-specific analysis in the FEIS. AR18360. As the Supreme Court made clear, "[s]o long as the EIS addresses environmental effects from the project at issue, courts should defer to agencies' decisions about where to draw the line." *Seven Cnty.*, 605 U.S. at 182.

Further, although the FEIS (and incorporated 2019 BA) itself fully complies with NEPA, the Forest Service also considered information in the 2023 BA as part of the NEPA process. Publication of the draft ROD and FEIS triggered an objection-resolution period during which those who had commented "during any designated opportunity for public participation," including during scoping and in response to the draft EIS, could object to the draft ROD and FEIS based on

[2] The primary change relevant to the Project is the 2023 ESA consultation's addition of design criteria 11c and 11d, which require review by a specialist team where activities could adversely affect habitat in an occupied site and preclude authorization of timber harvest activities that remove or downgrade spotted owl habitat in a core area. AR19651; *see* AR27734-55 (consistency review for Project). The ROD removed 500 acres of commercial harvest treatments in suitable habitat in occupied NSO range from the Project in response to these new design criteria. AR22233. In doing so, the Project fully complied with the ESA, and Plaintiffs do not claim otherwise.

their previous comments "*or new information that arose after the opportunities for comment*." AR18471 (emphasis added). Plaintiff Oregon Wild availed itself of that opportunity, submitting over 60 pages of objections, including several pages related to the Forest Service's consultation under the ESA and the FEIS's consideration of barred owls and wildfire. *See* AR19363-70; *see generally* AR19359-419 (objections). The Forest Service responded to these objections, explaining the "re-initiation of formal consultation with USFWS and the preparation of a revised Biological Assessment was completed to determine the effects of recent fires on listed species and their critical habitat [under the ESA]. However, the YRR project area was not affected by these fires and therefore, the determinations made in the YRR [FEIS] analysis remain unchanged." AR21311.

The ROD then noted that "concerns were raised regarding recent wildfires on the Middle Fork Ranger District and their influence on the effects of this project." AR22224. And the ROD included a table detailing the effect of wildfires on NSO habitat across the Forest:

**Table ROD 2: Spotted Owl Habitat on the Willamette National Forest as a result of 2021 and 2022 Fires**

| Habitat Type | 2020 Acres | Loss to Fires in 2021-2022* | 2020 minus Loss | Percent Change |
|---|---|---|---|---|
| Suitable Habitat | 767,417 | 34,371 | 733,046 | -4.5% |
| Dispersal Habitat | 218,355 | 4,994 | 213,361 | -2.3% |
| Habitat for Dispersal | 985,772 | 39,365 | 946,407 | -4.0% |

AR22225. Nevertheless, while recognizing that the wildfires "have impacted the District in many ways," the ROD explained that "none of the recent wildfire[s] have changed the impacts of this project and its proposed actions as they did not occur within the affected area that resource specialists used as the basis of their analysis findings." *Id.*; *see also* AR22224 (explaining one fire was more than eight miles from the Project area and two others were at least twenty miles away). The ROD then detailed effects to "Critical Habitat subunit (WCS-4)" that was affected by one of the fires, explaining that the fire had degraded habitat conditions in a way that "may influence movement patterns throughout the Critical Habitat subunit. However, residual habitat levels and

connectivity are such that fire impacts are not expected to adversely affect the function of the Critical Habitat subunit or create a strong filter or barrier to spotted owl landscape movement." AR22225. The ROD concluded that the Project "would not further reduce movement potential or the function of the Critical Habitat subunit." *Id.*

All this shows that the objection-resolution process continued to promote the twin aims of NEPA by fostering public participation about any potential effects of the wildfires on the FEIS's analysis and fully informing the agency decision-making process before a decision was made. *See Ctr. for Biological Diversity v. United States Bureau of Land Mgmt.*, 141 F.4th 976, 993 (9th Cir. 2025) (noting twin aims). And it illustrates the relevance of the Supreme Court's recent admonition that the "ultimate question is not whether an EIS in and of itself is inadequate, but whether the agency's final decision was reasonable and reasonably explained." *Seven Cnty.*, 605 U.S. at 184-85; *see also id.* at 180 ("Because an EIS is only one input into an agency's decision and does not itself require any particular substantive outcome, the adequacy of an EIS is relevant only to the question of whether an agency's final decision . . . . was reasonably explained."). The Forest Service's decision clearly meets this standard as the F&R correctly found.

