Sara Ghafouri, OSB #111021
American Forest Resource Council
700 N.E. Multnomah, Suite 320
Portland, Oregon 97232
Telephone: (503) 222-9505
Fax: (503) 222-3255
Email: sghafouri@amforest.org

Greg Hibbard, OSB #183602
American Forest Resource Council
924 Capitol Way South, Suite 102
Olympia, WA 98501
Telephone: (360) 352-3910
Fax: (360) 352-3917
Email: ghibbard@amforest.org

*Attorneys for Defendant-Intervenor*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF OREGON**
**EUGENE DIVISION**

| | |
|---|---|
| **OREGON WILD**, an Oregon nonprofit corporation; and **WILDEARTH GUARDIANS**, a New Mexico nonprofit corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>**DAVID WARNACK,** in his official capacity as Supervisor of the Willamette National Forest; and **UNITED STATES FOREST SERVICE,** a federal agency,<br><br>Defendants,<br><br>and<br><br>**AMERICAN FOREST RESOURCE COUNCIL,** an Oregon non-profit corporation,<br><br>Defendant-Intervenor. | Civil No. 6:24-cv-00949-AP<br><br>**DEFENDANT-INTERVENOR'S RESPONSE IN OPPOSITION TO PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION** |

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. FACTUAL BACKGROUND ..... 3

A. The Northwest Forest Plan ..... 3

B. The Youngs Rock Rigdon Project ..... 3

C. Procedural History ..... 8

III. STANDARD OF REVIEW ..... 12

IV. LEGAL BACKGROUND ..... 12

V. ARGUMENT ..... 16

A. The F&R Correctly Determined that the Range of Alternatives Analyzed Was Reasonable ..... 16

1. The F&R correctly determined that the Forest Service analyzed a reasonable range of alternatives ..... 16

2. The Forest Service explained why it did not analyze Plaintiffs' Proposed Alternative in more detail ..... 20

B. The F&R Correctly Determined that the Forest Service Took the Requisite Hard Look at the Project's Environmental Impacts ..... 24

1. The Forest Service took a hard look at impacts to the NSO ..... 24

2. The Forest Service took a hard look at fire and fuels impacts ..... 28

3. The Forest Service took a hard look at impacts on carbon storage and the climate ..... 31

VI. REMEDY ..... 34

VII. CONCLUSION ..... 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*350 Mont. v. Haaland*,
50 F.4th 1254 (9th Cir. 2022) ....................33

*Audubon Soc'y of Portland v. Haaland*,
40 F.4th 967 (9th Cir. 2022) ....................14, 17, 20

*Bark v. U.S. Forest Serv.*,
958 F.3d 865 (9th Cir. 2020) ....................30

*Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*,
153 F.4th 869 (9th Cir. 2025) ....................13, 15

*City of Los Angeles, Cal. v. Fed. Aviation Admin.*,
63 F.4th 835 (9th Cir. 2023) ....................10, 16

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*,
508 U.S. 602 (1993)....................12

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
538 F.3d 1172 (9th Cir. 2008) ....................13

*Dawson v. Marshall*,
561 F.3d 930 (9th Cir. 2009) ....................12

*Dep't of Transp. v. Pub. Citizen*,
541 U.S. 752 (2004)....................26

*Friends of Yosemite Valley v. Kempthorne*,
520 F.3d 1024 (9th Cir. 2008) ....................9, 19

*Idaho Wool Growers Ass'n v. Vilsack*,
816 F.3d 1095 (9th Cir. 2016) ....................33

*Lands Council v. McNair*,
537 F.3d 981 (9th Cir. 2008) (en banc) ....................12, 13, 24

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360 (1989)....................27

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
177 F.3d 800 (9th Cir. 1999) ....................9

*Myers v. Fulbright*,
367 F.Supp.3d 1171 (D. Mont. 2019) ............ 12

*N. Alaska Env't Ctr. v. Kempthorne*,
457 F.3d 969 (9th Cir. 2006) ............ 14

*N. Cascades Conservation Council v. U.S. Forest Serv.*,
136 F.4th 816 (9th Cir. 2025) ............ 15

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,
668 F.3d 1067 (9th Cir. 2011) ............ 13

*Native Ecosystems Council v. U.S. Forest Serv.*,
428 F.3d 1233 (9th Cir. 2005) ............ 18

*Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*,
625 F.3d 1092 (9th Cir. 2010) ............ 12

*Or. Wild v. U.S. Forest Serv.*,
819 F.Supp.3d 1185 (D. Or. 2026) ............ 15

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colo.*,
605 U.S. 168 (2025) ............ *passim*

*Stop B2H Coal. v. Bureau of Land Mgmt.*,
552 F.Supp.3d 1101 (D. Or. 2021) ............ 23

*Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*,
608 F.3d 592 (9th Cir. 2010) ............ 14

*Tenn. Valley Auth. v. Hill*,
437 U.S. 153 (1978) ............ 27

*W. Watersheds Project v. Bernhardt*,
543 F.Supp.3d 958 (D. Idaho 2021) ............ 18

*W. Watersheds Project v. Salazar*,
993 F.Supp.2d 1126 (C.D. Cal. 2012) ............ 27

**Statutes**

5 U.S.C. § 706(2)(A) ............ 12

28 U.S.C. § 636(b)(1) ............ 12

28 U.S.C. § 636(b)(1)(B) ............ 12

**Other Authorities**

40 C.F.R. 1503.4(a) ....................14
40 C.F.R. § 1502.2(b) ....................13
40 C.F.R. § 1502.14(a) ....................14
40 C.F.R. § 1503.4(a) ....................31
40 C.F.R. § 1503.4(a)(5) ....................32
85 Fed. Reg. 43304 (July 16, 2020) ....................13
87 Fed. Reg. 23453 (Apr. 20, 2022) ....................13
89 Fed. Reg. 35442 (May 1, 2024) ....................13
90 Fed. Reg. 10610 (Feb. 25, 2025) ....................13
Fed. R. Civ. P. 56(a) ....................12
Fed. R. Civ. P. 72(b)(3) ....................12

# ACRONYM LIST

| | |
|---|---|
| BA | Biological Assessment |
| BiOp | Biological Opinion |
| BLM | Bureau of Land Management |
| DEIS | Draft Environmental Impact Statement |
| ESA | Endangered Species Act |
| EIS | Environmental Impact Statement |
| FEIS | Final Environmental Impact Statement |
| F&R | Findings and Recommendation |
| FWS | Fish and Wildlife Service |
| LSR | Late-Successional Reserves |
| MMBF | Million Board Feet |
| NEPA | National Environmental Policy Act |
| NSO | Northern Spotted Owl |
| NWFP | Northwest Forest Plan |
| ROD | Record of Decision |

## I. INTRODUCTION

The need for the Forest Service to responsibly manage its lands grows with each ever-threatening wildfire season. The Youngs Rock Rigdon Project (the Project or Youngs Rock Project) is an example of a desirable forest health project that received broad community support. Plaintiffs seek to prevent this important work and raise purely procedural challenges against the Project under the National Environmental Policy Act (NEPA). After multiple rounds of briefing and now objections, it is evident that the only outcome that will assuage Plaintiffs is to require the Forest Service to alter the substance of the Project to align with Plaintiffs' preferred outcome. Such a demand is inappropriate under NEPA. *See Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colo.*, 605 U.S. 168, 177 (2025) ("NEPA does not mandate particular results, but simply prescribes the necessary process for an agency's environmental review of a project." (internal quotation marks omitted)). As Magistrate Judge Potter aptly put it, "Plaintiffs disagree with some of [the Forest Service's] reasoning and explanations, but that is not sufficient to support a NEPA violation." ECF No. 66 at 28 (F&R).

The F&R determined that it was appropriate to defer to the Forest Service because the agency evaluated a reasonable range of alternatives, explained its decision to not further consider the alternative proposed by Plaintiffs (Proposed Alternative), and took a hard look at impacts to the northern spotted owl (NSO), fire and fuels, and climate change or carbon storage. The Forest Service did what agencies are asked to do under NEPA—it disclosed environmental impacts and responded to Plaintiffs' Proposed Alternative (which was deemed non-viable), competing science, and other concerns raised in their comments.

In their Objections, Plaintiffs discount the F&R's analysis as reflexive deference that erodes NEPA standards. Plaintiffs instead seek to vacate the Project because the Forest Service

did not use the appropriate magic words in its analysis or respond to Plaintiffs' concerns with the level of detail that they would have preferred. In doing so, Plaintiffs overlook portions of the administrative record that undermine their arguments. Concerningly, Plaintiffs also attempt to distract from the procedural claims before the Court by repeatedly misrepresenting that the Project violates the Endangered Species Act (ESA). But this case is not about whether the Youngs Rock Project will jeopardize the NSO or result in adverse modification of NSO critical habitat. Violations of the ESA have never been pled, let alone litigated, because Plaintiffs elected to bring only NEPA claims.