**2. Fuel Reduction and Fire Risks**

The FEIS extensively assessed the potential effect of the alternatives on fuel reduction and fire risks. The action alternatives considered in the FEIS would promote forest diversity and structure through a combination of "commercial thinning, regeneration harvesting, and gap creation" followed by fuels treatments that include "underburning, pile burning, and mastication." AR17998. Non-commercial treatments would include, among other things, "recurring maintenance underburning." *Id.* The action alternatives would also reduce hazardous fuels "to improve fire resiliency, reduce fire risk around key areas, and create opportunities to manage wildfire safely and effectively" through "underburning, understory thinning, pruning, chipping,

piling, and burning." AR18000. Appendix A of the FEIS explained these various vegetation treatments. AR18287-300.

The FEIS detailed precisely how the action alternatives would improve the resiliency of the forest by shifting its composition "toward fire- and drought-tolerant species," moving "stands toward late-successional conditions in the long-term," and generally increasing the "diversity and structure of both mixed conifer and moist forests in the project area." AR18056; *see generally* AR18063-72. The FEIS further explained that commercial and non-commercial treatments would reduce fire severity in the area and promote firefighters' ability to respond to wildfire. AR18072-82.

In analyzing the effects of the alternatives on fuels and wildfire, the FEIS discussed the wildfire history in the area, explained that past fire suppression has caused the area to depart from the natural fire regime, provided detailed baseline information on fuel loading, weather, and fuel moisture, and quantified the effects of the alternatives through complex modeling that relied on this baseline information. AR18073-79. All this showed that the proposed activities would "reduce canopy density and increase spacing between crowns, creating forested stands less susceptible to a sustained crown fire," reduce surface fuels that would decrease the risk of fire climbing into the crowns of trees, and create "barriers to wildfire spread across the landscape," which would improve "firefighter effectiveness and provid[e] opportunities to protect resources at risk." AR18079-80. Indeed, the FEIS showed that surface fuel loading and crown-fire potential were substantially lower under either action alternative. AR18082 (Table 17: Predicted fire behavior by activity type).

These detailed analyses satisfied the Forest Service's procedural obligations under NEPA to consider the potential effects of the proposed action on fuels and wildfire. This should end the inquiry, as these "fact-dependent, context-specific, and policy-laden choices about the depth and

breadth of [the Forest Service's] inquiry," *Seven Cty.*, 605 U.S. at 183, are within the agency's technical expertise and are subject to the highest level of deference, *Cascadia Wildlands*, 153 F.4th at 906. In arguing otherwise, Plaintiffs do not dispute that the area departs from the natural fire regime, they do not challenge the detailed baseline information in the FEIS, and they do not quibble with the results of the modeling showing the action alternatives would substantially reduce the risk of crown fire. Instead, Plaintiffs claim the FEIS's detailed analysis is somehow invalid because of one fleeting sentence in their 121 pages of comments stating that "[s]ignificant reduction of canopy cover can increase fire hazard by making the stand hotter/dryer/windier, generating more hazardous slash, [and] stimulating the growth of future surface and ladder fuels." Obj. 24 (citing only AR16331); *see* AR16318-438 (Oregon Wild's comments).

But the Forest Service acknowledged and responded to Oregon Wild's comment, noting that thinning's "beneficial and adverse impacts on the landscape" are addressed throughout the EIS and specifically "distilled into the summary provided at the start of each section in Chapter 3." AR18428. And the FEIS candidly acknowledged that "[i]mmediately following harvest there would be an increased fire risk in stands until fuel reduction activities can take place due to the creation of post-harvest activity generated fuels." AR18080; *see also id.* ("Risk of undesirable fire behavior in areas proposed for strategic understory fuel treatments would temporarily increase until completion of treatments."); AR21331-32 ("[T]he project does not propose thinning alone. The proposed action includes post-harvest fuel treatments including underburning, pile burning, and mastication to manage activity generated fuels."). This approach to the "length, content, and level of detail" of responses is entitled to "substantial deference." *Seven Cty.*, 605 U.S. at 183.