Contrary to Plaintiffs' claims, the F&R applied the appropriate level of deference to the Forest Service's detailed analysis. Under NEPA, a high level of deference is required—it is not indicative of a thoughtless reflex. "When assessing significant environmental effects and feasible alternatives for purposes of NEPA, an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry—and also about the length, content, and level of detail of the resulting EIS. Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Seven Cnty.*, 605 U.S. 168 at 183; *id*. at 813–14 (setting forth a "course correction" under NEPA because "[s]ome courts have strayed and not applied NEPA with the level of deference demanded by the statutory text"). Because the F&R identified that this is an instance where the agency acted reasonably under NEPA, there is no risk that this decision will erode NEPA. Plaintiffs, ultimately, appear less concerned with process and more concerned with a substantive decision that aligns with their preferred management of the landscape. However, that relief is outside the scope of Plaintiffs' procedural NEPA claims. *Id.* at 183 ("A reviewing court may not substitute its judgment for that of the agency as to the

environmental consequences of its actions." (internal quotation marks omitted.)).

Because Plaintiffs fail to identify error in the F&R, Defendant-Intervenor respectfully requests that this Court adopt the F&R and uphold the Project.

## II. FACTUAL BACKGROUND

### A. The Northwest Forest Plan.

The Forest Service manages the Project under the 1994 Northwest Forest Plan (NWFP). *See* AR17984. The NWFP provides several land use allocations implicated by the Project, including Matrix, Riparian Reserves, and Late-Successional Reserves (LSR). *Id.* LSR areas represent 30% of the federal lands within the NSO's range and "are designed to serve as habitat for late-successional and old-growth related species including the [NSO]." AR2907. Riparian Reserves represent 11% of the federal lands within the NSO's range and are designed "to protect the health of the aquatic system and its dependent species." AR2908. Matrix lands represent 16% of the federal land within the NSO's range and are "the area[s] in which most timber harvest and other silvicultural activities will be conducted." *Id.* Matrix lands were designated to emphasize "the economic and social benefits of timber harvest," not quality habitat for the NSO. AR2951. That said, Matrix lands "provide for important ecological functions," "maintenance of ecologically valuable structural components such as down logs, snags, and large trees," and increase "ecological diversity by providing early-successional habitat." AR2996.

### B. The Youngs Rock Rigdon Project.

The Project is located on the Willamette National Forest. AR17970. Although the Project area is about 33,000 acres, the Project calls for treatments on approximately 6,500 acres. AR17974–75. The Project has received broad support since its early stages. The Project was identified under the 2019 Rigdon Landscape Analysis, which was collaboratively developed to

identify restoration opportunities in the approximately 100,000 acres in the Rigdon area. *See* AR17973–74. The Southern Willamette Forest Collaborative was instrumental in public outreach and engagement efforts, and helped develop the Project's location, design, and proposed treatments. AR17993. The Forest Service also consulted with tribal partners, including formal consultation with several tribes. AR17992. The Forest Service relied on its interdisciplinary team and twenty comment letters during the scoping period to identify key issues for the Project. AR17995–97.

The Forest Service identified five purposes and needs for the Project: (1) "[i]mprove stand and landscape diversity, structure, and resiliency"; (2) "[s]trategically reduce hazardous fuels"; (3) "[s]ustainably manage existing trail system and dispersed recreation while minimizing impacts to natural resources"; (4) "[i]dentify a sustainable road system needed for safe and efficient travel and for administration, utilization, and protection of National Forest System Lands"; and (5) [p]rovide a sustainable supply of Forest Products." AR17976–82. For each purpose and need, the Forest Service explained why the agency was taking action, described the existing conditions, and identified the desired conditions. *Id.*

The Project area is in a transition zone comprised of two forest types—dry forests in the south and moist forests in the north. AR17976. The vast majority of the Project area is located in the "Matrix" land use allocation under the NWFP. AR17985–86; *see* AR17988 (Figure 2). Only a minor portion of the Project area is LSR. *Id.* Historic fire suppression efforts have degraded meadows and oak savannas through the encroachment of conifers and non-native invasive species. AR17978. The Project seeks to restore meadows and oak savanna areas to provide well-distributed unique habitats that are more connected to each other. *Id.* In the moist areas, the stands occupy a variety of topographic conditions and are "dominated by Douglas-fir,

western hemlock in lower elevations, and Pacific silver fir and mountain hemlock in higher elevations." AR17977. Fire suppression efforts have promoted closed canopy conditions, which have increased stand density and decreased diversity. *Id.* Specifically, the Project area has seen a decrease in ponderosa pine, Oregon white oak, and sugar pine tree species. AR17976. The current stand composition is at risk of high-intensity wildfires because fire can easily spread in closed canopy forest conditions. *Id.* Canopy fuel treatments would reduce the likelihood of sustaining crown fires, protect private timberlands, and improve firefighting effectiveness. AR17979–80.

The Forest Service issued a Draft Environmental Impact Statement (DEIS) in July 2021 and opened a 45-day comment period. AR17995; AR15819–16253 (DEIS). The DEIS analyzed three alternatives—No Action, Alternative 2 (preferred alternative), and Alternative 3. AR15834. A portion of Alternative 3 was developed in response to public comments expressing concerns regarding the Project's effects to NSO habitat. AR17996. The Forest Service also identified alternatives that it considered but ultimately eliminated from further consideration. *See* AR15873–74. Additionally, the Forest Service considered Plaintiffs' Proposed Alternative but determined that it did not warrant further consideration because it was inconsistent with the Project's purposes and needs. *See* AR18411–29.

The alternatives varied in terms of type and intensity of treatment. *See* AR17971–73. While both action alternatives involved commercial treatments, there are significant differences in the types of commercial treatments, the amount of commercial treatments in natural and managed stands, and the amount of non-commercial treatments. Alternative 2 proposed 2,608 acres of commercial harvest and about 4,500 acres of non-commercial activities (not including skips); whereas, Alternative 3 proposed 1,853 acres of commercial harvest and about 5,300 acres

of non-commercial activities (not including skips). AR18012–13; *see also* AR17971 (Table 1). With respect to commercial activities, both Alternative 2 and 3 proposed thinning in natural stands, but Alternative 3 reduced the amount by 755 acres (664 acres versus 1,419 acres). AR18012. Alternative 3 proposed to commercially thin with larger gaps (one to three acres) on 261 acres instead of regeneration harvest activities within managed stands. AR18006; AR17971. Thinned areas in managed stands would also favor the retention of larger trees. AR18289.

The resulting canopy cover post-implementation would differ between the two alternatives. Managed stands currently average about 76% canopy cover. AR18125; AR18164. Alternative 3's commercial thinning in managed stands would result in 51–58% canopy cover and 80 trees per acre. *Id.*; AR18289. In contrast, Alternative 2's regeneration harvest would result in 21–38% canopy cover and 60–80 trees per acre. AR18125; AR18164; AR18288. Alternative 2 would retain at least 15% of Matrix lands in managed stands in "clumps," skips, or scattered trees that are at least 2.5 acres. AR18288. Under Alternative 3, up to 20% of each stand would be in the one- to three-acre gap areas. AR18068. In all, Alternative 3 would have resulted in less open areas than Alternative 2 in managed stands. AR18068–69.

The Forest Service received six comments on the DEIS. *See* AR18391–431. On March 29, 2023, the Forest Service issued its Final EIS (FEIS). AR17956–8431. The Forest Service included its response to public comments in Appendix K of the FEIS. AR18391–431. In particular, the Forest Service responded to the components of Plaintiffs' Proposed Alternative. AR18411–29; *see* ECF No. 51 at 15–19.

To inform its analysis, the Forest Service relied on broader analyses conducted by the Forest Service and the United States Fish and Wildlife Service (FWS). In 2019, the Forest Service engaged with an interagency Level 1 Team and issued a programmatic Biological

Assessment (2019 BA) regarding activities on the Columbia River Gorge National Scenic Area, the Mt. Hood National Forest, the Willamette National Forest, and the Northwest Oregon Bureau of Land Management (BLM) District. AR15209–748. The 2019 BA analyzed the effects of that programmatic action—habitat modification activities on BLM and Forest Service lands during a 27-year period—on the NSO and its critical habitat. AR15247–49 (noting that the proposed action is outlined in Appendix A); AR15608–28 (Appendix A); AR15402. FWS subsequently issued its programmatic Biological Opinion in 2019 (2019 BiOp), determining the proposed action "is not likely to jeopardize" the NSO or "destroy or adversely modify" NSO critical habitat. AR14935; *see generally* AR14849–953 (2019 BiOp).