Indeed, "the Forest Service is only required to acknowledge and respond to comments by outside parties that raise *significant scientific uncertainties and reasonably support that such*

*uncertainties exist*." *League of Wilderness Defs. Blue Mountains Biodiversity Proj. v. Allen*, 615 F.3d 1122, 1137 (9th Cir. 2010) (quoting *Lands Council v. McNair*, 537 F.3d 981, 1001 (9th Cir. 2008) (en banc) (emphasis in original)). Plaintiffs provide no reasonable support that significant scientific uncertainties exist. The comment Plaintiffs rely on to try to undermine the FEIS's extensive analysis of fuels reduction and fire risk contains no supporting citation, and Plaintiffs cite no academic studies or expert opinions to support their generic claim. This falls far short of reasonably supporting the existence of significant scientific uncertainties.

In earlier briefing, Plaintiffs cited a bevy of studies that they claimed supported their position. But they conspicuously omitted reference to those studies in objecting to the F&R. And that is likely because, as Federal Defendants previously explained, those studies show that the Forest Service's approach is based on strong scientific agreement that "thinning as well as the reintroduction of fire as an ecosystem process are critical to reducing fire severity and promoting ecosystem resilience and adaptive capacity (Agee and Skinner 2005, Raymond and Peterson 2005, Earles et al. 2014, Krofcheck et al. 2017)." Dkt. 55-1 at 10; *see generally* Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. J. 16-19, Dkt. 55. And as the Ninth Circuit has made abundantly clear, the Forest Service's acknowledgment that "short-term fuel loading increases will occur but long-term loading will be reduced" satisfies NEPA in this context. *Env'tl Prot. Info. Ctr. v. U.S. Forest Serv. (EPIC)*, 451 F.3d 1005, 1011, 1016-17 (9th Cir. 2006); *see also Allen*, 615 F.3d at 1137 (finding the Forest Service adequately addressed "opposing views" that "logging older trees would *increase* the risk of fire because of debris"); *Earth Island Inst. v. Muldoon*, 82 F.4th 624, 639-40 (9th Cir. 2023) (finding no scientific controversy where thinning followed by prescribed fire); *Friends of Big Bear Valley v. U.S. Forest Serv.*, 776 F. Supp. 3d 824, 832 (C.D. Cal. 2025) (same).

Plaintiffs further object to the F&R by claiming the Forest Service "failed to consider the low likelihood of a wildfire interacting with treated stands." Obj. 26. But the Forest Service expressly acknowledged Oregon Wild's comment that "[t]here is a very low likelihood that fuel treatments will interact with fire, so the benefits are unlikely, while the trade-offs on habitat and carbon are virtually certain to occur," and responded by referencing the FEIS's analysis of fireshed and air quality and explaining that regardless of interaction with fire, the proposed treatments would "start the process of restoration toward a more healthy and resilient landscape that includes different forms of disturbance." AR18426. And as the FEIS's assessment of fireshed details, the Project area "has averaged about 23 known fires per decade" since 1970 and "[r]ecent fire history information collected in the mixed conifer forest site indicate average fire return intervals from five to 14 years." AR18074.

Ignoring this reality, Plaintiffs cite only to fleeting references submitted in Oregon Wild's comments about carbon storage, noting a "generally low" probability of treated areas burning. *See* Obj. 26 (citing AR16391-400). But those comments contain no reference to the fire history or vegetation patterns in the Project area (which the FEIS contains), no discussion of the specific silvicultural and fuels treatments proposed by the alternatives (which the FEIS contains), and no analysis of the contribution of those treatments to improving the resiliency of the forest and reducing wildfire severity and intensity (which the FEIS contains). And Plaintiffs fail to understand that whether fire ultimately interacts with the treated areas says nothing about the forest resiliency-enhancing effects of the action alternatives and their ability to return the area to a natural fire regime that would continue for years into the future through maintenance underburning. AR18426; AR18080. Indeed, under Plaintiffs' view, important and necessary work to restore the resiliency of the forest could proceed only where the Forest Service can show with certainty that

a wildfire will interact with the treated stands. This impossible standard would foreclose all such work. NEPA's procedural mandate in no way supports Plaintiffs' extreme position. Plaintiffs have shown no significant scientific uncertainties as to the Project's potential effects that the Forest Service failed to respond to and this claim fails.