In response to the habitat losses during the 2020–2022 wildfires, the Forest Service updated its programmatic BA in February 2023, which took 18 months to prepare and was developed with FWS's technical assistance. AR17157–58. Shortly thereafter, FWS issued its programmatic 2023 BiOp in June 2023, determining that the proposed action is not likely to jeopardize the NSO or destroy or adversely modify NSO critical habitat. AR19797. In June 2023, FWS also conducted a Level 1 consistency review of this Project with the 2023 BA and 2023 BiOp. AR27737–50.

On December 8, 2023, the Forest Service issued its Record of Decision (ROD) and selected a modified Alternative 2. AR22210. The modified Alternative 2 authorizes treatments on approximately 6,500 acres including 2,242 acres of commercial harvest activities (thinning in natural stands, thinning in managed stands, and regeneration harvest); about 4,900 acres of non-commercial activities (thinning around pine and oaks, roadside pine release, and fuels treatment); and 276 acres of meadow restoration. AR22210–11. Commercial harvest treatments will occur in managed stands (less than 80 years old) and natural stands (up to 140 years old). AR22210.

The modified Alternative 2 drops 500 acres of commercial treatment in natural stands to reduce the amount of NSO suitable habitat removed. AR22233; AR22211. The modified Alternative 2 also authorizes various road management activities. AR22212. The ROD acknowledged that the modified Alternative 2 will allow more timber harvest activities in natural stands within the NSO's critical habitat than Alternative 3 but emphasized that these areas need restoration and fire resiliency work. AR22217. Ultimately, the Project will generate about 55–63 million board feet (MMBF) of volume over five timber sales, which will contribute toward the NWFP's 111 MMBF Probable Sale Quantity target. Geissler Decl. (ECF No. 20) ¶ 6; AR18239; AR17982.

**C. Procedural History.**

Plaintiffs filed their complaint in June 2024 and challenged the Project solely under NEPA. *See* ECF No. 1. Plaintiffs moved for summary judgment on four claims. First, Plaintiffs alleged that the Forest Service did not analyze a reasonable range of alternatives. ECF No. 41 at 13–17. Plaintiffs criticized the Forest Service for considering "virtually identical" action alternatives. *Id.* at 13 (internal quotation marks omitted). Plaintiffs also argued that the Forest Service failed to adequately explain why it excluded Plaintiffs' Proposed Alternative from detailed analysis in the FEIS. *Id.* at 17–18. Second, Plaintiffs argued that the Forest Service did not take a hard look at impacts to the NSO, primarily because the Forest Service relied on outdated information from the 2019 BA and BiOp rather than the subsequent 2023 consultation documents. *Id.* at 18–29. Third, Plaintiffs alleged that the Forest Service did not take a hard look at fuels reduction and fire risks. *Id.* at 29–31. Plaintiffs argued that they submitted multiple scientific studies in their NEPA comments that questioned or contradicted the Forest Service's assessment of how the treatments would reduce fire risk. *See id.* Lastly, Plaintiffs alleged that the Forest Service failed to take a hard look at carbon storage and emissions from the Project's

activities. *Id.* at 31–36.

Following oral argument on June 3, Magistrate Judge Potter issued a 29-page F&R on August 5. ECF No. 66. Magistrate Judge Potter recommended that Plaintiffs' Motion for Summary Judgment be denied in its entirety and that summary judgment be granted in favor of Federal Defendants and Defendant-Intervenor. ECF No. 66 at 2.

The F&R rejected Plaintiffs' argument that the action alternatives are virtually identical because "there are meaningful differences between the two action alternatives." *Id.* at 12. Relying on the differences in "scope and type of treatment," the F&R found that this instance was different than the situations posed by *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1038 (9th Cir. 2008) and *Muckleshoot Indian Tribe v. U.S. Forest Service*, 177 F.3d 800, 813 (9th Cir. 1999). *Id.* at 12 (explaining that the alternatives here were not virtually indistinguishable like in *Kempthorne* or merely labeled differently as in *Muckleshoot Indian Tribe*). The F&R also found that the Forest Service "responded to Plaintiffs' concerns and explained how Plaintiffs' [P]roposed [A]lternative was not consistent with the scope and purpose of the project." *Id.* at 13 ("Nineteen pages in Appendix K of the EIS are devoted to responding to Plaintiffs' comments and [P]roposed [A]lternative."). The F&R addressed the Forest Service's responses to the main components of Plaintiffs' Proposed Alternative. *Id.* at 13–15. The F&R found that the necessary analysis was contained in the EIS and it was immaterial if that analysis was contained in an appendix. *Id.* at 15.

Next, the F&R found that the Forest Service took the requisite hard look at the Project's impacts to the NSO, fire risks, and carbon storage and emissions. *Id.* at 16–27. Magistrate Judge Potter applied "the rule of reason" "to decide whether the agency's discussion of environmental impacts [was] sufficiently thorough." *Id.* (quoting *City of Los Angeles, Cal. v. Fed. Aviation*

*Admin.*, 63 F.4th 835, 842 (9th Cir. 2023)). The following findings from the F&R are relevant to Plaintiffs' Objections.

The F&R walked through the agency's NSO analysis in the FEIS. *Id.* at 16–18. Ultimately, the F&R reasoned that "[t]he fact that the EIS concluded there would be an impact on the NSO[] but [the Forest Service] decided to proceed anyway is not evidence of a lack of meaningful analysis." *Id.* at 18. The F&R found that, despite Plaintiffs' claims to the contrary, the FEIS "addresse[d] potential environmental impacts to the NSO." *Id.* at 16. The F&R acknowledged that the FEIS incorporated the 2019 BA and highlighted that the BA addressed some of Plaintiffs concerns such as "the effects of logging, thinning treatments, and reduction in older forests on competition between barred and spotted owls." *Id.* at 16, 19. The F&R found that "[t]he EIS, combined with the 2019 BA, gives a meaningful analysis of potential impacts to the NSO." *Id.* at 19.

The F&R noted that the agency did not merely rely on the 2019 BA. The F&R also emphasized that the FEIS provided NSO information that postdated the 2019 BA. *See id.*at 16–17. For example, the FEIS emphasized that "'the September 2020 fires resulted in an estimated 5.5% loss of suitable owl habitat forest wide [but] had a minimal effect on the critical habitat unit within which is the project area . . . [because] [t]he project area was not affected by fires in 2020.'" *Id.* (quoting AR18123; alterations in F&R). Although the FEIS could not have explicitly incorporated the 2023 BA, which was published after the FEIS, the F&R identified the importance of the consistency review that determined that the Project's "proposed treatments are consistent with all [Project Design Criteria] of the 2023 Revised Biological Assessment … and associated Biological Opinion." *Id.* at 20 (quoting AR27737; alterations in F&R). The F&R also acknowledged that the ROD "incorporated new information and findings as available" in part by

adopting a modified version of Alternative 2. ECF No. 66 at 21. The F&R called into question the conflicting nature of Plaintiffs' arguments. The F&R noted that Plaintiffs present a "no-win situation" by arguing both that the Forest Service was required to rely on the 2023 BiOp in its effects analysis but was precluded from doing so due to the timing of the 2023 BiOp and the Project's FEIS. *Id.* at 19. Ultimately, the F&R concluded that there was no "new information" that the Forest Service failed to consider and the agency was entitled to deference in its determination that it did not need to update the FEIS due to the 2023 consultation documents. *Id.* at 19–21.

Regarding fuels reduction and fire impacts, the F&R found that the Forest Service took the requisite hard look at the fire risk associated with the proposed thinning but explained that the Project will also "reduce stand densities, retain and release older trees, and shift composition toward fire- and drought-tolerant tree species.'" *Id.* at 24 (quoting AR18413). In addition to identifying the trade-offs with thinning activities, the F&R concluded that the Forest Service explained how the Project would minimize adverse impacts where possible and that "Plaintiffs have not identified any adverse expert opinion that was not disclosed or analyzed" by the Forest Service. *Id.* at 25.

Finally, with respect to climate change and carbon impacts, the F&R determined that the "EIS directly addresses carbon emissions" and competing scientific opinions. *Id.* at 25. The F&R found that the Forest Service addressed Plaintiffs' comments about short-term carbon trade-off and recommended deferring to the agency's reasoned decision in the face of science that is not settled. *Id.* at 27. In the F&R's words, the Forest Service "made a number of policy choices that are owed substantial deference. Plaintiffs' complaints about those documents are not sufficient to support the conclusion that the EIS is inadequate." *Id.* at 27.