**3. Carbon Storage and Emissions**

The F&R correctly found that the FEIS's assessment of potential effects to carbon storage and emissions satisfied NEPA. F&R 25-27. The action alternatives considered in the FEIS would improve the resiliency of the forest in the project area by "increasing diversity and structure of both mixed conifer and moist forests," AR18056, "decrease crown fire potential," AR18073, "reduce the long-term risk of large severe wildfires," AR18074, and "favor the retention and growth of more fire adapted species such as ponderosa pine, Douglas fir, oak, and madrone," *id.* The alternatives would do this through a variety of treatments, including up to 1,419 acres of commercial thinning in natural stands. AR17971. The FEIS examined the potential effects on climate change of these restorative activities on a small project in a small project area within a larger national forest. AR18251-53. Understandably, the FEIS explained that potential effects "would be minor" because the proposed activities would affect only about 20 percent of the 33,000-acre project area and there would be no effects to below-ground carbon stocks, which store 50 percent or more of ecosystem carbon. AR18251. The proposed activities would have "negligible" direct or indirect effects on greenhouse gas emissions and climate change. AR18252. The FEIS supported this conclusion with a detailed qualitative analysis of the potential effects of the proposed activities, AR18251-53, and it supported that analysis with an extensive bibliography of relevant references, AR18345-47.

The FEIS explained the largest source of global greenhouse gas emissions from the forestry sector is deforestation, which is "the removal of all trees to convert forested land to other land uses

that do not support trees or allow trees to regrow for an indefinite period of time." AR18252. Far from converting forest land to other uses, the FEIS explained the proposed activities would not "result in the loss of forested areas," but would instead retain forest stands while using thinning, harvesting, and prescribed burning "to mimic natural fire effects to maintain a vigorous condition that supports enhanced tree growth and productivity, thus contributing to long-term carbon uptake and storage." AR18252. And while these activities may result in a "relatively small quantity of carbon released to the atmosphere" in the short term, "any initial carbon emissions . . . would be balanced and possibly eliminated as the stand recovers and regenerates because the remaining trees and newly established trees typically have higher rates of growth and carbon storage (Hurteau and north 2009, Dwyer et al. 2010, McKinley et al. 2011)." AR18253. Further, some of the activities will result in carbon continuing to be stored in wood products or would be used in place of other products that would emit more greenhouse gas emissions. *Id.*

The FEIS directly responded to Plaintiffs' comments regarding potential carbon impacts. In doing so, the FEIS reiterated that "[r]estoration activities like thinning and prescribed fire incur a short-term carbon trade-off," but that in the long-term temporarily reducing stand density "through thinning or disturbance" will result in "enhanced growth rates with lower density [and] lead to carbon stores returning to their maximum levels within a few decades. Stand recovery growth can meet or exceed the growth rates in an unharvested stand (Raymond et al. 2015)." AR18412. The FEIS continued by acknowledging that although evidence exists showing carbon benefits from treating forest stands, "how these trade-offs work in the real world [is] not settled science. There is no consensus in the literature on whether thinning to reduce disturbance severity is a net climate benefit or not (McKinley et al. 2011)." AR18412. But the approach proposed by the action alternatives "is in line with national and international guidance as stated in the EIS,"

"emphasize[s] ecosystem functions and resilience, and recognize[s] carbon sequestration as one of many ecosystem services." AR18413; *see also* AR18417-18.

Plaintiffs challenge the FEIS's analysis, claiming the potential effects to climate change from this relatively small forest restoration project should have somehow been analyzed in more depth. Obj. 31-32. But "NEPA does not require the agency to weigh environmental consequences in any particular way," and instead permits an agency to "weigh environmental consequences as [it] reasonably sees fit under its governing statute and any relevant substantive environmental laws." *Seven Cty.*, 605 U.S. at 173. The FEIS reasonably analyzed the issue in proportion to its significance, and this reasonable "fact-dependent, context-specific, and policy-laden choice[] about the depth and breadth of its inquiry—and also about the length, content, and level of detail of the resulting EIS" must be given "substantial deference." *Id.* at 183.