Plaintiffs objected to all four NEPA claims rejected by the F&R. ECF No. 69.

## III. STANDARD OF REVIEW

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). This Court reviews the Forest Service's action based on the administrative record, and judgment on the administrative record is a form of summary judgment. *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1108 (9th Cir. 2010). The matter is now before this Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b)(3).

When any party objects to any portion of the F&R, the district court must make de novo determinations of that portion of the magistrate judge's report. 28 U.S.C. § 636(b)(1); *Dawson v. Marshall*, 561 F.3d 930, 932 (9th Cir. 2009). The court may "accept, reject, or modify, in whole or in part, the [F&R] made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3). The remaining findings and recommendation are reviewed for clear error, meaning the district court is left with a "'definite and firm conviction that a mistake has been committed.'" *Myers v. Fulbright*, 367 F.Supp.3d 1171, 1173–74 (D. Mont. 2019) (quoting *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 623 (1993)).

## IV. LEGAL BACKGROUND

Plaintiffs' claims are reviewed under the Administrative Procedure Act's deferential arbitrary and capricious standard of review. 5 U.S.C. § 706(2)(A). The arbitrary and capricious standard is a narrow one that precludes a reviewing court from substituting its own judgment for that of the agency. *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc).

Rather, an agency may only be reversed "if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (internal quotation marks omitted). In *McNair*, the Ninth Circuit held that "the Forest Service acts arbitrarily and capriciously only when the record plainly demonstrates that the Forest Service made a clear error in judgment." *Id.* at 994.

NEPA requires an agency to prepare an EIS when a "major" federal action will "significantly affect[] the quality of the human environment." *Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*, 153 F.4th 869, 880 (9th Cir. 2025) (internal quotation marks omitted). "Judicial review of agency decision-making under NEPA is limited to the question of whether the agency took a 'hard look' at the proposed action . . . ." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1075 (9th Cir. 2011) (internal quotation marks omitted). NEPA does not "require the agency to weigh environmental consequences in any particular way" but allows the agency to weigh them "as the agency reasonably sees fit." *Cascadia Wildlands*, 153 F.4th at 880 (internal quotation marks omitted). A "hard look" means "a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1194 (9th Cir. 2008) (internal quotation marks omitted). Relevant NEPA regulations directed agencies to discuss impacts "in proportion to their significance." 40 C.F.R. § 1502.2(b) (2019).[1] When responding to public

---

[1] For decades, regulations promulgated by the Council on Environmental Quality informed NEPA review. The regulations that were in place since 1978 were subsequently amended and ultimately rescinded in 2025. 85 Fed. Reg. 43304 (July 16, 2020); 87 Fed. Reg. 23453 (Apr. 20, 2022); 89 Fed. Reg. 35442 (May 1, 2024); 90 Fed. Reg. 10610 (Feb. 25, 2025). Relevant here, and

comments on an EIS, agencies were permitted to take various possible responses, including modifying their analysis or explaining why no further response from the agency was required. 40 C.F.R. 1503.4(a).

NEPA also requires the agency to "analyze a reasonable range of alternatives to the proposed action." *Audubon Soc'y of Portland v. Haaland*, 40 F.4th 967, 980 (9th Cir. 2022). "But an EIS need not consider an infinite range of alternatives, only reasonable or feasible ones." *Id.* at 981 (internal quotation marks omitted). An agency must "evaluate all reasonable alternatives" to the proposed action and for alternatives that the agency eliminated from detailed study, "briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a). "The range of alternatives that an agency must consider under NEPA is based on the purpose and need of the proposed agency action." *Audubon Soc'y of Portland*, 40 F.4th at 981. In other words, an agency does not need to consider alternatives that are not feasible, ineffective, or inconsistent with its management objectives. *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 978 (9th Cir. 2006). "NEPA does not require a separate analysis of alternatives which are not significantly distinguishable from alternatives actually considered, or which have substantially similar consequences." *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 602 (9th Cir. 2010) (internal quotation marks omitted). The extent of the alternatives analysis is limited by an "inherent … rule of reason." *Seven Cnty.*, 605 U.S. at 183 (internal quotation marks omitted); *see Audubon Soc'y of Portland*, 40 F.4th at 980 ("The rule of reason guides both the choice of alternatives as well as the extent to which the EIS must discuss each alternative." (internal quotation marks, brackets omitted)). As the F&R highlighted, "[t]his

---

referenced by Defendant-Intervenor throughout this brief, are the 2019 regulations that mirrored the 1978 regulations.

Court's "'only' role 'is to confirm that the agency has addressed environmental consequences and feasible alternatives as to the relevant project.'" ECF No. 66 at 27–28 (quoting *Seven Cnty.*, 605 U.S. at 180).

Although an EIS "requires more detailed information than an [environmental assessment]," *N. Cascades Conservation Council v. U.S. Forest Serv.*, 136 F.4th 816, 829 (9th Cir. 2025), the Supreme Court is clear on the deference that must be afforded to an agency when reviewing an EIS. In *Seven County*, the Supreme Court issued a "course correction" on judicial review under NEPA, emphasizing that it "is a purely procedural statute" that "imposes no substantive environmental obligations or restrictions." 605 U.S. at 180, 184. "[T]he central principle of judicial review in NEPA cases is *deference*." *Id.* at 179 (emphasis added).[2] Under NEPA, "[a]n agency must make predictive and scientific judgments in assessing the relevant impacts," including whether impacts "rise to the level of 'significant.'" *Id.* at 181 (internal quotation marks omitted). The Supreme Court emphasized that the level of detail included in NEPA documents, and the identification of significant environmental impacts, and analysis of feasible alternatives are all issues of fact in which the agency must be given "substantial deference." *Id.* at 180–83; *see Cascadia Wildlands*, 153 F.4th at 903 (applying *Seven County*). "Black-letter administrative law instructs that when an agency makes those kinds of speculative assessments or predictive or scientific judgments, and decides what qualifies as significant or feasible or the like, a reviewing court must be at its most deferential." *Seven Cnty*., 605 U.S. at 182 (internal quotation marks omitted). *Seven County* also cautioned courts against taking an "aggressive role in policing agency compliance with NEPA" and instructed to "not micromanage

[2] Contrary to Plaintiffs' suggestion, ECF No. 69 at 6, *Or. Wild v. U.S. Forest Serv.*, 819 F.Supp.3d 1185, 1204–05 (D. Or. 2026) concerns the uniqueness of reviewing a categorical exclusion under NEPA and does not undermine the deference required under *Seven County*.

those agency choices so long as they fall within a broad zone of reasonableness." *Id.* at 179, 183 (discussing the "rule of reason" that is "inherent in NEPA" (internal quotation marks omitted). "[U]nder the rule of reason, an agency acts arbitrarily and capriciously only when the record plainly demonstrates that the agency made a clear error in judgment in concluding that a project meets the requirements of NEPA." *City of Los Angeles*, 63 F.4th at 842 (internal quotation marks omitted).

## V. ARGUMENT

### A. The F&R Correctly Determined that the Forest Service Analyzed a Reasonable Range of Alternatives.

Plaintiffs present two broad categories of objections to the F&R's alternatives analysis. First, Plaintiffs argue that the Forest Service's action alternatives were virtually identical rather than significantly different, as the F&R determined. Second, Plaintiffs argue that the F&R erred in finding that the Forest Service adequately considered Plaintiffs' Proposed Alternative. As explained below, both categories of objections are without merit. The F&R identified significant differences in the type and intensity of proposed treatments between the action alternatives that distinguished this case from caselaw raised by Plaintiffs. Additionally, the F&R identified the portions of the record where the Forest Service considered, but rejected, Plaintiffs' Proposed Alternative. As a result, the F&R correctly determined that the Forest Service satisfied its obligation to consider a reasonable range of alternatives under NEPA.