Indeed, the Ninth Circuit previously upheld an environmental assessment for a project under NEPA that authorized timber harvest "to reduce likely fire intensity" that included *no* discussion of climate change. *Hapner v. Tidwell*, 621 F.3d 1239, 1242, 1245 (9th Cir. 2010). In doing so, the court correctly noted that potential "[i]mpacts shall be discussed in proportion to their significance." *Id.* at 1245 (quoting 40 C.F.R. § 1502.2(b)); *see Swomley v. Schroyer*, 484 F. Supp. 3d 970, 975-77 (D. Colo. 2020) (upholding EA's discussion of climate impacts of forest resilience project); *Earth Island Inst. v. Gibson*, 834 F. Supp. 2d 979, 990 (E.D. Cal. 2011) (deference to agency's assessment of climate impacts of fuel reduction project); *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1140 (9th Cir. 2011) (upholding analysis of greenhouse gas emissions). Plaintiffs fail to even mention this binding precedent. Instead, Plaintiffs rely on *Center for Biological Diversity v. U.S. Forest Serv. (Black Ram)*, 687 F. Supp. 3d 1053 (D. Mont. 2023). Pls.' Obj. 28. And that is understandable since *Black Ram* is the *only* case in which a court has found an

assessment of climate impacts for a forest restoration project insufficient under NEPA. But that case is easily distinguishable, as it relied on a "cookie-cutter" analysis in which an analysis for a project on one forest was copied and pasted into an analysis for a different project on another forest. *Black Ram*, 687 F. Supp. 3d at 1074 n.7. And the same court has refused to extend its holding. *See Ctr. for Biological Diversity v. U.S. Forest Serv.*, 811 F. Supp. 3d 1206, 1218-19 (D. Mont. 2025); *All. for the Wild Rockies v. Vilsack*, No. 24-cv-10-DLC, 2026 WL 1493808, at *2 (D. Mont. May 28, 2026).

But even if it were not distinguishable, it was wrongly decided. As an initial matter, *Black Ram* fails to defer to Forest Service expertise in assessing the potential climate impacts of a forest resiliency project. Perhaps this failure was less egregious before *Seven County*. But the Supreme Court made abundantly clear that such a failure to defer was wrong. *Ariz. Mining Reform Coal.*, 172 F.4th at 660 (explaining "the Supreme Court has made clear" that although "it will always be possible to identify some argument, raised by some stakeholder, that could have been analyzed in more detail," courts must defer to the agency as to "'whether a particular report is detailed enough in a particular case'" (quoting *Seven Cnty.*, 605 U.S. at 181)). The Forest Service's assessment of potential climate impacts is precisely the type of assessment where a court's deference is "at its apogee," and a court may not order an "agency to explain every possible scientific uncertainty." *See Cascadia Wildlands*, 153 F.4th at 906.

*Black Ram* also improperly disregarded *Hapner* and *Swomley* while relying on *350 Montana v. Haaland*, 50 F.4th 1254 (9th Cir. 2022). *See Black Ram*, 687 F. Supp. 3d at 1075-76. In doing so, *Black Ram* found neither *Hapner* nor *Swomley* applicable because those cases involved 810 acres and 1,631 acres of timber harvest respectively, while the project in *Black Ram* involved 3,902 acres. *Id.* at 1076. But the court did not explain why the potential carbon impact of

a project involving 3,902 acres is meaningfully different from a project involving 810 acres or 1,631 acres. Further, *Black Ram* ignored that the EA in *Hapner* provided no assessment of climate impacts. 621 F.3d at 1245. In doing so, the court failed to explain why a project involving 810 acres of timber harvest requires no analysis of potential climate impacts while a project involving 3,902 acres requires more than the qualitative analysis provided in that case. As *Seven County* explains, the Forest Service is best suited to make such determinations.

*Black Ram* and Plaintiffs' reliance on *350 Montana* to suggest otherwise is misplaced. 687 F. Supp. 3d at 1075; Obj. 28, 32. Unlike the project intended to improve forested ecosystem functions at issue in *Hapner* (and *Swomley*, *Earth Island Institute*, and here), *350 Montana* addressed an EA for a coal mine expansion that would "generate more [greenhouse gases] annually than the largest single point source of [greenhouse gas] emissions in the United States," totaling nearly 0.5 percent of annual *global* greenhouse gas emissions. 50 F.4th at 1265-66. The court faulted the agency for not citing "any scientific evidence supporting the characterization of the project's emissions as 'minor' compared to global emissions," nor identifying "any science-based criteria the agency used in its determination." *Id.* at 1266. But that case presented a qualitatively different scenario than the limited potential effects of forest resiliency projects that will have, at most, minor potential carbon-storage impacts from the removal of vegetation followed by improved carbon sequestration from healthier forests.