#### 1. The F&R correctly determined that the action alternatives are not virtually identical.

Plaintiffs contend that the Project's two action alternatives—Alternatives 2 and 3—are virtually identical because they both contemplated treating the same total acreage. ECF No. 69

at 8.[3] The Forest Service considered three alternatives: a no action alternative, the alternative that was ultimately selected (Alternative 2), and a middle ground alternative born out of public comments regarding concerns of impacts to the NSO (Alternative 3). *See* AR17958; AR22208. The FEIS provided multiple comparisons of all the alternatives. AR18012–13 (Table 6); *see also* AR17971 (Table 1). Regarding the non-commercial activities, Alternative 3 proposed 907 acres of non-commercial gap creation (755 acres more than Alternative 2) within NSO critical habitat to increase diversity and structure in mixed-conifer forests and strategically reduce hazardous fuels. AR18012. With respect to commercial activities, both Alternative 2 and 3 proposed thinning in natural stands, but Alternative 3 proposed 755 less acres (664 acres versus 1,419 acres). *Id.* The amount of commercial thinning with small gaps (up to a half-acre) in managed stands in mixed conifer and upland moist forests was the same (736 acres), but there were differences in some other managed stands. *Id.* Alternative 3 proposed to commercially thin with larger gaps (one to three acres) on 261 acres instead of regeneration harvest activities within managed stands. AR18006; AR17971.

Plaintiffs contend that the F&R erred because it "focuse[d] solely on the acreage of commercial versus noncommercial treatments while ignoring that the same NSO habitat acres will be degraded regardless." ECF No. 69 at 8. According to Plaintiffs, commercial output is irrelevant because the "*impact* on NSO habitat is virtually identical for each action alternative,"

---

[3] Plaintiffs suggest that a smaller footprint action alternative was required to be evaluated in greater detail. *See* ECF No. 69 at 9 n.3. The Forest Service was not required to evaluate alternatives with every possible Project size. *See Audubon Soc'y of Portland*, 40 F.4th at 981 (an "EIS need not consider an infinite range of alternatives" (internal quotation marks omitted)). Furthermore, Plaintiffs' attempt to require additional alternatives merely based on total acreage would run afoul of the deference that must be afforded to the Forest Service. *See Seven Cnty.*, 605 U.S. at 180, 182.

which they claim the F&R did not address.[4] *Id.* However, the F&R's observations extended beyond commercial output. The F&R highlighted the "significant differences" in acres to be thinned in natural versus managed stands, the amount of regeneration harvest in managed stands, and the total commercial volume from the two action alternatives. ECF No. 66 at 12.[5] In other words, the F&R highlighted that the two action alternatives significantly differed in the amount and intensity of the harvest activities within the NSO critical habitat—addressing the very issue at the heart of Plaintiffs' briefing. *Id.* (noting that Alternative 3 will commercially harvest fewer acres within the NSO critical habitat).

Plaintiffs do not persuasively establish that the impacts to NSO between action alternatives would be identical. The administrative record and Defendant-Intervenor's briefing highlight how Alternatives 2 and 3 differed in the amount of NSO suitable habitat, dispersal habitat, and critical habitat that would be either removed or "modified but maintained." *See* ECF No. 58 at 5 (citing FEIS Table 35 at AR18124). The resulting canopy cover would also significantly differ under each alternative with 51–58% under Alternative 3's thinning harvests and 21–38% under Alternative 2's regeneration harvest. *See* AR18125; AR18164. The FEIS noted that Alternative 3 would have less impacts on the NSO than Alternative 2:

> "Alternative 3 removes fewer acres of suitable habitat and dispersal habitat from owl home ranges than Alternative 2 while including more thinning in dispersal habitat promoting greater structural diversity within those stands. Alternative 3 would have less of an effect on northern spotted owl habitat while promoting greater structural diversity in

---

[4] Plaintiffs' reliance on *Native Ecosystems Council* is misplaced. *See* ECF No. 69 at 8. The referenced discussion from that case established that commercial harvest did not qualify as "timber management" under the Helena National Forest Plan in Montana. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1247 (9th Cir. 2005). It does not inform whether less intensive harvest between alternatives in this Project will result in different environmental impacts.

[5] The significant differences identified by the F&R, in addition to the no action alternative, distinguish this case from an all-or-nothing approach. *See* ECF No. 69 at 9 (comparing this case to *W. Watersheds Project v. Bernhardt*, 543 F.Supp.3d 958, 983 (D. Idaho 2021)).

managed stands than Alternative 2[.]"

AR18125.

Plaintiffs concede (as they must) that Alternative 3 would remove less and maintain more habitat. ECF No. 69 at 8 (citing AR18124). Alternative 3 represented approximately a 30% reduction in proposed removal of suitable habitat and approximately a 50% reduction in proposed removal of dispersal habitat compared to Alternative 2. *See* AR18124. Plaintiffs disregard that distinction by baselessly claiming that the maintained acres would only be "nominally" maintained. ECF No. 69 at 8. But Plaintiffs offer no support from the record to question the effectiveness of the Forest Service's ability to "maintain" NSO habitat.

Due to those differences, the F&R was correct to distinguish this instance from cases where the agency failed to analyze a range of alternatives. Plaintiffs, however, allege that the *Kempthorne* decision supports their position rather than the F&R's conclusions. *See* ECF No. 69 at 8 (citing *Kempthorne*, 520 F.3d at 1038). In that case, the Ninth Circuit found that three action alternatives were "essentially identical" for at least the first five years because, in managing for visitation levels at the Merced Wild and Scenic River, the alternatives were based on the same program and "start[ed] with levels of use consistent with current use levels." *Kempthorne*, 520 F.3d at 1039 (internal quotation marks omitted). Although there were slight differences in maximum use levels and annual visitation limits, the Ninth Circuit determined that they were not varied enough to allow for informed decisionmaking. *Id.* Plaintiffs attempt to equate the slight differences identified in *Kempthorne* to the significant differences between two action alternatives present here without sufficient support. *See* ECF No. 69 at 8–9. The F&R found significant differences in the thinning activities between Alternatives 2 and 3 and the record reflects that different impacts to NSO habitat would have resulted from the two action alternatives. Plaintiffs' Objections do not undermine the F&R's determination that the action

alternatives are not virtually identical.

### 2. The Forest Service explained why it did not analyze Plaintiffs' Proposed Alternative in more detail.

The F&R also determined that the Forest Service considered and explained why it rejected Plaintiffs' Proposed Alternative. Plaintiffs' Proposed Alternative urged the Forest Service to analyze a "[m]odified Alternative 3" that would authorize the following: (1) thinning the plantations and the drier forests and deferring treatment in moist forests that lack pine and oak; (2) scaling back harvest activities and treating mainly with prescribed fire; (3) retaining all trees greater than 24 inches at diameter breast height (DBH) and retaining all trees with old-growth characteristics; (4) protecting high quality NSO habitat; and (5) retaining more trees per acre in all mature forests. AR16325–26; *see also* AR16319–20. According to Plaintiffs, the Forest Service never considered this alternative, it merely reiterated why it was moving forward with its own alternatives. ECF No. 69. at 11. However, as demonstrated below, the F&R identified a response to each portion of the Proposed Alternative in the record. Instead, it is Plaintiffs that have failed to meet their duty to demonstrate the viability of their Proposed Alternative. *See Audubon Soc'y of Portland*, 40 F.4th at 983.

In summary judgment briefing, Defendant-Intervenor walked through each of the Forest Service responses to the five components of Plaintiffs' Proposed Alternative. ECF No. 51 at 15–18. The F&R provided a similar analysis and determined that the Forest Service's responses were adequate. *See* ECF No. 66 at 13–15. Rather than grapple with those identified responses from the Forest Service, Plaintiffs continue to make bald assertions that are contradicted by the record to substantiate their claims. Plaintiffs' selective reading of the record—in particular at this late stage of the matter when the issues have been thoroughly briefed and the parties and the Court have had ample time with the record—is fatal to their Objections.

First, Plaintiffs object to the F&R because "the Forest Service *never explained* why more targeted treatments that 'deprioritize' stands with few or no pines and oaks" would not be adequate. ECF No. 69 at 12 (emphasis added). The Forest Service directly explained why the Project had a broader intent than "only saving the current pines and oaks." AR18414. "To prioritize only those stands that currently have a larger component of pines and oaks would assume the other mixed conifer stands have less of a need to be restored to the targeted landscape of a more open forest." *Id.* Plaintiffs may disagree with this explanation, but to assert that an explanation does not exist cannot substantiate an objection.

Second, Plaintiffs argue that the Forest Service "merely restate[d]" their position on thinning rather than explaining why more limited logging under the Project would not advance the Project's purposes and needs. ECF No. 69 at 12. As the F&R identified, the Forest Service directly responded and explained the need to conduct thinning to "reduce stand densities, retain and release older trees, and shift composition" of stands to reduce risk of crown fire. ECF No. 66 at 14 (quoting AR18420).