This is what *Swomley v. Schroyer*, 484 F. Supp. 3d 970, 973 (D. Colo. 2020), written by the then chief judge of the U.S. Court of Appeals for the Tenth Circuit, got exactly right when considering whether the Forest Service sufficiently assessed the potential effect to climate change of a forest resiliency project that authorized "logging on 1,631 acres of land in the White River National Forest." The court explained that the plaintiffs "do little to show why the emissions from

the Project are sufficiently significant to require detailed analysis under NEPA" other than citing "a bevy of cases" that are easily distinguishable because they "involve[] projects, plans, or rules associated with the combustion or extraction of fossil fuels, such as coal, natural gas, or oil," in which "the significance of emissions was often beyond doubt." *Id.* at 976. Rather than rely on those cases, the court correctly found *Hapner* to be a "more apt comparison," concluding that "the Forest Service did not run afoul of NEPA or act arbitrarily or capriciously in not analyzing the effects of these impacts further." *Id.* at 977. So too here.

Attempting to avoid this conclusion, Plaintiffs cast their argument as a failure by the Forest Service to adequately respond to their comments. Obj. 28-31. But this gets them no further. An agency need not "respond to every single scientific study or comment. Furthermore, even if Plaintiffs disagree with the agency's responses, that disagreement does not render the Forest Service's review and comment process improper." *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1021 (9th Cir. 2012).

Oregon Wild's climate-related comments to the DEIS were sprawling, including dozens of hyperlinks to materials such as articles from various news outlets, blogposts, Wikipedia entries, YouTube videos, comments to state administrative agencies, and opinions of the Hague Court of Appeal. *See, e.g.*, AR16377, AR16430, AR16381-82, AR16415, AR16427 (news outlets), AR16381, AR16384, AR16396 (blogposts), AR16390 (Wikipedia), AR16415 (YouTube), AR16385 (comments to state agency), AR16378 (Hague Court of Appeal). Rather than responding to the individual points or citations, the FEIS responded by summarizing and responding to categories of issues. In the case of carbon storage and greenhouse gas emissions, the FEIS responded by acknowledging the "short-term carbon trade-off" of thinning and prescribed fire, clarifying that "no full or partial land-use change occurs as a result of the proposed management

action that would permanently affect the project area's carbon carry capacity," and explained the high likelihood that the remnant trees following treatment would likely be healthier and that carbon stores would return to maximum levels within a few decades. AR18412. After this discussion, the FEIS squarely acknowledged in response to Plaintiffs' comments that "[t]here is no consensus in the literature on whether thinning to reduce disturbance severity is a net climate benefit or not (McKinley et al. 2011)." *Id.* But the FEIS noted the Forest Service, consistent with national and international guidance, would manage the forest to improve long-term resiliency and ecosystem function rather than to maximize potential short-term carbon benefits. AR18412-13.

Plaintiffs clearly disagree with that policy choice, but such a disagreement does not establish a NEPA violation. Instead, the overriding inquiry is whether the agency's choices as to the depth and breadth of its inquiry, including its response to comments, fall within a broad zone of reasonableness. The FEIS considered potential climate impacts and responded to comments regarding those impacts in proportion to their significance. This approach was reasonable, is subject to substantial deference, and should be upheld.

## V. CONCLUSION

For the reasons stated above, the Court should adopt the F&R, deny Plaintiffs' motion for summary judgment and grant Federal Defendants' cross-motion.

Respectfully submitted this 16th day of September, 2026.

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Energy & Natural Resources Division

*/s/ Shaun M. Pettigrew*
SHAUN M. PETTIGREW
Senior Trial Attorney, CA Bar No. 254564
c/o NOAA Damage Assessment

7600 Sand Point Way, NE
Seattle, WA 98115
(202) 532-5973
shaun.pettigrew@usdoj.gov

*Attorney for Federal Defendants*