Third, Plaintiffs argue that "the Forest Service *never explained* why [the Proposed Alternative's] more-protective diameter limit warranted no further consideration." ECF No. 69 at 12 (emphasis added). Again, the Forest Service directly addressed this argument and explained that an absolute size limitation is not appropriate. The Forest Service identified that the relevant objective is to retain "legacy trees" which, "in general, average[e] 30 [inches diameter breast height]." AR18421. However, the agency noted that the diameter of legacy trees "can range widely." *Id.* Therefore, the agency chose to "not rely on a minimum diameter" and instead decided that "retention will be focused on a variety of morphological and/or physical characteristics of a tree species." *Id.* Although Plaintiffs refer to this portion of the record to

reference the summary of their comments, ECF No. 69 at 12, they disregard the Forest Service's response.

Fourth, Plaintiffs' argument related to NSO habitat prioritization is also without merit. *See* ECF No. 69 at 12–13 (citing AR18424). As summarized by the Forest Service, Plaintiffs suggested that "the Forest Service should be prioritizing conservation of suitable spotted owl[] habitat, rather than converting such habitat into savannas." AR18424. Plaintiffs now argue that the Forest Service did not explain why it could not both prioritize spotted owl habitat while also prioritizing for habit needs of other species. ECF No. 69 at 13 (alleging that such explanation is "absent" and that the "agency does not say" why it cannot prioritize multiple habitats). The Forest Service clearly explained, however, that the purpose and need of the Project included the need to "provide habitat needs for a full range of forest associated species by maintaining areas of early, mid, and late seral forest across the landscape." AR18424. Specifically, the Forest Service identified that "[o]pen forests, oak stands, and savannahs are an extremely limited habitat in the western Cascades and into the Willamette valley (99% of this habitat type has been lost)." *Id.* The Forest Service confirmed that it was managing for a full range of habitats but noted that it needed to prioritize habitats like savannahs that have become extremely limited. Plaintiffs fail to demonstrate why the Forest Service's explanation was unreasonable based on the Project's purposes and needs.

Lastly, Plaintiffs argue that the Forest Service "failed to explain" why their proposal to retain more trees per acre was not considered in more detail. ECF No. 69 at 13. Plaintiffs proposed that retaining more trees per acre would reduce the risk of blowdown, retain carbon, and mitigate impacts on late successional wildlife. AR18423. According to Plaintiffs, the Forest Service merely responded by explaining that retention levels were predetermined from data and

considerations from other nearby projects. ECF No. 69 at 13. Plaintiffs contend that the F&R erred in accepting this purportedly "conclusory 'response.'" *Id.* But the Forest Service's response was supported by the record. The Forest Service determined that before fire suppression efforts, the average trees per acre was 15 trees in the area. *See* AR18423; AR24004. The Forest Service also noted that the nearby Jim's Creek Savanna Restoration Project retained 20 trees per acre on average. AR18423. The Forest Service elected to retain trees much more aggressively in this Project and evaluate blowdown risks even further. *Id.* The Project's late-seral open prescriptions would leave 30 to 60 trees per acre, the late seral connectivity prescriptions would leave 60 to 80 trees per acre, and the complex early seral creation prescriptions would leave 60 to 80 trees per acre. AR18350–54 (Tables 2–6). Therefore, the Forest Service explained how it was already taking significant steps to increase tree retention to achieve the goals highlighted by Plaintiffs.

Notwithstanding those substantive responses to Plaintiffs' Proposed Alternative, Plaintiffs allege that the Forest Service violated NEPA because "nowhere in Appendix K nor elsewhere in the FEIS did the Forest Service ever assert" that Plaintiffs' Proposed Alternative "was not 'viable.'" ECF No. 69 at 14. The fact that the Forest Service did not explicitly use the word "viable" does not establish a NEPA violation. NEPA does not require the Forest Service to use any specific "magic words." *See Stop B2H Coal. v. Bureau of Land Mgmt.*, 552 F.Supp.3d 1101, 1127 (D. Or. 2021) ("Although the FEIS[] … could have been more clear, the [c]ourt is loath to engage in a magic words review, where the propriety of [the agency's] analysis hinges on whether it included the correct words in its FEIS, rather than whether its analysis carried the substantive weight arbitrary and capricious review demands." (internal brackets and quotation marks omitted)).

The Forest Service reasonably considered Plaintiffs' Proposed Alternative but declined to consider it in more detail because the components of the Proposed Alternative either did not meet the purpose and needs, were already included in the action alternative, or were not feasible.

**B. The F&R Correctly Determined that the Forest Service Took the Requisite Hard Look at the Project's Environmental Impacts.**

Plaintiffs object to the F&R's conclusion that the Forest Service took the requisite hard look at impacts to the NSO; fire risk and fuels; and the climate. Because the Forest Service disclosed the Project's impacts, considered competing viewpoints, and responded to public comment, the F&R's recommendation on the hard look claims should be adopted. Therefore, the Forest Service cannot be said to have "entirely failed to consider an important aspect of the problem." *McNair*, 537 F.3d at 987 (internal quotation marks omitted).

**1. The Forest Service took a hard look at impacts to the NSO.**

The F&R concluded that the Forest Service adequately evaluated the Project's impacts to the NSO under NEPA. ECF No. 66 at 16–23. The Forest Service satisfied its procedural obligations because it considered relevant information from both the 2019 BA that predated the FEIS, incorporated information that postdated the 2019 BA, participated in a consistency review which analyzed this Project and the 2023 BA, and made changes in the ROD to ensure that the Forest Service's decision reflected updated information. Although Plaintiffs raise concerns about the timing of these analyses, they fail to demonstrate that the Forest Service violated NEPA. Further, Plaintiffs' substantive arguments about the ESA are not before this Court and do not inform the NEPA analysis.

The Forest Service relied on the 2019 consultation process and disclosed the impacts from the Project on the NSO and its habitat. Not only did the Forest Service disclose the impacts to suitable, dispersal, and critical habitat under each alternative, AR18124 (Table 35), the Forest

Service analyzed the impacts of the harvest treatments on the 14 NSO sites that contain treatments within their home ranges. AR18126–27 (Table 36); AR18128–29 (Table 37).

As the F&R identified, the FEIS also incorporated information that postdated the 2019 BA. Specifically, the FEIS opined on the "minimal effect on the critical habitat unit" for the NSO in the Project area following multiple fires in 2020. ECF No. 66 at 16–17 (quoting AR18123; alterations in F&R). That minimal effect is reflected in the 2023 BA. In fact, the 2023 BA acknowledged increases in suitable and dispersal habitat between 2019 and 2021. AR19249 (Table K-17 shows increases in WCS-4 critical habitat unit).

The 2023 consultation documents were considered by the Forest Service.[6] The F&R highlighted that the FWS's consistency review[7] of the Project with the 2023 BA and BiOp concluded "that the proposed treatments are consistent with all [Project Design Criteria] of the 2023 Revised Biological Assessment . . . and associated Biological Opinion." ECF No. 66 at 20 (quoting AR 27737). In the consistency review, FWS explained that "[i]ncorporation to the [2023 BA], updated NSO survey information since 2020, and any changes due to this Level 1

[6] Plaintiffs argue that the "Forest Service implied that the 2023 Consultation was essentially the 2019 Consultation plus a discussion of recent wildfires" despite the "2023 Consultation also including new or revised information" on multiple issues. ECF No. 69 at 17 n.7. This argument is unpersuasive for at least three reasons. First, the Forest Service acknowledged some of the additional changes in its briefing. *See* ECF No. 55 at 10 n.2 (describing additional design criteria related to NSO habitat in 2023 consultation). Second, Plaintiffs identify this allegedly "new or revised information" but concede that they declined to bring a "'significant new information' claim." ECF No. 69 at 18. Lastly, Plaintiffs do not allege that the Forest Service violated any consultation documents.

[7] Although Plaintiffs criticize the F&R for conflating who authored the consistency review, *see* ECF No. 69 at 21, that is immaterial because the agencies worked together on the consistency review with the Forest Service providing key information to inform the FWS's analysis. AR27734 (email from FWS acknowledging the Forest Service's contributions). Plaintiffs allege that the consistency review "arguably constituted significant new information that might have warranted supplemental analysis." ECF No. 21 at n. 10. Again, however, Plaintiffs concede that they did not bring a "'significant new information' claim." ECF No. 69 at 18.

review will be documented in the Final [ROD]." AR27741. In the ROD, the Forest Service provided an assessment of the effects of the wildfires on NSO habitat but concluded that it "would not further reduce movement potential or the function of the Critical Habitat subunit." AR22225. Ultimately, the Forest Service determined that the recent wildfires reaffirmed the need to move forward with the Project's activities, as the "need has never been more prevalent" to ensure the project area is more resilient to the impacts of wildfires. AR22224. Notably, the Forest Service's modified Alternative 2 selected in the ROD drops 500 acres of commercial treatment in natural stands to reduce the amount of NSO suitable habitat removed. AR22233.

Plaintiffs' Objections do not undermine the F&R or the administrative record. Plaintiffs allege that the F&R solely analyzed the FEIS and the 2019 consultation rather than the entire administrative record, "which significantly undercuts the Forest Service's conclusions." ECF No. 69 at 17. However, as demonstrated above and in the F&R, the Forest Service considered information that postdated the 2019 BA, participated in a consistency review, and modified its selected alternative in the ROD. Although Plaintiffs acknowledge that the 2023 information informed the Forest Service's decision to make a change in the ROD, Plaintiffs allege that is not evidence of proper process but rather evidence that the Forest Service merely chose to ignore updated information before "significantly alter[ing] the Project at the last minute." *Id.* at 22. Plaintiffs fail to demonstrate why it was improper for the Forest Service to review the new information and determine, absent specific changes in the ROD, that its NSO analysis remain unchanged. Plaintiffs' preference for the Forest Service to treat the subsequent consultation differently runs counter to the F&R's findings and flies in the face of NEPA precedent "which ensures that agencies determine whether and to what extent to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process." *Seven Cnty.*, 605

U.S. at 183 (quoting *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004)).

Ultimately, the F&R correctly noted that Plaintiffs attempt to put the Forest Service in a "no-win situation." ECF No. 66 at 19. Plaintiffs argue that the Forest Service "could not rely on the 2019 or 2023" consultations. ECF No. 69 at 23. But the F&R determined that argument must fail because the Forest Service "did review and consider the information to the best of their ability." ECF No. 66 at 19. The F&R appropriately recommends deference to this process. *Id.* (relying on *Seven County*'s discussion of providing deference to an agency's decision about the depth and breadth of its inquiry in an EIS); *see also Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 373 (1989) ("[A]n agency need not supplement an EIS every time new information comes to light after the EIS is finalized."); *W. Watersheds Project v. Salazar*, 993 F.Supp.2d 1126, 1142 (C.D. Cal. 2012) (finding that the need for reinitiation of consultation under the ESA did not mandate supplemental NEPA analysis). The Forest Service's factual determination that the information in the 2023 BA and BiOp did not warrant updating the FEIS is entitled to deference. *Seven Cnty.*, 605 U.S. at 181–82 (courts should be "most deferential" to the agency's "scientific judgments in assessing the relevant impacts").

Plaintiffs tellingly attempt to bring in allegations that are not before this Court. Plaintiffs allege that the Forest Service's decision to rely on improper information "led the agency to design and choose a course of action that did not comply with the ESA." ECF No. 69 at 20; *see also id.* at 23–24 (describing the Project as a "proposal that violated the ESA"); *see also id.* at 33 (alleging that the Forest Service's flawed handling of information "led [it] to choose an alternative that violated the ESA"). Although Plaintiffs present an ESA violation as fact, Plaintiffs solely challenged the Project under NEPA and brought no substantive challenge under the ESA. That strategic decision is critical to this Court's review. *See, e.g.*, *Tenn. Valley Auth. v.*

*Hill*, 437 U.S. 153, 188 n.34 (1978) (distinguishing NEPA's "procedural requirement" related to an "inquiry as to the effect of federal actions on the environment" from the ESA's "substantive" requirement to "prevent the loss of any endangered species" (alterations omitted)). Because the Forest Service reviewed the relevant information and disclosed the impacts of the Project to the NSO, it satisfied its procedural obligations under NEPA.

**2. The Forest Service took a hard look at fire and fuels impacts.**

Plaintiffs' second hard look objection relates to the Forest Service's analysis of fire and fuels impacts and suffers from two primary faults. First, as a threshold issue, Plaintiffs have repackaged their fire concerns into a "heat/aridity/wind concern" to claim that its concerns were not addressed in the F&R. *See* ECF No. 69 at 24–25. However, the F&R addressed Plaintiffs' arguments as presented during summary judgment briefing and oral argument. Second, regardless of how Plaintiffs characterize their concerns, the Forest Service considered and responded to Plaintiffs' comments and competing science. Plaintiffs ignore key aspects of the record when they claim that the Forest Service "entirely failed" to consider or respond to public comment. *See id.* at 24.

Plaintiffs allege that the F&R and Forest Service did not engage with their concern about heat, aridity, and wind. *Id.* at 24–25, 25 n. 11. While Plaintiffs use this terminology at least three times in two pages of their Objections, Plaintiffs did not use that terminology once in their summary judgment briefing. At most, in 70 pages of summary judgment briefing, Plaintiffs mentioned concerns about wind or dry conditions one single time. *See* ECF No. 41 at 29 ("Moreover, the Project may actually make fires worse by creating 'a hotter-drier-windier microclimate that is favorable to greater flame lengths and rate of fire spread.'" (quoting AR16360)). Instead, Plaintiffs focused on whether the Forest Service had "fully analyzed or

disclosed the adverse trade-offs associated with the purported fuel reduction 'thinning' proposed as part of the Project." ECF No. 41 at 29; *see also* ECF No. 52 at 22 (describing Plaintiffs' concerns that "logging can increase fire hazard"). Plaintiffs now attempt to manufacture a legal error by alleging that the Forest Service "fail[ed] to consider an important aspect of the problem" by ignoring one of their concerns. ECF No. 69 at 25 (internal quotation marks omitted). Even if Plaintiffs are correct that their "concerns about increased heat, aridity and wind were lumped in with another consequence of reduced canopy cover—increased ladder fuels" in the F&R, *id.* at 25, that is entirely Plaintiffs' own creation due to how they briefed their claims before Magistrate Judge Potter.

Regardless of how Plaintiffs frame their arguments, the F&R properly concluded that the Forest Service disclosed potential impacts and sufficiently responded to all of Plaintiffs' fire risk concerns. ECF No. 66 at 23–25. The Forest Service specifically addressed flame length and fire spread. The Forest Service's modeling demonstrated that the Project would reduce flame length, surface fuel loading, and increase resiliency when compared to the no action alternative. *See* AR18082 (Table 17 comparing action alternatives to no action alternative). Thus, Plaintiffs' heat/aridity/wind concern was adequately addressed.

Plaintiffs also maintain that the Forest Service "failed to consider the low likelihood of a wildfire interacting with treated stands when determining the Project's probable environmental consequences." ECF No. 69 at 26 (internal question marks omitted). Plaintiffs base their allegation on studies more than a decade old that opine on the likelihood of wildfire occurring in any particularly treated area. *See id.*[8] For its part, the Forest Service explained why treatments

[8] As Defendant-Intervenor highlighted during the merits briefing, this argument is an attempt to attack the purpose and need of the Project without bringing such a claim. *See* ECF No. 51 at 28; *see generally* ECF No. 1.

were needed in this area. *See, e.g.*, AR17976–80. The Forest Service determined that the Project area currently exhibits increased stand density and decreased species diversity and health. AR17976. Therefore, the Forest Service concluded that treatments were needed to address "[t]he risk of habitat loss from high intensity wildfires [that has] increased because fire can easily spread in these closed canopy forest conditions." *Id.* The Forest Service emphasized its desire to return the area to its more resilient historical conditions, with species diversity and open forest conditions. AR17977; AR17979–80; AR18072–73. Although Plaintiffs present general concerns about whether fire will encounter the area after treatment, that should not overcome the needs specific to this area identified by the Forest Service.

Additionally, the Forest Service grappled with competing science presented by Plaintiffs.[9] Rather than ignore Plaintiffs' science, the Forest Service went as far as conceding the legitimacy of some of the conclusions. AR21325 (acknowledging the "good points" raised by articles identified by Plaintiffs). However, the Forest Service explained why it elected to move forward with the Project as-is despite acknowledging potential risks or disagreements raised by Plaintiffs. *Id.* (citing FEIS to explain that other scientific articles "make a strong case" for conducting the treatments proposed by the Project despite Plaintiffs' concerns). Unlike the *Bark* decision relied on by Plaintiffs, the Forest Service did not ignore opposing science in a manner that would cast doubt on the reasonableness of its conclusion. *See Bark v. U.S. Forest Serv.*, 958 F.3d 865, 871 (9th Cir. 2020) (holding that the Forest Service failed to adequately "engage" with the plaintiffs' contrary science that questioned the efficacy of variable density thinning because the agency

---

[9] As Defendant-Intervenor incorporated in its own Reply brief, ECF No. 58 at 22 n. 10, Defendants demonstrated that Plaintiffs selectively read various sources which, when read in their entirety, demonstrate that the Forest Service's decision "is based on strong scientific agreement." ECF No. 55 at 16.

merely drew "general conclusions" such as there were "no negative effects" from the proposed logging (internal quotation marks omitted)).

Therefore, while Plaintiffs presented a broad concern from science not specific to this Project, the Forest Service responded to competing science and tailored the Project to the needs of this area. That process and determination should be afforded deference.

### 3. The Forest Service took a hard look at impacts on carbon storage and the climate.

Plaintiff offers two arguments as to why the Forest Service's climate analysis failed to take the requisite hard look: (1) the Forest Service failed to consider or respond to Plaintiffs' opposing views; and (2) the "Forest Service failed to even attempt to forecast 'probable environmental consequences' related to climate impacts."[10] ECF No. 69 at 28.

According to Plaintiffs, the Forest Service failed to acknowledge or respond to Plaintiffs' offered science and the Forest Service failed to alter its analysis as a result. As a threshold matter, as discussed above, the Forest Service was not required to alter its analysis under NEPA. *See* 40 C.F.R. § 1503.4(a) (listing potential way to respond to comments). Additionally, the Forest Service considered Plaintiffs' science and explained why further response was not necessary.

Plaintiffs allege that the Forest Service did not consider the science they presented in their 64-page supplement that accompanied their public comments. *See* ECF No. 69 at 29. According to Plaintiffs' Objections, the agency's lack of consideration is reflected in the fact that

[10] To the extent that Plaintiffs' request for a "forecast" refers to a quantitative climate change analysis, Defendant-Intervenor explained why that is not required by the caselaw in its merits briefing. *See* ECF No. 51 at 34–36; ECF No. 58 at 26–28. Additionally, although Plaintiffs refer to the "*Black Ram*" decision from the Montana District Court, ECF No. 69 at 28, Plaintiffs do not argue that *Black Ram* requires a specific kind of analysis in this case, as Plaintiffs did in their summary judgment briefing. *See* ECF No. 52 at 27–31.

Plaintiffs had to rely on judicial intervention to get the supplement included in the administrative record for this litigation. ECF No. 69 at 29.

The findings associated with that motion undercut that argument. In support of their Motion to Supplement, Plaintiffs argued that the scientific literature associated with their 64-page supplement was "considered directly or indirectly by agency decision-makers in the process of analyzing and authorizing" the Project. ECF No. 27 at 2. Furthermore, Judge Kasubhai granted that motion, in part, because "Defendants provide a response to [Plaintiffs' comments containing the literature] that specifically summarizes and responds to the points made." ECF No. 32 at 6. Plaintiffs cannot have it both ways during this litigation. Plaintiffs and Judge Kasubhai already established that the Forest Service considered the science contained in their supplemental documents, and Plaintiffs' objection to the contrary is without merit.

Regarding the Forest Service's actual response, the agency explained that there would be a "short-term carbon trade off" that would result from harvest activities and prescribed fire in this Project and that "[t]here is no consensus in the literature" on net climate benefits of thinning treatments. AR18412. Given that lack of consensus, the Forest Service refused to "presume that short-term carbon maximization is the wisest approach to sustainable forest management." *Id.* The Forest Service noted that its preference for a long-term management focus aligned "with national and international guidance as stated in the EIS" and "the agency's carbon policy articulated in its carbon principles which include emphasiz[ing] ecosystem function and resilience, and recogniz[ing] carbon sequestration as one of many ecosystem services." AR18412–13; *see also* AR18417–18 (same). The Forest Service's explanation that Plaintiffs' comments focus on a different management approach than what the agency determined was the more favorable approach (managing the Project area for resiliency) is a sufficient explanation for

why no further agency response was required under 40 C.F.R. § 1503.4(a)(5). Additionally, the Forest Service's analysis qualitatively demonstrated that the emission or carbon impacts from this Project would not be significant. AR18251–53. Therefore, the F&R appropriately recommended deferring to this analysis.

Plaintiffs also offer their abstract thoughts on the concept of scientific consensus in their Objections. *See* ECF No. 69 at 30–31. Building on those thoughts, Plaintiffs argue that the F&R "dangerously recommend[ed] that the Court accept [a] blanket invocation of uncertainty as a reasonable treatment of extensive scientific literature directly contradicting the agency's position." ECF No. 69 at 30.

The F&R recommended deferring to the Forest Service due to the inherent judgment calls that are subject to the agency's expertise. Plaintiffs themselves argue, "[s]cience, by its nature, is never settled, and rarely reaches a 'consensus' as research develops and challenges previous assumptions." *Id.* Here, the Forest Service made a reasoned decision about the best path forward in the long-term given the lack of scientific census regarding these types of timber treatments and climate change. Plaintiffs' desire to supplant the agency's decision in this context runs afoul of longstanding NEPA principles. *See Idaho Wool Growers Ass'n v. Vilsack*, 816 F.3d 1095, 1109 (9th Cir. 2016) (agency actions should not be "hamstrung by the need for unattainable scientific certainty" and "explanations and acknowledgements are all that NEPA requires"); *see also 350 Mont. v. Haaland*, 50 F.4th 1254, 1271–72 (9th Cir. 2022) ("NEPA does not require" a court to decide whether an agency's NEPA analysis "is based on the best scientific methodology available, nor does NEPA require [courts] to resolve disagreements among various scientists as to methodology." (internal quotation marks omitted)). In the Supreme Court's words, courts "must defer to the informed discretion of the responsible federal agencies." *Seven*

*Cnty.*, 605 U.S. at 184 (internal quotation marks omitted). The Forest Service acknowledged Plaintiffs' competing viewpoints, the lack of scientific consensus, and made a reasoned judgment to manage for the long-term. While Plaintiffs argue once again that they are right on the substance of the science, the "correct" view of the science is not before this Court. The Forest Service did what was required under NEPA.

## VI. REMEDY

In the event that this Court does not adopt the F&R in its entirety, separate briefing should be held on the appropriate remedy. In their Objections, Plaintiffs make vague references to what activities could proceed despite the alleged errors under NEPA. *See* ECF No. 69 at 34. Those references are too brief to understand or support a remedy. The Supreme Court recently clarified that vacatur is not the presumptive remedy in NEPA cases: "Even if an EIS falls short in some respects, that deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the EIS." *Seven Cnty.*, 605 U.S. at 185. Therefore, if relevant, the appropriate equitable remedy should be decided separately in a standalone round of briefing.

## VII. CONCLUSION

The Youngs Rock Project is the type of agency work that should be incentivized and allowed to take effect. The Forest Service did a laudable job undertaking an EIS, analyzing a reasonable range of alternatives, responding to competing viewpoints, and explaining the reasoning behind its decision.

This case asks whether the Forest Service satisfied its purely procedural obligations under NEPA. It is clear that Plaintiffs disagree with the Forest Service in some respects and would manage this landscape differently. That, however, is not enough to give rise to a NEPA violation.

As Judge Potter correctly noted, "[r]eturning this to the agency to complete more review of scientific studies and require[] more detailed responses to all objections would further stall a project that has been pending for five years; the Court does not believe further delay upon delay in this case is consistent with NEPA." ECF No. 66 at 28 (internal quotation marks and brackets omitted). Accordingly, Defendant-Intervenor respectfully requests that this Court adopt Magistrate Judge Potter's F&R in full and uphold the Project.

Respectfully submitted this 16th day of September, 2026.

*/s Sara Ghafouri*
Sara Ghafouri, OSB #111021
American Forest Resource Council
700 N.E. Multnomah, Suite 320
Portland, Oregon 97232
Telephone: (503) 222-9505
Fax: (503) 222-3255
sghafouri@amforest.org

Greg Hibbard, OSB #183602
American Forest Resource Council
924 Capitol Way South, Suite 102
Olympia, WA 98501
Telephone: (360) 352-3910
Fax: (360) 352-3917
Email: ghibbard@amforest.org

*Attorneys for Defendant-Intervenor*

**CERTIFICATE OF COMPLIANCE**

The preceding memorandum complies with the applicable word-count limit under LR 7-2(b), because it comprises 10,965 words, based on the word-count of the word processing system used to prepare the memorandum. This word count includes headings, footnotes, and quotations, but excludes the caption, table of contents, table of authorities, acronym list, motion, signature block, and any certificates of counsel.

**CERTIFICATE OF SERVICE**

I, Sara Ghafouri, hereby certify that on September 16, 2026, I caused the foregoing to be served upon counsel of record through the Court's electronic service system.

Dated this 16th day of September, 2026.

*/s/ Sara Ghafouri*
Sara Ghafouri

*Attorney for Defendant-Intervenor*